# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## Case No. 25-1055

(consolidated with Case Nos. 25-1079, 25-1080, 25-1081, 25-1082, 25-1083, 25-1084, 25-1093, 25-1098, 25-1118, 25-1132, 25-1133, 25-1144)

---

**UNITED STEEL PAPER and FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL and SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.,**

*Petitioners*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent*.

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

**BRIEF OF PETITIONERS CENTER FOR ENVIRONMENTAL HEALTH and ENVIRONMENTAL DEFENSE FUND**

---

Robert M. Sussman
SUSSMAN & ASSOCIATES
310 Garfield St., N.W.
Washington, D.C. 20008
202-716-0118
bobsussman@comcast.net
*Counsel for Petitioner Center for Environmental Health*

**May 13, 2026**

Samantha Liskow
ENVIRONMENTAL DEFENSE FUND
257 PARK AVE S
NEW YORK, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Petitioner Environmental Defense Fund*

ii

**CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST (FRAP 26.1)**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, Petitioners Center for Environmental Health and Environmental Defense Fund make the following statements:

1) For non-governmental corporate parties, please list all parent corporations: **None/not applicable**.

2) For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the company's stock. **None/not applicable.**

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests. **None/not applicable.**

Dated: May 13, 2026

s/ Robert Sussman
Robert Sussman
*Counsel for Petitioner Center for Environmental Health*

s/ Samantha Liskow
Samantha Liskow
*Counsel for Environmental Defense Fund*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................iv

GLOSSARY ............................................................................................xi

INTRODUCTION ....................................................................................1

STATUTES AND REGULATIONS ........................................................4

STATEMENT OF JURISDICTION ........................................................5

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................7

STATEMENT OF RELATED CASES AND PROCEEDINGS ..............8

STATEMENT OF THE CASE..................................................................9

    I.   The Identification and Regulation of Chemicals that Cause Harm is Central to TSCA ....................................................................................9

       A.  Congress enacted TSCA to prevent chemical companies from experimenting on the public with dangerous chemicals............................9

       B.  Congress recognized the need to strengthen EPA's authority to regulate existing chemicals ..................................................................10

    II.  People Have Been Widely Exposed to and Harmed by Toxic TCE ..............15

    III. EPA Evaluated TCE and Found Unreasonable Risk ....................................21

    IV. EPA Takes Actions to Strengthen its Evaluation of TCE ..............................24

    V.  EPA Addresses TCE's Unreasonable Risk by Banning TCE, But Provides for Numerous Compliance Delays and Certain Exclusions ................................29

SUMMARY OF ARGUMENT..................................................................33

STANDARD OF REVIEW ........................................................................38

    I.   EPA's Failure to Protect Fenceline Communities from Unreasonable Risks Violates TSCA and Is Arbitrary and Capricious............................................39

       A.  TSCA Requires EPA to Determine Whether TCE Emitted from Facilities Presents Unreasonable Risks ....................................................40

       B.  EPA's Refusal to Determine TCE's Risks to Fenceline Communities Violated TSCA's Requirement to Address Environmental Exposure Pathways in Risk Evaluations..................................................................42

C. Fenceline Communities Are Potentially Exposed or Susceptible Subpopulations for Which TSCA Required Risk Determinations ...........44

D. EPA's Failure to Determine Unreasonable Risk Was Arbitrary and Capricious and Lacked Substantial Evidence Support ..............................48

    1. EPA's Claim that its Assessment Methodology Was Not Intended to Inform Unreasonable Risk Determinations Is Contradicted by the Agency Itself ..................................................................................................48

    2. EPA Did Not Demonstrate that Technical Deficiencies in the Methodology Made it Unsuitable for Determinations of Unreasonable Risk ...........................................................................................................50

    3. If EPA Was Concerned about the Limitations of its Assessments, Its Methodology Required It to Conduct Further Analysis ........................51

    4. EPA Had No Basis to Conclude that Protecting Fenceline Communities During their Years of Exposure to TCE Was Unnecessary Because the Rule Provided for Ultimate Prohibition ..................................................52

E. EPA Erroneously Concluded That Clean Air Act Standards for Chemical Facilities Would Prevent Increases in Emissions under EPA's Rule .........55

F. EPA's Failure to Require Interim Protections for Fenceline Communities Was Arbitrary and Capricious In Light of Its Decision to Require Interim Protections for Workers ........................................................................................57

G. Substantial Evidence in the Record Demonstrates that Risks to Fenceline Communities are Unreasonable ...............................................................................58

    1. The Methodology EPA Used to Determine the Magnitude of Fenceline Risks Was Consistent With Established TSCA Policy and Practice .....58

    2. EPA's Fenceline Assessments Showed Risk Levels for Communities that Were Unreasonable ......................................................................................60

    3. Because EPA's Methodology Significantly Understated Fenceline Risks, They Were Likely Greater than EPA Calculated ........................60

H. The Court Should Remand the Rule to EPA to Revise It to Protect Fenceline Communities During the Interim Period..................................62

II. EPA Violated TSCA by Excluding TCE Production as a Byproduct from Its Risk Evaluation and Rule ..............................................................................................63

A. Exemption of TCE Byproducts from Section 6(a) Rules Violates TSCA.65

    B.  EPA's Exemption for TCE Byproducts Processed at their Sites of Manufacture Is Unlawful ..................................................................69

    C.  The Court Should Vacate and Remand EPA's Actions Regarding TCE Byproducts ..................................................................................70

III.  The Rule's Exemption of *De Minimis* Levels of TCE Was Unlawful ...........70

    A.  EPA Lacks Authority to Exempt Conditions of Use from Section 6 Unless It Determines That They do Not Contribute to Unreasonable Risk ..........71

    B.  EPA Did Not Provide Adequate Notice and Opportunity for Comment on Its *De Minimis* Exemption ...................................................................75

IV.  Petitioners Have Demonstrated Standing ....................................................78

CONCLUSION ........................................................................................................82

COMBINED CERTIFICATIONS ...........................................................................84

CERTIFICATE OF SERVICE ................................................................................85

# TABLE OF AUTHORITIES

**Cases**

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ...........................78

*Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 72 F.4th 1324 (D.C. Cir. 2023) ....................................................................................................................77

*Chem. Mfrs. Ass'n v. EPA,* 859 F.2d 977 (D.C. Cir. 1988) ......................................39

*Child.'s Health Def., Inc. v. Rutgers,* 93 F.4th 66 (3d Cir. 2024)............................78

*Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018) .....................................................................................................78

*Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387 (D.C. Cir. 1990).........83

*Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991)............................11

*Finnbin, LLC v. Consumer Prod. Safety Comm'n,* 45 F.4th 127 (D.C. Cir. 2022)..83

*Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158 (5th Cir. 2012) ...............82

*Labor Council for Latin Am. Advancement v. United States EPA*, 12 F.4th 234 (2d Cir. 2021) ...............................................................................................39

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)...............................................................................................38

*N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74 (3d Cir. 2014) ..................................50

*N.J. Coal. of Auto. Retailers, Inc. v. Mazda Motor of Am., Inc.*, 957 F.3d 390 (3d Cir. 2020) .....................................................................................................78

*Nat. Res. Def. Council v. Wheeler,* 955 F.3d 68 (D.C. Cir. 2020)...........................83

*Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326 (2d Cir. 2006)..9

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011)............................75

*Shell Oil Co. v. EPA*, 950 F.2d 741 (D.C. Cir. 1991) ..............................................77

*Sierra Club v. United States EPA*, 972 F.3d 290 (3d Cir. 2020) ...................... 79, 80

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789 (5th Cir. 2000) ..................................................................................81

*Toll Bros., Inc. v. Twp. Of Readington*, 553 F.3d 131 (3d Cir. 2009).......................81

*Valley Forge Christian College. v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982)...............................................................................79

**Statutes**

5 U.S.C. § 553(b) .....................................................................................................75

5 U.S.C. §706............................................................................................................38

15 U.S.C. § 2602 ............................................................................................. passim

15 U.S.C. § 2602 .......................................................................... 24, 40, 44, 66

15 U.S.C. § 2605 ..................................................................................... passim

15 U.S.C. § 2605(a) ........................................................................ 15, 43, 73

15 U.S.C. § 2605(b)(1).....................................................................................13

15 U.S.C. § 2605(b)(4)(A)...............................................................................66

15 U.S.C. § 2605(b)(4)......................................................................................13

15 U.S.C. § 2605(b)(4)(A) ................................................................ 24, 40, 42, 44

15 U.S.C. § 2605(b)(4)(F)(i) ................................................................... 14, 41

15 U.S.C. § 2605(g)(1).....................................................................................15

15 U.S.C. § 2605(g)(4).....................................................................................15

15 U.S.C. § 2605(i)(2) ................................................................................5, 6

15 U.S.C. § 2608(b) .........................................................................................56

15 U.S.C. § 2618 ................................................................... 5, 38, 39, 48

15 U.S.C. § 2618(a)(1)(A) .............................................................................5, 6

15 U.S.C. § 2618(c)(1)(B) ...............................................................................38

15 U.S.C. § 2618(c)(1)(B)(i)(I)........................................................................39

15 U.S.C. § 2625(o) .........................................................................................14

## Regulations

29 C.F.R. § 1910.1200(a)(2) ...........................................................................74

40 C.F.R. § 23.5………………………………………………………………5

40 C.F.R. § 720.3 ............................................................................................65

40 C.F.R. § 751.301 ................................................................................ passim

40 C.F.R. § 751.305(b)............................................................................ 54, 64

40 C.F.R. § 751.307 .........................................................................................53

40 C.F.R. § 751.325 .........................................................................................54

## Federal Register

15 Fed. Reg. 17,574 ........................................................................................74

85 Fed. Reg. 11,079 ........................................................................................21

86 Fed. Reg. 24,230 ........................................................................................68

88 Fed. Reg. 1222…………………………………………………………28

88 Fed. Reg. 74,712 .............................................. 29, 55, 58, 62, 65, 66, 71, 76

89 Fed. Reg. 21,970…………………………………………………………43

89 Fed. Reg. 37,028 ................................................................................. 66, 72

89 Fed. Reg. 102,568 ............................................................................. passim

*Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0*, EPA-HQ-OPPT-2021-0415-0012 ......................................................................................25

EPA, Response to Public Comments (November 20, 2024), EPA-HQ-OPPT-2020-0642-0726 ...................................................................................64

EPA, *Risk Evaluation for Trichloroethylene* (Nov. 2020) EPA-HQ-OPPT-2016-0737-0127 ................................................................................... passim

EPA, *Toxicological Review of Trichloroethylene* (Sept. 2011) EPA-HQ-OPPT-2020-0642-0170 ..................................................... 16, 17, 20, 22

EPA, *TSCA Work Plan Chemical Risk Assessment - Trichloroethylene: Degreasing, Spot Cleaning and Arts & Crafts Uses* (June 2014) ..............................................20

US. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Trichloroethylene* (June 2019) EPA-HQ-OPPT-2020-0642-0322 ...............................................................17

## Legislative Materials

Frank L. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 140 Stat. 448 (2016).................................................................12

Cong. Rec., H3007-H3025 (2016)............................................................12

Cong. Rec., S3511-5315 (2016)...............................................................11

Cong. Rec., S3511-S3525 (2016) .............................................................12

Cong. Rec., S3517 (2016).........................................................................12

H.R. Rep. No. 94-1341 (1976)..................................................................41

S. Rep. No. 114-67 (2015) ........................................................................12

S. Rep. No. 94-698 (1976) ................................................................. 12, 41

## Other Authorities

Bove, Frank, Environmental Health, *Mortality Study of Civilian Employees Exposed to Contaminated Drinking Water at USMC Base Camp Lejeune*, 13:68 (Aug. 2014) ........................................................................19

*Carcinogenesis Bioassay of Trichloroethylene*, https://ntp.niehs.nih.gov/publications/reports/tr/000s/tr002 ................................19

Costas, K, Science of the Total Environment, *A Case-Control Study of Childhood Leukemia in Woburn, Massachusetts*, Vol. 300, Issues 1-3 (Dec. 2002) .............18

*EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ................................................................................ 24, 39

EPA Office of the Science Advisor, Risk Assessment Forum, *Framework for Human Health Risk Assessment to Inform Decision Making* (April 12, 2014)...50

EPA, Guidelines for Carcinogen Risk Assessment (March 2025)..........................20

EPA, TRI Explorer ...............................................................................16

EPA, *Trichloroethylene (TCE): Fenceline Technical Support – Ambient Air Pathwa*y (March 3, 2022), EPA-HQ-OPPT-2020-0642-0091 ..................... 27, 46

EPA, *Trichloroethylene and Vapor Intrusion*, https://www.epa.gov/vaporintrusion/vapor-intrusion-superfund-sites ................18

EPA, *Trichloroethylene: Fenceline Technical Support – Water Pathway* (March 24, 2023) ..............................................................................................27

EPA, *United States Environmental Protection Agency Charter, Science Advisory Committee On Chemicals* (February 23, 2026),. ...................................14

Johnson, Paula et al., *Threshold of Trichloroethylene Contamination in Maternal Drinking Waters Affecting Fetal Heart Development in the Rat*, 111 Environmental Health Perspectives, 289 (March 2003).......................................19

Science Advisory Committee on Chemicals, *Meeting Minutes and Final Report* EPA-HQ-OPPT-2021-0415-0095 .................................................. 23, 26, 61, 62

Toxicological Review and U.S. Department of Health and Human Services National Toxicology Program, *Report on Carcinogens, Monograph on Trichloroethylene* (January 2015) ....................................................................19

United States Government Accountability Office, *Chemical Regulation: Options Exist to Improve EPA*'s *Ability to Assess Health Risks and Manage Its Chemical Review Program* (2005) ..............................................................................10

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EDF | Environmental Defense Fund |
| EPA | Respondent United States Environmental Protection Agency |
| CEH | Center for Environmental Health |
| JA | Joint Appendix |
| NESHAP | National Emissions Standards for Hazardous Air Pollutants |
| OSHA | Occupational Safety and Health Administration |
| Rule | United States Environmental Protection Agency, "Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)," 89 Fed. Reg. 102,568 (Dec. 17, 2024) |
| TCE | Trichloroethylene |
| TSCA | Toxic Substances Control Act |

# INTRODUCTION

Trichloroethylene (TCE), a highly toxic solvent, causes multiple types of cancer in humans and has been linked to Parkinson's disease, immune and reproduction system harm, kidney, liver, and neurological damage, and defects in the developing human heart. These harms can occur at extremely low levels of exposure. Over the years, Environmental Protection Agency (EPA) and other expert bodies have exhaustively reviewed the scientific literature on TCE toxicity and confirmed its multiple hazards.

