**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

**Case No. 25-1055**
(consolidated with Case Nos. 25-1079, 25-1080, 25-1081, 25-1082, 25-1083, 25-1084, 25-1093, 25-1098, 25-1118, 25-1132, 25-1133, 25-1144)

---

**UNITED STEEL PAPER and FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL and SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.,**

*Petitioners*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent*.

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

**ADDENDUM of PETITIONERS CENTER FOR ENVIRONMENTAL HEALTH and ENVIRONMENTAL DEFENSE FUND**

---

# TABLE OF CONTENTS

**Declarations** ………………………………………………………………..ADD001

    Declaration of Paige Varner…………………………………………..ADD001

    Declaration of Licia Davis…………………………………………ADD010

    Declaration of Susan Heath……………………………………...ADD014

    Declaration of Lynda Means……………………………………….ADD018

    Declaration of Cynthia Robertson…………………………………ADD021

    Declaration of Ashley Esslinger…………………………………ADD025


**Statutory Provisions** ………………………………………………...........ADD030

    15 U.S.C. § 2602…………………………………………………ADD030

    15 U.S.C. § 2605…………………………………………………ADD034

    15 U.S.C. § 2608…………………………………………………ADD050

    15 U.S.C. § 2618…………………………………………………ADD054


**Regulatory Provisions** …………………………………………………ADD055

    40 C.F.R. § 751.301 ......................................................................ADD055

    40 C.F.R. § 751.305 ......................................................................ADD057

    40 C.F.R. § 751.307 ......................................................................ADD062

    40 C.F.R. § 751.325 ......................................................................ADD064

    40 C.F.R. § 751.303…………………………………………….ADD070

    40 C.F.R. § 720.3 ......................................................................ADD071

# DECLARATION OF PAIGE VARNER

I, Paige Varner, declare as follows:

1. I am a scientist at Environmental Defense Fund ("EDF"). In this role, I work within the Healthy Communities department to integrate scientific knowledge on environmental health and toxicology to reduce exposure to toxic chemicals and protect public health. I hold a PhD in environmental engineering and toxicology from Duke University.

2. The information in this declaration is based on my personal knowledge and experience. I am submitting this declaration in support of EDF's petition for review of EPA's Trichloroethylene TSCA rule ("Rule"), in the U.S. Court of Appeals in the Third Circuit.

3. Through my role, I am familiar with EDF's structure, mission, activities, and membership. EDF is a national nonprofit organization that links science, economics, and the law to create innovative, equitable, and cost-effective solutions to urgent environmental problems. EDF is one of the world's largest environmental organizations, with hundreds of thousands of members across the United States and a staff of over 1,000 scientists, policy experts, and other professionals from around the world.

4. EDF was founded in 1967 to address the impacts of the toxic pesticide DDT. Since then, EDF has continued to advocate for regulation of toxic chemicals.

EDF played a central role in the 2016 bipartisan reform of the Toxic Substances Control Act ("TSCA").

5. Since passage of TSCA's amendments, EDF has closely tracked implementation of the new law, continuously advocating for health- and environmentally protective practices, policies, and regulations. EDF has filed thousands of pages of comments on EPA's proposed actions, publicly reported on the Agency's policies and rules implementing the reforms, and engaged with EPA in public meetings.

6. EDF has long advocated for regulation of the toxic chemical trichloroethylene ("TCE") that would protect the health of people living in this country, including our members, from TCE unreasonable risks. Many of our members are exposed to TCE. EDF currently has more than 350,000 members in the United States, across all 50 states and the District of Columbia. EDF conducted an analysis of where our members are adjacent to certain subsets of categories of facilities who engage in TCE use, processing, or manufacturing. Based on that analysis, here are just two examples of categories of many EDF members directly affected by emissions of TCE:

   a. Over 8,000 EDF members reside within ten miles of U.S. facilities that use TCE for an industrial process known as batch vapor degreasing or for producing the HFC 134a gas. A distance of 10 miles

represents an appropriate distance within which health impacts could occur, as EPA notes that TCE has the ability to transport long distances in air, with a half-life of several days, and EPA utilized this distance to evaluate TCE risks from drinking water exposure from facility releases – in which they found developmental (based on congenital heart defects) and cancer risks from exposure to drinking water.[1] Many of these members will likely be exposed to TCE for years to come, as EPA's Rule allows many of the facilities in their communities multiple years to continue using TCE. For example, facilities that engage in batch vapor degreasing for certain aerospace uses can continue using TCE until December 2031.[2] Some of these members live in Census block groups that have cancer risks from TCE greater than 99% of the rest of the U.S.

b. As another example, over 2,000 EDF members reside with ten miles of U.S. facilities that manufacture 1,2-dichloroethane, which is a

---

[1] EPA, "Risk Evaluation for Trichlorethylene," at 83 (Nov. 2020), https://www.epa.gov/sites/default/files/2020-11/documents/1._risk_evaluation_for_trichloroethylene_tce_casrn_79-01-6.pdf; EPA, "Trichloroethylene: Fenceline Technical Support – Water Pathway, at 3-5 (March 2023), https://www.regulations.gov/document/EPA-HQ-OPPT-2020-0642-0062.

[2] 15 U.S.C. § 751.305(17).

chemical that produces TCE as a byproduct, a use that is allowed under the Rule in perpetuity and will expose surrounding communities. (See Paragraph 9, below).

7. These examples represent a fraction of the EDF members who are exposed to TCE. For example, numerous additional members reside adjacent to plants engaged in the use of TCE as a processing aid for lead-acid battery separator manufacturing. Under the Rule, those facilities can continue using TCE until December 2044, exposing these members for 20 years beyond the Rule's promulgation.[3]

8. TCE causes multiple harms to human health, including kidney, immunological, neurological, reproductive, and developmental effects as well as multiple types of cancer (liver, kidney, and non-Hodgkin's lymphoma). These harms can occur at extremely low levels of exposure.[4] EPA and other authoritative bodies have identified that TCE causes cancer, particularly kidney cancer, through a mutagenic mode of action.[5] A mutagenic mode of action "is the mode of action of radiation and several other agents that are known

[3] 15 U.S.C. § 751.305(23)

[4] 89 Fed. Reg. 102611

[5] *Id.*

4

carcinogens."[6] When carcinogens act through a mutagenic mode of action, EPA applies a linear no-threshold approach to risk assessment, which means that no exposure level is assumed to be without an increased cancer risk.[7] Therefore, even very low levels of TCE exposure may contribute to an increased risk of cancer.

9. In addition to members' exposure from facilities that are continuing to use, process, or manufacture TCE under the Rule's various extended phaseouts, numerous EDF members—as referenced above—reside near facilities that expose them to TCE that was manufactured as a byproduct, which was excluded from consideration in the Rule. In addition, EDF members live in fenceline communities near facilities that release TCE that was produced as a byproduct from the manufacture of 1,2-dichloroethane and subsequently processed. The Rule allows facilities to continue indefinitely producing TCE as a byproduct if it "is processed within a site-limited, physically-enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was

---

[6] EPA. "Guidelines for Carcinogen Risk Assessment," https://www.epa.gov/sites/default/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf, at 1-11, (March 2005).

[7] *Id.* at 3-21 to 3-22.

generated."[8] As EPA stated in the Rule, such "engineering controls" that aim to prevent exposures to workers in facilities can "ventilate more TCE outside,"[9] and thus into a facility's surrounding community. In addition, downstream processing of the byproduct streams, such as the use of 1,2-dichloroethane byproduct streams, that include TCE, as a reactant to produce HCl, could also expose community members.[10]

10.     EPA recently analyzed risks from TCE that is formed as a byproduct of 1,2-dichloroethane manufacturing.[11] However, EPA only assessed the risk to the general population, or those living near the facilities, from the manufacturing process itself and notably did not assess the risk from the processing of any of the

_____

[8] 40 C.F.R. § 751.301(c)

[9] 89 Fed. Reg. 102,613

[10] EPA, "Byproducts Assessment for 1,2-Dichloroethane: Technical Support Document for the Risk Evaluation," at 13, https://www.epa.gov/system/files/documents/2026-05/04-1-2-dichloroethane-byproducts-assess-public-release-april-2026v2.pdf (April 2026) ("Once separated from purified 1,2-dichloroethane, most facilities process the light- and heavy-ends liquid byproduct streams as a reactant to produce hydrochloric acid (HCl) in HCl furnaces or dispose of the byproduct streams, including in an incinerator or thermal oxidizer.").

[11] EPA, "Risk Evaluation for 1,2-Dichlorethane," https://www.epa.gov/system/files/documents/2026-05/01-1-2-dichloroethane-risk-evaluation-public-release-april-2026.pdf (April 2026).

6

byproducts' streams which would contribute to the risk of health effects from TCE exposure from these processes to those living near these facilities.[12]

11. In addition, many of these EDF members are and will be exposed to TCE via EPA's permanent allowance in the Rule for "*de minimis*" concentrations of TCE.[13] TCE concentrations of up to 0.1% by weight will be permitted in any product. This can harm EDF's members in multiple ways. First, members can also be exposed through EPA's allowance of TCE processing as a byproduct, described above. Further, individuals could be exposed to consumer products that contain TCE at the *de minimis* threshold.

12. In addition, because TCE causes cancer through a mutagenic mode of action, even low levels of TCE carry some amount of risk of cancer. These risks and potential for harm increase if individuals are exposed to TCE from multiple products or through their environment. As EPA notes, even low levels of TCE can cause harm, especially when considered in aggregate.[14] For example, a

---

[12] EPA, "Byproducts Assessment for 1,2-Dichloroethane: Technical Support Document for the Risk Evaluation," at 13, https://www.epa.gov/system/files/documents/2026-05/04-1-2-dichloroethane-byproducts-assess-public-release-april-2026v2.pdf (April 2026) (""EPA notes that any processing of the byproducts streams is not addressed").

[13] 89 Fed. Reg. 102,591 ("To aid the regulated community with implementing the prohibitions on TCE and to account for TCE as a byproduct or impurity in products, EPA is establishing a regulatory threshold of 0.1% for TCE").

[14] 89 Fed. Reg. 37,033

community member living near multiple petrochemical facilities releasing TCE could be exposed to higher levels of TCE in air and drinking water which could result in health harms, even if the releases from individual facilities are relatively low. These individuals might also be exposed to TCE through use of multiple consumer products, even if they meet the *de minimis* threshold, in addition to living near TCE-releasing facilities. Together, these aggregate exposures could result in TCE exposure levels that subject individuals to unreasonable risk.

13.     EDF and its members have engaged in many activities to reduce harm from TCE. For example, in 2023 over 10,000 EDF members responded to an "action alert" to have comments submitted to EPA urging the Agency to rapidly ban TCE. And EDF staff have submitted over 15 administrative comments to EPA, and testified at hearings, urging the Agency to fully evaluate the risks of TCE, and then issue a fully protective TSCA regulation.

14.     The Rule contains significant protections for EDF's members for which EDF has long advocated. If the Court grants any petitioners' request to narrow or undo the Rule, it will harm the many EDF members who are exposed to TCE, along with many others in this country. At the same time, the portions of the Rule that fail to protect EDF's members – described above and in Petitioners' accompanying brief – will injure EDF members through exposure to TCE that can cause health harms. Our members, and EDF as an organization, have a strong

interest in ensuring that TCE is regulated in a fully protective manner without exemptions so that the unreasonable risk from this toxic chemical is eliminated, as required by TSCA.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct.

Date: May 12, 2026

*Paige Varner*

Paige Varner, PhD

9

# DECLARATION OF LICIA DAVIS

I, Licia Davis, declare as follows:

1. My name is Licia Davis, and I live in Wichita, Kansas, in a neighborhood southeast of downtown.

2. I admire groups who litigate for the environment, and I try to support them as I can, especially those who have good ratings for effectiveness on Charity Navigator like NRDC and EDF, of which I am a member. I love to help people, and have a business working as a masseuse out of my home.

3. I have lived in Wichita for years. In November 2019, I moved to my current house. I love it here, because there is lots of nature and a humongous back yard with a creek in the back, and I try to be outside as much as possible. The trees and space give me so much.

4. I have been a fairly healthy older person. However, since I moved in, I have respiratory problems that have worsened each year, and a pulmonologist last year ruled out COPD. I have to use an inhaler some days, after I have been outside in the yard. I also developed allergy type symptoms, like headaches, and I had not had headaches for decades, before I moved here. On some days, my legs feel heavy and weak.