TCE has widely contaminated air, soil, surface and drinking water, and waste sites. TCE vapor is known to seep into homes from contaminated soil and groundwater, endangering residents' health. Harm from TCE-contaminated drinking water in communities such as Woburn, Massachusetts and Camp Lejeune, North Carolina have received national attention. Comprehensive regulation of TCE, which had languished for decades, finally gained momentum after Congress overhauled the Toxic Substances Control Act (TSCA) in 2016. Enacted by a large bipartisan margin, the revised law strengthened EPA's authorities to evaluate the risks of high-concern chemicals and eliminate those risks that it deemed unreasonable. TCE was one of the first substances to undergo the enhanced TSCA risk evaluation and risk management process, which resulted in a risk evaluation in 2020 and a risk management rule in 2024.

EPA's evaluation found that 52 of TCE's 54 "conditions of use" present unreasonable risks to human health. Once EPA has made a determination of unreasonable risk, TSCA requires EPA to impose restrictions to eliminate such risk. Here, EPA determined that prohibition is the best way to address TCE's unreasonable risk, and that a rule allowing TCE uses to continue under restrictions would not effectively protect workers and the general public.

Despite the Rule's prohibitions on TCE production and use, it contains several loopholes and exemptions that weaken its protections. Most significantly, its prohibitions will be delayed for long periods for a number of TCE uses, prolonging people's exposure to this toxic chemical. During these years, fenceline communities near plants producing and using TCE will remain exposed to unreasonable health harms because EPA chose not to control facility releases to air and water. Moreover, some TCE manufacturing and processing activities are not restricted at all, allowing unsafe exposures to continue at current levels indefinitely.

Petitioners Center for Environmental Health (CEH) and Environmental Defense Fund (EDF) challenge these shortcomings in the Rule's protections, which violate EPA's obligations under TSCA to identify and eliminate unreasonable risks. We show in this Brief that three aspects of the rule are unlawful and should be set aside:

First, EPA's analyses of the health risks to communities near industrial facilities that released TCE to air and water demonstrated that communities were exposed to TCE levels that exceeded EPA unreasonable risk benchmarks. Yet in its rule, the Agency took no action to protect the communities during the years that they would still be exposed to the chemical. This violated TSCA and was arbitrary and capricious.

Second, EPA's risk evaluation and rule did not address the production of TCE as a byproduct on the erroneous ground that byproduct production did not constitute TCE "manufacture" as defined in TSCA. The rule also allows site-limited processing of TCE byproducts in enclosed systems without demonstrating that these activities do not present unreasonable risk as TSCA requires.

Finally, EPA exempted from the rule's prohibitions industrial, commercial, and consumer products containing TCE at thresholds less than 0.1 percent by weight. Yet in its rulemaking, EPA did not analyze the risks of the TCE exposures that would result from the exemption. Thus, the Agency lacked any basis to conclude that, individually or in the aggregate, they would not contribute to TCE's unreasonable risk. EPA also failed to provide sufficient notice and opportunity to comment on the exemption.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in this brief's addendum.

**STATEMENT OF JURISDICTION**

The Courts of Appeals have exclusive jurisdiction to review rules issued under TSCA. 15 U.S.C. § 2618(a)(1)(A).

On December 17, 2024, Respondent United States Environmental Protection Agency (hereinafter, "EPA" or "Agency") published the rule that is the subject of the consolidated petitions. Joint Appendix ("JA")__(89 Fed. Reg. 102,568) ("Rule"); *see also* 40 C.F.R. § 23.5 (specifying that promulgation date for purposes of judicial review is two weeks from date of Federal Register publication). United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO timely petitioned this Court for review of the Rule on January 10, 2025. Petition for Review, No 25-1055, Dkt. No. 1; *see* 15 U.S.C. § 2618(a)(1)(A) (establishing 60-day deadline after promulgation to petition for review of TSCA rules).

On January 6, 2025, Petitioner Center for Environmental Health ("CEH") timely petitioned the Ninth Circuit for review of the Rule. On January 8, 2025, Petitioner Environmental Defense Fund ("EDF") timely petitioned the Second Circuit for review of the Rule. Those petitions, along with various other petitions of industry parties filed in other courts, were transferred to this Court by the United States Judicial Panel on Multidistrict Litigation. Consolidation Order, Case MCP No. 193, Dkt. No. 4 (Jan. 14, 2025). On January 24, 2025, the Court consolidated

the cases "for the purposes of scheduling, the appendix, the respondent's brief, and disposition." Clerk Order, No. 25-1055, Dkt. No. 15.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.  Did EPA violate TSCA and act arbitrarily and capriciously by failing to protect fenceline communities from unreasonable risks caused by the continued manufacture and use of the toxic chemical TCE?

2.  Did EPA violate TSCA by failing to consider the risks presented by the manufacturing and processing of TCE byproducts in its risk evaluation and address such risks in its risk management rule?

3.  Did EPA's creation of a *de minimis* exemption violate both substantive requirements of TSCA and procedural requirements of the Administrative Procedure Act because it was promulgated without adequate notice and opportunity for comment?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

These consolidated cases have not been before this Court previously, and Petitioners are not aware of any other related case or proceeding as defined by Third Circuit Rule 28.1(a)(2).

## STATEMENT OF THE CASE

## I. The Identification and Regulation of Chemicals that Cause Harm is Central to TSCA

### A. Congress enacted TSCA to prevent chemical companies from experimenting on the public with dangerous chemicals

Concerned about the large number of unsafe chemicals to which Americans were exposed in daily life, "Congress enacted TSCA in 1976 with the express purpose of limiting the public health and environmental risks associated with exposure to and release of toxic chemical substances and mixtures." *Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006). According to the Senate Report on the law, "we have become literally surrounded by a manmade chemical environment. … [T]oo frequently, we have discovered that certain of these chemicals present lethal health and environmental dangers." S. Rep. No. 94-698, at 3 (1976).

Unique among the nation's environmental statutes, TSCA is not narrowly focused on particular media, such as air, water or waste. Instead, under TSCA, EPA must "look comprehensively" at the risks of chemicals from manufacturing through disposal and "protect the public and the environment" throughout the lifecycle of hazardous chemicals. S. Rep. No. 94-698, at 2-3 (1976). This lifecycle approach, Congress believed, would be "far more effective" than focusing on the downstream regulation of chemical releases to the environment. *Id.* at 5. Thus,

Congress designed TSCA to fill "regulatory gaps," *id.* at 1, through an expansive approach that considered "the full extent of human or environmental exposure." H.R. Rep. No. 94-1341, at 6 (1976).

### B. Congress recognized the need to strengthen EPA's authority to regulate existing chemicals

**Shortcomings of the 1976 Law.** A centerpiece of TSCA since its enactment has been "Section 6," 15 U.S.C. §2605. This provision requires EPA to assess certain high priority existing chemicals and, if EPA determines that they present unreasonable risks of injury to health or the environment, to ban or restrict them to eliminate such risks.[1] 15 U.S.C. §2605(a)-(c). Unfortunately, as originally enacted, Section 6 presented obstacles to effective regulation, and progress in addressing harmful existing chemicals in the first four decades of TSCA was slow and frustrating. *See* United States Government Accountability Office, *Chemical Regulation: Options Exist to Improve EPA*'s *Ability to Assess Health Risks and Manage Its Chemical Review Program* (2005), https://www.gao.gov/assets/gao-05-458.pdf. Only a handful of the thousands of chemicals that were pervasive in the economy and environment were evaluated by EPA under Section 6 to determine

---

[1] Section 6 applies to "existing chemicals" – i.e. those commercially manufactured or imported before the effective date of the 1976 TSCA or otherwise included on the existing chemical inventory compiled and maintained under TSCA section 8(b), 15 U.S.C. §2607(b). Separately, "new chemicals" that are not inventory-listed are reviewed and regulated under section 5, 15 U.S.C. §2604. TSCA's new chemical provisions are not at issue in this case.

their health and environmental effects, and even fewer were restricted to protect against documented risks. *Id.* at 18 (explaining that "[o]nly five chemical substances or groups of chemical substances have been regulated under [TSCA]" between 1976 and 2005).

**The 1991 Asbestos Court Decision.** The deficiencies of the original law were crystallized by EPA's inability to ban asbestos. In 1989, EPA issued a rule under Section 6 prohibiting the manufacture, processing, or distribution in commerce of asbestos in almost all products. "Asbestos: Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions," 54 Fed. Reg. 29460 (July 12, 1989). However, the Fifth Circuit overturned the rule in 1991 in *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991). The Court did not question the dangers of asbestos but found that EPA failed to comply with TSCA's then-requirements to balance costs and benefits and adopt the "least burdensome" regulatory alternative, which TSCA required as originally enacted. *Id.* at 1214-19. Following the decision, EPA did not regulate another existing chemical under TSCA for more than two decades.

**Strengthening TSCA in 2016.** As TSCA approached its fortieth anniversary, growing public and Congressional disappointment with the law's meager accomplishments spurred a multi-year effort to overhaul and strengthen its key provisions. Cong. Rec., S3511-5315 (June 7, 2016). As a result, TSCA was

extensively amended in 2016 with overwhelming bipartisan support. Frank L. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 140 Stat. 448 (2016); Cong. Rec., S3511-S3525 (June 7, 2016); Cong. Rec., H3007-H3025 (May 24, 2016).

The 2016 amendments sought to promote more "effective implementation" of the 1976 law's objectives. *See* S. Rep. No. 114-67, at 2 (2015). Thus, Congress affirmed that the intent of the original law—to give EPA "authority to look at the hazards [of chemicals] in total," S. Rep. No. 94-698, at 2—remained "intact." S. Rep. No. 114-67, at 7. Indeed, in a statement accompanying the law's passage, its Senate Democratic sponsors underscored that, with the expanded authorities conferred by Congress, TSCA should not be "construed as a 'gap filler' statutory authority of last resort" but "as the primary statute for the regulation of toxic substances." Cong. Rec., S3517 (June 7, 2016).

**Putting Teeth into Risk Evaluation and Risk Management.** A high priority for Congress was increasing the stringency and pace of existing chemical risk evaluations and risk reductions under Section 6. To that end, Congress amended the law to require EPA to evaluate chemicals of concern to determine if they pose unreasonable risk of injury to people or the environment and, if so, to regulate such that this unreasonable risk is eliminated. Congress precluded EPA from considering costs and other "non-risk factors" in making risk determinations

and restricting or prohibiting chemicals of concern, and eliminated the requirement that EPA adopt the "least burdensome alternative" that had doomed the 1989 asbestos ban in the Fifth Circuit. Congress also required EPA to evaluate a minimum number of substances for unreasonable risk and to set deadlines for completing risk evaluations and follow-up rulemakings.

**The New Framework for Existing Chemicals**. Congress' reconstructed Section 6 establishes a three-part framework for addressing existing chemicals: (1) periodic designation of chemicals of concern to enter the pipeline for risk evaluation and potential regulation, 15 U.S.C. § 2605(b)(1); (2) risk evaluations of these substances by set deadlines to determine whether their "conditions of use" present "an unreasonable risk of injury to health or the environment," *id.* at § 2605(b)(2)-(4); and (3) for those chemicals determined to present unreasonable risks, risk management rulemakings to impose restrictions to eliminate the unreasonable risk, which may include a ban and lesser requirements. *id.* at § 2605(a) and (c). The latter two components of the framework—risk evaluation and risk management—are the focus of this case.

**Key Risk Evaluation Requirements.** EPA risk evaluations must "determine whether a chemical substance presents an unreasonable risk of injury. . . under the conditions of use." 15 U.S.C. § 2605(b)(4). These unreasonable risk determinations must be made "without consideration of costs or other nonrisk factors." *Id.* They

13

must also address unreasonable risks to any "potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by" EPA. *Id.*

TSCA risk evaluations must "integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations." 15 U.S.C. § 2605(b)(4)(F)(i). They must also "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance." *Id.* at § 2605(b)(4)(F)(iv).

EPA must establish a Science Advisory Committee on Chemicals ("Science Committee") "to provide independent advice and expert consultation" on TSCA science issues. 15 U.S.C. § 2625(o). The Science Committee, comprised of external scientists unaffiliated with EPA, has reviewed and offered recommendations on EPA's risk evaluations and many related scientific issues. EPA, *United States Environmental Protection Agency Charter, Science Advisory Committee On Chemicals* (February 23, 2026), https://www.epa.gov/system/files/documents/2026-02/2026-science-advisory-committee-on-chemicals-charter_0.pdf.

**Key Risk Management Requirements.** If EPA finds through the risk evaluation that a chemical "presents an unreasonable risk of injury to health or the

environment," the Agency "shall by rule" restrict the chemical "to the extent necessary so that the chemical substance or mixture no longer presents such [unreasonable] risk." 15 U.S.C. § 2605(a). In doing so, EPA applies one or more of seven authorized requirements. *Id.* These restrictions may apply to any or all phases of a chemical's lifecycle, and prohibit or limit the manufacture, processing, use, distribution in commerce, disposal, or "any combination of such activities." 15 U.S.C. § 2605(a).