5. I have always mowed my own yards, but I had to stop doing this since I've lived here, because it's hard for me to breathe when I try to mow this yard.

6.      The creek by my house is only like a quarter of a mile from aircraft facilities. I worry about exposures to chemicals through the air and water, and I wonder if my health problems are linked to chemicals. I have a Brita, but I worry that is not enough to keep toxic chemicals out of my drinking water.

7.      A while back, I went to a class about an air quality program sponsored by Wichita Parks and Recreation. It was a program where people could get air monitoring stations in their locations. I was hoping that I could get a monitor in this area, and that this could help me understand and fix my asthma and allergies. However, there is no longer any federal funding for the program.

8.      I am sad that the Earth is not considered as important as it is, because of course there is no future without us helping the Earth.

9.      I understand that EPA has found the chemical trichloroethylene (TCE) to be harmful and moved to ban it. I support the ban of toxic chemicals, and support EDF's efforts to defend this regulation of TCE. But I also understand that there are exceptions to the ban that could harm me.

10.     I have been made aware of numerous sources of TCE in my area, to which I fear I am being exposed. In addition to the aircraft facilities that are near my backyard, there is an OxyChem facility less than ten miles from my home. I have seen documents showing that OxyChem manufactures 1,2-dichloroethane, a

2

process that can make TCE as a byproduct. I understand that EPA has allowed companies to continue this process.

11.     I also understand that aerospace companies, like the ones near my house, are able to use TCE for adhesives or for "degreasing" for many years into the future. Examples of the companies I am near are Textron Aviation, which is less than 2,000 feet from my house, and reported releasing a total of over 145,000 pounds of TCE from 2020-2024; Spirit Aerosystems, 2 miles away, which reported releasing a total of over 185,000 pounds of TCE from 2020-2024; and I live less than 10 miles from other aviation facilities that have reported releasing TCE.

12.     I do not feel protected by these decisions of EPA's, and I support EDF's case seeking to ask EPA to protect people like me and communities like mine that are exposed to TCE. Even though I love where I live, I have considered moving because of the progression of my health.

I declare under the penalty of perjury that, to the best of my knowledge, the

above is true and correct.


Date: May 7, 2026

Licia Davis

# DECLARATION OF SUSAN HEATH

I, Susan Heath, declare as follows:

1.   My name is Susan Heath. I have lived in Albany, Oregon, since 2014.

2.   I am a member of the Environmental Defense Fund. I support EDF and other environmental organizations because I want to help address the negative effects that certain industries can have on the environment and on people's health.

3.   Since moving to Oregon, I have learned about the damage that some companies with significant political influence have done here. For example, I learned that timber companies, after they clear cut, spray toxic chemicals which gets into the air and into the watershed.

4.   I am aware of a company called ENTEK, which is located in Lebanon, Oregon, less than eight miles from me. I have been made aware that ENTEK uses the toxic chemical TCE, and that it will be allowed to continue using this chemical for 20 more years. I have friends who live in Lebanon and have told me about a history of toxic emissions – in particular, that a company there was releasing some kind of chemical through their smokestack in high amounts.

5.   People report that there is a concerning odor in the air in my area. However, I do not have a sense of smell. I am concerned that there may be something toxic that I need to detect but cannot.

6. I see signs of apparent pollution. A major crop here is grass. During the summer, huge clouds of dust come onto and from the fields and settle for weeks. I'm anxious about what is in this dust. I have sinus issues that are exacerbated by the dust. Sometimes, it mixes with wildfire smoke and you can't do a lot about it – you have to go indoors.

7. I am also concerned that this dust material ends up in our watershed. I have heard people report that they have arsenic in their well water here. I am on the city water system, but I drink bottled water.

8. I live with my sister and our dogs. We are in our sixties. I volunteer for various organizations, and my sister works at her job and raises puppies for Canine Companions. We both like to garden and create a nice area for the dogs to roam in, but when the dust gets bad, we feel that we have to stay inside and close the windows. We don't have central air or air filtration.

9. I am aware that, according to data shown to me from the EPA "Toxic Release Inventory," that ENTEK reported emitting, from 2020 to 2024, over 240,000 pounds of TCE. The last time they reported – about what they released in 2024 – they had emitted over 50,000 pounds of TCE in one year.

10. My sister, myself, our dogs, and my community are exposed to TCE by living near it. I worry about our health and the health of the surrounding community. I understand that TCE causes cancer, and can affect the nervous

2

system, kidneys, and liver, and is linked to Parkinson's disease. After learning about TCE emissions near me, I worry about being outside.

11. In addition to the fact that ENTEK will not have to stop using TCE for 20 years, I understand that companies can keep using and releasing TCE even after these delay times if TCE is produced as a "byproduct" from making or using other chemicals, or if they are in products under a certain amount. So I may be exposed to TCE through use of TCE-containing products, which could make harms from TCE from ENTEK worse.

12. Also, I have heard that another battery company may be seeking to open here in Albany. I understand that many battery companies use TCE, and that the EPA regulation may permit them 10-20 years to use this chemical. If that happened, my family and I and my community would be exposed to even more TCE.

13. While these things go on, to my knowledge there is no protection that EPA is giving to my community. I am concerned that my community is not protected from TCE, which I understand EPA has decided is toxic and decided to ban. It is important to me that EPA's ban of TCE go forward, but also that communities like mine who have to wait for it to go into effect be protected from the chemical.

14.     I am submitting this declaration in support of Environmental Defense Fund's case to help show why the national TCE regulation should not be weakened, and should be strengthened, to protect our health from the TCE emissions in our area, and to prevent and reduce the serious harm that my family and my community face from this pollution.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct

Date: May _6_, 2026

Susan Heath
Susan Heath

# DECLARATION OF LYNDA MEANS

I, Lynda Means, declare as follows:

1. My name is Lynda Means. I live in a neighborhood next to the St. Louis airport, called St. John, in a house that I purchased 46 years ago.

2. I raised my children here. My children visit me often in this home, along with my grandchildren and great grandchildren.

3. I am retired from my career teaching university classes in Native American studies.

4. I have been a member of the Environmental Defense Fund for over 30 years.

5. I became connected to the environment through my father. He was what I would call a conservationist – he was always very respectful of nature. In that way, I became connected to Native American philosophies about nature, and in the 1970s I began supporting environmental groups. For example, I was a founding member of the Cousteau Society.

6. I work outside in my yard. I also like to get around as much as possible. There are times, however, when I smell odd smells and wonder what they are. I assume they are coming from the airport. The saving grace of my neighborhood is our many old trees.

7. I have dealt with post-nasal drip for years, and from time to time it will flare up, and then I can get infections. I take an antihistamine to try to prevent this.

8. I understand that I live less than 3 miles from a Boeing facility, at 6300 James S. McDonell Boulevard, and that the facility is reported to release many pounds of the chemical TCE. For example, it released over 18,000 pounds of TCE in the period from 2020 to 2024. I also understand that companies who use TCE for certain reasons like "degreasing for essential aerospace parts" may continue to do so for years, despite the fact that EPA has called the chemical toxic and called for a ban. I understand that I will therefore likely be exposed for years.

9. I will not feel comfortable being outside and having my grandchildren and great grandchildren over knowing that I am exposed to a toxic chemical.

10. I support EDF bringing this case so that we can have a ban on this toxic chemical, and so that in the meantime people like me, my family, and my community – located near where TCE is emitted – will be protected.

I declare under the penalty of perjury that, to the best of my knowledge, the above

is true and correct

Date: May ___7___, 2026

_____
Lynda/Means

# DECLARATION OF CYNTHIA ROBERTSON

I, Cynthia Robertson, declare as follows:

1. My name is Cynthia Robertson, and I live in Sulphur, Louisiana, less than five miles from 17 petrochemical facilities.

2. I have done lots of things in my working life, including starting a foundation in Texas that worked with the elderly with physical and emotional disabilities. I went to seminary school. I have a masters in social work, a few credits away from a PhD. I also had a restaurant in an old school bus.

3. I lived in Sulphur when I was younger. As an older adult, I moved back to take care of my mother, and I began volunteering with the Open Door Biker Church, which works with community members in need of support.

4. Through that experience, I realized what a great need there was for more assistance here. So, I bought a house here in the neighborhood of Portie Town and moved in. I started by putting a food box in front of the house. Then, we had historic flooding here. Fifty percent of the buildings in our parish were seriously damaged or demolished. So much remains unrepaired. Across the street, one of my neighbors still has a blue tarp on his roof.

5. I founded a group, which I named Micah 6:8 Mission, and we started looking at the root causes of the problems here. Since then, next door we've

established The Commons @ Micah 6:8, which is a resilience education program for the community.

6.     The people here struggle. For example, I have recently gotten grants to give away food assistance, and distributed thousands in gift cards. Many of the people who came for assistance have been making do with only around $1,200 per month.

7.     Increasing climate change means increasing struggle. Here at Micah 6:8 Mission, we have a community garden, a greenhouse, a rainwater catchment system, a rain garden, and solar power. We built these to demonstrate to the community how they might adapt to the changing climate, since most of the residents are low income and cannot afford to move away.

8.     The petrochemical facilities and industry are also a big part of people's struggles. We have very high cancer rates in our community. We have many people with respiratory problems who cannot be outside on certain days. My group has set up air pollution detectors – including through federal grants from the previous administration's Environmental Protection Agency – to try to give people some idea of what pollution they're dealing with. Also, I have two amazing scientists working with me, and they have studied and challenged permit applications filed for the area.

9. The petrochemical industry is huge in my family. My daddy was a chemical engineer, and he worked for Union Carbide in New Orleans and then Texas City, Texas, and then ended up at Olin in Westlake. He died of heart disease, for which he had received a heart transplant.

10. My mom was a high school teacher in Westlake, less than three miles from the petrochemical facilities. She had dealt with high blood pressure and atrial fibrillation.

11. I have many health issues, including chronic fatigue and fibromyalgia, that I'm sure are associated with living in and around chemical plant areas.

12. I understand from information that I have reviewed that the Eagle US 2/Westlake US 2 facility produces 1,2-dichloroethane (1,2-DCA), from which trichlorethylene (TCE) is a byproduct, and that they are listed as emitting a total of over 216,000 pounds of 1,2-DCA from 2020-2024. I also understand that EPA, in its 2024 regulation, has allowed companies to emit certain TCE byproducts, even after its ban of TCE goes into effect.

13. My community already has so much exposure to so many toxic chemicals. We deserve to and must be relieved of the burden of toxic TCE, which EPA saw fit to ban in many places. Therefore, I support EDF's case seeking to defend a ban of TCE with no loopholes and with robust protections for communities like mine.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct.

Date: May 10, 2026

Cynthia Robertson

# DECLARATION OF ANGELA ESSLINGER

I, Angela Esslinger, declare as follows:

1. My name is Angela Esslinger. I have been a member of Environmental Defense Fund ("EDF") since 2015. I became particularly interested in environmental issues when I learned about threats to environmental protections. I stay involved by reading about issues such as toxic chemicals, signing petitions to agencies, and educating my friends on social media.

2. My family and I have resided on our block in Wichita, Kansas, for 45 years. We bought a house on this block in 1979. Ten years later, we bought and moved into the house next door.

3. I currently live in the house with my husband. My husband is 72, and I will turn 70 next month. We are both retired and spend a lot of our time at home. We plan to stay in this house.

4. All of my children and grandchildren live in the area. I have four children, ten grandchildren and one great grandchild, who is two years old.

5. The two-year-old, along with the younger grandchildren, come to my house frequently. My husband and I babysit the children, and they also come over to visit with their parents. When the children are over, they play outside constantly.

6. My husband and I also are outside as much as weather permits, either working in the yard, being with our two dogs, or watching and playing with the grandchildren.

7. From the environmental news I have read and the petitions I have signed, I learned about the chemical trichlorethylene, also known as TCE. I became aware that the chemical was very toxic and that the Environmental Protection Agency was trying to regulate it.

8. I have more recently learned that five separate facilities near my home emit TCE. I am aware that, according to data reported to the EPA Toxic Release Inventory, the facilities Spirit Aerosystems, Textron Aviation, 3P Processing, Globe Engineering, and Metal Finishing combined, from 2017 to 2022, have reported emitting over 400,000 pounds of TCE.

9. Most of my children and grandchildren also live near these facilities.

10. My husband worked for years at the Spirit facility, as an industrial engineer. I now have a son-in-law who works at the same plant. And, my son works at the Textron facility. He works with various chemicals, and wears gloves for protection. These activities likely have increased my family's exposure to TCE.