EPA may grant a time-limited exemption from a requirement of a risk management rule "for a specific condition of use of a chemical substance" if it is "a critical or essential use for which no technically and economically feasible safer alternative is available," restricting the use "would significantly disrupt the national economy, national security, or critical infrastructure," or the condition of use "provides a substantial benefit to health, the environment, or public safety." 15 U.S.C. § 2605(g)(1), (3). In addition to a time limit, EPA must impose conditions on the exemption it deems "necessary to protect health and the environment while achieving the purposes of the exemption." 15 U.S.C. § 2605(g)(4).

## II.  People Have Been Widely Exposed to and Harmed by Toxic TCE

As EPA recognized when it evaluated TCE's risks, the chemical has endangered the health of workers who manufacture, process and use TCE; consumers who use stain removers, degreasers and other TCE-containing products;

and communities across the country whose air, water, and homes are contaminated by the chemical. EPA, *Risk Evaluation for Trichloroethylene* (Nov. 2020) ("Risk Evaluation"), EPA-HQ-OPPT-2016-0737-0127, at 415-59, JA__-__.

Before EPA's rulemaking, more than 170 million pounds of TCE were produced in or imported into the United States each year. JA__ (Risk Evaluation at 47). EPA estimated that nearly 95,000 workers were exposed to TCE and it was used at thousands of facilities. JA__-__ (Risk Evaluation at 91, 144).

**Releases to Air.**  TCE is a volatile organic chemical with significant emissions to air. More than 865,000 pounds of TCE were released to the air in 2022, according to industry self-reported Toxics Release Inventory data. EPA, TRI Explorer, https://enviro.epa.gov/triexplorer/tri_release.chemical.

According to EPA, "TCE can be released to indoor air from use of consumer products that contain it (i.e., adhesives and tapes), vapor intrusion (migration of volatile chemicals from the subsurface into overlying buildings), and volatilization from the water supply." EPA, *Toxicological Review of Trichloroethylene* (Sept. 2011) ("Toxicological Review"), EPA-HQ-OPPT-2020-0642-0170, at 2-10, https://iris.epa.gov/static/pdfs/0199tr.pdf. Consistently, measured indoor levels have been shown to be higher than outdoor levels. *Id.* at 2-10 to 2-11.

**Water Contamination.** TCE is "the most frequently detected organic solvent and the one present in the highest concentration" in United States

groundwater. US. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Trichloroethylene* (June 2019) ("Toxicological Profile"), EPA-HQ-OPPT-2020-0642-0322, at 330. Not surprisingly, TCE is also a common contaminant in drinking water. According to EPA, "[i]t has been estimated that between 9 and 34% of the drinking water supply sources tested in the United States may have some TCE contamination." Toxicological Review at 2-12. The Environmental Working Group has estimated that TCE has contaminated drinking water supplies for 19 million people. *Tap Water of More Than 19 Million Americans Polluted by 'Civil Action' Carcinogen That EPA Is Poised To Ban* (Nov. 7, 2023), https://www.ewg.org/news-insights/news-release/2023/11/tap-water-more-19-million-americans-polluted-civil-action.

**Cleanup Sites.** TCE's mobility in soil is well-documented and, when spilled or released to land, it readily leaches to the subsurface and to groundwater. Toxicological Profile at 317. Given this leaching, along with the chemical's extensive use and its volatility, TCE is commonly found at contaminated sites selected for cleanups under the federal Superfund law and state and local remediation programs. *See* Toxicological Profile at 330.

**Vapor Intrusion Into Homes.** A common pathway for human exposure is "vapor intrusion" of TCE into buildings overlaying contaminated soil and

groundwater. As described by the State of Minnesota, "TCE can evaporate from the polluted soil and groundwater and rise toward the ground surface. If these TCE vapors come to a basement as they travel to the surface, they may enter through cracks in the foundation, around pipes, or through a sump or drain system." Minnesota Department of Health, *Trichloroethylene (TCE) and Your Health*, https://www.health.state.mn.us/communities/environment/hazardous/topics/tce.html. EPA has acknowledged the health risks of TCE's vapor intrusion to building occupants and has published guidance on mitigating these risks. EPA, *Trichloroethylene and Vapor Intrusion*, https://www.epa.gov/vaporintrusion/vapor-intrusion-superfund-sites.

**Community Impacts.** TCE contamination has devastated communities across the country. Several of these cases have received attention from members of Congress and the media. For example, twenty-one children in Woburn, Massachusetts were diagnosed with leukemia after TCE from an industrial facility contaminated local drinking water supplies. Costas, K, Science of the Total Environment, *A Case-Control Study of Childhood Leukemia in Woburn, Massachusetts*, Vol. 300, Issues 1-3 (Dec. 2002), at 23-25. In Camp Lejeune, North Carolina, TCE from a military base widely contaminated the drinking water supplies. Bove, Frank, Environmental Health, *Mortality Study of Civilian Employees Exposed to Contaminated Drinking Water at USMC Base Camp*

*Lejeune*, 13:68 (Aug. 2014). TCE's many harmful effects on health have been broadly recognized for decades. The National Cancer Institute (NCI) reported evidence of TCE's carcinogenicity in 1976, *Carcinogenesis Bioassay of Trichloroethylene*, https://ntp.niehs.nih.gov/publications/reports/tr/000s/tr002, and a key study documenting TCE's effects on fetal cardiac development was published in 2003. Johnson, Paula et al., *Threshold of Trichloroethylene Contamination in Maternal Drinking Waters Affecting Fetal Heart Development in the Rat*, 111 Environmental Health Perspectives, 289 (March 2003) ("Johnson Study") https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241384/pdf/ehp0111-000289.pdf; JA__ (Risk Evaluation at 628).

**Cancer Risks to Humans.** Based on extensive peer-reviewed evidence of carcinogenicity in animals and humans, TCE has been classified as a known human carcinogen by EPA, *See* Toxicological Review and U.S. Department of Health and Human Services National Toxicology Program, *Report on Carcinogens, Monograph on Trichloroethylene* (January 2015) https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/monographs/finaltce_508.pdf; and internationally by the International Agency for Research on Cancer, *Trichloroethylene, Tetrachloroethylene, and Some Other Chlorinated Agents* (2014), at 106, https://www.ncbi.nlm.nih.gov/books/NBK294281/pdf/Bookshelf_NBK294281.pd,.

In the United States and internationally, designation as a "human carcinogen" denotes the highest possible level of evidence for carcinogenicity and the greatest degree of confidence in a substance's ability to cause cancer. EPA, Guidelines for Carcinogen Risk Assessment (March 2025), at 2-53 to 2-58, https://www.epa.gov/sites/default/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf.

**Fetal Heart Malformations**. TCE also poses harms to pregnant women at very low concentrations, causing fetal heart defects. Risk Evaluation at 628. EPA assessments concluded that, as the health harm occurring at the lowest exposure levels, TCE-induced fetal heart malformations should drive risk determinations for short-term and chronic TCE exposure. Toxicological Review at 4-565; EPA, *TSCA Work Plan Chemical Risk Assessment - Trichloroethylene: Degreasing, Spot Cleaning and Arts & Crafts Uses* (June 2014) ("Work Plan Assessment"), at 110-12, https://www.epa.gov/sites/default/files/2015-09/documents/tce_opptworkplanchemra_final_062414.pdf. However, EPA's reliance on the fetal heart malformations to drive risk determinations has been strongly challenged by industry stakeholders. EPA has consistently defended use of the Johnson Study against these criticisms.

### III. EPA Evaluated TCE and Found Unreasonable Risk

A draft TCE risk evaluation was published for comment in 2020, 85 Fed. Reg. 11,079 (Feb. 26, 2020); the Science Committee then held a peer review meeting on the draft evaluation in March 2020, *id.*; and the final Risk Evaluation was issued in November 2020. JA__.

**Overall Findings.** EPA compiled and analyzed available information on TCE uses, exposure levels, and hazards to health and the environment, and then made determinations of unreasonable risk for the identified conditions of use. EPA determined unreasonable risks to health for 52 of the 54 use conditions it assessed. JA__-__ (Risk Evaluation at 460-462). EPA made separate unreasonable risk determinations for each of TCE's cancer and non-cancer health effects and found that nearly all use conditions of use presented unreasonable risks for nearly all effects. *Id.* at 408-409.

EPA found risks to workers that exceeded its worker cancer benchmark of one in 10,000 for nearly all exposure scenarios and use conditions, often by a large margin. *Id.* at 389-401. EPA also evaluated unreasonable risks of acute (short term) non-cancer effects (developmental toxicity and immunosuppression) and chronic (repeat exposure) risks of non-cancer effects (liver toxicity, kidney toxicity, neurotoxicity, autoimmunity, reproductive toxicity, and developmental toxicity). *Id.* at 301, 408.

EPA's evaluation found unreasonable non-cancer risks, based on acute immunosuppression and chronic autoimmunity, for nearly all use conditions and toxicity types for both workers and consumers. *Id.* at 415-459. However, the Agency declined to rely on the congenital heart malformations. *Id.* at 280. Comments on the draft risk evaluation heavily criticized EPA's rejection of this toxic effect as a driver for risk management notwithstanding the express findings of EPA's 2011 and 2014 TCE assessments and the conclusions of multiple peer reviews. *See* Toxicological Review at xliii; Work Plan Assessment at 99.[2]

**Environmental Releases.** Despite TCE's risks to communities and widespread presence in environmental media, EPA concluded that "exposures to the general population via surface water, drinking water, ambient air, soil and sediment pathways are covered under the jurisdiction of other environmental statutes." JA__(Risk Evaluation at 39). Citing its interpretation of TSCA as a "gap-filling" statute and desire to "avoid duplicating efforts taken pursuant to other Agency programs," "EPA did not evaluate risk to the general population from

---

[2] An investigative report published following release of the draft evaluation revealed that, during interagency review of the draft, the White House directed EPA not to use fetal heart defects to determine unreasonable risk, and the draft was modified to downplay a key study. Shogren, E., Reveal/Center for Investigative Reporting, *EPA scientists found a toxic chemical damages fetal hearts. The Trump White House rewrote their assessment,* (Feb. 28, 2020) https://www.revealnews.org/article/epa-scientists-found-a-toxic-chemical-damages-fetal-hearts-the-trump-white-house-rewrote-their-assessment/.

ambient air, water and disposal and pathways for any condition of use, and the unreasonable risk determinations do not account for exposures to the general population." *Id.*

**Aggregate Exposure and Risks to Vulnerable Populations.** TSCA requires EPA risk evaluations to describe whether aggregate exposures to the chemical under the conditions of use were considered and the basis for the consideration. 15 U.S.C. § 2605(b)(4)(F)(ii). EPA defines "aggregate exposure" as "the combined exposures from a chemical substance across multiple routes and across multiple pathways." 40 C.F.R. § 702.33. The Science Committee panel reviewing the draft TCE evaluation urged EPA to consider TCE exposure from multiple routes and sources. *See* Science Advisory Committee on Chemicals, *Meeting Minutes and Final Report* ("Science Committee Report"), EPA-HQ-OPPT-2021-0415-0095, at 51, 53, 59, 05, JA__.

However, the final evaluation did not examine aggregate health risks to populations exposed to TCE. EPA acknowledged that "not aggregating exposures in any manner may potentially underestimate total exposure for a given individual." JA__ (Risk Evaluation at 37).

Similarly, while acknowledging differences in exposure and susceptibility among impacted subpopulations, EPA's Risk Evaluation did not include fenceline communities among the subpopulations it identified as "potentially exposed or

susceptible subpopulations." Under TSCA, EPA is required to assess the risks of all impacted subpopulations that are "group[s] of individuals within the general population . . . who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure" to TCE. *Id.* 15 U.S.C. § 2602(12). Further, EPA did not make separate unreasonable risk determinations for fenceline communities as TSCA requires. Had EPA complied fully with TSCA's risk evaluation requirements, 15 U.S.C. § 2605(b)(4)(A), its evaluation would have highlighted vulnerable groups with elevated risks that required special attention during risk management.

**IV. EPA Takes Actions to Strengthen its Evaluation of TCE**

**Fenceline Communities.** In June 2021, eight months after the Risk Evaluation was issued, new EPA leadership "announced important policy changes surrounding risk evaluations issued under the Toxic Substances Control Act." *EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ("2021 Path Forward"), [https://www.epa.gov/newsreleases/epa-announces-path-forward-tsca-chemical-risk-evaluations](https://www.epa.gov/newsreleases/epa-announces-path-forward-tsca-chemical-risk-evaluations), JA__. EPA recognized that the risk evaluations it had thus far completed "fail[ed] to consistently and comprehensively address potential exposures to potentially exposed or susceptible subpopulations, including fenceline communities" and the Agency committed to "ensure these chemicals are used safely and all communities are protected." *Id.* EPA announced it would conduct

new assessments to determine if the completed evaluations for TCE and five other chemicals failed "to identify and protect fenceline communities." *Id.* The goal of the additional assessments was to examine whether these chemicals presented "the potential for unreasonable risk to fenceline communities associated with air and water exposures." *Id.*

EPA followed up in January 2022 by releasing for public comment its *Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0* ("Methodology"), EPA-HQ-OPPT-2021-0415-0012, https://www.epa.gov/system/files/documents/2022-01/draft-fenceline-report_sacc.pdf, JA__. The Methodology "uses reasonably available data, information, and models to quantify environmental releases, evaluate exposures to fenceline communities and characterize risks associated with such releases and exposures." JA__ (Methodology at 11). EPA planned to compare those risk calculations to benchmark levels, including a 1-in-1,000,000 cancer risk benchmark, *id.* at 54, which the Agency has used under TSCA to determine unreasonable risks to the general population. EPA, TCE Proposed Rule, 88 Fed. Reg. at 74,712, 74,768 (Oct. 31, 2023) ("Proposed Rule"), JA__. The Methodology promised that EPA's risk assessments would "ensure potential risks to fenceline communities will not go unidentified and unaddressed" and the Agency would "address these risks via protective and expeditiously promulgated risk management

rules." JA__ (Methodology at 17). EPA added that "the law requires, and the public is entitled to, protections from the identified risks as quickly as those protections can be finalized and implemented." *Id.*

**Science Committee Review of the Fenceline Methodology**. At EPA's request, the Science Committee reviewed the Methodology. JA__ (Science Committee Report). The Committee endorsed EPA's use of the cancer benchmark levels in the Methodology, maintaining that "[t]he threshold of $10^{-6}$ [one in a million] is more protective and should be used in the fenceleine [*sic*] assessments." *Id.* at 27-28. Although EPA had repeatedly described its Methodology as "conservative," *i.e.* erring on the side of health-protective assumptions, *e.g.,* JA__, __, __ (Methodology at 30, 33, 58), the Science Committee warned that EPA's calculations "may not be protective overall because potential key exposure pathways are excluded" and because there was no "consideration for cumulative exposures, multiple source exposures, [or] aggregate exposures." JA__ (Science Committee Report at 15). The Committee thus urged EPA to revise the Methodology to include "aggregate . . . exposures from populations exposed at work who live in the community, or who may also be exposed to multiple facility emissions." *Id.* at 18.