11. I am aware that data from EPA's Toxics Release Inventory indicates that some of the facilities near me have some of the highest releases of TCE across the country. In fact, because of these releases, my census block group has greater

2

cancer risks from TCE than 99% of the rest of the block groups in the country, according to EPA's AirToxScreen.

12. Our area has long dealt with toxic issues. A train spilled TCE into our soil that has contaminated our groundwater for many years.

13. Down on Kellogg, there is a company that refines old oil. When they are processing it, we get smells like a rendering plant.

14. About two years ago, I began noticing a film that would develop on top of the water in our bird bath. I've called my husband out to look at it, and we could not figure out what it was. I often dump out the water and refill the bird bath, but the next day, the film will be back.

15. My husband and I both have asthma. Our symptoms did not develop until the mid-1980s.

16. Five of my grandchildren have asthma. They seem to have particular trouble with their asthma when there is a strong wind outside. My six-year-old granddaughter and my 12-year-old grandson cannot be around a campfire without their symptoms becoming severe, and that grandson was hospitalized during an asthma attack. My son-in-law was also hospitalized for asthma.

17. Two other of my grandchildren repeatedly get sick and get infections.

18. I worry about my health and the health of my family. I understand that TCE is a concern, and a potential health harm, particularly because we are close to

so many facilities that release it. I understand that TCE causes cancer, and can affect the nervous system, kidneys, and liver. Even small amounts can be highly toxic and can hurt the immune system and development during pregnancy. I am also concerned about the harms from breathing in other industrial emissions in my area, which can cause some of the same health effects as TCE and increase the risk and severity of these harms.

19. I worry about my grandchildren playing outside – especially those children with asthma – and I worry about the fact that TCE harms fetuses, as I have children and grandchildren who are likely to have more children. After learning about TCE emissions near me from the facilities, I do not feel as comfortable with my family being outside.

20. I understand that EPA issued a regulation to ban TCE. I also understand that it is now being challenged in a court case. It is very important to me that this law stay in place, so that the TCE emissions in our community will stop.

21. I am submitting this declaration in support of the intervention and litigation of EDF to help show why the national TCE rule should not be weakened, and should be strengthened, to protect our health from the TCE emissions in our area, and to prevent and reduce the serious harm that my family and my community face from these sources' pollution.

4

I declare under the penalty of perjury that, to the best of my knowledge, the above

is true and correct

Date: January 29, 2025.

_____
Angela Esslinger

5

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.

*United States Code Service  >  TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123)  >  CHAPTER 53. TOXIC SUBSTANCES CONTROL (§§ 2601 — 2697)  >  CONTROL OF TOXIC SUBSTANCES (§§ 2601 — 2629)*

## § 2602. Definitions

As used in this Act [15 USCS §§ 2601 et seq.]:

**(1)**  the [The] term "Administrator" means the Administrator of the Environmental Protection Agency.

**(2)**

**(A)**  Except as provided in subparagraph (B), the term "chemical substance" means any organic or inorganic substance of a particular molecular identity, including—

**(i)**  any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and

**(ii)**  any element or uncombined radical.

**(B)**  Such term does not include—

**(i)**  any mixture,

**(ii)**  any pesticide (as defined in the Federal Insecticide, Fungicide, and Rodenticide Act [7 USCS §§ 136 et seq.]) when manufactured, processed, or distributed in commerce for use as a pesticide,

**(iii)**  tobacco or any tobacco product,

**(iv)**  any source material, special nuclear material, or byproduct material (as such terms are defined in the Atomic Energy Act of 1954 [42 USCS §§ 2011 et seq.] and regulations issued under such Act),

**(v)**  any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1954 [1986] [26 USCS § 4181] (determined without regard to any exemptions from such tax provided by section 4182 or 4221 [26 USCS § 4182 or 4221] or any other provision of such Code) and any component of such an article (limited to shot shells, cartridges, and components of shot shells and cartridges), and

**(vi)**  any food, food additive, drug, cosmetic, or device (as such terms are defined in section 201 of the Federal Food, Drug, and Cosmetic Act [21 USCS

§ 321]) when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

The term "food" as used in clause (vi) of this subparagraph includes poultry and poultry products (as defined in sections 4(e) and 4(f) of the Poultry Products Inspection Act [21 USCS § 453(e) and 4(f)]), meat and meat food products (as defined in section 1(j) of the Federal Meat Inspection Act [21 USCS § 601(j)]), and eggs and egg products (as defined in section 4 of the Egg Products Inspection Act [21 USCS § 1033]).

**(3)** The term "commerce" means trade, traffic, transportation, or other commerce (A) between a place in a State and any place outside of such State, or (B) which affects trade, traffic, transportation, or commerce described in clause (A).

**(4)** The term "conditions of use" means the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of.

**(5)** The terms "distribute in commerce" and "distribution in commerce" when used to describe an action taken with respect to a chemical substance or mixture or article containing a substance or mixture mean to sell, or the sale of, the substance, mixture, or article in commerce; to introduce or deliver for introduction into commerce, or the introduction or delivery for introduction into commerce of, the substance, mixture, or article; or to hold, or the holding of, the substance, mixture, or article after its introduction into commerce.

**(6)** The term "environment" includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things.

**(7)** The term "guidance" means any significant written guidance of general applicability prepared by the Administrator.

**(8)** The term "health and safety study" means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying information and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological studies of a chemical substance or mixture, and any test performed pursuant to this Act [15 USCS §§ 2601 et seq.].

**(9)** The term "manufacture" means to import into the customs territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States), produce, or manufacture.

**(10)** The term "mixture" means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except that such term does include any combination which occurs, in whole or in part, as a result of a chemical reaction if none of the chemical substances comprising the combination is a new chemical substance and if the combination could have been manufactured for commercial purposes without a

chemical reaction at the time the chemical substances comprising the combination were combined.

**(11)** The term "new chemical substance" means any chemical substance which is not included in the chemical substance list compiled and published under section 8(b) [15 USCS § 2607(b)].

**(12)** The term "potentially exposed or susceptible subpopulation" means a group of individuals within the general population identified by the Administrator who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, or the elderly.

**(13)** The term "process" means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce—

  **(A)** in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

  **(B)** as part of an article containing the chemical substance or mixture.

**(14)** The term "processor" means any person who processes a chemical substance or mixture.

**(15)** The term "protocols and methodologies for the development of information" means a prescription of—

  **(A)** the—

    **(i)** health and environmental effects, and

    **(ii)** information relating to toxicity, persistence, and other characteristics which affect health and the environment,

  for which information for a chemical substance or mixture are to be developed and any analysis that is to be performed on such information, and

  **(B)** to the extent necessary to assure that information respecting such effects and characteristics are reliable and adequate—

    **(i)** the manner in which such information are [is] to be developed,

    **(ii)** the specification of any test protocol or methodology to be employed in the development of such information, and

    **(iii)** such other requirements as are necessary to provide such assurance.

**(16)** The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, or any other territory or possession of the United States.

**(17)** The term "United States", when used in the geographic sense, means all of the States.

# History

**HISTORY:**

Oct. 11, 1976, P. L. 94-469, Title I, § 3, 90 Stat. 2004; Oct. 22, 1986, P. L. 99-519, § 3(c), 100 Stat. 2989; Aug. 23, 1988, P. L. 100-418, Title I, Subtitle B, § 1214(e)(1), 102 Stat. 1156; Nov. 25, 2015, P. L. 114-92, Div A, Title III, Subtitle B, § 315, 129 Stat. 791, June 22, 2016, P. L. 114-182, Title I, §§ 3, 19(c), 130 Stat. 448, 505.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.

*United States Code Service* > *TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123)* > *CHAPTER 53. TOXIC SUBSTANCES CONTROL (§§ 2601 — 2697)* > *CONTROL OF TOXIC SUBSTANCES (§§ 2601 — 2629)*

## § 2605. Prioritization, risk evaluation, and regulation of chemical substances and mixtures

**(a) Scope of regulation.** If the Administrator determines in accordance with subsection (b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment, the Administrator shall by rule and subject to section 18, and in accordance with subsection (c)(2), apply one or more of the following requirements to such substance or mixture to the extent necessary so that the chemical substance or mixture no longer presents such risk:

**(1)** A requirement (A) prohibiting or otherwise restricting the manufacturing, processing, or distribution in commerce of such substance or mixture, or (B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce.

**(2)** A requirement—

**(A)** prohibiting or otherwise restricting the manufacture, processing, or distribution in commerce of such substance or mixture for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement, or

**(B)** limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement.

**(3)** A requirement that such substance or mixture or any article containing such substance or mixture be marked with or accompanied by clear and adequate minimum warnings and instructions with respect to its use, distribution in commerce, or disposal or with respect to any combination of such activities. The form and content of such minimum warnings and instructions shall be prescribed by the Administrator.

**(4)** A requirement that manufacturers and processors of such substance or mixture make and retain records of the processes used to manufacture or process such substance or mixture or monitor or conduct tests which are reasonable and necessary

to assure compliance with the requirements of any rule applicable under this subsection.

**(5)** A requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance or mixture.

**(6)**

**(A)** A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance or mixture, or of any article containing such substance or mixture, by its manufacturer or processor or by any other person who uses, or disposes of, it for commercial purposes.

**(B)** A requirement under subparagraph (A) may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision, and shall require each person subject to it to notify each State and political subdivision in which a required disposal may occur of such disposal.

**(7)** A requirement directing manufacturers or processors of such substance or mixture (A) to give notice of such determination to distributors in commerce of such substance or mixture and, to the extent reasonably ascertainable, to other persons in possession of such substance or mixture or exposed to such substance or mixture, (B) to give public notice of such risk of injury, and (C) to replace or repurchase such substance or mixture as elected by the person to which the requirement is directed.

Any requirement (or combination of requirements) imposed under this subsection may be limited in application to specified geographic areas.

**(b) Risk evaluations.**

**(1)** Prioritization for risk evaluations.

**(A)** Establishment of process. Not later than 1 year after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall establish, by rule, a risk-based screening process, including criteria for designating chemical substances as high-priority substances for risk evaluations or low-priority substances for which risk evaluations are not warranted at the time. The process to designate the priority of chemical substances shall include a consideration of the hazard and exposure potential of a chemical substance or a category of chemical substances (including consideration of persistence and bioaccumulation, potentially exposed or susceptible subpopulations and storage near significant sources of drinking water), the conditions of use or significant changes in the conditions of use of the chemical substance, and the volume or significant changes in the volume of the chemical substance manufactured or processed.

**(B)** Identification of priorities for risk evaluation.

**(i)** High-priority substances. The Administrator shall designate as a high-priority substance a chemical substance that the Administrator concludes, without consideration of costs or other nonrisk factors, may present an

unreasonable risk of injury to health or the environment because of a potential hazard and a potential route of exposure under the conditions of use, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator.

**(ii)** Low-priority substances. The Administrator shall designate a chemical substance as a low-priority substance if the Administrator concludes, based on information sufficient to establish, without consideration of costs or other nonrisk factors, that such substance does not meet the standard identified in clause (i) for designating a chemical substance a high-priority substance.

**(C)** Information request and review and proposed and final prioritization designation. The rulemaking required in subparagraph (A) shall ensure that the time required to make a priority designation of a chemical substance be no shorter than nine months and no longer than 1 year, and that the process for such designations includes—

**(i)** a requirement that the Administrator request interested persons to submit relevant information on a chemical substance that the Administrator has initiated the prioritization process on, before proposing a priority designation for the chemical substance, and provide 90 days for such information to be provided;

**(ii)** a requirement that the Administrator publish each proposed designation of a chemical substance as a high- or low-priority substance, along with an identification of the information, analysis, and basis used to make the proposed designations, and provide 90 days for public comment on each such proposed designation; and

**(iii)** a process by which the Administrator may extend the deadline in clause (i) for up to three months in order to receive or evaluate information required to be submitted in accordance with section 4(a)(2)(B) [15 USCS § 2603(a)(2)(B)], subject to the limitation that if the information available to the Administrator at the end of such an extension remains insufficient to enable the designation of the chemical substance as a low-priority substance, the Administrator shall designate the chemical substance as a high-priority substance.

**(2)** Initial risk evaluations and subsequent designations of high- and low-priority substances.

**(A)** Initial risk evaluations. Not later than 180 days after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall ensure that risk evaluations are being conducted on 10 chemical substances drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments and shall publish the list of such chemical substances during the 180 day period.