EPA, however, declined to adopt these recommendations.

**EPA's Fenceline Assessments**. In March 2022, EPA released fenceline assessments for TCE that quantified levels of risk to impacted communities from facility air emissions and water exposure pathways. The Agency's air emissions assessment showed that numerous populations near TCE-emitting facilities faced cancer risks above EPA's benchmark. EPA, *Trichloroethylene (TCE): Fenceline Technical Support – Ambient Air Pathwa*y (March 3, 2022), EPA-HQ-OPPT-2020-0642-0091, JA__.

As summarized in the Rule:

> [t]he multi-year analysis evaluated 217 facilities and found risk estimates above one in a million for cancer for 133 of those facilities at a distance of 100 meters from the releasing facility. . . 58 of these 133 facilities [] had cancer risks above one in a million at distances farther than 100 meters . . .

JA__ (89 Fed. Reg. at 102,613).

The Agency's water pathway assessment addressed the health risks of water discharges from people drinking or having dermal or oral contact with contaminated water. EPA, *Trichloroethylene: Fenceline Technical Support – Water Pathway*, (March 24, 2023), EPA-HQ-OPPT-2020-0642-0062, JA__. In its comments on EPA's proposed rule, Petitioner EDF explained that the water pathway analysis showed "acute, chronic, and cancer risks for the extended phaseout uses through drinking water and incidental oral and dermal exposure routes." EDF, Comments on the Proposed

Rule (Dec. 15, 2023) ("EDF Comments"), EPA-HQ-OPPT-2020-0642-0312, at 10, JA__.

**TCE Whole Chemical Risk Determination.** EPA's 2021 announcement also indicated that it would no longer make "separate unreasonable risk determinations for every condition of use of a chemical" but would instead "make the determination of unreasonable risk just once for the whole chemical when it is clear the majority of the conditions of use warrant one determination." JA__ (2021 Path Forward). The Agency committed to revise previous risk determinations for its 10 completed risk evaluations so that they applied to the "whole substance." *Id.*

EPA implemented this interpretation of TSCA in its December 2022 revised risk determination for TCE. *Notice - Toxic Substances Control Act Determination: Trichlorethyelene*, 88 Fed. Reg. 1222 (Jan. 9, 2023), EPA-HQ-OPPT-2016-0737-0147. As EPA explained in the accompanying Federal Register notice, "a whole chemical approach is appropriate for TCE in order to protect health and the environment" because risks exceed EPA benchmarks "for a substantial number of conditions of use (spanning across most aspects of the chemical lifecycle)." 88 Fed. Reg. 1222, 1224-25 (January 9, 2023).

## V. EPA Addresses TCE's Unreasonable Risk by Banning TCE, But Provides for Numerous Compliance Delays and Certain Exclusions

While the Rule requires important and long-overdue protections against TCE's many health harms, it contains loopholes and limitations that weaken the scope of these protections.

**Prohibition as the Best Risk Management Option.** After considering alternative approaches, the Proposed Rule "determined that prohibition is the best way to address the unreasonable risk." JA__ (88 Fed. Reg. at 74,733). As EPA found in its evaluation, serious health harms such as fetal heart malformations and immunotoxicity present risks to workers at exposure levels below those that can be reliably measured, much less consistently attained. *Id.* at 74,762. Thus, elimination of all TCE use was necessary because of the uncertain "feasibility of exposure reduction to sufficiently address the unreasonable risk across the broad range of occupational environments" and "the irreversible health effects associated with TCE exposures." *Id.* at 74,732-3. EPA stated:

> Ultimately, a prohibition would result in elimination of unreasonable risk from TCE, rather than allowing TCE use to continue in perpetuity, which would necessitate burdensome requirements to achieve exposure reductions to implement a technically challenging long-term program to meet a very low exposure limit.

*Id.* at 74,762.

**Inadequate Protection Against Fetal Heart Defects and Immunotoxicity.** Departing from the position it took in its risk evaluation, EPA based its Rule on

fetal heart malformations, which it again described as the "most sensitive" health harm for TCE. JA__ (Rule at 102,572). However, because of the "challenges of reliably reducing exposure below" this limit and accurately measuring for TCE at very low concentrations, EPA's Rule set an exposure limit well above the levels predicted to present fetal heart malformation and immunotoxicity risks. *Id.* at 102,579. Thus, EPA conceded that its new exposure limit would continue to put "[p]otentially exposed persons . . . at risk for the developmental and immunotoxicity effects that provide the basis for EPA's ultimate prohibition" on TCE use. *Id.* at 102,581.

**Lengthy Compliance Periods for Numerous Conditions of Use.** While ultimately phasing out all of the use conditions that EPA determined to present unreasonable risks, the Agency provided staggered timeframes for this prohibition to take effect, with years-long delays for numerous uses. All consumer and some commercial use conditions must be terminated within one year of the Rule's effective date, 40 C.F.R. § 751.305(b)(1)-(7), but other conditions representing a substantial portion of TCE production are allowed to continue for several years. 40 C.F.R. § 751.305(8)-(26).

EPA allowed an 8.5-year phaseout of the use of TCE that represents the highest annual production volume of the chemical: the manufacturing and processing of TCE for use as an intermediate in the production of the refrigerant

hydrofluourocarbon 134-a. 40 C.F.R. § 751.305(18) (prohibited after June 2033). Approximately 84% of TCE's annual production volume is devoted to this use. JA__ (Rule at 102,614). The Agency granted twenty years delay of the prohibition to users, manufacturers, processors, and distributors of TCE as a "processing aid" for lead-acid battery separator manufacturing. 40 C.F.R. § 751.305(23) (prohibited after December 2044). EPA also allowed years-long delays of prohibitions for numerous additional conditions of use, such as aerospace applications and specialty material manufacturing. *See* 40 C.F.R. § 751.305(10)-(26). These extended phaseout dates range from 2027 to 2074. *Id.* For the extended uses, facilities must implement a "Workplace Chemical Protection Program," which requires certain facilities to comply with an indoor air concentration limit. 40 C.F.R. § 751.315.

**Lack of Fenceline Community Protections.** Despite mandating worker protections at the facilities where TCE will continue to be used, and identifying risks of facility releases to air and water, EPA's Proposed Rule failed to include emission reductions that would address these risks during the phase out periods. Numerous commenters expressed concerns about this lack of fenceline community protections, but EPA declined to incorporate them in the Rule. *See* JA__ ("EDF Comments"); Various community organizations, Comments on the

31

Proposed Rule ("Communities' Comments) (Dec. 15, 2023), EPA-HQ-OPPT-2020-0642-0321.

**Exclusions from Compliance with the Prohibition.** The Rule also excluded various TCE production and use activities from prohibition, allowing them to continue indefinitely. These carve-outs are for (1) production of TCE as a byproduct, both at TCE production facilities and during manufacture of other chemicals; (2) processing of TCE byproducts within site-limited, physically enclosed systems; and (3) products containing TCE at thresholds less than 0.1 percent by weight (so-called "*de minimis* levels"). 40 C.F.R. § 751.301(b)-(c).

## SUMMARY OF ARGUMENT

1. In 2021, EPA acknowledged the failure of its prior risk evaluations for TCE and other substances to address facility releases to air and water that put fenceline communities at risk. To address this deficiency, EPA conducted detailed assessments that confirm that releases of TCE from these facilities meet its criteria for unreasonable risk. However, the protections it promised to communities while they remained exposed to TCE were not included in the Rule.

EPA had no discretion to ignore its risk findings for fenceline communities. TSCA requires the Agency to address the health risks of facility environmental releases. In addition, fenceline communities are a highly exposed and vulnerable subpopulation for which TSCA specifically requires determinations of unreasonable risk. Although its assessments showed risks exceeding the cancer risk levels that EPA considers unreasonable, it refused to make a definitive risk determination in the Rule. Instead, it said it could not "rule out unreasonable risk to fenceline communities" but would not affirmatively find that such an unreasonable risk existed. JA__ (Rule at 102,612). This evasiveness violated TSCA because Section 6 provides no discretion for the Agency to refuse to make an unreasonable risk finding for a use condition that the law requires its evaluation to address.

EPA offered strained justifications for disregarding fenceline risks that were either arbitrary and capricious, unsupported by substantial evidence, or both. For

33

example, EPA asserted that its Fenceline Assessment Methodology was not developed "for the purpose" of enabling EPA to make unreasonable risk determinations. Yet the Methodology itself explained how EPA would use the results to make determinations of unreasonable risk and take risk management action. JA__ (Methodology at 18-20.) Moreover, when announcing in June 2021 that it would conduct the fenceline assessments, EPA leadership committed to, consistently with TSCA, use the assessments for risk management if EPA determined that they showed unreasonable risk. JA__ (2021 Path Forward).

EPA claimed that the prohibitions on TCE production and use in its Rule would eliminate fenceline risks and that further EPA risk management was unnecessary. But this ignored the Rule's lengthy phase-out periods for substantial portions of TCE production and use, which would expose communities to TCE emissions for years.

Overall, the record provided substantial undisputed evidence of unreasonable risks to fenceline communities. Under TSCA, this placed an affirmative risk management duty on the Agency to fully protect such communities from unreasonable risks during phase-out periods. The Court should require EPA to discharge this obligation.

2. EPA's Rule failed to address TCE produced as a byproduct in the manufacture of TCE and other chemicals. This violated TSCA. TSCA does not

allow EPA to circumvent risk evaluation and risk management requirements based on how, where, and why chemicals are produced. EPA's professed plan to address TCE byproduct production not in the TCE rulemaking but in future evaluations of chemicals whose manufacturing processes produce TCE is both unworkable and contrary to TSCA.

The Rule also exempts the processing of TCE byproducts when performed in so-called "enclosed" systems at their sites of manufacture. This exemption, too, was unlawful because EPA did not evaluate whether these conditions would protect against unreasonable risk and eliminate the need for risk management.

3. EPA's so-called *de minimis* exemption for TCE in products at levels of 0.1% or less was unlawful. Section 6 contains no exemption for products that contain supposedly "small" levels of chemicals, but instead requires that EPA address and manage all unreasonable risk. Thus, no level of TCE in products or plant operations can be presumptively excluded from risk management.

Workers, fenceline communities, and consumers are exposed to TCE from multiple sources, many of which have TCE levels below the so-called *de minimis* threshold. It is the combination of exposures—as opposed to any one exposure individually—that drives unreasonable risk. EPA, *Procedures for Chemical Risk Evaluation under TSCA*, 89 Fed. Reg. 37028 (May 3, 2024). Yet EPA made no

effort to analyze the combined risks of the TCE exposures that would fall within its exemption.

EPA's Proposed Rule did not propose a *de minimis* exemption but merely sought public comment on whether one should be adopted. The Agency's comment request was non-committal and open-ended and neither explained the rationale for a possible exemption nor identified the specific exemption threshold under consideration. As a result, EPA failed to "disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35–36 (D.C. Cir. 1977). Because EPA did not afford sufficient notice and opportunity to comment, its *de minimis* exemption must be vacated.

4. The remedies Petitioners seek are tailored to these three issues. First, in response to EPA's failure to protect fenceline communities from unreasonable risks, the Court should remand this aspect of the Rule to EPA so that it is revised to protect those communities. Second, the Court should vacate and remand EPA's conclusion that the production of TCE as a byproduct does not constitute "manufacture" under TSCA, vacate and remand EPA's exemption of site-limited processing of TCE byproducts from the Rule, order EPA to undertake a new or supplemental risk evaluation to address the manufacturing and processing of TCE byproducts, and direct EPA to undertake a risk management rulemaking to

eliminate any unreasonable risks that are identified. Third, the Court should vacate the de minimis exemption as contrary to TSCA and for failing to meet notice and comment requirements.

Petitioners otherwise support the TCE Rule and urge that it not be vacated and implementation should be allowed to proceed.

5. The Rule deficiencies that Petitioners challenge place industrial fenceline communities in harm's way. EPA was obligated under TSCA to fully consider and protect these people, thousands of whom are EDF members, from unreasonable risk. Not having done so, the Agency has left them exposed to a highly toxic chemical for years. Petitioners have standing to seek an order directing EPA to fill the Rule's gaps and protect these individuals.