**(B)** Additional risk evaluations. Not later than three and one half years after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall ensure that risk

evaluations are being conducted on at least 20 high-priority substances and that at least 20 chemical substances have been designated as low-priority substances, subject to the limitation that at least 50 percent of all chemical substances on which risk evaluations are being conducted by the Administrator are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments.

**(C)** Continuing designations and risk evaluations. The Administrator shall continue to designate priority substances and conduct risk evaluations in accordance with this subsection at a pace consistent with the ability of the Administrator to complete risk evaluations in accordance with the deadlines under paragraph (4)(G).

**(D)** Preference. In designating high-priority substances, the Administrator shall give preference to—

**(i)** chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments as having a Persistence and Bioaccumulation Score of 3; and

**(ii)** chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments that are known human carcinogens and have high acute and chronic toxicity.

**(E)** Metals and metal compounds. In identifying priorities for risk evaluation and conducting risk evaluations of metals and metal compounds, the Administrator shall use the Framework for Metals Risk Assessment of the Office of the Science Advisor, Risk Assessment Forum, and dated March 2007, or a successor document that addresses metals risk assessment and is peer reviewed by the Science Advisory Board.

**(3)** Initiation of risk evaluations; designations.

**(A)** Risk evaluation initiation. Upon designating a chemical substance as a high-priority substance, the Administrator shall initiate a risk evaluation on the substance.

**(B)** Revision. The Administrator may revise the designation of a low-priority substance based on information made available to the Administrator.

**(C)** Ongoing designations. The Administrator shall designate at least one high-priority substance upon the completion of each risk evaluation (other than risk evaluations for chemical substances designated under paragraph (4)(C)(ii)).

**(4)** Risk evaluation process and deadlines.

**(A)** In general. The Administrator shall conduct risk evaluations pursuant to this paragraph to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use.

**(B)** Establishment of process. Not later than 1 year after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall establish, by rule, a process to conduct risk evaluations in accordance with subparagraph (A).

**(C)** Requirement. The Administrator shall conduct and publish risk evaluations, in accordance with the rule promulgated under subparagraph (B), for a chemical substance—

> **(i)** that has been identified under paragraph (2)(A) or designated under paragraph (1)(B)(i); and

> **(ii)** subject to subparagraph (E), that a manufacturer of the chemical substance has requested, in a form and manner and using the criteria prescribed by the Administrator in the rule promulgated under subparagraph (B), be subjected to a risk evaluation.

**(D)** Scope. The Administrator shall, not later than 6 months after the initiation of a risk evaluation, publish the scope of the risk evaluation to be conducted, including the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider, and, for each designation of a high-priority substance, ensure not less than 12 months between the initiation of the prioritization process for the chemical substance and the publication of the scope of the risk evaluation for the chemical substance, and for risk evaluations conducted on chemical substances that have been identified under paragraph (2)(A) or selected under subparagraph (E)(iv)(II) of this paragraph, ensure not less than 3 months before the Administrator publishes the scope of the risk evaluation.

**(E)** Limitation and criteria.

> **(i)** Percentage requirements. The Administrator shall ensure that, of the number of chemical substances that undergo a risk evaluation under clause (i) of subparagraph (C), the number of chemical substances undergoing a risk evaluation under clause (ii) of subparagraph (C) is—

>> **(I)** not less than 25 percent, if sufficient requests are made under clause (ii) of subparagraph (C); and

>> **(II)** not more than 50 percent.

> **(ii)** Requested risk evaluations. Requests for risk evaluations under subparagraph (C)(ii) shall be subject to the payment of fees pursuant to section 26(b) [15 USCS § 2625(b)], and the Administrator shall not expedite or otherwise provide special treatment to such risk evaluations.

> **(iii)** Preference. In deciding whether to grant requests under subparagraph (C)(ii), the Administrator shall give preference to requests for risk evaluations on chemical substances for which the Administrator determines that restrictions imposed by 1 or more States have the potential to have a significant impact on interstate commerce or health or the environment.

**(iv)** Exceptions.

**(I)** Chemical substances for which requests have been granted under subparagraph (C)(ii) shall not be subject to section 18(b) [15 USCS § 2617(b)].

**(II)** Requests for risk evaluations on chemical substances which are made under subparagraph (C)(ii) and that are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments shall be granted at the discretion of the Administrator and not be subject to clause (i)(II).

**(F)** Requirements. In conducting a risk evaluation under this subsection, the Administrator shall—

**(i)** integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations identified as relevant by the Administrator;

**(ii)** describe whether aggregate or sentinel exposures to a chemical substance under the conditions of use were considered, and the basis for that consideration;

**(iii)** not consider costs or other nonrisk factors;

**(iv)** take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance; and

**(v)** describe the weight of the scientific evidence for the identified hazard and exposure.

**(G)** Deadlines. The Administrator—

**(i)** shall complete a risk evaluation for a chemical substance as soon as practicable, but not later than 3 years after the date on which the Administrator initiates the risk evaluation under subparagraph (C); and

**(ii)** may extend the deadline for a risk evaluation for not more than 6 months.

**(H)** Notice and comment. The Administrator shall provide no less than 30 days public notice and an opportunity for comment on a draft risk evaluation prior to publishing a final risk evaluation.

## (c) Promulgation of subsection (a) rules.

**(1)** Deadlines. If the Administrator determines that a chemical substance presents an unreasonable risk of injury to health or the environment in accordance with subsection (b)(4)(A), the Administrator—

**(A)** shall propose in the Federal Register a rule under subsection (a) for the chemical substance not later than 1 year after the date on which the final risk evaluation regarding the chemical substance is published;

**(B)** shall publish in the Federal Register a final rule not later than 2 years after the date on which the final risk evaluation regarding the chemical substance is published; and

**(C)** may extend the deadlines under this paragraph for not more than 2 years, subject to the condition that the aggregate length of extensions under this subparagraph and subsection (b)(4)(G)(ii) does not exceed 2 years, and subject to the limitation that the Administrator may not extend a deadline for the publication of a proposed or final rule regarding a chemical substance drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments or a chemical substance that, with respect to persistence and bioaccumulation, scores high for 1 and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), without adequate public justification that demonstrates, following a review of the information reasonably available to the Administrator, that the Administrator cannot complete the proposed or final rule without additional information regarding the chemical substance.

**(2)** Requirements for rule.

**(A)** Statement of effects. In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to—

**(i)** the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

**(ii)** the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

**(iii)** the benefits of the chemical substance or mixture for various uses; and

**(iv)** the reasonably ascertainable economic consequences of the rule, including consideration of—

**(I)** the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

**(II)** the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

**(III)** the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

**(B)** Selecting requirements. In selecting among prohibitions and other restrictions, the Administrator shall factor in, to the extent practicable, the considerations under subparagraph (A) in accordance with subsection (a).

**(C)** Consideration of alternatives. Based on the information published under subparagraph (A), in deciding whether to prohibit or restrict in a manner that substantially prevents a specific condition of use of a chemical substance or mixture, and in setting an appropriate transition period for such action, the Administrator shall consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect.

**(D)** Replacement parts.

> **(i)** In general. The Administrator shall exempt replacement parts for complex durable goods and complex consumer goods that are designed prior to the date of publication in the Federal Register of the rule under subsection (a), unless the Administrator finds that such replacement parts contribute significantly to the risk, identified in a risk evaluation conducted under subsection (b)(4)(A), to the general population or to an identified potentially exposed or susceptible subpopulation.

> **(ii)** Definitions. In this subparagraph—

>> **(I)** the term "complex consumer goods" means electronic or mechanical devices composed of multiple manufactured components, with an intended useful life of 3 or more years, where the product is typically not consumed, destroyed, or discarded after a single use, and the components of which would be impracticable to redesign or replace; and

>> **(II)** the term "complex durable goods" means manufactured goods composed of 100 or more manufactured components, with an intended useful life of 5 or more years, where the product is typically not consumed, destroyed, or discarded after a single use.

**(E)** Articles. In selecting among prohibitions and other restrictions, the Administrator shall apply such prohibitions or other restrictions to an article or category of articles containing the chemical substance or mixture only to the extent necessary to address the identified risks from exposure to the chemical substance or mixture from the article or category of articles so that the substance or mixture does not present an unreasonable risk of injury to health or the environment identified in the risk evaluation conducted in accordance with subsection (b)(4)(A).

**(3)** Procedures. When prescribing a rule under subsection (a) the Administrator shall proceed in accordance with section 553 of title 5, United States Code (without regard to any reference in such section to sections 556 and 557 of such title [5 USCS §§ 556, 557]), and shall also—

**(A)** publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule;

**(B)** allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available;

**(C)** promulgate a final rule based on the matter in the rulemaking record; and

**(D)** make and publish with the rule the determination described in subsection (a).

**(d) Effective date.**

**(1)** In general. In any rule under subsection (a), the Administrator shall—

**(A)** specify the date on which it shall take effect, which date shall be as soon as practicable;

**(B)** except as provided in subparagraphs (C) and (D), specify mandatory compliance dates for all of the requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in a case of a use exempted under subsection (g);

**(C)** specify mandatory compliance dates for the start of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in the case of a use exempted under subsection (g);

**(D)** specify mandatory compliance dates for full implementation of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable; and

**(E)** provide for a reasonable transition period.

**(2)** Variability. As determined by the Administrator, the compliance dates established under paragraph (1) may vary for different affected persons.

**(3)**

**(A)** The Administrator may declare a proposed rule under subsection (a) to be effective, and compliance with the proposed requirements to be mandatory, upon publication in the Federal Register of the proposed rule and until the compliance dates applicable to such requirements in a final rule promulgated under section 6(a) [subsec. (a) of this section] or until the Administrator revokes such proposed rule, in accordance with subparagraph (B), if—

**(i)** the Administrator determines that—

**(I)** the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture subject to such proposed rule or any combination of such activities is likely to result in an unreasonable risk of serious or widespread injury to health or the environment before such effective date without consideration of costs or other non-risk factors; and

**(II)** making such proposed rule so effective is necessary to protect the public interest; and

**(ii)** in the case of a proposed rule to prohibit the manufacture, processing, or distribution of a chemical substance or mixture because of the risk determined under clause (i)(I), a court has in an action under section 7 [15 USCS § 2606] granted relief with respect to such risk associated with such substance or mixture.

Such a proposed rule which is made so effective shall not, for purposes of judicial review, be considered final agency action.

**(B)** If the Administrator makes a proposed rule effective upon its publication in the Federal Register, the Administrator shall, as expeditiously as possible, give interested persons prompt notice of such action in accordance with subsection (c), and either promulgate such rule (as proposed or with modifications) or revoke it.

**(e) Polychlorinated biphenyls.**

**(1)** Within six months after the effective date of this Act [15 USCS § 2601 effective date note] the Administrator shall promulgate rules to—

**(A)** prescribe methods for the disposal of polychlorinated biphenyls, and

**(B)** require polychlorinated biphenyls to be marked with clear and adequate warnings, and instructions with respect to their processing, distribution in commerce, use, or disposal or with respect to any combination of such activities.

Requirements prescribed by rules under this paragraph shall be consistent with the requirements of paragraphs (2) and (3).

**(2)**

**(A)** Except as provided under subparagraph (B), effective one year after the effective date of this Act [15 USCS § 2601 effective date note] no person may manufacture, process, or distribute in commerce or use any polychlorinated biphenyl in any manner other than in a totally enclosed manner.

**(B)** The Administrator may by rule authorize the manufacture, processing, distribution in commerce or use (or any combination of such activities) of any polychlorinated biphenyl in a manner other than in a totally enclosed manner if the Administrator finds that such manufacture, processing, distribution in commerce, or use (or combination of such activities) will not present an unreasonable risk of injury to health or the environment.

**(C)** For the purposes of this paragraph, the term "totally enclosed manner" means any manner which will ensure that any exposure of human beings or the environment to a polychlorinated biphenyl will be insignificant as determined by the Administrator by rule.

**(3)**

**(A)** Except as provided in subparagraphs (B) and (C)—

**(i)** no person may manufacture any polychlorinated biphenyl after two years after the effective date of this Act [15 USCS § 2601 effective date note], and

**(ii)** no person may process or distribute in commerce any polychlorinated biphenyl after two and one-half years after such date [15 USCS § 2601 effective date note].

**(B)** Any person may petition the Administrator for an exemption from the requirements of subparagraph (A), and the Administrator may grant by rule such an exemption if the Administrator finds that—

> **(i)** an unreasonable risk of injury to health or environment would not result, and
>
> **(ii)** good faith efforts have been made to develop a chemical substance which does not present an unreasonable risk of injury to health or the environment and which may be substituted for such polychlorinated biphenyl.