## STANDARD OF REVIEW

TSCA incorporates the standard of review of agency action in the Administrative Procedure Act ("APA"), 5 U.S.C. §706. 15 U.S.C. § 2618(c)(1)(B). Therefore, courts reviewing TSCA section 6 risk management rules must reject as unlawful EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under this standard, agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Although this is a "narrow standard" under which the Court's review is therefore deferential, "the agency cannot reach whatever conclusion it likes and then defend it with vague allusions to its own expertise." *Keystone-Conemaugh Projects LLC v. EPA,* 100 F.4th 434, 445 (3d Cir. 2024) (citing *Sierra Club v. United States EPA*, 972 F.3d 290, 298 (3d Cir. 2020)).

TSCA also augments the APA standard of review by requiring courts to "hold unlawful and set aside [a TSCA Section 6(a)] rule  . . . not supported by substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. §

38

2618(c)(1)(B)(i)(I). This TSCA-specific substantial evidence standard is "more demanding" than the [substantial evidence standard] otherwise prescribed by the APA," *Labor Council for Latin Am. Advancement v. United States EPA*, 12 F.4th 234, 245 (2d Cir. 2021) and is a "fairly rigorous standard of record review," *Chem. Mfrs. Ass'n v. EPA,* 859 F.2d 977, 992 (D.C. Cir. 1988).ARGUMENT

## I.  EPA's Failure to Protect Fenceline Communities from Unreasonable Risks Violates TSCA and Is Arbitrary and Capricious

In 2021, EPA concluded that completed risk evaluations for TCE and other chemicals had failed to comply with TSCA because they ignored sources of exposure and risk to people from air and water releases by facilities producing and using chemicals. JA__ (2021 Path Forward). EPA then developed its Fenceline Assessment Methodology and conducted air and water "pathway" analyses to create a foundation for protecting fenceline communities from unreasonable risks. JA__ (Methodology). These analyses demonstrated that TCE levels in air and water exceeded established EPA unreasonable risk benchmarks. Yet in its Rule, the Agency backed away from its earlier commitment to protect fenceline communities, and took no action.

Thus, EPA failed to put interim protections in place for the fenceline communities who will continue to be exposed to TCE during the multi-year periods for which many uses will continue until their final prohibition. In the Rule, EPA finessed its obligations to address the risks from facility environmental

releases by the sleight of hand of taking no definitive position on the existence of unreasonable risks. This avoidance of its duty was a violation of the law's express requirements, unsupported by substantial evidence, and arbitrary and capricious. In fact, substantial evidence in the record supports a determination that fenceline communities faced unreasonable risks, and TSCA requires EPA to provide protections against this risk.

### A. TSCA Requires EPA to Determine Whether TCE Emitted from Facilities Presents Unreasonable Risks

When EPA evaluates an existing chemical, it must determine "whether a chemical substance presents an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(b)(4)(A). This broad focus on the chemical substance requires EPA to examine all TSCA-regulated sources of exposure that may contribute to health and environmental risk, including TCE releases from facilities that may expose fenceline communities to adverse health effects. TSCA also requires that EPA, in its risk evaluation, must determine the substance's risks under the chemical's "conditions of use." 15 U.S.C. § 2605(b)(4)(A). This term is defined as "the circumstances . . . under which a chemical substance is intended, known or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." 15 U.S.C. § 2602(4). EPA may not select some circumstances for evaluation but disregard others. Thus, the "circumstances" of a

chemical that EPA must evaluate would necessarily encompass releases to air and water from facilities at which TCE is manufactured or processed.

This conclusion is reinforced by TSCA's requirement that risk evaluations must "integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance . . . that is relevant to specific risks of injury to health or the environment." 15 U.S.C. § 2605(b)(4)(F)(i). Since facility environmental releases are conditions of uses that may pose "risks of injury to health or the environment," EPA risk evaluations must compile and assess all "available information" on their "hazards and exposures." *Id.* This requires the Agency to evaluate the magnitude of fenceline communities' exposures to these releases and the associated health hazards and then "integrate" this information into a determination of unreasonable risk. *Id.*

As described above, when it enacted TSCA in 1976, Congress recognized that existing environmental laws were "clearly inadequate" to address the "serious risks of harm" from chemicals, H.R. Rep. No. 94-1341, at 7 (1976), and did not give EPA authority to "comprehensively" evaluate the "total" hazards of a chemical. S. Rep. No. 94-698, at 2 (1976). Congress designed TSCA to fill these "regulatory gaps," S. Rep. No. 94-698, at 1, and intended for EPA to consider "the full extent of human or environmental exposure," H.R. Rep. No. 94-1341, at 6. This goal would be unachievable if EPA could exclude environmental releases

from risk management by refusing to determine whether they present unreasonable risks.

## B. EPA's Refusal to Determine TCE's Risks to Fenceline Communities Violated TSCA's Requirement to Address Environmental Exposure Pathways in Risk Evaluations

In the Rule, EPA acknowledged that its "fenceline analysis for the air and water pathways for TCE did not allow EPA to rule out unreasonable risk to fenceline communities with confidence." JA__ (Rule at 102,612). But EPA then asserted that it lacked a basis to conclude whether or not the risks to these communities were "unreasonable" and therefore the Agency was "unable to determine with this analysis whether those risks drive the unreasonable risk of injury to health presented by TCE." *Id.* EPA thus violated its core TSCA obligation to determine whether these key sources of exposure to TCE presented an unreasonable risk to people.

For chemicals that undergo risk evaluations, TSCA provides that EPA "*shall . . .determine whether a chemical substance presents an unreasonable risk of injury . . . under its conditions of use.*" 15 U.S.C. § 2605(b)(4)(A) (emphasis added). In accordance with this statutory text, EPA must determine if the evidence does or does not demonstrate an unreasonable risk. TSCA provides no discretion to EPA to

avoid making this binary choice.[3] And where EPA determines an unreasonable risk, its path is clear: the Agency "shall" impose restrictions "so that the chemical substance . . . no longer presents such risk." 15 U.S.C. § 2605(a).

EPA's TSCA risk evaluations and risk management rules have conformed to this two-step approach, first making determinations of unreasonable risk for the chemical's conditions of use and then imposing requirements that eliminate these identified risks. *See, e.g.,* EPA, *Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act*, 89 Fed. Reg. 21,970 (March 28, 2024). In the case of TCE, EPA developed its Methodology expressly so that the Agency could determine whether air and water releases posed unreasonable risks. But when its analyses showed cancer risks to nearby communities above its benchmarks, EPA refused to take the required next step of determining whether these risks were "unreasonable." The Agency thereby circumvented its obligation under TSCA to determine whether a chemical poses unreasonable risks and then to regulate to ensure that people will no longer face those unreasonable risks from the chemical.

---

[3] EPA might be able to delay a determination where it needs more time for scientific analysis but, as discussed below, EPA rejected this option for TCE.

### C. Fenceline Communities Are Potentially Exposed or Susceptible Subpopulations for Which TSCA Required Risk Determinations

TSCA also specifically directs EPA to make risk determinations for any "potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation" by the Agency. 15 U.S.C. § 2605(b)(4)(A). These subpopulations are defined as "a group of individuals within the general population identified by the Administrator who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture." 15 U.S.C. § 2602(12).

EPA's fenceline risk assessments show that, as a result of facility emissions, residents of communities located near TCE facilities have elevated levels of exposure to TCE. Thus, due to "greater exposure" to TCE, these communities are "at greater risk . . . of adverse health effects . . . than the general population." *Id.* Indeed, in its 2021 announcement committing to protect fenceline communities, EPA explicitly recognized these communities as "potentially exposed or susceptible subpopulations." JA__ (Path Forward). EPA went even further in the Rule itself, conducting an environmental justice analysis that "determined that there are potential environmental justice concerns in communities surrounding facilities subject to this regulation," JA__ (Rule at 102,623), and that TCE facility operations "have the potential to result in disproportionate and adverse human

health or environmental effects on communities with [environmental justice] concerns." *Id.* at 102,622.

Underscoring this conclusion, commenters on EPA's Proposed Rule demonstrated that many populations facing the greatest risks from facility releases are low-wealth communities or communities of color, who are exposed not only to TCE but to other toxic chemicals that cause the same types of harms, including cancer, and thus contribute to these communities' cumulative risks of harm. For instance, citing EPA's TCE fenceline assessment for air emissions,   comments on the Proposed Rule from various community and environmental organizations explain that:

> the Westlake Chemical Company in Westlake, Louisiana presents fenceline cancer risks exceeding 1-in-10,000, with elevated risks extending up to 2,500 meters from the facility. That facility is located near the border of Westlake and Mossville, a historically Black community that is burdened by more than a dozen industrial facilities within and around its borders. According to EPA's Air Toxics Cancer Risk and Air Toxics Respiratory Hazard Index, air pollution in Mossville is among the worst in the Nation.

JA__ (Communities' Comments at 15-16) (footnotes and citations omitted). As a significant producer of TCE, the Westlake facility would be allowed to continue production under the Rule to supply TCE for HFC-134a manufacture, and the substantial risks to fenceline communities calculated by EPA would therefore be present for years. The Westlake facility also produces TCE as a byproduct, which the Rule does not restrict at all, contributing to the substantial risks to fenceline

communities. EPA, *Envirofacts*, https://enviro.epa.gov/envirofacts/tri/form-r/dcn-list/70669PPGNDCOLUM/2024. As the commenters also explain,

> On the other side of the state, residents of Geismar, Louisiana experience unreasonable risks because of Occidental Chemical Company's processing and release of TCE to manufacture other chemicals. In addition to TCE, that facility releases large amounts of methylene chloride, carbon tetrachloride, 1,2-dichloroethane, and other carcinogens, and it is surrounded by other industrial facilities that blanket the surrounding area in toxic pollution.

*Id.* at 16. EPA identified this facility as engaging in a TCE use that is subject to the extended phase out time of 8.5 years and therefore would also continue to expose surrounding communities. EPA, *Trichloroethylene (TCE): Fenceline Technical Support – Ambient Air Pathwa*y (March 3, 2022), at 33, EPA-HQ-OPPT-2020-0642-0091, JA__.

The commenters provide a graphic depiction of the intense concentration of chemical plants in the Geismar area and the numerous carcinogens they produce:



**Fenceline Community Exposures in Geismar and Surrounding Areas, Ascension Parish, LA***
*Map does not depict all exposure sources or all chemicals released in Geismar or Ascension Parish, LA.*

*Id.* at 17. Plainly, combined exposure to TCE and other carcinogens in the Gesimar area is a significant risk to surrounding communities. By failing to apply TSCA's definition of Potentially Exposed and Susceptible Subpopulations to fenceline communities like Geismar, Westlake, and Mossvile, EPA avoided its obligation to determine whether risks of TCE to such subpopulations are unreasonable. This was a further violation of section 6 of TSCA.

47

**D. EPA's Failure to Determine Unreasonable Risk Was Arbitrary and Capricious and Lacked Substantial Evidence Support**

As explained below, EPA's rationale for not making an unreasonable risk determination for fenceline communities exposed to TCE was confused, contradictory, and in many cases incorrect or unsupported. Thus, its failure to address TCE risks to fenceline communities should be set aside as arbitrary and capricious and lacking substantial evidence in the rulemaking record under the APA and Section 19 of TSCA, 15 U.S.C. § 2618.

**1. EPA's Claim that its Assessment Methodology Was Not Intended to Inform Unreasonable Risk Determinations Is Contradicted by the Agency Itself**

EPA maintained in the Rule that "the screening level fenceline analyses...do not allow EPA to conclude whether those risks of injury to fenceline communities contribute to the unreasonable risk *because those fenceline screening methodologies were not developed for that purpose*." JA__ (Rule at 102,614) (emphasis added). This is simply untrue. The very reason that EPA developed the Methodology was to evaluate the risks from environmental releases of TCE and other chemicals.

When it announced its plan to assess fenceline risks in June 2021, the Agency faulted EPA's earlier risk evaluations because they "fail[ed] to consistently and comprehensively address potential exposures to potentially exposed or susceptible subpopulations, including fenceline communities." JA__ (2021 Path

Forward). The Agency committed to fill this gap, promising to "ensure these chemicals are used safely and all communities are protected." *Id.* This would be accomplished by determining if TCE and other chemicals "do present unreasonable risks to these communities." *Id*. Thus, EPA committed to "developing a screening-level approach to conduct ambient air and surface water fenceline assessments" which "will use existing data and information to determine if there is the potential for unreasonable risk to fenceline communities associated with air and water exposures." *Id.*

EPA's Methodology also emphasized that, where fenceline assessments show risks that the Agency determines are unreasonable, it would "ensure potential risks to fenceline communities will not go . . . unaddressed" and "it is imperative the Agency address these risks via protective and expeditiously promulgated risk management rules." JA__ (Methodology at 17). To illustrate, EPA explained that where "unreasonable risks [are] found to fenceline communities through the screening level analysis," the Agency would "expeditiously propose[] a ban on the chemical from use" or "reduce fugitive releases to levels below which an unreasonable risk is expected." JA__ (Methodology at 19). These statements directly contradict EPA's claim in the Rule that the "purpose" of its assessment methodology was not to determine whether the risks demonstrated in its assessments were "unreasonable" and required risk management.

"One strains to accept such scant treatment as 'reasoned analysis' sufficient to satisfy the demands of the APA." *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 104 (3d Cir. 2014). Because EPA failed to explain why it was departing from the stated purpose of its Methodology, and from the Methodology's findings, its change in position was arbitrary and capricious.

### 2. EPA Did Not Demonstrate that Technical Deficiencies in the Methodology Made it Unsuitable for Determinations of Unreasonable Risk

EPA's Rule noted that "[t]here are some uncertainties associated with the fenceline analysis for the air pathway for TCE" and cited aspects of its Methodology that suggested that projected exposure levels "may be overestimated." JA__ (Rule at 102,612-13). However, EPA has noted that "uncertainties" exist in all risk determination methodologies and do not necessarily produce a "bias" toward overestimating risks. EPA Office of the Science Advisor, Risk Assessment Forum, *Framework for Human Health Risk Assessment to Inform Decision Making* (April 12, 2014), at 44, https://www.epa.gov/sites/default/files/2014-12/documents/hhra-framework-final-2014.pdf. Indeed, in this case, the "bias" was likely in the direction of understating risks. As noted above, EPA's Science Committee recommended changes in its Methodology to account for additional sources of exposure that would necessarily

increase risk levels estimated by EPA in its fenceline assessments. EPA did not adopt these adjustments. JA__ (Rule at 102,612).