An exemption granted under this subparagraph shall be subject to such terms and conditions as the Administrator may prescribe and shall be in effect for such period (but not more than one year from the date it is granted) as the Administrator may prescribe.

**(C)** Subparagraph (A) shall not apply to the distribution in commerce of any polychlorinated biphenyl if such polychlorinated biphenyl was sold for purposes other than resale before two and one half years after the date of enactment of this Act [enacted Oct. 11, 1976].

**(4)** Any rule under paragraph (1), (2)(B), or (3)(B) shall be promulgated in accordance with paragraph (3) of subsection (c).

**(5)** This subsection does not limit the authority of the Administrator, under any other provision of this Act [15 USCS §§ 2601 et seq.] or any other Federal law, to take action respecting any polychlorinated biphenyl.

## (f) Mercury.

**(1)** Prohibition on sale, distribution, or transfer of elemental mercury by federal agencies. Except as provided in paragraph (2), effective beginning on the date of enactment of this subsection [enacted Oct. 14, 2008], no Federal agency shall convey, sell, or distribute to any other Federal agency, any State or local government agency, or any private individual or entity any elemental mercury under the control or jurisdiction of the Federal agency.

**(2)** Exceptions. Paragraph (1) shall not apply to—

> **(A)** a transfer between Federal agencies of elemental mercury for the sole purpose of facilitating storage of mercury to carry out this Act [15 USCS §§ 2601 et seq.]; or
>
> **(B)** a conveyance, sale, distribution, or transfer of coal.

**(3)** Leases of Federal coal. Nothing in this subsection prohibits the leasing of coal.

## (g) Exemptions.

**(1)** Criteria for exemption. The Administrator may, as part of a rule promulgated under subsection (a), or in a separate rule, grant an exemption from a requirement of a subsection (a) rule for a specific condition of use of a chemical substance or mixture, if the Administrator finds that—

> **(A)** the specific condition of use is a critical or essential use for which no technically and economically feasible safer alternative is available, taking into consideration hazard and exposure;

**(B)** compliance with the requirement, as applied with respect to the specific condition of use, would significantly disrupt the national economy, national security, or critical infrastructure; or

**(C)** the specific condition of use of the chemical substance or mixture, as compared to reasonably available alternatives, provides a substantial benefit to health, the environment, or public safety.

**(2)** Exemption analysis and statement. In proposing an exemption under this subsection, the Administrator shall analyze the need for the exemption, and shall make public the analysis and a statement describing how the analysis was taken into account.

**(3)** Period of exemption. The Administrator shall establish, as part of a rule under this subsection, a time limit on any exemption for a time to be determined by the Administrator as reasonable on a case-by-case basis, and, by rule, may extend, modify, or eliminate an exemption if the Administrator determines, on the basis of reasonably available information and after adequate public justification, the exemption warrants extension or modification or is no longer necessary.

**(4)** Conditions. As part of a rule promulgated under this subsection, the Administrator shall include conditions, including reasonable recordkeeping, monitoring, and reporting requirements, to the extent that the Administrator determines the conditions are necessary to protect health and the environment while achieving the purposes of the exemption.

**(h) Chemicals that are persistent, bioaccumulative, and toxic.**

**(1)** Expedited action. Not later than 3 years after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall propose rules under subsection (a) with respect to chemical substances identified in the 2014 update of the TSCA Work Plan for Chemical Assessments—

**(A)** that the Administrator has a reasonable basis to conclude are toxic and that with respect to persistence and bioaccumulation score high for one and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), and are not a metal or a metal compound, and for which the Administrator has not completed a Work Plan Problem Formulation, initiated a review under section 5, or entered into a consent agreement under section 4 [15 USCS § 2603], prior to the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016]; and

**(B)** exposure to which under the conditions of use is likely to the general population or to a potentially exposed or susceptible subpopulation identified by the Administrator, or the environment, on the basis of an exposure and use assessment conducted by the Administrator.

**(2)** No risk evaluation required. The Administrator shall not be required to conduct risk evaluations on chemical substances that are subject to paragraph (1).

**(3)** Final rule. Not later than 18 months after proposing a rule pursuant to paragraph (1), the Administrator shall promulgate a final rule under subsection (a).

**(4)** Selecting restrictions. In selecting among prohibitions and other restrictions promulgated in a rule under subsection (a) pursuant to paragraph (1), the Administrator shall address the risks of injury to health or the environment that the Administrator determines are presented by the chemical substance and shall reduce exposure to the substance to the extent practicable.

**(5)** Relationship to subsection (b). If, at any time prior to the date that is 90 days after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator makes a designation under subsection (b)(1)(B)(i), or receives a request under subsection (b)(4)(C)(ii), such chemical substance shall not be subject to this subsection, except that in selecting among prohibitions and other restrictions promulgated in a rule pursuant to subsection (a), the Administrator shall both ensure that the chemical substance meets the rulemaking standard under subsection (a) and reduce exposure to the substance to the extent practicable.

**(i) Final agency action.** Under this section and subject to section 18 [15 USCS § 2617]—

**(1)** a determination by the Administrator under subsection (b)(4)(A) that a chemical substance does not present an unreasonable risk of injury to health or the environment shall be issued by order and considered to be a final agency action, effective beginning on the date of issuance of the order; and

**(2)** a final rule promulgated under subsection (a), including the associated determination by the Administrator under subsection (b)(4)(A) that a chemical substance presents an unreasonable risk of injury to health or the environment, shall be considered to be a final agency action, effective beginning on the date of promulgation of the final rule.

**(j) Definition.** For the purposes of this Act, the term "requirement" as used in this section shall not displace statutory or common law.

# History

**HISTORY:**

Oct. 11, 1976, P. L. 94-469, Title I, § 6, 90 Stat. 2020; Oct. 22, 1986, P. L. 99-519, § 3(c), 100 Stat. 2989; Oct. 17, 2006, P. L. 109-364, Div A, Title III, Subtitle B, § 317(a), 120 Stat. 2142; Oct. 14, 2008, P. L. 110-414, § 3, 122 Stat. 4342; June 22, 2016, P. L. 114-182, Title I, § 6, 130 Stat. 460.

United States Code Service
Copyright © 2026 All rights reserved.

15 USCS § 2605

---

**End of Document**

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.

*United States Code Service > TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123) > CHAPTER 53. TOXIC SUBSTANCES CONTROL (§§ 2601 — 2697) > CONTROL OF TOXIC SUBSTANCES (§§ 2601 — 2629)*

## § 2608. Relationship to other Federal laws

(a) **Laws not administered by the Administrator.**

**(1)** If the Administrator determines that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator, under the conditions of use, and determines, in the Administrator's discretion, that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator, the Administrator shall submit to the agency which administers such law a report which describes such risk and includes in such description a specification of the activity or combination of activities which the Administrator has reason to believe so presents such risk. Such report shall also request such agency—

  **(A)**

    **(i)** to determine if the risk described in such report may be prevented or reduced to a sufficient extent by action taken under such law, and

    **(ii)** if the agency determines that such risk may be so prevented or reduced, to issue an order declaring whether or not the activity or combination of activities specified in the description of such risk presents such risk; and

  **(B)** to respond to the Administrator with respect to the matters described in subparagraph (A).

Any report of the Administrator shall include a detailed statement of the information on which it is based and shall be published in the Federal Register. The agency receiving a request under such a report shall make the requested determination, issue the requested order, and make the requested response within such time as the Administrator specifies in the request, but such time specified may not be less than 90 days from the date the request was made. The response of an agency shall be accompanied by a detailed statement of the findings and conclusions of the agency and shall be published in the Federal Register.

**(2)** If the Administrator makes a report under paragraph (1) with respect to a chemical substance or mixture and the agency to which such report was made either—

    **(A)** issues an order, within the time period specified by the Administrator in the report, declaring that the activity or combination of activities specified in the description of the risk described in the report does not present the risk described in the report, or

    **(B)** responds within the time period specified by the Administrator in the report and initiates, within 90 days of the publication in the Federal Register of the response of the agency under paragraph (1), action under the law (or laws) administered by such agency to protect against such risk associated with such activity or combination of activities,

the Administrator may not take any action under section 6(a) or 7 [15 USCS § 2605(a) or 2606] with respect to such risk.

**(3)** The Administrator shall take the actions described in paragraph (4) if the Administrator makes a report under paragraph (1) with respect to a chemical substance or mixture and the agency to which the report was made does not—

    **(A)** issue the order described in paragraph (2)(A) within the time period specified by the Administrator in the report; or

    **(B)**

        **(i)** respond under paragraph (1) within the timeframe specified by the Administrator in the report; and

        **(ii)** initiate action within 90 days of publication in the Federal Register of the response described in clause (i).

**(4)** If an agency to which a report is submitted under paragraph (1) does not take the actions described in subparagraph (A) or (B) of paragraph (3), the Administrator shall—

    **(A)** initiate or complete appropriate action under section 6(a) [15 USCS § 2605(a)]; or

    **(B)** take any action authorized or required under section 7 [15 USCS § 2606], as applicable.

**(5)** This subsection shall not relieve the Administrator of any obligation to take any appropriate action under section 6(a) or 7 [15 USCS § 2605(a) or 2606] to address risks from the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or any combination of those activities, that are not identified in a report issued by the Administrator under paragraph (1).

**(6)** If the Administrator has initiated action under section 6(a) or 7 [15 USCS § 2605(a) or 2606] with respect to a risk associated with a chemical substance or mixture which was the subject of a report made to an agency under paragraph (1), such agency shall before taking action under the law (or laws) administered by it to protect against such risk consult with the Administrator for the purpose of avoiding duplication of Federal action against such risk.

**(b) Laws administered by the Administrator.**

**(1)** The Administrator shall coordinate actions taken under this Act [15 USCS §§ 2601 et seq.] with actions taken under other Federal laws administered in whole or in part by the Administrator. If the Administrator determines that a risk to health or the environment associated with a chemical substance or mixture could be eliminated or reduced to a sufficient extent by actions taken under the authorities contained in such other Federal laws, the Administrator shall use such authorities to protect against such risk unless the Administrator determines, in the Administrator's discretion, that it is in the public interest to protect against such risk by actions taken under this Act [15 USCS §§ 2601 et seq.]. This subsection shall not be construed to relieve the Administrator of any requirement imposed on the Administrator by such other Federal laws.

**(2)** In making a determination under paragraph (1) that it is in the public interest for the Administrator to take an action under this title [15 USCS §§ 2601 et seq.] with respect to a chemical substance or mixture rather than under another law administered in whole or in part by the Administrator, the Administrator shall consider, based on information reasonably available to the Administrator, all relevant aspects of the risk described in paragraph (1) and a comparison of the estimated costs and efficiencies of the action to be taken under this title [15 USCS §§ 2601 et seq.] and an action to be taken under such other law to protect against such risk.

**(c) Occupational safety and health.** In exercising any authority under this Act [15 USCS §§ 2601 et seq.], the Administrator shall not, for purposes of section 4(b)(1) of the Occupational Safety and Health Act of 1970 [29 USCS § 653(b)(1)], be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

**(d) Coordination.** In administering this Act [15 USCS §§ 2601 et seq.], the Administrator shall consult and coordinate with the Secretary of Health and Human Services and the heads of any other appropriate Federal executive department or agency, any relevant independent regulatory agency, and any other appropriate instrumentality of the Federal Government for the purpose of achieving the maximum enforcement of this Act [15 USCS §§ 2601 et seq.] while imposing the least burdens of duplicative requirements on those subject to the Act and for other purposes. The Administrator shall, in the report required by section 30 [15 USCS § 2629], report annually to the Congress on actions taken to coordinate with such other Federal departments, agencies, or instrumentalities, and on actions taken to coordinate the authority under this Act with the authority granted under other Acts referred to in subsection (b).

**(e) Exposure information.** In addition to the requirements of subsection (a), if the Administrator obtains information related to exposures or releases of a chemical substance or mixture that may be prevented or reduced under another Federal law, including a law not administered by the Administrator, the Administrator shall make such information available to the relevant Federal agency or office of the Environmental Protection Agency.

# History

**HISTORY:**

Oct. 11, 1976, P. L. 94-469, § 9, 90 Stat. 2030; Oct. 22, 1986, P. L. 99-519, § 3(c), 100 Stat. 2989; June 22, 2016, P. L. 114-182, Title I, §§ 9, 19(h), 130 Stat. 476, 507.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.