To support its decision not to account for these exposures, EPA would have needed to explain why its deficiencies compromised its analyses' scientific validity and made it unsuitable for determining unreasonable risk. But EPA nowhere provided that explanation. Thus, its unexplained reliance on "uncertainties" to back away from its fenceline analyses and its accompanying TSCA duty to protect fenceline communities was arbitrary and capricious and unsupported by substantial evidence in the record.

### 3. If EPA Was Concerned about the Limitations of its Assessments, Its Methodology Required It to Conduct Further Analysis

As described above, EPA's Methodology identified five possible outcomes of fenceline risk assessments. A "no action" scenario (Outcome One) was only warranted where EPA determined that fenceline releases did not present an unreasonable risk. JA__ (Methodology at 19). However, in its Rule, EPA expressly stated that it could not make this determination for TCE. JA__ (Rule at 102,612). Since EPA did not find an absence of unreasonable risk and the risks it demonstrated in its analyses exceeded its cancer risk benchmark, Outcomes Two, Three and Four of the Methodology expressly called for EPA to proceed with risk management under TSCA or other environmental laws. *Id.* at 19-20.

The only alternative to risk management foreseen by the Methodology (Outcome Five) is the case in which EPA would find that its analyses had "uncertainties which should be considered prior to proposing a risk management rule." In this case, "rather than expeditiously propose" that rule, EPA would undertake "additional analysis beyond the screening level analysis . . . to further substantiate the unreasonable risk finding." *Id.* at 20.

Here, however, EPA did not identify uncertainties in its fenceline assessments that it found warranted further analysis and in fact made clear that it "does not intend to revisit the air pathway for TCE as part of a supplemental risk evaluation." JA__ (Rule at 102,612). Thus, EPA failed to follow the outcome framework in its methodology, opting for "no action" without either finding the absence of unreasonable risk or conducting the "further analysis" it deemed necessary to address "uncertainties" in its initial assessments. EPA's disregard of the Methodology it earlier adopted without acknowledging or explaining this change in position was arbitrary and capricious.

### 4. EPA Had No Basis to Conclude that Protecting Fenceline Communities During their Years of Exposure to TCE Was Unnecessary Because the Rule Provided for Ultimate Prohibition

EPA also justified taking no action on fenceline risks because the "ultimate prohibition of manufacture, processing, distribution in commerce, use, and disposal of TCE is expected to address the risks identified in the screening analysis." JA__

52

(Rule at 102,614). However, the Rule allows most production of TCE to continue for several years, and several uses to continue for several decades. An unreasonable risk will remain until these prohibitions take effect. Without controls on emissions and discharges, which are missing from the Rule, fenceline communities will continue to experience years of exposure to TCE at levels above EPA's cancer benchmark.

EPA acknowledged as much. It found in the Rule that fenceline cancer risks exceeding $1\times10^{-6}$ (one in a million) "may be associated with the following conditions of use that EPA is prohibiting under longer compliance timeframes: degreasing (open-top batch vapor degreasing; closed-loop batch vapor degreasing); industrial processing aid; manufacturing; and processing as a reactant." JA__ (Rule at 102,613).

An examination of the Rule bears this out. Approximately 84% of TCE's annual production volume is used as an intermediate in the production of the refrigerant HFC-134a. JA__ (Rule at 102,614). The Rule provides an 8.5-year phase-out deadline for this condition of use. 40 C.F.R. § 751.307. To maintain a source of supply for the use, several sites will continue to manufacture TCE and then transport it to other sites to produce HFC-134. 40 C.F.R. § 751.307. Of the HFC-134a production sites, the Arkema facility in Marshall, Kentucky and the Mexichem Fluor facility in Iberville, Louisiana are in areas with multiple high-

emitting chemical plants, exposing fenceline communities not just to TCE but emissions of other toxic chemicals. 14 Attorney Generals, Comments on the Proposed Rule (Dec. 15, 2023), EPA-HQ-OPPT-2020-0642-0311, at 11, JA__.

For 11 other conditions of use, the Rule provides extended phase-out deadlines ranging between 2027 and 2034. 40 C.F.R. § 751.305(b)(10)-(22). For eight additional conditions of use, the Rule grants exemptions allowing TCE use until between 2031 and 2074. 40 C.F.R. § 751.325. For example, until December 2034, TCE may be used for "industrial and commercial uses of TCE. . .for vessels of the Armed Forces and their systems." *Id.* at § 751.325(3). TCE use "as a processing aid for specialty polymeric microporous sheet materials manufacturing" may continue until December 2039, *Id.* at § 751.325, and the chemical's use for "lead-acid battery separator manufacturing" is allowed until December 18, 2044. *Id.* at § 751.325(5). All of these exempted uses have the potential for releases to air and water that pose risks to fenceline communities. Declaration of EDF scientist Paige Varner, Addendum at 001-009

Moreover, as discussed below in Sections II and III, numerous facilities producing and processing TCE as a byproduct or at concentrations under 0.1% are excluded from the Rule. 40 C.F.R. § 751.301. These facilities may thus continue to release and discharge TCE indefinitely, potentially resulting in additional exposure

by fenceline communities to cancer risks above EPA's unreasonable risk benchmark.

In short, extensive evidence in the record showed that, in the absence of restrictions on TCE releases to air and water, the Rule's extended phase-outs of TCE and exclusions from prohibitions of TCE manufacture and use will expose fenceline communities to continuing risks of significant harm long after the Rule's promulgation. EPA's contrary claims were arbitrary and capricious and contradicted by substantial evidence in the record.

### E. EPA Erroneously Concluded That Clean Air Act Standards for Chemical Facilities Would Prevent Increases in Emissions under EPA's Rule

As commenters pointed out and EPA itself acknowledged, "efforts to reduce exposures in the workplace to levels below the [workplace air concentration limit] could lead to adoption of engineering controls that ventilate more TCE outside." JA__ (Rule at 102,613). In this event, fenceline community exposures and risks would *increase.* EPA's Proposed Rule sought comment on whether "owners and operators should be required to attest in their exposure control plan that engineering controls selected do not increase emissions of TCE to ambient air outside of the workplace and document . . . whether additional equipment was installed to capture emissions of TCE to ambient air." JA__ (88 Fed. Reg. at 74,740). However, these requirements were not included in the Rule.

Instead, EPA in the Rule downplayed concerns about increased fenceline emissions, maintaining that EPA "expects that in some situations potential exposure may be limited through facility compliance with existing National Emissions Standards for Hazardous Air Pollutants (NESHAP) that cover TCE." JA__ (Rule at 102,613).

But NESHAPs were in effect when EPA conducted its fenceline risk assessments. JA__ (Risk Evaluation at 492-93). Thus, any emission controls as a result of NESHAPs had already failed to prevent exceedances of EPA's cancer risk benchmark. Since NESHAPs had not previously eliminated unsafe TCE emissions, continued implementation of their requirements could not reduce fenceline risks during the TCE phaseout period.

EPA is required under TSCA to evaluate TCE for unreasonable risk by all pathways, and to regulate any unreasonable risk. If EPA felt fenceline risks could be reduced under the NESHAPs or other air regulations under the Clean Air Act without action under TSCA, EPA must follow the mandates of TSCA Section 9(b), which details required steps for declining regulation under TSCA and seeking action under other EPA-administered laws. 15 U.S.C. § 2608(b). However, the Agency expressly declined to invoke section 9(b) because there was no basis to conclude that the "unreasonable risk from TCE under its conditions of use . . ,

could be eliminated or reduced to a sufficient extent by actions taken under other Federal laws administered in whole or in part by EPA." JA__ (Rule at 102,616).

Having expressly concluded that the Clean Air Act was not an effective vehicle for addressing TCE's risks to fenceline communities, EPA could not credibly use existing Clean Air Act regulations as an excuse to forego addressing these risks under TSCA. EPA's reliance on NESHAP to rationalize its failure to require TSCA fenceline protections during the phaseout of TCE was thus arbitrary and capricious.

### F. EPA's Failure to Require Interim Protections for Fenceline Communities Was Arbitrary and Capricious In Light of Its Decision to Require Interim Protections for Workers

The Rule requires facilities with extended phase-out periods to implement interim "Workplace Chemical Protection Programs" to safeguard employees from TCE's harms before its elimination. These protections impose limits on workplace exposure based on EPA's findings of unreasonable risk to workers, including cancer risks exceeding EPA's benchmark. Yet under the Rule, fenceline communities near the very same facilities do not receive protections from their unsafe releases of TCE.

This contradiction was highlighted in Petitioners' comments on EPA's proposed rule. JA__ (EDF Comments) and JA__ (Communities' Comments). However, EPA failed to adequately explain why interim protections were

warranted to eliminate unreasonable risks to workers but not similar risks to fenceline communities. This too was arbitrary and capricious.

### G. Substantial Evidence in the Record Demonstrates that Risks to Fenceline Communities are Unreasonable

Taken as a whole, the record contains substantial evidence that TCE presented unreasonable risks to fenceline communities that EPA was required to eliminate in its risk management rule.

### 1. The Methodology EPA Used to Determine the Magnitude of Fenceline Risks Was Consistent With Established TSCA Policy and Practice

In the Proposed Rule, EPA stated that "[e]stimates of cancer risk to fenceline communities were calculated and compared to $1\times10^{-6}$ as a benchmark value for cancer risk in fenceline communities." JA__ (88 Fed. Reg. at 74,768). In its Methodology, EPA explained that it "used $1\times10^{-6}$ as the benchmark for cancer risk in fenceline communities. This is consistent with the cancer benchmark used for general population cancer risk in *several other EPA programs and in previous risk evaluations*." Methodology at 54 (emphasis added).

EPA has consistently used this benchmark under TSCA risk evaluations for making unreasonable risk determinations for consumers and the general population. For example, in its risk determination for 1,4-dioxane, EPA used 1 "used $1\times10^{-6}$ as the benchmark for the cancer risk to consumers and bystanders from consumer use of products containing 1,4-dioxane as a byproduct," "used

$1{\times}10^{-6}$ as the benchmark for exposures to surface water from recreational swimming," and stated that "[u]nder TSCA, it is preferable for the drinking water and ambient air concentrations of 1,4 dioxane to not result in an increased cancer risk above the $1{\times}10^{-6}$ benchmark." *Unreasonable Risk Determination for 1,4-Dioxane*, (Nov. 2024), at 10-11, https://www.epa.gov/system/files/documents/2024-11/2.-1-4-dioxane-.-revised-risk-determination-.-public-release-.-hero-.-nov-2024.pdf. As EPA explained, "a calculated cancer risk estimate that is greater than [this] cancer benchmark supports a determination of unreasonable risk of injury to health from cancer." *Id.* at 11.

Similarly, in its risk evaluation for chrysotile asbestos under TSCA, EPA used the $1{\times}10^{-6}$ cancer benchmark to determine unreasonable risk to consumers and bystanders exposed to asbestos during "do-it-yourself" repair and replacement of asbestos brakes. EPA Document EPA-740-R1-8012 (Dec. 2020), at 204-09, https://www.epa.gov/system/files/documents/2024-11/1.-1-4-dioxane-.-supplement-to-the-risk-evaluation-.-public-release-.-hero.-nov-2024.pdf

For these reasons, established policy and practice under TSCA required EPA to apply a cancer risk threshold of $1{\times}10^{-6}$ to determine unreasonable risk to fenceline community residents breathing TCE-contaminated air or ingesting contaminated water.

### 2. EPA's Fenceline Assessments Showed Risk Levels for Communities that Were Unreasonable

EPA's single-year analysis for TCE air releases found that, out of the 217 facilities evaluated, risk estimates for fenceline communities were above a risk of 1 x $10^{-6}$ for cancer for 133 facilities at a distance of 100 meters from the releasing facility. JA__ (Rule at 102,613). Based on the multi-year analysis, 58 of these 133 facilities either had cancer risks above $1\times10^{-6}$ at distances farther than 100 meters when compared to the single year analysis or posed risks above the benchmark that were not captured in that analysis. *Id.* EPA also found fenceline community risks exceeding its cancer benchmark from exposure to TCE in drinking water, incidental oral ingestion from ambient water, and incidental dermal contact with ambient water. JA__ (Rule at 102, 612).

### 3. Because EPA's Methodology Significantly Understated Fenceline Risks, They Were Likely Greater than EPA Calculated

EPA's fenceline assessments were based on unrealistic exposure assumptions that systematically understated risks to fenceline communities. For example, EPA assumed that community members were only exposed to TCE from a single emission source, via a single exposure route, and without any exposures to other hazardous chemicals or non-chemical stressors that increased their susceptibility to harm. JA__-__ (Risk Evaluation at 301-02). In reality, however, community members are exposed to TCE from multiple sources. They may use TCE-

containing consumer products in their homes, ingest drinking water from groundwater contaminated by spills, leaks, and outdoor releases of TCE, and work at plants manufacturing and processing TCE or commercial establishments where TCE-containing products are used or disposed. At home or at work, exposure may also result from TCE vapor intrusion into buildings. *See* Declarations of EDF members Licia Davis, Angela Esslinger, Susan Heath, Lynda Means, Cynthia Robertson, Addendum at 010-029, and Declaration of EDF scientist Paige Varner, Addendum at 001-009.