*United States Code Service > TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123) > CHAPTER 53. TOXIC SUBSTANCES CONTROL (§§ 2601 — 2697) > CONTROL OF TOXIC SUBSTANCES (§§ 2601 — 2629)*

## § 2618. Judicial review

(a) **In general.**

(1)

(A) Except as otherwise provided in this title [15 USCS §§ 2601 et seq.], not later than 60 days after the date on which a rule is promulgated under this title, title II, or title IV [15 USCS §§ 2601 et seq., 2641 et seq. or 2681 et seq.], or the date on which an order is issued under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS §§ 2603, 2604(e), (f), 2605(i)(1)], [,] any person may file a petition for judicial review of such rule or order with the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which such person resides or in which such person's principal place of business is located. Courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of such a rule or order if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

(B) Except as otherwise provided in this title [15 USCS §§ 2601 et seq.], courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of an order issued under this title [15 USCS §§ 2601 et seq.], other than an order under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS § 2603, 2604(e), (f), or 2605(i)(1)], if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

(C)

(i) Not later than 60 days after the publication of a designation under section 6(b)(1)(B)(ii) [15 USCS § 2605(b)(1)(B)(ii)], any person may commence a civil action to challenge the designation.

(ii) The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over a civil action filed under this subparagraph.

(2) Copies of any petition filed under paragraph (1)(A) shall be transmitted forthwith to the Administrator and to the Attorney General by the clerk of the court with which such petition was filed. The provisions of section 2112 of title 28, United States Code, shall

apply to the filing of the record of proceedings on which the Administrator based the rule or order being reviewed under this section and to the transfer of proceedings between United States courts of appeals.

**(b) Additional submissions and presentations; modifications.** If in an action under this section to review a rule, or an order under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS § 2603, 2604(e), (f), or 2605(i)(1)], the petitioner or the Administrator applies to the court for leave to make additional oral submissions or written presentations respecting such rule or order and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the proceeding before the Administrator, the court may order the Administrator to provide additional opportunity to make such submissions and presentations. The Administrator may modify or set aside the rule or order being reviewed or make a new rule or order by reason of the additional submissions and presentations and shall file such modified or new rule or order with the return of such submissions and presentations. The court shall thereafter review such new or modified rule or order.

**(c) Standard of review.**

**(1)**

**(A)** Upon the filing of a petition under subsection (a)(1) for judicial review of a rule or order, the court shall have jurisdiction (i) to grant appropriate relief, including interim relief, as provided in chapter 7 of title 5, United States Code [5 USCS §§ 701 et seq.], and (ii) except as otherwise provided in subparagraph (B), to review such rule or order in accordance with chapter 7 of title 5, United States Code [5 USCS §§ 701 et seq.].

**(B)** Section 706 of title 5, United States Code, shall apply to review of a rule or order under this section, except that—

**(i)** in the case of review of—

**(I)** a rule under section 4(a), 5(b)(4), 6(a) [15 USCS § 2603(a), 2604(b)(4), or 2605(a)] (including review of the associated determination under section 6(b)(4)(A)), or 6(e) [15 USCS § 2605(b)(4)(a), or 2605(e)], the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole; and

**(II)** an order under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS § 2603, 2604(f), or 2605(i)(1)] , the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such order if the court finds that the order is not supported by substantial evidence in the record taken as a whole; and"; and

**(ii)** the court may not review the contents and adequacy of any statement of basis and purpose required by section 553(c) of title 5, United States Code, to

be incorporated in the rule or order, except as part of the record, taken as a whole.

**(2)** The judgment of the court affirming or setting aside, in whole or in part, any rule or order reviewed in accordance with this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of title 28, United States Code.

**(d) Fees and costs.** The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such a decision, may include an award of costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate.

**(e) Other remedies.** The remedies as provided in this section shall be in addition to and not in lieu of any other remedies provided by law.

## History

**HISTORY:**

Oct. 11, 1976, P. L. 94-469, Title I, § 19, 90 Stat. 2039; Oct. 22, 1986, P. L. 99-519, § 3(b)(2), (c), 100 Stat. 2989; Oct. 28, 1992, P. L. 102-550, Title X, Subtitle A, § 1021(b)(8), 106 Stat. 3923; June 22, 2016, P. L. 114-182, Title I, §§ 14, 19(m), 130 Stat. 498, 508.

United States Code Service
Copyright © 2026 All rights reserved.

# 40 CFR 751.301

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  Title 40 Protection of Environment  > Chapter I — Environmental Protection Agency  >  Subchapter R — Toxic Substances Control Act >  Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act  >  Subpart D — Trichloroethylene (TCE)*

## § 751.301 General.

**(a)** Applicability. This subpart sets certain restrictions on the manufacture (including import), processing, distribution in commerce, use, and disposal of trichloroethylene (TCE) (CASRN 79-01-6) to prevent unreasonable risk of injury to health in accordance with TSCA section 6(a).

**(b)** Regulatory threshold. Unless otherwise specified in this subpart, the prohibitions and restrictions of this subpart do not apply to products containing TCE at thresholds less than 0.1 percent by weight. This threshold does not apply to wastewater.

**(c)** Byproducts within site-limited, physically enclosed systems. Unless otherwise specified in this subpart, the prohibitions and restrictions of this subpart do not apply to TCE processed as a byproduct when that byproduct TCE is processed within a site-limited, physically enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was generated. This exclusion does not permit TCE to be present in any product that results from such site-limited, physically enclosed systems, except as permitted by paragraph (b) of this section.

**(d)** Owner and operator requirements. Any requirement for an owner or operator or an owner and operator is a requirement for any individual that is either an owner or an operator.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

§ 751.301 General.

**End of Document**

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS* > *Title 40 Protection of Environment* > *Chapter I — Environmental Protection Agency* > *Subchapter R — Toxic Substances Control Act* > *Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act* > *Subpart D — Trichloroethylene (TCE)*

## § 751.305 Prohibitions of manufacturing, processing, distribution in commerce, use and disposal.

**(a)** Applicability. The provisions of this section apply to the following:

**(1)** Manufacturing (including importing and manufacturing for export);

**(2)** Processing (including processing for export);

**(3)** All industrial and commercial uses;

**(4)** All consumer uses;

**(5)** Distribution in commerce; and

**(6)** Disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(b)** Prohibitions.

**(1)** After March 17, 2025, all persons are prohibited from manufacturing (including importing and manufacturing for export) TCE, except as specified for manufacturing in paragraphs (b)(5) through (25) of this section.

**(2)** After June 16, 2025, all persons are prohibited from processing (including processing for export) and distributing in commerce (including making available) TCE, including any TCE-containing products, except as specified for processing or distributing in commerce in paragraphs (b)(5) through (25) of this section, and all retailers are prohibited from distributing in commerce (including making available) TCE for any use.

**(3)** After September 15, 2025, all persons are prohibited from industrial and commercial use of TCE, including any TCE-containing products, except as specified for industrial or commercial use in paragraphs (b)(5) through (25) of this section.

**(4)** After September 15, 2025, all persons manufacturing (including importing), processing, and using TCE are prohibited from disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works except as specified in paragraphs (b)(14), (23) (24), and (26) of this section.

Page 4 of 16

§ 751.305 Prohibitions of manufacturing, processing, distribution in commerce, use and disposal.

**(5)** After June 16, 2025, all persons are prohibited from manufacturing (including importing) TCE for industrial and commercial use for batch vapor degreasing in open-top and closed-loop degreasing equipment, except for the use specified in paragraphs (b)(11), (15), (16), (17), (20), and (21) of this section.

**(6)** After September 15, 2025, all persons are prohibited from processing TCE for industrial and commercial use for batch vapor degreasing in open-top and closed-loop degreasing equipment, except for the use specified in paragraphs (b)(11), (15), (16), (17), (20), and (21) of this section.

**(7)** After December 18, 2025, all persons are prohibited from the industrial and commercial use of TCE for batch vapor degreasing in open-top and closed-loop degreasing equipment, except for the use specified in paragraphs (b)(11), (15), (16), (17), (20), and (21) of this section.

**(8)** After June 10, 2026, all persons are prohibited from manufacturing (including importing) TCE for: (i) Processing of TCE as a reactant/intermediate, except for the use as specified in paragraph (b)(18) of this section; and (ii) Processing TCE for the industrial and commercial use of TCE as a processing aid for: process solvent used in battery manufacture; process solvent used in polymer fiber spinning, fluoroelastomer manufacture and Alcantara manufacture; extraction solvent used in caprolactam manufacture; precipitant used in beta-cyclodextrin manufacture, except for those uses specified in paragraphs (b)(14), (23) and (24) of this section.

**(9)** After December 18, 2026, except for those uses specified in paragraphs (b)(14), (23), (24), and (27) of this section, all persons are prohibited from:

**(i)** Processing TCE as a reactant/intermediate, except for the use as specified in paragraph (b)(18) of this section;

**(ii)** Processing for and industrial and commercial use of TCE as a processing aid in: process solvent used in battery manufacture; process solvent used in polymer fiber spinning, fluoroelastomer manufacture and Alcantara manufacture; extraction solvent used in caprolactam manufacture; precipitant used in beta-cyclodextrin manufacture; and

**(iii)** The disposal of TCE from the uses specified in (b)(9)(i) and (ii) of this section to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(10)** After December 18, 2027, all persons are prohibited from industrial and commercial use of TCE in energized electrical cleaners and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such a use.

**(11)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop batch vapor degreasing for rayon fabric scouring for end use in producing rocket booster nozzles for Federal agencies and their contractors, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use. If such persons obtain and maintain the records required by §§ 751.309 and 751.323 demonstrating that a final pre-launch test was completed using an alternative to TCE in the production of the rocket booster nozzles, the industrial and commercial use of TCE as a solvent in closed-loop batch

§ 751.305 Prohibitions of manufacturing, processing, distribution in commerce, use and disposal.

vapor degreasing for rayon fabric scouring for end use in producing rocket booster nozzles for Federal agencies and their contractors, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use may continue beyond December 18, 2029.

**(12)** After December 18, 2029, all persons are prohibited from industrial and commercial use of TCE in adhesives and sealants for essential aerospace applications, and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such uses.

**(13)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE as a laboratory chemical for asphalt testing and recovery using manual centrifuge processes, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as further detailed in § 751.311.

**(14)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE as a processing aid for lithium battery separator manufacturing, and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use as well as the disposal of TCE from such industrial or commercial use to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(15)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE for batch vapor degreasing for land-based DoD defense systems by Federal agencies and their contractors, and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(16)** After December 18, 2031, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop batch vapor degreasing necessary for rocket engine cleaning by Federal Agencies and their contractors as described in § 751.325(b)(1) and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(17)** After December 18, 2031, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop and open-top batch vapor degreasing for essential aerospace parts and components and narrow tubing for medical devices, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use as described in § 751.325(b)(2).

**(18)** After June 18, 2033, all persons are prohibited from the industrial and commercial use of TCE as an intermediate for manufacturing hydrofluorocarbon 134-a, also known as 1,1,1,2-tetrafluroethane (HFC-134a: CASRN 811-97-2), and manufacturing (including importing), processing, and distribution in commerce for such use as described in § 751.307.

**(19)** After December 18, 2034, all persons are prohibited from the industrial and commercial use of TCE in laboratory use for asphalt testing and recovery, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as described in § 751.311.

§ 751.305 Prohibitions of manufacturing, processing, distribution in commerce, use and disposal.

**(20)** After December 18, 2034, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop batch vapor degreasing for rayon fabric scouring for end use in producing rocket booster nozzles for Federal agencies and their contractors, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(21)** After December 18, 2034, for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems, prohibit the industrial and commercial use of TCE as (and manufacturing (including importing), processing, and distribution in commerce of TCE for): potting compounds for naval electronic systems and equipment; sealing compounds for high and ultra-high vacuum systems; bonding compounds for materials testing and maintenance of underwater systems and bonding of nonmetallic materials; and cleaning agents to satisfy cleaning requirements (which includes degreasing using wipes, sprays, solvents and vapor degreasing) for: materials and components required for military ordnance testing; temporary resin repairs in vessel spaces where welding is not authorized; ensuring polyurethane adhesion for electronic systems and equipment repair and installation of elastomeric materials; various naval combat systems, radars, sensors, equipment; fabrication and prototyping processes to remove coolant and other residue from machine parts; machined part fabrications for naval systems; installation of topside rubber tile material aboard vessels; and vapor degreasing required for substrate surface preparation prior to electroplating processes.