Similarly, as the Science Committee recognized, where TCE industrial operations are located in areas with several TCE-use sites, the contribution of multiple emission sources to overall exposure levels must be factored into determinations of individual risk. *See* JA__ (Science Committee Report at 15). And where TCE-using facilities also manufacture other substances with known carcinogenic or other adverse health effects also caused by TCE, the risks to community members would be increased by the cumulative harms caused by multiple chemicals with similar toxicity profiles. *Id.*

For these reasons, in its peer review of the Methodology, the Science Committee warned that the "methodology was not protective because of the lack of consideration for cumulative exposures [and] multiple source exposures." *Id.* at 38. It thus urged EPA to "include aggregate . . . exposures from populations exposed at

work who live in the community, or who may also be exposed to multiple facility emissions." *Id.* at 18.

EPA declined the opportunity to strengthen the Methodology to capture all pathways of exposure to TCE and chemicals with similar cancer-causing properties. If the Agency had used more realistic exposure assumptions as recommended by the Science Committee, the Agency-predicted TCE concentrations at various distances from the emitting facility would have been significantly higher and risks exceeding the benchmark would have been found at greater distances from facility boundaries. This would have likely increased both the number of facilities with risks above the benchmark and the size of the population exposed to such risks. *Id.* at 15, 18; JA__ (Proposed Rule at 74768-74770).

Substantial evidence in the record established unreasonable risks to fenceline communities via air and water releases and required risk management to eliminate these risks.

## H. The Court Should Remand the Rule to EPA to Revise It to Protect Fenceline Communities During the Interim Period

While EPA did not consider fenceline exposures as part of the Risk Evaluation, it did consider them in its separate Methodology as part of this rulemaking. As described above, that analysis showed risks above the thresholds that EPA normally applies to identify unreasonable risks to the general population.

Nonetheless, EPA failed to require measures to protect fenceline communities during the lengthy periods before TCE use will be phased out, even though the Agency did require exposure limits for protecting workers at the same facilities from similar risks during the interim period. EPA's failure also to take steps to protect fenceline communities, which are potentially exposed and susceptible subpopulations, during the same interim periods was arbitrary and capricious and ignored substantial evidence that demonstrated an unreasonable risk. To remedy this serious deficiency in EPA's risk management rule for TCE, Petitioners request that the Court remand the rule to EPA so that it can be revised to protect those communities in harm's way.

## II. EPA Violated TSCA by Excluding TCE Production as a Byproduct from Its Risk Evaluation and Rule

EPA's risk evaluation does not estimate the quantities of TCE produced as a byproduct, examine the magnitude of exposure to these quantities of TCE, or determine whether exposure to TCE produced as a byproduct presents an unreasonable risk to health. Despite generally prohibiting TCE manufacture, the Rule does not impose any restrictions on the production of TCE as a byproduct.

The Rule also allows unrestricted site-limited processing of byproduct TCE in an enclosed system under 40 C.F.R. § 751.301(c).[4]

A toxic chemical produced as an unintentional byproduct has the same toxicity profiled and ability to cause harm as a toxic chemical intentionally produced. As EPA noted, "TCE is unintentionally manufactured as a byproduct during complex chemical processing streams and then processed and re-processed within those streams alongside other, similar chemicals." EPA, Response to Public Comments (November 20, 2024), EPA-HQ-OPPT-2020-0642-0726, at 36. Production of TCE occurs both at TCE production sites and facilities that produce other chemicals. TCE byproducts are also transported to additional sites where they are used as intermediates in the production of other chemicals. For example, at least 13 facilities produced TCE as a byproduct of 1,2-dichloroethane (1,2-DCA) based on 2015 company reporting for the Toxic Release Inventory. EPA, *Byproducts Assessment for 1,2-Dichloroethane* (April 2026), at 16-17, https://www.epa.gov/system/files/documents/2026-05/04-1-2-dichloroethane-byproducts-assess-public-release-april-2026v2.pdf. Since 1,2-DCA is just one

---

[4] However, TCE byproducts are subject to the prohibition on processing TCE as a reactant/intermediate that takes effect in December 2026 under 40 C.F.R. § 751.305(b)(9).

chemical whose manufacture produces TCE as a byproduct, the number of facilities producing TCE byproducts must necessarily be considerably larger.

### A. Exemption of TCE Byproducts from Section 6(a) Rules Violates TSCA

Contrary to the Rule, TSCA required EPA to address the risks of TCE byproduct production.

TSCA does not define "byproduct." However, EPA regulations provide that "byproducts" are chemicals "produced without a separate commercial intent during the manufacture, processing, use, or disposal of another chemical substance or mixture." 40 C.F.R. § 720.3(d). EPA's long-standing position has been that "substances that are produced coincidentally during the manufacture, processing, use, or disposal of another substance or mixture" are deemed to be "manufacture[d] for commercial purposes" and are subject to TSCA. 40 C.F.R. § 720.3(r)(2).

In its Proposed Rule, EPA asserted that production of TCE as a byproduct did not fall within TSCA's definition of "manufacture" and was not a TCE "condition of use" requiring inclusion in its risk evaluation. 88 Fed. Reg. at 74,726. EPA reiterated this determination in the Rule. JA__ (89 Fed. Reg. at 102,592). This reading of TSCA is contrary to its plain language.

Byproducts are knowingly manufactured as part of a commercial chemical process. TSCA defines "manufacture" as "produce" or "manufacture." 15 U.S.C. §

65

2602(9). This definition does not differentiate between chemicals based on the purpose for which they are produced or the conditions of their manufacture. Section 6 likewise contains no such distinctions. Risk evaluations must determine unreasonable risks for a chemical's "conditions of use." 15 U.S.C. § 2605(b)(4(A). As defined in section 3(4), this term applies to the "circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured." 15 U.S.C. § 2602(4). Even if lacking commercial intent, formation of TCE as a byproduct is a "known" and "reasonably foreseen" "circumstance" of TCE manufacture and therefore comprises a TCE "condition of use."

Since TSCA does not exempt byproducts, EPA should have considered them in its TCE risk evaluation. As EPA acknowledged in its 2023 proposed rule to establish a framework for TSCA existing chemical risk evaluations, "the known, intended, and reasonably foreseen production of a chemical as a byproduct . . . [is] squarely [a] 'condition[] of use' that generally must be included within the scope of risk evaluations." 88 Fed. Reg. at 74,298. This approach, which was carried forward in the subsequent final rule, 89 Fed. Reg. 37,028, 37,033 (May 3, 2024), was directly contrary to EPA's subsequent exclusion of TCE manufacture as a byproduct in its TCE Rule promulgated six months later. JA__ (89 Fed. Reg. at 102,592). EPA should have followed the framework rule, as a rule of general

66

applicability governing all EPA risk evaluations, or explained why its approach to TCE byproducts differed. EPA did neither.

In the Rule, EPA also took the position that, rather than addressing TCE byproducts, it would wait until it conducted evaluations of the other chemicals whose manufacturing process generated TCE as a byproduct. JA__ (Rule at 102,598). As an example, EPA points to 1,2-DCA, a TSCA high-priority chemical for which the Agency was conducting a risk evaluation that examined the risks of TCE and other byproducts formed during its manufacture. JA__ (Rule at 102,598).[5]

EPA's bifurcated approach simply does not comport with the basic design and goals of section 6. As TSCA's legislative history confirms, risk evaluations and risk management rules are intended to provide a comprehensive picture of risks across a chemical's lifecycle. Thus, EPA framed its unreasonable risk determination for TCE to apply to the "whole chemical." It would defeat this approach if TCE manufactured as a byproduct was managed not under an integrated, holistic framework for the chemical but through piecemeal evaluations conducted at different times using different datasets and methodologies. The

---

[5] In fact, EPA recently finalized the 1,2-DCA risk evaluation. In that evaluation, EPA did not assess the risk from the processing of any of the byproducts' streams, which include TCE and which would contribute to the risk of harm from TCE exposure to those living near the facilities. Declaration of EDF scientist Paige Varner, Addendum at 001, ¶ 10.

inevitable result would be that some exposed populations would receive less protection than others (or no protection at all) and that risks are haphazardly managed (or not) based on when (or if) other chemicals are prioritized for attention under Section 6.

1,2-DCA is an instructive example. While EPA recently finalized its risk evaluation, Notice of Availability, 86 Fed. Reg. 24,230 (May 5, 2026), risk management may take several more years based on the recent history of TSCA rulemakings.[6] During this period, byproduct TCE formed during 1,2-DCA production would not be subject to any restrictions even though other TCE conditions of use would be banned under the Rule. Indeed, there is no assurance that, when it is finally promulgated, a 1,2-DCA rule would regulate byproduct TCE production at all, as opposed to focusing only the risks of 1,2-DCA. Inaction or delay in regulating 1,2-DCA would create an unlevel playing field that treats workers and communities facing identical TCE health risks differently depending on how TCE is produced.

Moreover, 1,2-DCA is only one of several chemicals whose production generates TCE as a byproduct. TCE is also produced as a byproduct in the manufacture of vinylidene chloride and other chemicals that are not presently on

---

[6] For example, the TCE risk evaluation was finalized in November 2020 but the final rule was not promulgated until December 2024.

track for TSCA risk evaluations. JA__ (Communities' Comments at 19). If these chemicals are never evaluated and regulated, the risks of TCE byproducts produced during their manufacture will be ignored.

### B. EPA's Exemption for TCE Byproducts Processed at their Sites of Manufacture Is Unlawful

Although it generally prohibits processing of byproducts at other sites, the Rule also allows the processing of byproducts "within a site-limited, physically enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was generated." 40 C.F.R. § 751.301(c). Like the exclusion for production of byproducts, this exemption violates TSCA. A toxic chemical produced as a byproduct has the same health effects as the same chemical that is intentionally produced. While the Rule may require processing to be conducted in a "site-limited, physically enclosed system," this is no guarantee that emissions and leaks that expose workers and communities to TCE will not occur or will be too small to cause harm. As EPA stated in the Rule, "engineering controls" that aim to prevent exposures to workers in facilities can "ventilate more TCE outside" and thus into a facility's surrounding community. JA__ (Rule at 102,613). Therefore, with no further analysis, EPA cannot guarantee that engineering controls such as enclosed systems will protect communities near these facilities from unreasonable risks of TCE.

As a result, EPA had no basis to conclude that fenceline community exposures resulting from these activities were below EPA benchmarks for TCE cancer and non-cancer risks. Because EPA merely assumed without any analysis that TCE byproducts processed at the sites where they are produced do not present an unreasonable risk, its exemption of these byproducts from the Rule violated TSCA and was arbitrary and capricious.

## C. The Court Should Vacate and Remand EPA's Actions Regarding TCE Byproducts

Accordingly, the Court should vacate and remand EPA's conclusion that the production of byproducts of TCE does not constitute "manufacture" under TSCA. The Court should also vacate and remand EPA's exemption of site-limited processing of TCE byproducts from its rule. The Court should order that, on remand, EPA conduct a new or supplemental risk evaluation addressing the risks of manufacturing and processing TCE byproducts. If unreasonable risks are identified as part of the additional risk evaluation, EPA must undertake rulemaking to eliminate those unreasonable risks.

## III. The Rule's Exemption of *De Minimis* Levels of TCE Was Unlawful

The Rule also exempts from all prohibitions and restrictions "products containing TCE at thresholds less than 0.1 percent by weight." 40 C.F.R. § 751.301(b). This exemption was not included in EPA's Proposed Rule. Instead, the Agency "request[ed] comment on whether it should consider a *de minimis* level of

TCE in formulations to account for impurities (*e.g.,* 0.1% or 0.5%) when finalizing

the [rule's] prohibitions . . . and, if so, information on and rationale for any level

that should be considered *de minimis.*" JA__ (Proposed Rule at 74,733). The

Agency did not elaborate on the rationale for a possible exemption or what

threshold level EPA might consider appropriate and why.

In the Rule, EPA established "a regulatory threshold of 0.1% for TCE,

indicating that TCE at concentrations less than 0.1% by weight are not subject to

the prohibitions and restrictions outlined in this rulemaking." JA__ (Rule at

102,591).

### A. EPA Lacks Authority to Exempt Conditions of Use from Section 6 Unless It Determines That They do Not Contribute to Unreasonable Risk

Section 6 contains no exemptions from risk evaluations and risk

management rules for products and manufacturing and processing activities that

contain *de minimis* levels of chemicals. 15 U.S.C. § 2605. Nor is there such an

exemption in other TSCA provisions, such as the definitions of "chemical

substance" and "mixture" in Sections 3(2) and 3(10) and "conditions of use" in

Section 3(4). 15 U.S.C. § 2602. Accordingly, as with all other sources and

pathways of exposure, EPA must determine whether *de minimis* levels of TCE in

products and in mixtures manufactured, processed, used, or disposed present an

"unreasonable risk." It cannot *assume* that these concentrations of TCE do not

71

present an unreasonable risk simply because the Agency considers the amounts "small."

In its 2024 risk evaluation framework rule, EPA in fact explicitly rejected exemptions of "so-called '*de minimis*' uses . . .where a chemical may only be present in small amounts as an impurity or within an article." 89 Fed. Reg. at 37,033 (May 3, 2024). As EPA emphasized, "relatively low exposures individually may contribute to unreasonable risk when considered in aggregate." *Id.* Thus, a categorical determination that all exposures of a given chemical below the exemption threshold do not contribute to unreasonable risk would likely be unsupportable.

Yet in the Rule, EPA ignored its prior statements. It provided no analysis demonstrating the absence of unreasonable risk for TCE concentrations below the 0.1% exemption threshold and never found that these concentrations do not present an unreasonable risk. Indeed, EPA's risk evaluation determined that TCE is a genotoxic carcinogen without a threshold for tumor formation, thus producing a response at even the lowest exposure levels. JA__ (Risk Evaluation at 244). Accordingly, a 0.1% exemption level would not provide adequate protection against unreasonable carcinogenic risks.