**(22)** After December 18, 2034, all persons are prohibited from manufacturing (including import), processing, distribution in commerce, or use of TCE, including any TCE containing products, for industrial or commercial use in an emergency by NASA or its contractors as described in § 751.325(b)(4), and manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(23)** After December 18, 2044, all persons are prohibited from the industrial and commercial use of TCE as a processing aid for lead-acid battery separator manufacturing, and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as well as the disposal of TCE from such industrial or commercial use to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(24)** After December 18, 2039, all persons are prohibited from the industrial and commercial use of TCE as a processing aid for specialty polymeric microporous sheet materials manufacturing, and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as well as the disposal of TCE from such industrial or commercial use to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(25)** After December 18, 2074, all persons are prohibited from industrial and commercial uses of TCE for the laboratory uses described in § 751.325(b)(7), and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such uses.

§ 751.305 Prohibitions of manufacturing, processing, distribution in commerce, use and disposal.

**(26)** After December 18, 2074, all persons are prohibited from disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works for the purposes of cleanup projects of TCE-contaminated water and groundwater as described in § 751.325(b)(8).

**(27)** After September 15, 2028, all persons are prohibited from the industrial and commercial use of TCE as a processing aid in the manufacture of nuclear fuel, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025; 90 FR 44772, 44781, Sept. 17, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

**End of Document**

# 40 CFR 751.307

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  Title 40 Protection of Environment  > Chapter I — Environmental Protection Agency  >  Subchapter R — Toxic Substances Control Act >  Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act  >  Subpart D — Trichloroethylene (TCE)*

## § 751.307 Phase-out of processing trichloroethylene to manufacture of HFC-134a.

**(a)** Baseline. Before June 16, 2025, each manufacturer of HFC-134a who processes TCE as an intermediate must establish a baseline annual volume of TCE processed as an intermediate.

> **(1)** The manufacturer must use the average annual volume of any 12 consecutive months in the 3 years preceding December 17, 2024 to calculate the baseline.

> **(2)** The manufacturer must retain records that demonstrate how the baseline annual volume was calculated, in accordance with § 751.323(d)(1).

**(b)** Phase-out.

> **(1)** Beginning June 7, 2027, each manufacturer of HFC-134a who processes TCE as an intermediate is not permitted to process TCE as an intermediate at an annual volume greater than 75 percent of the baseline.

> **(2)** Beginning June 18, 2029, each manufacturer of HFC-134a who processes TCE as an intermediate is not permitted to process TCE as an intermediate at an annual volume greater than 50 percent of the baseline.

> **(3)** Beginning June 18, 2031, each manufacturer of HFC-134a who processes TCE as an intermediate is not permitted to process TCE as an intermediate at an annual volume greater than 25 percent of the baseline so established.

> **(4)** Beginning June 18, 2033, each manufacturer of HFC-134a who processes TCE as an intermediate is prohibited from processing TCE as an intermediate.

**(c)** Workplace chemical protection program. The owner or operator of the location where TCE is processed as an intermediate in accordance with this section, and manufacturers (including importers) and processors of TCE for such use, must comply with § 751.315.

**(d)** Recordkeeping. The owner or operator of the location where TCE is processed as an intermediate in accordance with this section must comply with the recordkeeping requirements in § 751.323.

§ 751.307 Phase-out of processing trichloroethylene to manufacture of HFC-134a.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

**End of Document**

# 40 CFR 751.325

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  Title 40 Protection of Environment  > Chapter I — Environmental Protection Agency  >  Subchapter R — Toxic Substances Control Act >  Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act  >  Subpart D — Trichloroethylene (TCE)*

## § 751.325 Exemptions.

**(a)** In general.

**(1)** The time-limited exemptions described in this section are established in accordance with 15 U.S.C. 2605(g).

**(2)** In order to be eligible for the exemptions described in this section, regulated parties must comply with all conditions established for such exemptions in this section.

**(b)** Exemptions—

**(1)** Closed-loop batch vapor degreasing necessary for rocket engine cleaning by Federal agencies and their contractors until December 18, 2031. The following are specific conditions of the exemption for industrial and commercial use of TCE as a solvent for closed-loop vapor degreasing necessary for rocket engine cleaning by Federal agencies and their contractors described in § 751.305(b)(15):

**(i)** The use of TCE in industrial and commercial as a solvent for closed-loop vapor degreasing is limited to the closed-loop batch vapor degreasing necessary for rocket engine cleaning by Federal agencies and their contractors.

**(ii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iii)** The owner or operator of the location where such use of TCE occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the recordkeeping requirements in § 751.323.

**(2)** Closed-loop and Open-top batch vapor degreasing for essential aerospace parts and components and narrow tubing for medical devices until December 18, 2031. The following are specific conditions of the exemption for vapor degreasing described in § 751.305(b)(16):

**(i)** The use of TCE for closed-loop and open-top batch vapor degreasing is limited to the cleaning of:

§ 751.325 Exemptions.

**(A)** Essential aerospace parts and components where cleaning alternatives present technical feasibility or performance challenges to meet specifications from Federal agencies or other long-standing design specifications included in existing contracts; and

**(B)** Narrow tubing for medical devices.

**(ii)** The owner or operator of the location where such use of TCE occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iii)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(3)** Certain industrial and commercial uses of TCE for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems until December 18, 2034. The following are specific conditions of the exemption for industrial and commercial uses of TCE for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems described in § 751.305(b)(20):

**(i)** The industrial and commercial use of TCE must be limited for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems: as potting compounds for naval electronic systems and equipment; sealing compounds for high and ultra-high vacuum systems; bonding compounds for materials testing and maintenance of underwater systems and bonding of nonmetallic materials; and cleaning agents to satisfy cleaning requirements (which includes degreasing using wipes, sprays, solvents and vapor degreasing) for: materials and components required for military ordnance testing; temporary resin repairs in vessel spaces where welding is not authorized; ensuring polyurethane adhesion for electronic systems and equipment repair and installation of elastomeric materials; various naval combat systems, radars, sensors, equipment; fabrication and prototyping processes to remove coolant and other residue from machine parts; machined part fabrications for naval systems; installation of topside rubber tile material aboard vessels; and vapor degreasing required for substrate surface preparation prior to electroplating processes.

**(ii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iii)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(4)** Use of TCE or TCE-containing products in an emergency by the National Aeronautics and Space Administration and its contractors operating within the scope of their contracted work until December 18, 2034—

**(i)** Applicability. This exemption shall apply to the following specific conditions of use:

## § 751.325 Exemptions.

**(A)** Industrial and commercial use as solvent for open-top or closed-loop batch vapor degreasing.

**(B)** Industrial and commercial use as solvent for cold cleaning.

**(C)** Industrial and commercial use as a solvent for aerosol spray degreaser/cleaner and mold release.

**(D)** Industrial and commercial use as a lubricant and grease in tap and die fluid.

**(E)** Industrial and commercial use as a lubricant and grease in penetrating lubricant.

**(F)** Industrial and commercial use as an adhesive and sealant in solvent-based adhesives. and sealants.

**(G)** Industrial and commercial as a functional fluid in heat exchange fluid.

**(H)** Industrial and commercial use in corrosion inhibitors and anti-scaling agents.

**(I)** Industrial and commercial use of TCE as a processing aid.

**(J)** Manufacturing (including importing) and processing of TCE for the industrial and commercial uses listed in paragraphs (b)(4)(i)(A) through (I) of this section.

**(ii)** Emergency use.

**(A)** In general. An emergency is a serious and sudden situation requiring immediate action, within 15 days or less, necessary to protect:

**(1)** Safety of NASA's or their contractors' personnel;

**(2)** NASA's missions;

**(3)** Human health, safety, or property, including that of adjacent communities; or

**(4)** The environment.

**(B)** Duration. Each emergency is a separate situation; if use of TCE exceeds 15 days, then justification must be documented.

**(iii)** Eligibility. To be eligible for the exemption, the NASA and its contractors must:

**(A)** Select TCE because there are no technically and economically feasible safer alternatives available during the emergency.

**(B)** Perform the emergency use of TCE at locations controlled by NASA or its contractors.

**(C)** Comply with the following conditions:

**(1)** Notification. Within 15 working days of the emergency use by NASA and its contractors, NASA must provide notice to the EPA Assistant Administrators of both the Office of Enforcement and Compliance Assurance and the Office of Chemical Safety and Pollution Prevention that includes the following:

§ 751.325 Exemptions.

**(i)** Identification of the conditions of use detailed in paragraph (b)(4)(i) of this section that the emergency use fell under;

**(ii)** An explanation for why the emergency use met the definition of emergency in paragraph (b)(4)(i)(B) of this section; and

**(iii)** An explanation of why TCE was selected, including why there were no technically and economically feasible safer alternatives available in the particular emergency.

**(2)** Exposure control. The owner or operator must comply with the Workplace Chemical Protection Program provisions in § 751.315, to the extent technically feasible in light of the particular emergency.

**(3)** Recordkeeping. The owner or operator of the location where the use takes place must comply with the recordkeeping requirements in § 751.323.

**(5)** Lead-acid battery separator manufacturing until December 18, 2044. The following are specific conditions of the exemption for use as a processing aid in the manufacturing of lead-acid battery separators described in § 751.305(b)(22):

**(i)** The use of TCE as a processing aid for battery separator manufacturing must be limited to lead acid battery separator manufacturing.

**(ii)** This specific industrial and commercial use of TCE as a processing aid can only be used at industrial facilities in which TCE is in use for the manufacture of lead acid battery separators prior to February 18, 2025.

**(iii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iv)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(6)** Industrial and commercial use of TCE as a processing aid for specialty polymeric microporous sheet materials manufacturing until December 18, 2039. The following are specific conditions of the exemption for industrial and commercial use as a processing aid at § 751.305(b)(23):

**(i)** The use of TCE as a processing aid must be limited to specialty polymeric microporous sheet materials manufacturing.

**(ii)** This specific industrial and commercial use of TCE as a processing aid can only be used at industrial facilities in which TCE is in use for the manufacture of specialty polymeric microporous sheet materials prior to February 18, 2025.

**(iii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iv)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

§ 751.325 Exemptions.

**(7)** Laboratory use for essential laboratory activities until December 18, 2074. The following are specific conditions of the exemption for laboratory use at § 751.305(b)(24):

**(i)** The industrial and commercial use of TCE as a laboratory chemical must only be for essential laboratory activities. Essential laboratory activities are:

**(A)** Laboratory activities associated with cleanup and exposure monitoring activities, including chemical analysis, chemical synthesis, extracting or purifying other chemicals, dissolving other substances, research and development for the advancement of cleanup activities, and as an analytical standard for monitoring related to TCE contamination or exposure monitoring.

**(B)** Laboratory activities conducted by Federal agencies and their contractors, other than those described in paragraph (b)(7)(i)(A) of this section, and similar laboratory activities, provided the use is essential to the agency's mission.

**(ii)** The use of TCE as a laboratory chemical for testing asphalt is regulated under § 751.311, and is not considered an essential laboratory activity.

**(iii)** The use of TCE as a laboratory chemical must be performed on the premises of a laboratory.

**(iv)** The owner or operator of the location where such use of TCE occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(v)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(8)** Disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works for the purposes of cleanup projects of TCE-contaminated water and groundwater until December 18, 2074. The following are specific conditions of the exemption for disposal at § 751.305(b)(25):

**(i)** The disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works must only be for the purposes of cleanup projects of TCE-contaminated water and groundwater, and is limited to sites undergoing cleanup under CERCLA, RCRA, or other Federal, state, and local government laws, regulations, or requirements.

**(ii)** The owner or operator of the cleanup site location where TCE industrial treatment or pretreatment occurs must comply with the wastewater worker protection requirements in § 751.319.

**(iii)** The owner or operator of publicly owned treatment works that receive TCE wastewater must comply with the worker protection requirements in § 751.319.

**(iv)** The owner or operator of the location where such disposal of TCE occurs must comply with the recordkeeping requirements in § 751.323.

# Statutory Authority

§ 751.325 Exemptions.

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

**End of Document**

# 40 CFR 751.303

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS > Title 40 Protection of Environment > Chapter I — Environmental Protection Agency > Subchapter R — Toxic Substances Control Act > Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act > Subpart D — Trichloroethylene (TCE)*

## § 751.303 Definitions.

The definitions in subpart A of this part apply to this subpart unless otherwise specified in this section. In addition, the following definitions apply:

Distribute in commerce has the same meaning as in section 3 of the Act, except that the term does not include retailers for purposes of § 751.321 and § 751.323.