In addition to the risks that individual products with "low" levels of TCE may present in isolation, workers and consumers are exposed to TCE from

multiple sources, including other chlorinated organics, many of which have TCE levels below the *de minimis* threshold. *See* JA__ (Rule at 102,591). It is the combination of exposures, as opposed to any one exposure individually, that drives the unreasonable risk. Also, environmental releases of mixtures with less than 0.1% TCE will contribute to fenceline community exposure and risk, particularly in communities with multiple facilities that process or use TCE and other chlorinated organics. Since TSCA's mandate under Section 6(a) is to restrict the chemical "to the extent necessary" to eliminate its unreasonable risk, 15 U.S.C. § 2605(a), no level of TCE in products or manufacturing, processing, use, and disposal activities can be presumptively excluded from risk management.

Because EPA made no effort to analyze the combined risks of the TCE exposures that would fall within its *de minimis* exemption, JA__ (Rule at 102,591), it lacked any basis to conclude that, in aggregate, they would not contribute to TCE's unreasonable risk. As an organization representing former EPA employees commented, "[e]ven if EPA could identify a safe concentration of TCE in a particular product . . . , "[a]llowing ongoing sale and use of products with *de minimis* TCE concentrations would leave exposed populations subject to unreasonable risk from their total exposure." Environmental Protection Network, Comments on the Proposed Rule (Dec. 12, 2023), EPA-HQ-OPPT-2020-0642-0266, at 2.

EPA's Rule cited the Hazard Communication Standard of the Occupational Safety and Health Administration (OSHA) as a precedent for the *de minimis* exemption, JA__ (Rule at 102,591), but this standard provides a plainly insufficient justification.

The goal of the hazard communication standards under OSHA, unlike TSCA, is not to eliminate unreasonable risk but to inform workers about chemical hazards and recommend prudent protective measures. 29 C.F.R. § 1910.1200(a)(2). Accordingly, OSHA has recognized that "risk may remain at concentrations below [exemption] cut-offs, and where there is evidence that is the case, the mixtures are considered hazardous under the standard." *Hazard Communication; Final Rule*; 15 Fed. Reg. 17,574, 17,850 (March 26, 2012). Thus, the hazard communication standard exemption—based on another statute with its own goals and requirements—is simply not determinative of the absence of unreasonable risk under TSCA and consistency with the HCS is not a valid rationale for adopting its 0.1% exemption threshold.

In the absence of a risk-based justification, EPA's sole rationale for the *de minimis* exemption was to "increase regulatory certainty and ease implementation of the eventual prohibition of this chemical." JA__ (Rule at 102,592). These are "costs and other non-risk factors" that TSCA explicitly precludes EPA from considering in its risk evaluations and risk management rules. 15 U.S.C. §§ 2605.

Since the exemption is based solely on reducing cost and inconvenience to regulated entities and not the absence of unreasonable risk, EPA's *de minimis* exemption violated TSCA.

### B. EPA Did Not Provide Adequate Notice and Opportunity for Comment on Its *De Minimis* Exemption

The APA requires agencies to provide a notice of proposed rulemaking that contains "either the terms or substance of the proposed rule or description of the subjects and issues involved." 5 U.S.C. § 553(b). Following notice, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). TSCA requires that risk management rulemakings must be conducted "in accordance" with APA requirements. 15 U.S.C. § 2605(c)(3). In addition, EPA must publish a notice of proposed rulemaking "stating with particularity the reason for the proposed rule" and "allow interested persons to submit written data, views and arguments." *Id.*

This Court addressed what agencies must do to provide adequate notice and opportunity for comment in *Prometheus Radio Project v. FCC*, 652 F.3d 431, 449 (3d Cir. 2011). It described the goals of these requirements as "'(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby

enhance the quality of judicial review.'" *Id.* (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005)). This Court also explained that, to achieve those purposes, an agency's proposal must

> disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based . . . *[A]n agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible*."

*Id.* (quoting *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35–36 (D.C. Cir. 1977). In *Prometheus Radio*, this Court found that the Federal Communications Commission failed to meet this standard because its proposal was "simply too general and open-ended to have fairly apprised the public of the Commission's new approach to cross-ownership." 652 F.3d at 453.

This is the case here. EPA's proposed rule did not include a *de minimis* exemption but merely mentioned that one may be under consideration. The single sentence requesting comment on the issue (repeated virtually verbatim in three different places) was non-committal and open-ended. JA__,__,__ (Proposed Rule at 74,733, 74,734, and 74,766). It did not provide the Agency's rationale for the exemption or identify the specific exemption threshold it was considering. The proposal provided two illustrative examples of possible exemption levels but did not discuss the factors EPA would apply in choosing among them or explain why

they would satisfy the requirements of TSCA. No analysis was provided of the numbers of TCE-containing products that different exemption thresholds would cover or the risk implications of excluding these products from the protections afforded by the Rule.

Because EPA failed in its obligation to "disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based," the public was not "fairly apprised" of the issues raised and lacked the ability to submit focused and informed comments supported by targeted data and analysis. Petitioners "do not have a high burden in demonstrating prejudice in notice-and-comment cases. In general, an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 72 F.4th 1324, 1338 (D.C. Cir. 2023) (citations omitted).

While some commenters took positions on the need for an exemption and its desired scope, their comments were not in the record during the comment period and other commenters could not respond. In any case, agencies "cannot bootstrap notice from a comment." *Shell Oil Co. v. EPA*, 950 F.2d 741, 760 (D.C. Cir. 1991). "The APA requires interested parties wishing to play a role in the rulemaking process to comment on the *agency's* proposals, not on other interested parties'

proposals." *Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991, 1006 (8th Cir. 2018) (emphasis in original).

As explained above, EPA's lack of statutory authorization for its *de minimis* exemption requires the exemption's vacatur. In addition, vacatur is warranted by EPA's violation of the notice and comment requirements of the APA and TSCA. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (stating that "deficient notice is a 'fundamental flaw' that almost always requires vacatur") (citation omitted).

## IV. Petitioners Have Demonstrated Standing

At least one petitioner must have standing to assert Petitioners' claims. *See Horne v. Flores*, 557 U.S. 433, 446-47 (2009); *Child.'s Health Def., Inc. v. Rutgers,* 93 F.4th 66, 75 (3d Cir. 2024). Petitioner Center for Environmental Health (CEH) is not a membership organization and has brought this case on behalf of its supporters. CEH supports and relies on the standing of co-petitioner Environmental Defense Fund to bring this action. An organization such as Petitioner Environmental Defense Fund has standing to bring an action on behalf of its members where: (1) the organization's members, or any one of them, would have standing to sue individually, *N.J. Coal. of Auto. Retailers, Inc. v. Mazda Motor of Am., Inc.*, 957 F.3d 390, 392 (3d Cir. 2020) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); (2) the interests at stake are germane to the organization's purpose,

*Sierra Club v. United States EPA*, 972 F.3d 290, 299 (3d Cir. 2020); and (3) neither the claim asserted nor the relief requested requires individual members to participate in the lawsuit. *Id.*

EDF members would have standing here to sue on their own behalf because they have: (1) suffered an actual or threatened injury; (2) that is fairly traceable to the challenged action; and (3) is likely to be redressed by a favorable decision. *Valley Forge Christian College. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982). EPA's failure to evaluate and regulate TCE emissions to the extent that TSCA requires injures EDF members. Numerous EDF members live near facilities that, under the Rule, are permitted to continue emitting TCE for years-long phaseouts. *See* Declarations of EDF members Licia Davis, Angela Esslinger, Susan Heath, Lynda Means, Cynthia Robertson, Addendum at 010-029, and Declaration of EDF scientist Paige Varner, Addendum at 001-009; These members will thus continue to be exposed for years to the risks from TCE emissions, which are associated with an increased risk of cancer, Parkinson's, and numerous other harms. *See* JA__-__(Rule at 102,574-76); Varner Declaration, Addendum at 001, ¶¶ 8, 12,.

Members are also exposed indefinitely to TCE due to EPA's decision not to address the unreasonable risk of TCE as a byproduct and contained in products at a *de minimis* threshold. *See* Davis Declaration, Addendum at 010; Heath Declaration,

Addendum at 014; Robertson Declaration, Addendum at 021; Varner Declaration, Addendum at 001. The EDF members who are exposed to the toxic chemical in aggregate ways have increased risk and increased potential harm beyond the individual risks EPA evaluated. Varner Declaration, Addendum at 001, ¶ 12. In addition, EDF's members exposed to TCE who also live within fenceline communities are "a potentially exposed or susceptible subpopulation" of whom Congress mandated EPA to take special care to protect from exposure to existing chemicals. 15 U.S.C. §§ 2602(12), 2605(b)(4)(A).

Concern about the negative effects that TCE has on their health also impacts EDF members' ability to safely work or recreate outside near their homes and workplaces. For example, EDF member Licia Davis' backyard is less than 2,000 feet from a plant that releases thousands of pounds of TCE each year. Davis Declaration, Addendum at 010, ¶ 11. Ms. Davis cherishes her home's large backyard, including a creek alongside, and wants to be outside as much as possible. *Id.* ¶ 3. However, since moving into the home seven years ago she has developed, for the first time, respiratory problems and other health issues that flare up when she's outside and keep her from doing things like mowing her yard. *Id.* ¶ 4-5. She worries about her exposure to TCE from the aerospace facility and other nearby plants. *Id.* ¶ 6-12. Such injuries confer standing. *See Sierra Club v. United States EPA*, 972 F.3d 290, 298-99 (3d Cir. 2020) (organization properly alleged

standing where it described negative impacts of ozone pollution on health and recreational opportunities on its members); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (breathing polluted air is sufficient to demonstrate injury-in-fact).

EDF members' injuries are all "fairly traceable" to EPA's failure to manage the risks TCE poses to them. EDF members are currently exposed to TCE, and will continue to experience these exposures, until EPA manages these risks. *See Toll Bros., Inc. v. Twp. Of Readington*, 553 F.3d 131, 142 (3d Cir. 2009). These harms are redressable by the relief that Petitioner seeks, which is full evaluation and management of the unreasonable risks to their members.

EDF also meets the two remaining prongs of the associational standing test. Petitioner's interest in protecting its members from TCE exposure is germane to the organization's mission to protect public health and the environment. Varner Declaration, Addendum at 001, ¶¶ 3-6 and 13-14. Its interests in this case also align with its mission to address the widespread toxic chemical pollution that threatens communities across the country, particularly communities on the fenceline. *Id.*

Finally, because Petitioners seek injunctive relief, and their claims are broadly applicable to people living near facilities emitting TCE, "the claims asserted and the relief sought by [Petitioners] are not particular to any individual" and "are thus properly resolved in a group context." *Gulf Restoration Network, Inc.*

*v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344 (1977).

**CONCLUSION**

The remedies Petitioners seek are tailored to the three issues raised in this brief. First, as to EPA's failure to protect fenceline communities from unreasonable risks during the interim period prior to the phase-out of TCE, Petitioners request that the Court remand the Rule to EPA so that it is revised to protect those communities.

Second, as to the exclusion of production of TCE as a byproduct from the Risk Evaluation and Rule, Petitioners request that the Court vacate and remand EPA's conclusion that the production of TCE byproducts does not constitute "manufacture" under TSCA. Petitioners also request that the court vacate and remand EPA's exemption of site-limited processing of TCE byproducts from the Rule. Finally, Petitioners request that the Court order EPA to undertake a new or supplemental risk evaluation of the risk of manufacturing and processing TCE byproducts and then engage in rulemaking to eliminate unreasonable risks that are identified.

Third, Petitioners request that the Court vacate the *de minimis* exemption as contrary to TSCA and for violating notice and comment requirements.

Petitioners, who support all other aspects of the Rule, are requesting this partial vacatur to address only its shortcomings demonstrated in this brief. Vacatur limited to the exclusion of byproducts and the *de minimis* exemption from the Rule is fully within the authority of the Court. "It is a routine feature of severability doctrine that a court may invalidate only some applications even of indivisible text, so long as the valid applications can be separated from invalid ones." *Nat. Res. Def. Council v. Wheeler,* 955 F.3d 68, 81 (D.C. Cir. 2020) (citation omitted); *Finnbin, LLC v. Consumer Prod. Safety Comm'n,* 45 F.4th 127, 136 (D.C. Cir. 2022) (stating that partial vacatur is presumptively the appropriate remedy when only one aspect of a rule is challenged). Vacating only these provisions would allow implementation of the remainder of the Rule to proceed.

Partial vacatur is also supported by ordinary severability principles and EPA's expressed preference for severability of the Rule. JA__ (Rule at 102,594). *See Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (noting that a court's "presumption [regarding a regulation] is always in favor of severability.") And partial vacatur is preferable to full vacatur of the entirety of the Rule because "there is no reason to think that [EPA] . . . would have preferred no new rules at all" given EPA's recognition of the need to restrict TCE in light of its unreasonable risks. *Finnbin,* 45 F.4th at 136.

# COMBINED CERTIFICATIONS

1. The foregoing brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(g)(1) and 32(a)(7)(B)(i) because it contains 16,868 words, excluding the parts excluded from length as to briefs under Federal Rule of Appellate Procedure 32(f); and with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

2. In accordance with Third Circuit Local Appellate Rule 28.3(d), counsel for Petitioners Center for Environmental Health and Environmental Defense Fund are members of the bar of the United States Court of Appeals for the Third Circuit.

3. The electronic version of this Brief is identical to the paper copies of the brief filed with the Court.

4. Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program was run on the electronic version of the brief using Windows Security and no virus was detected.

# CERTIFICATE OF SERVICE

On May 13, 2026, I electronically filed the foregoing with the Clerk of Court

for the United States Court of Appeals for the Third Circuit by using the CM/ECF

system.

s/ Samantha Liskow
*Counsel for Petitioner*
*Environmental Defense Fund*