Interim ECEL means a concentration of airborne TCE of 0.2 parts per million (ppm) calculated as an eight (8)-hour time weighted average (TWA) that will be in place only for the timeframes indicated for specified conditions of use, after which prohibitions would take effect.

Interim ECEL action level means a concentration of airborne TCE of 0.1 parts per million (ppm) calculated as an eight (8)-hour time-weighted average (TWA).

Site-limited has the same meaning as in 40 CFR 711.3.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

End of Document

# 40 CFR 720.3

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  Title 40 Protection of Environment  >  Chapter I — Environmental Protection Agency  >  Subchapter R — Toxic Substances Control Act  >  Part 720 — Premanufacture Notification  >  Subpart A — General Provisions*

## § 720.3 Definitions.

In addition to the definitions under section 3 of the Act, 15 U.S.C. 2602, the following definitions apply to this part.

Act means the Toxic Substances Control Act, 15 U.S.C. 2601 et seq.

Applicable review period means the period starting on the date EPA receives a complete notice under section 5(a)(1) of the Act and ending 90 days after that date or on such date as is provided for in sections 5(b)(1) or 5(c) of the Act.

Article means a manufactured item:

**(1)** Which is formed to a specific shape or design during manufacture;

**(2)** Which has end use function(s) dependent in whole or in part upon its shape or design during end use; and

**(3)** Which has either no change of chemical composition during its end use or only those changes of composition which have no commercial purpose separate from that of the article and that may occur as described in § 720.30(h)(5), except that fluids and particles are not considered articles regardless of shape or design.

Byproduct means a chemical substance produced without a separate commercial intent during the manufacture, processing, use, or disposal of another chemical substance or mixture.

Byproduct material, source material, and special nuclear material have the meanings contained in the Atomic Energy Act of 1954, 42 U.S.C. 2014 et seq. and the regulations issued under it.

Central Data Exchange or CDX means EPA's centralized electronic document receiving system, or its successors.

Chemical substance means any organic or inorganic substance of a particular molecular identity, including any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and any chemical element or uncombined radical, except that "chemical substance" does not include:

**(1)** Any mixture;

**(2)** Any pesticide when manufactured, processed, or distributed in commerce for use as a pesticide;

**(3)** Tobacco or any tobacco product;

**(4)** Any source material, special nuclear material, or byproduct material;

**(5)** Any pistol, firearm, revolver, shells, or cartridges; or

**(6)** Any food, food additive, drug, cosmetic, or device, when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

Commerce means trade, traffic, transportation, or other commerce:

**(1)** Between a place in a State and any place outside of such State; or

**(2)** Which affects trade, traffic, transportation, or commerce between a place in a State and any place outside of such State.

Cosmetic, device, drug, food, and food additive have the meanings contained in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 321 et seq., and the regulations issued under it. In addition, the term "food" includes poultry and poultry products, as defined in the Poultry Products Inspection Act, 21 U.S.C. 453 et seq.; meats and meat food products, as defined in the Federal Meat Inspection Act, 21 U.S.C. 60 et seq.; and eggs and egg products, as defined in the Egg Products Inspection Act, 21 U.S.C. 1033 et seq.

Customs territory of the United States means the 50 States, Puerto Rico, and the District of Columbia.

Director means the Director of the EPA Office of Pollution Prevention and Toxics (OPPT).

Distribute in commerce means to sell in commerce, to introduce or deliver for introduction into commerce, or to hold after introduction into commerce.

EPA means the U.S. Environmental Protection Agency.

e-PMN software means electronic-PMN software created by EPA for use in preparing and submitting Premanufacture Notices (PMNs) and other TSCA section 5 notices and support documents electronically to the Agency.

Health and safety study or study means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying data and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological, or other studies of a chemical substance or mixture, and any test performed under the Act. Chemical identity is always part of a health and safety study.

**(1)** Not only is information which arises as a result of a formal, disciplined study included, but other information relating to the effects of a chemical substance or mixture on health or the environment is also included. Any data that bear on the effects of a chemical substance on health or the environment would be included.

**(2)** Examples include:

**(i)** Long- and short-term tests of mutagenicity, carcinogenicity, or teratogenicity; data on behavioral disorders; dermatoxicity; pharmacological effects; mammalian

absorption, distribution, metabolism, and excretion; cumulative, additive, and synergistic effects; acute, subchronic, and chronic effects; and structure/activity analyses.

**(ii)** Tests for ecological or other environmental effects on invertebrates, fish, or other animals, and plants, including acute toxicity tests, chronic toxicity tests, critical life stage tests, behavioral tests, algal growth tests, seed germination tests, plant growth or damage tests, microbial function tests, bioconcentration or bioaccumulation tests, and model ecosystem (microcosm) studies.

**(iii)** Assessments of human and environmental exposure, including workplace exposure, and impacts of a particular chemical substance or mixture on the environment, including surveys, tests, and studies of: Biological, photochemical, and chemical degradation; air, water, and soil transport; biomagnification and bioconcentration; and chemical and physical properties, e.g., boiling point, vapor pressure, evaporation rates from soil and water, octanol/water partition coefficient, and water solubility.

**(iv)** Monitoring data, when they have been aggregated and analyzed to measure the exposure of humans or the environment to a chemical substance or mixture.

**(v)** Any assessments of risk to health and the environment resulting from the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance.

Importer means any person who imports a chemical substance, including a chemical substance as part of a mixture or article, into the customs territory of the United States. "Importer" includes the person primarily liable for the payment of any duties on the merchandise or an authorized agent acting on his or her behalf. The term also includes, as appropriate:

**(1)** The consignee.

**(2)** The importer of record.

**(3)** The actual owner if an actual owner's declaration and superseding bond has been filed in accordance with 19 CFR 141.20; or

**(4)** The transferee, if the right to draw merchandise in a bonded warehouse has been transferred in accordance with 19 CFR part 144, subpart C. (See "principal importer.")

Impurity means a chemical substance which is unintentionally present with another chemical substance.

Intermediate means any chemical substance that is consumed, in whole or in part, in chemical reactions used for the intentional manufacture of another chemical substance(s) or mixture(s), or that is intentionally present for the purpose of altering the rates of such chemical reactions.

Inventory means the list of chemical substances manufactured or processed in the United States that EPA compiled and keeps current under section 8(b) of the Act.

Known to or reasonably ascertainable by means all information in a person's possession or control, plus all information that a reasonable person similarly situated might be expected to possess, control, or know.

Manufacture means to produce or manufacture in the United States or import into the customs territory of the United States.

Manufacture for commercial purposes means:

**(1)** To manufacture with the purpose of obtaining an immediate or eventual commercial advantage for the manufacturer, and includes, among other things, "manufacture" of any amount of a chemical substance or mixture.

**(2)** The term also applies to substances that are produced coincidentally during the manufacture, processing, use, or disposal of another substance or mixture, including byproducts that are separated from that other substance or mixture and impurities that remain in that substance or mixture. Byproducts and impurities without separate commercial value are nonetheless produced for the purpose of obtaining a commercial advantage, since they are part of the manufacture of a chemical substance for commercial purposes.

Manufacture solely for export means to manufacture for commercial purposes a chemical substance solely for export from the United States under the following restrictions on activities in the United States:

**(1)** Distribution in commerce is limited to purposes of export or processing solely for export as defined in § 721.3 of this chapter.

**(2)** The manufacturer and any person to whom the substance is distributed for purposes of export or processing solely for export (as defined in § 721.3 of this chapter), may not use the substance except in small quantities solely for research and development in accordance with § 720.36.

Manufacturer means a person who imports, produces, or manufactures a chemical substance. A person who extracts a component chemical substance from a previously existing chemical substance or a complex combination of substances is a manufacturer of that component chemical substance. A person who contracts with a manufacturer to manufacture or produce a chemical substance is also a manufacturer if:

**(1)** The manufacturer manufactures or produces the substance exclusively for that person; and

**(2)** That person specifies the identity of the substance and controls the total amount produced and the basic technology for the plant process.

Mixture means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except "mixture" does include:

**(1)** Any combination which occurs, in whole or in part, as a result of a chemical reaction if the combination could have been manufactured for commercial purposes without a chemical reaction at the time the chemical substances comprising the

combination were combined, and if all of the chemical substances comprising the combination are not new chemical substances; and

**(2)** Hydrates of a chemical substance or hydrated ions formed by association of a chemical substance with water, so long as the nonhydrated form is itself not a new chemical substance.

New chemical substance means any chemical substance which is not included on the Inventory.

Nonisolated intermediate means any intermediate that is not intentionally removed from the equipment in which it is manufactured, including the reaction vessel in which it is manufactured, equipment which is ancillary to the reaction vessel, and any equipment through which the chemical substance passes during a continuous flow process, but not including tanks or other vessels in which the substance is stored after its manufacture.

Person means any natural person, firm, company, corporation, joint-venture, partnership, sole proprietorship, association, or any other business entity, any State or political subdivision thereof, any municipality, any interstate body, and any department, agency or instrumentality of the Federal Government.

Pesticide has the meaning contained in the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136 et seq. and the regulations issued under it.

Possession or control means in possession or control of the submitter, or of any subsidiary, partnership in which the submitter is a general partner, parent company, or any company or partnership which the parent company owns or controls, if the subsidiary, parent company, or other company or partnership is associated with the submitter in the research, development, test marketing, or commercial marketing of the chemical substance in question. (A parent company owns or controls another company if the parent owns or controls 50 percent or more of the other company's voting stock. A parent company owns or controls any partnership in which it is a general partner). Information is included within this definition if it is:

**(1)** In files maintained by submitter's employees who are:

**(i)** Associated with research, development, test marketing, or commercial marketing of the chemical substance in question.

**(ii)** Reasonably likely to have such data.

**(2)** Maintained in the files of other agents of the submitter who are associated with research, development, test marketing, or commercial marketing of the chemical substance in question in the course of their employment as such agents.

Potentially exposed or susceptible subpopulation means a group of individuals within the general population identified by EPA who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, the elderly, or overburdened communities.

Principal importer means the first importer who, knowing that a new chemical substance will be imported rather than manufactured domestically, specifies the identity of the

chemical substance and the total amount to be imported. Only persons who are incorporated, licensed, or doing business in the United States may be principal importers.

Process means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce:

**(1)** In the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

**(2)** As part of a mixture or article containing the chemical substance or mixture.

Processor means any person who processes a chemical substance or mixture.

Small quantities solely for research and development (or "small quantities solely for purposes of scientific experimentation or analysis or chemical research on, or analysis of, such substance or another substance, including such research or analysis for the development of a product") means quantities of a chemical substance manufactured or processed or proposed to be manufactured or processed solely for research and development that are not greater than reasonably necessary for such purposes.

State means any State of the United States and the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, and any other territory or possession of the United States.

Support documents means material and information submitted to EPA in support of a TSCA section 5 notice, including but not limited to, correspondence, amendments (if notices for these amendments were submitted prior to January 19, 2016), and test data. The term "support documents" does not include orders under TSCA section 5(e) (either consent orders or orders imposed pursuant to TSCA section 5(e)(2)(B)).

Technically qualified individual means a person or persons:

**(1)** Who, because of education, training, or experience, or a combination of these factors, is capable of understanding the health and environmental risks associated with the chemical substance which is used under his or her supervision;

**(2)** Who is responsible for enforcing appropriate methods of conducting scientific experimentation, analysis, or chemical research to minimize such risks; and

**(3)** Who is responsible for the safety assessments and clearances related to the procurement, storage, use, and disposal of the chemical substance as may be appropriate or required within the scope of conducting a research and development activity.

Test data means data from a formal or informal test or experiment, including information concerning the objectives, experimental methods and materials, protocols, results, data analyses, recorded observations, monitoring data, measurements, and conclusions from a test or experiment.

Test marketing means the distribution in commerce of no more than a predetermined amount of a chemical substance, mixture, or article containing that chemical substance or mixture, by a manufacturer or processor, to no more than a defined number of potential

customers to explore market capability in a competitive situation during a predetermined testing period prior to the broader distribution of that chemical substance, mixture, or article in commerce.

United States, when used in the geographic sense, means all of the States.

## History

[48 FR 21742, May 13, 1983, as amended at 51 FR 15101, Apr. 22, 1986; 75 FR 773, 784, Jan. 6, 2010.; 80 FR 42739, 42745, July 20, 2015; 87 FR 39756, 39763, July 5, 2022; 89 FR 102773, 102789, Dec. 18, 2024]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

**End of Document**