**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

**Case No. 25-1055**
(consolidated with Case Nos. 25-1079, 25-1080, 25-1081, 25-1082, 25-1083, 25-1084, 25-1093, 25-1098, 25-1118, 25-1132, 25-1133, 25-1144)

---

**UNITED STEEL PAPER and FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL and SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.,**

*Petitioners*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent.*

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

# FINAL BRIEF OF PETITIONERS CENTER FOR ENVIRONMENTAL HEALTH and ENVIRONMENTAL DEFENSE FUND

---


Robert M. Sussman
SUSSMAN & ASSOCIATES
310 Garfield St., N.W.
Washington, D.C. 20008
202-716-0118
bobsussman@comcast.net
*Counsel for Petitioner Center for Environmental Health*


**September 21, 2026**

Samantha Liskow
ENVIRONMENTAL DEFENSE FUND
257 PARK AVE S
NEW YORK, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Petitioner Environmental Defense Fund*

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST (FRAP 26.1)

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, Petitioners Center for Environmental Health and Environmental Defense Fund make the following statements:

1) For non-governmental corporate parties, please list all parent corporations: **None/not applicable**.

2) For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the company's stock.
**None/not applicable.**

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests.
**None/not applicable.**

Dated: September 21, 2026

s/ Robert Sussman
Robert Sussman
*Counsel for Petitioner Center for Environmental Health*

s/ Samantha Liskow
Samantha Liskow
*Counsel for Environmental Defense Fund*

## TABLE OF CONTENTS


TABLE OF CONTENTS ........................................................................ iv

GLOSSARY ........................................................................ xi

INTRODUCTION ........................................................................ 1

STATUTES AND REGULATIONS ........................................................................ 4

STATEMENT OF JURISDICTION ........................................................................ 5

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................................ 7

STATEMENT OF RELATED CASES AND PROCEEDINGS ........................................ 8

STATEMENT OF THE CASE ........................................................................ 9

I. The Identification and Regulation of Chemicals that Cause Harm is Central to TSCA ........................................................................ 9

A. Congress enacted TSCA to prevent chemical companies from experimenting on the public with dangerous chemicals ........................................ 9

B. Congress recognized the need to strengthen EPA's authority to regulate existing chemicals ........................................................................ 10

II. People Have Been Widely Exposed to and Harmed by Toxic TCE ............. 15

III. EPA Evaluated TCE and Found Unreasonable Risk ........................................ 21

IV. EPA Takes Actions to Strengthen its Evaluation of TCE ........................................ 24

V. EPA Addresses TCE's Unreasonable Risk by Banning TCE, But Provides for Numerous Compliance Delays and Certain Exclusions ........................................ 29

SUMMARY OF ARGUMENT ........................................................................ 33

STANDARD OF REVIEW ........................................................................ 38

I. EPA's Failure to Protect Fenceline Communities from Unreasonable Risks Violates TSCA and Is Arbitrary and Capricious ........................................ 39

A. TSCA Requires EPA to Determine Whether TCE Emitted from Facilities Presents Unreasonable Risks ........................................................................ 40

B. EPA's Refusal to Determine TCE's Risks to Fenceline Communities Violated TSCA's Requirement to Address Environmental Exposure Pathways in Risk Evaluations ........................................................................ 42

C. Fenceline Communities Are Potentially Exposed or Susceptible Subpopulations for Which TSCA Required Risk Determinations ............44

D. EPA's Failure to Determine Unreasonable Risk Was Arbitrary and Capricious and Lacked Substantial Evidence Support.............................48

1. EPA's Claim that its Assessment Methodology Was Not Intended to Inform Unreasonable Risk Determinations Is Contradicted by the Agency Itself.........................................................................48

2. EPA Did Not Demonstrate that Technical Deficiencies in the Methodology Made it Unsuitable for Determinations of Unreasonable Risk ..........................................................................................50

3. If EPA Was Concerned about the Limitations of its Assessments, Its Methodology Required It to Conduct Further Analysis ........................51

4. EPA Had No Basis to Conclude that Protecting Fenceline Communities During their Years of Exposure to TCE Was Unnecessary Because the Rule Provided for Ultimate Prohibition...............................................52

E. EPA Erroneously Concluded That Clean Air Act Standards for Chemical Facilities Would Prevent Increases in Emissions under EPA's Rule .........55

F. EPA's Failure to Require Interim Protections for Fenceline Communities Was Arbitrary and Capricious In Light of Its Decision to Require Interim Protections for Workers .......................................................................57

G. Substantial Evidence in the Record Demonstrates that Risks to Fenceline Communities are Unreasonable..............................................................58

1. The Methodology EPA Used to Determine the Magnitude of Fenceline Risks Was Consistent With Established TSCA Policy and Practice .....58

2. EPA's Fenceline Assessments Showed Risk Levels for Communities that Were Unreasonable ....................................................................60

3. Because EPA's Methodology Significantly Understated Fenceline Risks, They Were Likely Greater than EPA Calculated ........................60

H. The Court Should Remand the Rule to EPA to Revise It to Protect Fenceline Communities During the Interim Period..................................62

II. EPA Violated TSCA by Excluding TCE Production as a Byproduct from Its Risk Evaluation and Rule .......................................................................63

A. Exemption of TCE Byproducts from Section 6(a) Rules Violates TSCA.65

B. EPA's Exemption for TCE Byproducts Processed at their Sites of Manufacture Is Unlawful ... 69

C. The Court Should Vacate and Remand EPA's Actions Regarding TCE Byproducts ... 70

III. The Rule's Exemption of *De Minimis* Levels of TCE Was Unlawful ... 70

A. EPA Lacks Authority to Exempt Conditions of Use from Section 6 Unless It Determines That They do Not Contribute to Unreasonable Risk ... 71

B. EPA Did Not Provide Adequate Notice and Opportunity for Comment on Its *De Minimis* Exemption ... 75

IV. Petitioners Have Demonstrated Standing ... 78

CONCLUSION ... 82

COMBINED CERTIFICATIONS ... 84

CERTIFICATE OF SERVICE ... 85

On September 21, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. ... 85

## TABLE OF AUTHORITIES

### Cases

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ..........................78
*Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 72 F.4th 1324 (D.C. Cir. 2023) ..........................77
*Chem. Mfrs. Ass'n v. EPA,* 859 F.2d 977 (D.C. Cir. 1988) ..........................39
*Child.'s Health Def., Inc. v. Rutgers,* 93 F.4th 66 (3d Cir. 2024)..........................78
*Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018) ..........................78
*Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387 (D.C. Cir. 1990)..........83
*Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991)..........................11
*Finnbin, LLC v. Consumer Prod. Safety Comm'n,* 45 F.4th 127 (D.C. Cir. 2022)..83
*Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158 (5th Cir. 2012) ...............82
*Labor Council for Latin Am. Advancement v. United States EPA*, 12 F.4th 234 (2d Cir. 2021) ..........................39
*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)..........................38
*N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74 (3d Cir. 2014) ..........................50
*N.J. Coal. of Auto. Retailers, Inc. v. Mazda Motor of Am., Inc.*, 957 F.3d 390 (3d Cir. 2020) ..........................78
*Nat. Res. Def. Council v. Wheeler,* 955 F.3d 68 (D.C. Cir. 2020)..........................83
*Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326 (2d Cir. 2006)..9
*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011)..........................75
*Shell Oil Co. v. EPA*, 950 F.2d 741 (D.C. Cir. 1991) ..........................77
*Sierra Club v. United States EPA*, 972 F.3d 290 (3d Cir. 2020) ....................... 79, 80
*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789 (5th Cir. 2000)..........................81
*Toll Bros., Inc. v. Twp. Of Readington*, 553 F.3d 131 (3d Cir. 2009)......................81
*Valley Forge Christian College. v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982)..........................79

### Statutes

5 U.S.C. § 553(b) ..........................75
5 U.S.C. §706..........................38
15 U.S.C. § 2602.......................... passim
15 U.S.C. § 2602.......................... 24, 40, 44, 66

15 U.S.C. § 2605 ........ passim
15 U.S.C. § 2605(a) ........ 15, 43, 73
15 U.S.C. § 2605(b)(1)........ 13
15 U.S.C. § 2605(b)(4)(A) ........ 66
15 U.S.C. § 2605(b)(4)........ 13
15 U.S.C. § 2605(b)(4)(A) ........ 24, 40, 42, 44
15 U.S.C. § 2605(b)(4)(F)(i)........ 14, 41
15 U.S.C. § 2605(g)(1)........ 15
15 U.S.C. § 2605(g)(4)........ 15
15 U.S.C. § 2605(i)(2) ........ 5, 6
15 U.S.C. § 2608(b) ........ 56
15 U.S.C. § 2618 ........ 5, 38, 39, 48
15 U.S.C. § 2618(a)(1)(A) ........ 5, 6
15 U.S.C. § 2618(c)(1)(B) ........ 38
15 U.S.C. § 2618(c)(1)(B)(i)(I)........ 39
15 U.S.C. § 2625(o) ........ 14

**Regulations**

29 C.F.R. § 1910.1200(a)(2) ........ 74
40 C.F.R. § 23.5........ 5
40 C.F.R. § 720.3 ........ 65
40 C.F.R. § 751.301 ........ passim
40 C.F.R. § 751.305(b)........ 54, 64
40 C.F.R. § 751.307 ........ 53
40 C.F.R. § 751.325 ........ 54

**Federal Register**

15 Fed. Reg. 17,574 ........ 74
85 Fed. Reg. 11,079 ........ 21
86 Fed. Reg. 24,230 ........ 68
88 Fed. Reg. 1222........ 28
88 Fed. Reg. 74,712 ........ 29, 55, 58, 62, 65, 66, 71, 76
89 Fed. Reg. 21,970........ 43
89 Fed. Reg. 37,028 ........ 66, 72
89 Fed. Reg. 102,568 ........ passim

*Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0*, EPA-HQ-OPPT-2021-0415-0012 .....25
EPA, Response to Public Comments (November 20, 2024), EPA-HQ-OPPT-2020-0642-0726 .....64
EPA, *Risk Evaluation for Trichloroethylene* (Nov. 2020) EPA-HQ-OPPT-2016-0737-0127 ..... passim
EPA, *Toxicological Review of Trichloroethylene* (Sept. 2011) EPA-HQ-OPPT-2020-0642-0170 ..... 16, 17, 20, 22
EPA, *TSCA Work Plan Chemical Risk Assessment - Trichloroethylene: Degreasing, Spot Cleaning and Arts & Crafts Uses* (June 2014) .....20
US. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Trichloroethylene* (June 2019) EPA-HQ-OPPT-2020-0642-0322 .....17

**Legislative Materials**

Frank L. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 140 Stat. 448 (2016).....12
Cong. Rec., H3007-H3025 (2016).....12
Cong. Rec., S3511-5315 (2016).....11
Cong. Rec., S3511-S3525 (2016) .....12
Cong. Rec., S3517 (2016).....12
H.R. Rep. No. 94-1341 (1976).....41
S. Rep. No. 114-67 (2015) .....12
S. Rep. No. 94-698 (1976) ..... 12, 41

**Other Authorities**

Bove, Frank, Environmental Health, *Mortality Study of Civilian Employees Exposed to Contaminated Drinking Water at USMC Base Camp Lejeune*, 13:68 (Aug. 2014) .....19
*Carcinogenesis Bioassay of Trichloroethylene*, https://ntp.niehs.nih.gov/publications/reports/tr/000s/tr002 .....19
Costas, K, Science of the Total Environment, *A Case-Control Study of Childhood Leukemia in Woburn, Massachusetts*, Vol. 300, Issues 1-3 (Dec. 2002) .....18

*EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ........................................................................................ 24, 39
EPA Office of the Science Advisor, Risk Assessment Forum, *Framework for Human Health Risk Assessment to Inform Decision Making* (April 12, 2014)...50
EPA, Guidelines for Carcinogen Risk Assessment (March 2025) ..........................20
EPA, TRI Explorer ..........................................................................................16
EPA, *Trichloroethylene (TCE): Fenceline Technical Support – Ambient Air Pathwa*y (March 3, 2022), EPA-HQ-OPPT-2020-0642-0091 ...................... 27, 46
EPA, *Trichloroethylene and Vapor Intrusion*, https://www.epa.gov/vaporintrusion/vapor-intrusion-superfund-sites ................18
EPA, *Trichloroethylene: Fenceline Technical Support – Water Pathway* (March 24, 2023) ..............................................................................................................27
EPA, *United States Environmental Protection Agency Charter, Science Advisory Committee On Chemicals* (February 23, 2026),. ...............................................14
Johnson, Paula et al., *Threshold of Trichloroethylene Contamination in Maternal Drinking Waters Affecting Fetal Heart Development in the Rat*, 111 Environmental Health Perspectives, 289 (March 2003).....................................19
Science Advisory Committee on Chemicals, *Meeting Minutes and Final Report* EPA-HQ-OPPT-2021-0415-0095 .................................................. 23, 26, 61, 62
Toxicological Review and U.S. Department of Health and Human Services National Toxicology Program, *Report on Carcinogens, Monograph on Trichloroethylene* (January 2015) ...................................................................19
United States Government Accountability Office, *Chemical Regulation: Options Exist to Improve EPA*'s *Ability to Assess Health Risks and Manage Its Chemical Review Program* (2005) ..........................................................................10

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EDF | Environmental Defense Fund |
| EPA | Respondent United States Environmental Protection Agency |
| CEH | Center for Environmental Health |
| JA | Joint Appendix |
| NESHAP | National Emissions Standards for Hazardous Air Pollutants |
| OSHA | Occupational Safety and Health Administration |
| Rule | United States Environmental Protection Agency, "Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)," 89 Fed. Reg. 102,568 (Dec. 17, 2024) |
| TCE | Trichloroethylene |
| TSCA | Toxic Substances Control Act |

## INTRODUCTION

Trichloroethylene (TCE), a highly toxic solvent, causes multiple types of cancer in humans and has been linked to Parkinson's disease, immune and reproduction system harm, kidney, liver, and neurological damage, and defects in the developing human heart. These harms can occur at extremely low levels of exposure. Over the years, Environmental Protection Agency (EPA) and other expert bodies have exhaustively reviewed the scientific literature on TCE toxicity and confirmed its multiple hazards.

TCE has widely contaminated air, soil, surface and drinking water, and waste sites. TCE vapor is known to seep into homes from contaminated soil and groundwater, endangering residents' health. Harm from TCE-contaminated drinking water in communities such as Woburn, Massachusetts and Camp Lejeune, North Carolina have received national attention. Comprehensive regulation of TCE, which had languished for decades, finally gained momentum after Congress overhauled the Toxic Substances Control Act (TSCA) in 2016. Enacted by a large bipartisan margin, the revised law strengthened EPA's authorities to evaluate the risks of high-concern chemicals and eliminate those risks that it deemed unreasonable. TCE was one of the first substances to undergo the enhanced TSCA risk evaluation and risk management process, which resulted in a risk evaluation in 2020 and a risk management rule in 2024.

EPA's evaluation found that 52 of TCE's 54 "conditions of use" present unreasonable risks to human health. Once EPA has made a determination of unreasonable risk, TSCA requires EPA to impose restrictions to eliminate such risk. Here, EPA determined that prohibition is the best way to address TCE's unreasonable risk, and that a rule allowing TCE uses to continue under restrictions would not effectively protect workers and the general public.

Despite the Rule's prohibitions on TCE production and use, it contains several loopholes and exemptions that weaken its protections. Most significantly, its prohibitions will be delayed for long periods for a number of TCE uses, prolonging people's exposure to this toxic chemical. During these years, fenceline communities near plants producing and using TCE will remain exposed to unreasonable health harms because EPA chose not to control facility releases to air and water. Moreover, some TCE manufacturing and processing activities are not restricted at all, allowing unsafe exposures to continue at current levels indefinitely.

Petitioners Center for Environmental Health (CEH) and Environmental Defense Fund (EDF) challenge these shortcomings in the Rule's protections, which violate EPA's obligations under TSCA to identify and eliminate unreasonable risks. We show in this Brief that three aspects of the rule are unlawful and should be set aside:

First, EPA's analyses of the health risks to communities near industrial facilities that released TCE to air and water demonstrated that communities were exposed to TCE levels that exceeded EPA unreasonable risk benchmarks. Yet in its rule, the Agency took no action to protect the communities during the years that they would still be exposed to the chemical. This violated TSCA and was arbitrary and capricious.

Second, EPA's risk evaluation and rule did not address the production of TCE as a byproduct on the erroneous ground that byproduct production did not constitute TCE "manufacture" as defined in TSCA. The rule also allows site-limited processing of TCE byproducts in enclosed systems without demonstrating that these activities do not present unreasonable risk as TSCA requires.

Finally, EPA exempted from the rule's prohibitions industrial, commercial, and consumer products containing TCE at thresholds less than 0.1 percent by weight. Yet in its rulemaking, EPA did not analyze the risks of the TCE exposures that would result from the exemption. Thus, the Agency lacked any basis to conclude that, individually or in the aggregate, they would not contribute to TCE's unreasonable risk. EPA also failed to provide sufficient notice and opportunity to comment on the exemption.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in this brief's addendum.

## STATEMENT OF JURISDICTION

The Courts of Appeals have exclusive jurisdiction to review rules issued under TSCA. 15 U.S.C. § 2618(a)(1)(A).

On December 17, 2024, Respondent United States Environmental Protection Agency (hereinafter, "EPA" or "Agency") published the rule that is the subject of the consolidated petitions. Joint Appendix ("JA") 55 (89 Fed. Reg. 102,568) ("Rule"); *see also* 40 C.F.R. § 23.5 (specifying that promulgation date for purposes of judicial review is two weeks from date of Federal Register publication). United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO timely petitioned this Court for review of the Rule on January 10, 2025. Petition for Review, No 25-1055, Dkt. No. 1; *see* 15 U.S.C. § 2618(a)(1)(A) (establishing 60-day deadline after promulgation to petition for review of TSCA rules).

On January 6, 2025, Petitioner Center for Environmental Health ("CEH") timely petitioned the Ninth Circuit for review of the Rule. On January 8, 2025, Petitioner Environmental Defense Fund ("EDF") timely petitioned the Second Circuit for review of the Rule. Those petitions, along with various other petitions of industry parties filed in other courts, were transferred to this Court by the United States Judicial Panel on Multidistrict Litigation. Consolidation Order, Case MCP No. 193, Dkt. No. 4 (Jan. 14, 2025). On January 24, 2025, the Court consolidated

the cases "for the purposes of scheduling, the appendix, the respondent's brief, and disposition." Clerk Order, No. 25-1055, Dkt. No. 15.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did EPA violate TSCA and act arbitrarily and capriciously by failing to protect fenceline communities from unreasonable risks caused by the continued manufacture and use of the toxic chemical TCE?

2. Did EPA violate TSCA by failing to consider the risks presented by the manufacturing and processing of TCE byproducts in its risk evaluation and address such risks in its risk management rule?

3. Did EPA's creation of a *de minimis* exemption violate both substantive requirements of TSCA and procedural requirements of the Administrative Procedure Act because it was promulgated without adequate notice and opportunity for comment?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

These consolidated cases have not been before this Court previously, and Petitioners are not aware of any other related case or proceeding as defined by Third Circuit Rule 28.1(a)(2).

## STATEMENT OF THE CASE

### I. The Identification and Regulation of Chemicals that Cause Harm is Central to TSCA

#### A. Congress enacted TSCA to prevent chemical companies from experimenting on the public with dangerous chemicals

Concerned about the large number of unsafe chemicals to which Americans were exposed in daily life, "Congress enacted TSCA in 1976 with the express purpose of limiting the public health and environmental risks associated with exposure to and release of toxic chemical substances and mixtures." *Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006). According to the Senate Report on the law, "we have become literally surrounded by a manmade chemical environment. … [T]oo frequently, we have discovered that certain of these chemicals present lethal health and environmental dangers." S. Rep. No. 94-698, at 3 (1976).

Unique among the nation's environmental statutes, TSCA is not narrowly focused on particular media, such as air, water or waste. Instead, under TSCA, EPA must "look comprehensively" at the risks of chemicals from manufacturing through disposal and "protect the public and the environment" throughout the lifecycle of hazardous chemicals. S. Rep. No. 94-698, at 2-3 (1976). This lifecycle approach, Congress believed, would be "far more effective" than focusing on the downstream regulation of chemical releases to the environment. *Id.* at 5. Thus,

Congress designed TSCA to fill "regulatory gaps," *id.* at 1, through an expansive approach that considered "the full extent of human or environmental exposure." H.R. Rep. No. 94-1341, at 6 (1976).

### B. Congress recognized the need to strengthen EPA's authority to regulate existing chemicals

**Shortcomings of the 1976 Law.** A centerpiece of TSCA since its enactment has been "Section 6," 15 U.S.C. §2605. This provision requires EPA to assess certain high priority existing chemicals and, if EPA determines that they present unreasonable risks of injury to health or the environment, to ban or restrict them to eliminate such risks.[1] 15 U.S.C. §2605(a)-(c). Unfortunately, as originally enacted, Section 6 presented obstacles to effective regulation, and progress in addressing harmful existing chemicals in the first four decades of TSCA was slow and frustrating. *See* United States Government Accountability Office, *Chemical Regulation: Options Exist to Improve EPA*'s *Ability to Assess Health Risks and Manage Its Chemical Review Program* (2005), https://www.gao.gov/assets/gao-05-458.pdf. Only a handful of the thousands of chemicals that were pervasive in the economy and environment were evaluated by EPA under Section 6 to determine

[1] Section 6 applies to "existing chemicals" – i.e. those commercially manufactured or imported before the effective date of the 1976 TSCA or otherwise included on the existing chemical inventory compiled and maintained under TSCA section 8(b), 15 U.S.C. §2607(b). Separately, "new chemicals" that are not inventory-listed are reviewed and regulated under section 5, 15 U.S.C. §2604. TSCA's new chemical provisions are not at issue in this case.

their health and environmental effects, and even fewer were restricted to protect against documented risks. *Id.* at 18 (explaining that "[o]nly five chemical substances or groups of chemical substances have been regulated under [TSCA]" between 1976 and 2005).

**The 1991 Asbestos Court Decision.** The deficiencies of the original law were crystallized by EPA's inability to ban asbestos. In 1989, EPA issued a rule under Section 6 prohibiting the manufacture, processing, or distribution in commerce of asbestos in almost all products. "Asbestos: Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions," 54 Fed. Reg. 29460 (July 12, 1989). However, the Fifth Circuit overturned the rule in 1991 in *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991). The Court did not question the dangers of asbestos but found that EPA failed to comply with TSCA's then-requirements to balance costs and benefits and adopt the "least burdensome" regulatory alternative, which TSCA required as originally enacted. *Id.* at 1214-19. Following the decision, EPA did not regulate another existing chemical under TSCA for more than two decades.

**Strengthening TSCA in 2016.** As TSCA approached its fortieth anniversary, growing public and Congressional disappointment with the law's meager accomplishments spurred a multi-year effort to overhaul and strengthen its key provisions. Cong. Rec., S3511-5315 (June 7, 2016). As a result, TSCA was

extensively amended in 2016 with overwhelming bipartisan support. Frank L. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 140 Stat. 448 (2016); Cong. Rec., S3511-S3525 (June 7, 2016); Cong. Rec., H3007-H3025 (May 24, 2016).

The 2016 amendments sought to promote more "effective implementation" of the 1976 law's objectives. *See* S. Rep. No. 114-67, at 2 (2015). Thus, Congress affirmed that the intent of the original law—to give EPA "authority to look at the hazards [of chemicals] in total," S. Rep. No. 94-698, at 2—remained "intact." S. Rep. No. 114-67, at 7. Indeed, in a statement accompanying the law's passage, its Senate Democratic sponsors underscored that, with the expanded authorities conferred by Congress, TSCA should not be "construed as a 'gap filler' statutory authority of last resort" but "as the primary statute for the regulation of toxic substances." Cong. Rec., S3517 (June 7, 2016).

**Putting Teeth into Risk Evaluation and Risk Management.** A high priority for Congress was increasing the stringency and pace of existing chemical risk evaluations and risk reductions under Section 6. To that end, Congress amended the law to require EPA to evaluate chemicals of concern to determine if they pose unreasonable risk of injury to people or the environment and, if so, to regulate such that this unreasonable risk is eliminated. Congress precluded EPA from considering costs and other "non-risk factors" in making risk determinations

and restricting or prohibiting chemicals of concern, and eliminated the requirement that EPA adopt the "least burdensome alternative" that had doomed the 1989 asbestos ban in the Fifth Circuit. Congress also required EPA to evaluate a minimum number of substances for unreasonable risk and to set deadlines for completing risk evaluations and follow-up rulemakings.

**The New Framework for Existing Chemicals**. Congress' reconstructed Section 6 establishes a three-part framework for addressing existing chemicals: (1) periodic designation of chemicals of concern to enter the pipeline for risk evaluation and potential regulation, 15 U.S.C. § 2605(b)(1); (2) risk evaluations of these substances by set deadlines to determine whether their "conditions of use" present "an unreasonable risk of injury to health or the environment," *id.* at § 2605(b)(2)-(4); and (3) for those chemicals determined to present unreasonable risks, risk management rulemakings to impose restrictions to eliminate the unreasonable risk, which may include a ban and lesser requirements. *id.* at § 2605(a) and (c). The latter two components of the framework—risk evaluation and risk management—are the focus of this case.

**Key Risk Evaluation Requirements.** EPA risk evaluations must "determine whether a chemical substance presents an unreasonable risk of injury. . . under the conditions of use." 15 U.S.C. § 2605(b)(4). These unreasonable risk determinations must be made "without consideration of costs or other nonrisk factors." *Id.* They

must also address unreasonable risks to any "potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by" EPA. *Id.*

TSCA risk evaluations must "integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations." 15 U.S.C. § 2605(b)(4)(F)(i). They must also "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance." *Id.* at § 2605(b)(4)(F)(iv).

EPA must establish a Science Advisory Committee on Chemicals ("Science Committee") "to provide independent advice and expert consultation" on TSCA science issues. 15 U.S.C. § 2625(o). The Science Committee, comprised of external scientists unaffiliated with EPA, has reviewed and offered recommendations on EPA's risk evaluations and many related scientific issues. EPA, *United States Environmental Protection Agency Charter, Science Advisory Committee On Chemicals* (February 23, 2026), https://www.epa.gov/system/files/documents/2026-02/2026-science-advisory-committee-on-chemicals-charter_0.pdf.

**Key Risk Management Requirements.** If EPA finds through the risk evaluation that a chemical "presents an unreasonable risk of injury to health or the

environment," the Agency "shall by rule" restrict the chemical "to the extent necessary so that the chemical substance or mixture no longer presents such [unreasonable] risk." 15 U.S.C. § 2605(a). In doing so, EPA applies one or more of seven authorized requirements. *Id.* These restrictions may apply to any or all phases of a chemical's lifecycle, and prohibit or limit the manufacture, processing, use, distribution in commerce, disposal, or "any combination of such activities." 15 U.S.C. § 2605(a).

EPA may grant a time-limited exemption from a requirement of a risk management rule "for a specific condition of use of a chemical substance" if it is "a critical or essential use for which no technically and economically feasible safer alternative is available," restricting the use "would significantly disrupt the national economy, national security, or critical infrastructure," or the condition of use "provides a substantial benefit to health, the environment, or public safety." 15 U.S.C. § 2605(g)(1), (3). In addition to a time limit, EPA must impose conditions on the exemption it deems "necessary to protect health and the environment while achieving the purposes of the exemption." 15 U.S.C. § 2605(g)(4).

## II. People Have Been Widely Exposed to and Harmed by Toxic TCE

As EPA recognized when it evaluated TCE's risks, the chemical has endangered the health of workers who manufacture, process and use TCE; consumers who use stain removers, degreasers and other TCE-containing products;

and communities across the country whose air, water, and homes are contaminated by the chemical. EPA, *Risk Evaluation for Trichloroethylene* (Nov. 2020) ("Risk Evaluation"), EPA-HQ-OPPT-2016-0737-0127, at 415-59, JA308-352.

Before EPA's rulemaking, more than 170 million pounds of TCE were produced in or imported into the United States each year. JA263 (Risk Evaluation at 47). EPA estimated that nearly 95,000 workers were exposed to TCE and it was used at thousands of facilities. JA277-279 (Risk Evaluation at 91, 144).

**Releases to Air.** TCE is a volatile organic chemical with significant emissions to air. More than 865,000 pounds of TCE were released to the air in 2022, according to industry self-reported Toxics Release Inventory data. EPA, TRI Explorer, https://enviro.epa.gov/triexplorer/tri_release.chemical.

According to EPA, "TCE can be released to indoor air from use of consumer products that contain it (i.e., adhesives and tapes), vapor intrusion (migration of volatile chemicals from the subsurface into overlying buildings), and volatilization from the water supply." EPA, *Toxicological Review of Trichloroethylene* (Sept. 2011) ("Toxicological Review"), EPA-HQ-OPPT-2020-0642-0170, at 2-10, https://iris.epa.gov/static/pdfs/0199tr.pdf. Consistently, measured indoor levels have been shown to be higher than outdoor levels. *Id.* at 2-10 to 2-11.

**Water Contamination.** TCE is "the most frequently detected organic solvent and the one present in the highest concentration" in United States

groundwater. US. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Trichloroethylene* (June 2019) ("Toxicological Profile"), EPA-HQ-OPPT-2020-0642-0322, at 330. Not surprisingly, TCE is also a common contaminant in drinking water. According to EPA, "[i]t has been estimated that between 9 and 34% of the drinking water supply sources tested in the United States may have some TCE contamination." Toxicological Review at 2-12. The Environmental Working Group has estimated that TCE has contaminated drinking water supplies for 19 million people. *Tap Water of More Than 19 Million Americans Polluted by 'Civil Action' Carcinogen That EPA Is Poised To Ban* (Nov. 7, 2023), https://www.ewg.org/news-insights/news-release/2023/11/tap-water-more-19-million-americans-polluted-civil-action.

**Cleanup Sites.** TCE's mobility in soil is well-documented and, when spilled or released to land, it readily leaches to the subsurface and to groundwater. Toxicological Profile at 317. Given this leaching, along with the chemical's extensive use and its volatility, TCE is commonly found at contaminated sites selected for cleanups under the federal Superfund law and state and local remediation programs. *See* Toxicological Profile at 330.

**Vapor Intrusion Into Homes.** A common pathway for human exposure is "vapor intrusion" of TCE into buildings overlaying contaminated soil and

groundwater. As described by the State of Minnesota, "TCE can evaporate from the polluted soil and groundwater and rise toward the ground surface. If these TCE vapors come to a basement as they travel to the surface, they may enter through cracks in the foundation, around pipes, or through a sump or drain system." Minnesota Department of Health, *Trichloroethylene (TCE) and Your Health*, https://www.health.state.mn.us/communities/environment/hazardous/topics/tce.html. EPA has acknowledged the health risks of TCE's vapor intrusion to building occupants and has published guidance on mitigating these risks. EPA, *Trichloroethylene and Vapor Intrusion*, https://www.epa.gov/vaporintrusion/vapor-intrusion-superfund-sites.

**Community Impacts.** TCE contamination has devastated communities across the country. Several of these cases have received attention from members of Congress and the media. For example, twenty-one children in Woburn, Massachusetts were diagnosed with leukemia after TCE from an industrial facility contaminated local drinking water supplies. Costas, K, Science of the Total Environment, *A Case-Control Study of Childhood Leukemia in Woburn, Massachusetts*, Vol. 300, Issues 1-3 (Dec. 2002), at 23-25. In Camp Lejeune, North Carolina, TCE from a military base widely contaminated the drinking water supplies. Bove, Frank, Environmental Health, *Mortality Study of Civilian Employees Exposed to Contaminated Drinking Water at USMC Base Camp*

*Lejeune*, 13:68 (Aug. 2014). TCE's many harmful effects on health have been broadly recognized for decades. The National Cancer Institute (NCI) reported evidence of TCE's carcinogenicity in 1976, *Carcinogenesis Bioassay of Trichloroethylene*, https://ntp.niehs.nih.gov/publications/reports/tr/000s/tr002, and a key study documenting TCE's effects on fetal cardiac development was published in 2003. Johnson, Paula et al., *Threshold of Trichloroethylene Contamination in Maternal Drinking Waters Affecting Fetal Heart Development in the Rat*, 111 Environmental Health Perspectives, 289 (March 2003) ("Johnson Study") https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241384/pdf/ehp0111-000289.pdf; JA363 (Risk Evaluation at 628).

**Cancer Risks to Humans.** Based on extensive peer-reviewed evidence of carcinogenicity in animals and humans, TCE has been classified as a known human carcinogen by EPA, *See* Toxicological Review and U.S. Department of Health and Human Services National Toxicology Program, *Report on Carcinogens, Monograph on Trichloroethylene* (January 2015) https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/monographs/finaltce_508.pdf; and internationally by the International Agency for Research on Cancer, *Trichloroethylene, Tetrachloroethylene, and Some Other Chlorinated Agents* (2014), at 106, https://www.ncbi.nlm.nih.gov/books/NBK294281/pdf/Bookshelf_NBK294281.pd,.

In the United States and internationally, designation as a "human carcinogen" denotes the highest possible level of evidence for carcinogenicity and the greatest degree of confidence in a substance's ability to cause cancer. EPA, Guidelines for Carcinogen Risk Assessment (March 2025), at 2-53 to 2-58, https://www.epa.gov/sites/default/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf.

**Fetal Heart Malformations**. TCE also poses harms to pregnant women at very low concentrations, causing fetal heart defects. JA363 (Risk Evaluation at 628). EPA assessments concluded that, as the health harm occurring at the lowest exposure levels, TCE-induced fetal heart malformations should drive risk determinations for short-term and chronic TCE exposure. Toxicological Review at 4-565; EPA, *TSCA Work Plan Chemical Risk Assessment - Trichloroethylene: Degreasing, Spot Cleaning and Arts & Crafts Uses* (June 2014) ("Work Plan Assessment"), at 110-12, https://www.epa.gov/sites/default/files/2015-09/documents/tce_opptworkplanchemra_final_062414.pdf. However, EPA's reliance on the fetal heart malformations to drive risk determinations has been strongly challenged by industry stakeholders. EPA has consistently defended use of the Johnson Study against these criticisms.

## III. EPA Evaluated TCE and Found Unreasonable Risk

A draft TCE risk evaluation was published for comment in 2020, 85 Fed. Reg. 11,079 (Feb. 26, 2020); the Science Committee then held a peer review meeting on the draft evaluation in March 2020, *id*.; and the final Risk Evaluation was issued in November 2020. JA217.

**Overall Findings.** EPA compiled and analyzed available information on TCE uses, exposure levels, and hazards to health and the environment, and then made determinations of unreasonable risk for the identified conditions of use. EPA determined unreasonable risks to health for 52 of the 54 use conditions it assessed. JA353-355 (Risk Evaluation at 460-462). EPA made separate unreasonable risk determinations for each of TCE's cancer and non-cancer health effects and found that nearly all use conditions of use presented unreasonable risks for nearly all effects. JA301-302 (Risk Evaluation at 408-409).

EPA found risks to workers that exceeded its worker cancer benchmark of one in 10,000 for nearly all exposure scenarios and use conditions, often by a large margin. JA288-300 (Risk Evaluation at 389-401). EPA also evaluated unreasonable risks of acute (short term) non-cancer effects (developmental toxicity and immunosuppression) and chronic (repeat exposure) risks of non-cancer effects (liver toxicity, kidney toxicity, neurotoxicity, autoimmunity, reproductive toxicity, and developmental toxicity). JA285, 301 (Risk Evaluation at 301, 408).

EPA's evaluation found unreasonable non-cancer risks, based on acute immunosuppression and chronic autoimmunity, for nearly all use conditions and toxicity types for both workers and consumers. JA308-352 (Risk Evaluation at 415-459). However, the Agency declined to rely on the congenital heart malformations. JA283 (Risk Evaluation at 280). Comments on the draft risk evaluation heavily criticized EPA's rejection of this toxic effect as a driver for risk management notwithstanding the express findings of EPA's 2011 and 2014 TCE assessments and the conclusions of multiple peer reviews. *See* Toxicological Review at xliii; Work Plan Assessment at 99.[2]

**Environmental Releases.** Despite TCE's risks to communities and widespread presence in environmental media, EPA concluded that "exposures to the general population via surface water, drinking water, ambient air, soil and sediment pathways are covered under the jurisdiction of other environmental statutes." JA255 (Risk Evaluation at 39). Citing its interpretation of TSCA as a "gap-filling" statute and desire to "avoid duplicating efforts taken pursuant to other

---

[2] An investigative report published following release of the draft evaluation revealed that, during interagency review of the draft, the White House directed EPA not to use fetal heart defects to determine unreasonable risk, and the draft was modified to downplay a key study. Shogren, E., Reveal/Center for Investigative Reporting, *EPA scientists found a toxic chemical damages fetal hearts. The Trump White House rewrote their assessment,* (Feb. 28, 2020) https://www.revealnews.org/article/epa-scientists-found-a-toxic-chemical-damages-fetal-hearts-the-trump-white-house-rewrote-their-assessment/.

Agency programs," "EPA did not evaluate risk to the general population from ambient air, water and disposal and pathways for any condition of use, and the unreasonable risk determinations do not account for exposures to the general population." *Id.*

**Aggregate Exposure and Risks to Vulnerable Populations.** TSCA requires EPA risk evaluations to describe whether aggregate exposures to the chemical under the conditions of use were considered and the basis for the consideration. 15 U.S.C. § 2605(b)(4)(F)(ii). EPA defines "aggregate exposure" as "the combined exposures from a chemical substance across multiple routes and across multiple pathways." 40 C.F.R. § 702.33. The Science Committee panel reviewing the draft TCE evaluation urged EPA to consider TCE exposure from multiple routes and sources. *See* Science Advisory Committee on Chemicals, *Meeting Minutes and Final Report* ("Science Committee Report"), EPA-HQ-OPPT-2021-0415-0095, at 51, 53, 59, JA917, 919, 925.

However, the final evaluation did not examine aggregate health risks to populations exposed to TCE. EPA acknowledged that "not aggregating exposures in any manner may potentially underestimate total exposure for a given individual." JA253 (Risk Evaluation at 37).

Similarly, while acknowledging differences in exposure and susceptibility among impacted subpopulations, EPA's Risk Evaluation did not include fenceline

communities among the subpopulations it identified as "potentially exposed or susceptible subpopulations." Under TSCA, EPA is required to assess the risks of all impacted subpopulations that are "group[s] of individuals within the general population . . . who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure" to TCE. *Id.* 15 U.S.C. § 2602(12). Further, EPA did not make separate unreasonable risk determinations for fenceline communities as TSCA requires. Had EPA complied fully with TSCA's risk evaluation requirements, 15 U.S.C. § 2605(b)(4)(A), its evaluation would have highlighted vulnerable groups with elevated risks that required special attention during risk management.

**IV. EPA Takes Actions to Strengthen its Evaluation of TCE**

**Fenceline Communities.** In June 2021, eight months after the Risk Evaluation was issued, new EPA leadership "announced important policy changes surrounding risk evaluations issued under the Toxic Substances Control Act." *EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ("2021 Path Forward"), https://www.epa.gov/newsreleases/epa-announces-path-forward-tsca-chemical-risk-evaluations, JA370. EPA recognized that the risk evaluations it had thus far completed "fail[ed] to consistently and comprehensively address potential exposures to potentially exposed or susceptible subpopulations, including fenceline communities" and the Agency committed to "ensure these chemicals are used

safely and all communities are protected." *Id.* EPA announced it would conduct new assessments to determine if the completed evaluations for TCE and five other chemicals failed "to identify and protect fenceline communities." *Id.* The goal of the additional assessments was to examine whether these chemicals presented "the potential for unreasonable risk to fenceline communities associated with air and water exposures." *Id.*

EPA followed up in January 2022 by releasing for public comment its *Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0* ("Methodology"), EPA-HQ-OPPT-2021-0415-0012, https://www.epa.gov/system/files/documents/2022-01/draft-fenceline-report_sacc.pdf, JA488. The Methodology "uses reasonably available data, information, and models to quantify environmental releases, evaluate exposures to fenceline communities and characterize risks associated with such releases and exposures." JA498 (Methodology at 11). EPA planned to compare those risk calculations to benchmark levels, including a 1-in-1,000,000 cancer risk benchmark, *id.* at 54, which the Agency has used under TSCA to determine unreasonable risks to the general population. EPA, TCE Proposed Rule, 88 Fed. Reg. at 74,712, 74,768 (Oct. 31, 2023) ("Proposed Rule"), JA179. The Methodology promised that EPA's risk assessments would "ensure potential risks to fenceline communities will not go unidentified and unaddressed" and the

Agency would "address these risks via protective and expeditiously promulgated risk management rules." JA504 (Methodology at 17). EPA added that "the law requires, and the public is entitled to, protections from the identified risks as quickly as those protections can be finalized and implemented." *Id.*

**Science Committee Review of the Fenceline Methodology**. At EPA's request, the Science Committee reviewed the Methodology. JA865 (Science Committee Report). The Committee endorsed EPA's use of the cancer benchmark levels in the Methodology, maintaining that "[t]he threshold of $10^{-6}$ [one in a million] is more protective and should be used in the fenceleine [*sic*] assessments." *Id.* at 27-28. Although EPA had repeatedly described its Methodology as "conservative," *i.e.* erring on the side of health-protective assumptions, *e.g.,* JA517, 520, 526 (Methodology at 30, 33, 58), the Science Committee warned that EPA's calculations "may not be protective overall because potential key exposure pathways are excluded" and because there was no "consideration for cumulative exposures, multiple source exposures, [or] aggregate exposures." JA881 (Science Committee Report at 15). The Committee thus urged EPA to revise the Methodology to include "aggregate . . . exposures from populations exposed at work who live in the community, or who may also be exposed to multiple facility emissions." *Id.* at JA612 (18).

EPA, however, declined to adopt these recommendations.

**EPA's Fenceline Assessments**. In March 2022, EPA released fenceline assessments for TCE that quantified levels of risk to impacted communities from facility air emissions and water exposure pathways. The Agency's air emissions assessment showed that numerous populations near TCE-emitting facilities faced cancer risks above EPA's benchmark. EPA, *Trichloroethylene (TCE): Fenceline Technical Support – Ambient Air Pathwa*y (March 3, 2022), EPA-HQ-OPPT-2020-0642-0091, JA528.

As summarized in the Rule:

> [t]he multi-year analysis evaluated 217 facilities and found risk estimates above one in a million for cancer for 133 of those facilities at a distance of 100 meters from the releasing facility. . . 58 of these 133 facilities [] had cancer risks above one in a million at distances farther than 100 meters . . .

JA100 (89 Fed. Reg. at 102,613).

The Agency's water pathway assessment addressed the health risks of water discharges from people drinking or having dermal or oral contact with contaminated water. EPA, *Trichloroethylene: Fenceline Technical Support – Water Pathway*, (March 24, 2023),

EPA-HQ-OPPT-2020-0642-0062, JA479. In its comments on EPA's proposed rule, Petitioner EDF explained that the water pathway analysis showed "acute, chronic, and cancer risks for the extended phaseout uses through drinking water and incidental oral and dermal exposure routes." EDF, Comments on the Proposed

Rule (Dec. 15, 2023) ("EDF Comments"), EPA-HQ-OPPT-2020-0642-0312, at 10, JA647.

**TCE Whole Chemical Risk Determination.** EPA's 2021 announcement also indicated that it would no longer make "separate unreasonable risk determinations for every condition of use of a chemical" but would instead "make the determination of unreasonable risk just once for the whole chemical when it is clear the majority of the conditions of use warrant one determination." JA370 (2021 Path Forward). The Agency committed to revise previous risk determinations for its 10 completed risk evaluations so that they applied to the "whole substance." *Id.*

EPA implemented this interpretation of TSCA in its December 2022 revised risk determination for TCE. *Notice - Toxic Substances Control Act Determination: Trichlorethyelene*, 88 Fed. Reg. 1222 (Jan. 9, 2023), EPA-HQ-OPPT-2016-0737-0147. As EPA explained in the accompanying Federal Register notice, "a whole chemical approach is appropriate for TCE in order to protect health and the environment" because risks exceed EPA benchmarks "for a substantial number of conditions of use (spanning across most aspects of the chemical lifecycle)." 88 Fed. Reg. 1222, 1224-25 (January 9, 2023).

## V. EPA Addresses TCE's Unreasonable Risk by Banning TCE, But Provides for Numerous Compliance Delays and Certain Exclusions

While the Rule requires important and long-overdue protections against TCE's many health harms, it contains loopholes and limitations that weaken the scope of these protections.

**Prohibition as the Best Risk Management Option.** After considering alternative approaches, the Proposed Rule "determined that prohibition is the best way to address the unreasonable risk." JA144 (88 Fed. Reg. at 74,733). As EPA found in its evaluation, serious health harms such as fetal heart malformations and immunotoxicity present risks to workers at exposure levels below those that can be reliably measured, much less consistently attained. *Id.* at 74,762. Thus, elimination of all TCE use was necessary because of the uncertain "feasibility of exposure reduction to sufficiently address the unreasonable risk across the broad range of occupational environments" and "the irreversible health effects associated with TCE exposures." *Id.* at 74,732-3. EPA stated:

> Ultimately, a prohibition would result in elimination of unreasonable risk from TCE, rather than allowing TCE use to continue in perpetuity, which would necessitate burdensome requirements to achieve exposure reductions to implement a technically challenging long-term program to meet a very low exposure limit.

*Id.* at 74,762.

**Inadequate Protection Against Fetal Heart Defects and Immunotoxicity.** Departing from the position it took in its risk evaluation, EPA based its Rule on fetal heart malformations, which it again described as the "most sensitive" health harm for TCE. JA59 (Rule at 102,572). However, because of the "challenges of reliably reducing exposure below" this limit and accurately measuring for TCE at very low concentrations, EPA's Rule set an exposure limit well above the levels predicted to present fetal heart malformation and immunotoxicity risks. *Id.* at JA66 (102,579). Thus, EPA conceded that its new exposure limit would continue to put "[p]otentially exposed persons . . . at risk for the developmental and immunotoxicity effects that provide the basis for EPA's ultimate prohibition" on TCE use. *Id.* at JA68 (102,581).

**Lengthy Compliance Periods for Numerous Conditions of Use.** While ultimately phasing out all of the use conditions that EPA determined to present unreasonable risks, the Agency provided staggered timeframes for this prohibition to take effect, with years-long delays for numerous uses. All consumer and some commercial use conditions must be terminated within one year of the Rule's effective date, 40 C.F.R. § 751.305(b)(1)-(7), but other conditions representing a substantial portion of TCE production are allowed to continue for several years. 40 C.F.R. § 751.305(8)-(26).

EPA allowed an 8.5-year phaseout of the use of TCE that represents the highest annual production volume of the chemical: the manufacturing and processing of TCE for use as an intermediate in the production of the refrigerant hydrofluourocarbon 134-a. 40 C.F.R. § 751.305(18) (prohibited after June 2033). Approximately 84% of TCE's annual production volume is devoted to this use. JA101 (Rule at 102,614). The Agency granted twenty years delay of the prohibition to users, manufacturers, processors, and distributors of TCE as a "processing aid" for lead-acid battery separator manufacturing. 40 C.F.R. § 751.305(23) (prohibited after December 2044). EPA also allowed years-long delays of prohibitions for numerous additional conditions of use, such as aerospace applications and specialty material manufacturing. *See* 40 C.F.R. § 751.305(10)-(26). These extended phaseout dates range from 2027 to 2074. *Id.* For the extended uses, facilities must implement a "Workplace Chemical Protection Program," which requires certain facilities to comply with an indoor air concentration limit. 40 C.F.R. § 751.315.

**Lack of Fenceline Community Protections.** Despite mandating worker protections at the facilities where TCE will continue to be used, and identifying risks of facility releases to air and water, EPA's Proposed Rule failed to include emission reductions that would address these risks during the phase out periods. Numerous commenters expressed concerns about this lack of fenceline community

protections, but EPA declined to incorporate them in the Rule. *See* JA638 (“EDF Comments”); Various community organizations, Comments on the Proposed Rule (“Communities’ Comments) (Dec. 15, 2023), EPA-HQ-OPPT-2020-0642-0321, JA750.

**Exclusions from Compliance with the Prohibition.** The Rule also excluded various TCE production and use activities from prohibition, allowing them to continue indefinitely. These carve-outs are for (1) production of TCE as a byproduct, both at TCE production facilities and during manufacture of other chemicals; (2) processing of TCE byproducts within site-limited, physically enclosed systems; and (3) products containing TCE at thresholds less than 0.1 percent by weight (so-called “*de minimis* levels”). 40 C.F.R. § 751.301(b)-(c).

## SUMMARY OF ARGUMENT

1. In 2021, EPA acknowledged the failure of its prior risk evaluations for TCE and other substances to address facility releases to air and water that put fenceline communities at risk. To address this deficiency, EPA conducted detailed assessments that confirm that releases of TCE from these facilities meet its criteria for unreasonable risk. However, the protections it promised to communities while they remained exposed to TCE were not included in the Rule.

EPA had no discretion to ignore its risk findings for fenceline communities. TSCA requires the Agency to address the health risks of facility environmental releases. In addition, fenceline communities are a highly exposed and vulnerable subpopulation for which TSCA specifically requires determinations of unreasonable risk. Although its assessments showed risks exceeding the cancer risk levels that EPA considers unreasonable, it refused to make a definitive risk determination in the Rule. Instead, it said it could not "rule out unreasonable risk to fenceline communities" but would not affirmatively find that such an unreasonable risk existed. JA99 (Rule at 102,612). This evasiveness violated TSCA because Section 6 provides no discretion for the Agency to refuse to make an unreasonable risk finding for a use condition that the law requires its evaluation to address.

EPA offered strained justifications for disregarding fenceline risks that were either arbitrary and capricious, unsupported by substantial evidence, or both. For

example, EPA asserted that its Fenceline Assessment Methodology was not developed "for the purpose" of enabling EPA to make unreasonable risk determinations. Yet the Methodology itself explained how EPA would use the results to make determinations of unreasonable risk and take risk management action. JA505-507 (Methodology at 18-20.) Moreover, when announcing in June 2021 that it would conduct the fenceline assessments, EPA leadership committed to, consistently with TSCA, use the assessments for risk management if EPA determined that they showed unreasonable risk. JA370 (2021 Path Forward).

EPA claimed that the prohibitions on TCE production and use in its Rule would eliminate fenceline risks and that further EPA risk management was unnecessary. But this ignored the Rule's lengthy phase-out periods for substantial portions of TCE production and use, which would expose communities to TCE emissions for years.

Overall, the record provided substantial undisputed evidence of unreasonable risks to fenceline communities. Under TSCA, this placed an affirmative risk management duty on the Agency to fully protect such communities from unreasonable risks during phase-out periods. The Court should require EPA to discharge this obligation.

2. EPA's Rule failed to address TCE produced as a byproduct in the manufacture of TCE and other chemicals. This violated TSCA. TSCA does not

allow EPA to circumvent risk evaluation and risk management requirements based on how, where, and why chemicals are produced. EPA's professed plan to address TCE byproduct production not in the TCE rulemaking but in future evaluations of chemicals whose manufacturing processes produce TCE is both unworkable and contrary to TSCA.

The Rule also exempts the processing of TCE byproducts when performed in so-called "enclosed" systems at their sites of manufacture. This exemption, too, was unlawful because EPA did not evaluate whether these conditions would protect against unreasonable risk and eliminate the need for risk management.

3. EPA's so-called *de minimis* exemption for TCE in products at levels of 0.1% or less was unlawful. Section 6 contains no exemption for products that contain supposedly "small" levels of chemicals, but instead requires that EPA address and manage all unreasonable risk. Thus, no level of TCE in products or plant operations can be presumptively excluded from risk management.

Workers, fenceline communities, and consumers are exposed to TCE from multiple sources, many of which have TCE levels below the so-called *de minimis* threshold. It is the combination of exposures—as opposed to any one exposure individually—that drives unreasonable risk. EPA, *Procedures for Chemical Risk Evaluation under TSCA*, 89 Fed. Reg. 37028 (May 3, 2024). Yet EPA made no

effort to analyze the combined risks of the TCE exposures that would fall within its exemption.

EPA's Proposed Rule did not propose a *de minimis* exemption but merely sought public comment on whether one should be adopted. The Agency's comment request was non-committal and open-ended and neither explained the rationale for a possible exemption nor identified the specific exemption threshold under consideration. As a result, EPA failed to "disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35–36 (D.C. Cir. 1977). Because EPA did not afford sufficient notice and opportunity to comment, its *de minimis* exemption must be vacated.

4. The remedies Petitioners seek are tailored to these three issues. First, in response to EPA's failure to protect fenceline communities from unreasonable risks, the Court should remand this aspect of the Rule to EPA so that it is revised to protect those communities. Second, the Court should vacate and remand EPA's conclusion that the production of TCE as a byproduct does not constitute "manufacture" under TSCA, vacate and remand EPA's exemption of site-limited processing of TCE byproducts from the Rule, order EPA to undertake a new or supplemental risk evaluation to address the manufacturing and processing of TCE byproducts, and direct EPA to undertake a risk management rulemaking to

eliminate any unreasonable risks that are identified. Third, the Court should vacate the de minimis exemption as contrary to TSCA and for failing to meet notice and comment requirements.

Petitioners otherwise support the TCE Rule and urge that it not be vacated and implementation should be allowed to proceed.

5. The Rule deficiencies that Petitioners challenge place industrial fenceline communities in harm's way. EPA was obligated under TSCA to fully consider and protect these people, thousands of whom are EDF members, from unreasonable risk. Not having done so, the Agency has left them exposed to a highly toxic chemical for years. Petitioners have standing to seek an order directing EPA to fill the Rule's gaps and protect these individuals.

## STANDARD OF REVIEW

TSCA incorporates the standard of review of agency action in the Administrative Procedure Act ("APA"), 5 U.S.C. §706. 15 U.S.C. § 2618(c)(1)(B). Therefore, courts reviewing TSCA section 6 risk management rules must reject as unlawful EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under this standard, agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Although this is a "narrow standard" under which the Court's review is therefore deferential, "the agency cannot reach whatever conclusion it likes and then defend it with vague allusions to its own expertise." *Keystone-Conemaugh Projects LLC v. EPA,* 100 F.4th 434, 445 (3d Cir. 2024) (citing *Sierra Club v. United States EPA*, 972 F.3d 290, 298 (3d Cir. 2020)).

TSCA also augments the APA standard of review by requiring courts to "hold unlawful and set aside [a TSCA Section 6(a)] rule . . . not supported by substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. §

2618(c)(1)(B)(i)(I). This TSCA-specific substantial evidence standard is "more demanding" than the [substantial evidence standard] otherwise prescribed by the APA," *Labor Council for Latin Am. Advancement v. United States EPA*, 12 F.4th 234, 245 (2d Cir. 2021) and is a "fairly rigorous standard of record review," *Chem. Mfrs. Ass'n v. EPA,* 859 F.2d 977, 992 (D.C. Cir. 1988).ARGUMENT

**I. EPA's Failure to Protect Fenceline Communities from Unreasonable Risks Violates TSCA and Is Arbitrary and Capricious**

In 2021, EPA concluded that completed risk evaluations for TCE and other chemicals had failed to comply with TSCA because they ignored sources of exposure and risk to people from air and water releases by facilities producing and using chemicals. JA370 (2021 Path Forward). EPA then developed its Fenceline Assessment Methodology and conducted air and water "pathway" analyses to create a foundation for protecting fenceline communities from unreasonable risks. JA488 (Methodology). These analyses demonstrated that TCE levels in air and water exceeded established EPA unreasonable risk benchmarks. Yet in its Rule, the Agency backed away from its earlier commitment to protect fenceline communities, and took no action.

Thus, EPA failed to put interim protections in place for the fenceline communities who will continue to be exposed to TCE during the multi-year periods for which many uses will continue until their final prohibition. In the Rule, EPA finessed its obligations to address the risks from facility environmental

releases by the sleight of hand of taking no definitive position on the existence of unreasonable risks. This avoidance of its duty was a violation of the law's express requirements, unsupported by substantial evidence, and arbitrary and capricious. In fact, substantial evidence in the record supports a determination that fenceline communities faced unreasonable risks, and TSCA requires EPA to provide protections against this risk.

### A. TSCA Requires EPA to Determine Whether TCE Emitted from Facilities Presents Unreasonable Risks

When EPA evaluates an existing chemical, it must determine "whether a chemical substance presents an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(b)(4)(A). This broad focus on the chemical substance requires EPA to examine all TSCA-regulated sources of exposure that may contribute to health and environmental risk, including TCE releases from facilities that may expose fenceline communities to adverse health effects. TSCA also requires that EPA, in its risk evaluation, must determine the substance's risks under the chemical's "conditions of use." 15 U.S.C. § 2605(b)(4)(A). This term is defined as "the circumstances . . . under which a chemical substance is intended, known or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." 15 U.S.C. § 2602(4). EPA may not select some circumstances for evaluation but disregard others. Thus, the "circumstances" of a

chemical that EPA must evaluate would necessarily encompass releases to air and water from facilities at which TCE is manufactured or processed.

This conclusion is reinforced by TSCA's requirement that risk evaluations must "integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance . . . that is relevant to specific risks of injury to health or the environment." 15 U.S.C. § 2605(b)(4)(F)(i). Since facility environmental releases are conditions of uses that may pose "risks of injury to health or the environment," EPA risk evaluations must compile and assess all "available information" on their "hazards and exposures." *Id.* This requires the Agency to evaluate the magnitude of fenceline communities' exposures to these releases and the associated health hazards and then "integrate" this information into a determination of unreasonable risk. *Id.*

As described above, when it enacted TSCA in 1976, Congress recognized that existing environmental laws were "clearly inadequate" to address the "serious risks of harm" from chemicals, H.R. Rep. No. 94-1341, at 7 (1976), and did not give EPA authority to "comprehensively" evaluate the "total" hazards of a chemical. S. Rep. No. 94-698, at 2 (1976). Congress designed TSCA to fill these "regulatory gaps," S. Rep. No. 94-698, at 1, and intended for EPA to consider "the full extent of human or environmental exposure," H.R. Rep. No. 94-1341, at 6. This goal would be unachievable if EPA could exclude environmental releases

from risk management by refusing to determine whether they present unreasonable risks.

### B. EPA's Refusal to Determine TCE's Risks to Fenceline Communities Violated TSCA's Requirement to Address Environmental Exposure Pathways in Risk Evaluations

In the Rule, EPA acknowledged that its "fenceline analysis for the air and water pathways for TCE did not allow EPA to rule out unreasonable risk to fenceline communities with confidence." JA99 (Rule at 102,612). But EPA then asserted that it lacked a basis to conclude whether or not the risks to these communities were "unreasonable" and therefore the Agency was "unable to determine with this analysis whether those risks drive the unreasonable risk of injury to health presented by TCE." *Id.* EPA thus violated its core TSCA obligation to determine whether these key sources of exposure to TCE presented an unreasonable risk to people.

For chemicals that undergo risk evaluations, TSCA provides that EPA "*shall* . . .determine whether a chemical substance presents an unreasonable risk of injury . . . under its conditions of use." 15 U.S.C. § 2605(b)(4)(A) (emphasis added). In accordance with this statutory text, EPA must determine if the evidence does or does not demonstrate an unreasonable risk. TSCA provides no discretion to EPA to

avoid making this binary choice.[3] And where EPA determines an unreasonable risk, its path is clear: the Agency "shall" impose restrictions "so that the chemical substance . . . no longer presents such risk." 15 U.S.C. § 2605(a).

EPA's TSCA risk evaluations and risk management rules have conformed to this two-step approach, first making determinations of unreasonable risk for the chemical's conditions of use and then imposing requirements that eliminate these identified risks. *See, e.g.,* EPA, *Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act*, 89 Fed. Reg. 21,970 (March 28, 2024). In the case of TCE, EPA developed its Methodology expressly so that the Agency could determine whether air and water releases posed unreasonable risks. But when its analyses showed cancer risks to nearby communities above its benchmarks, EPA refused to take the required next step of determining whether these risks were "unreasonable." The Agency thereby circumvented its obligation under TSCA to determine whether a chemical poses unreasonable risks and then to regulate to ensure that people will no longer face those unreasonable risks from the chemical.

[3] EPA might be able to delay a determination where it needs more time for scientific analysis but, as discussed below, EPA rejected this option for TCE.

### C. Fenceline Communities Are Potentially Exposed or Susceptible Subpopulations for Which TSCA Required Risk Determinations

TSCA also specifically directs EPA to make risk determinations for any "potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation" by the Agency. 15 U.S.C. § 2605(b)(4)(A). These subpopulations are defined as "a group of individuals within the general population identified by the Administrator who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture." 15 U.S.C. § 2602(12).

EPA's fenceline risk assessments show that, as a result of facility emissions, residents of communities located near TCE facilities have elevated levels of exposure to TCE. Thus, due to "greater exposure" to TCE, these communities are "at greater risk . . . of adverse health effects . . . than the general population." *Id.* Indeed, in its 2021 announcement committing to protect fenceline communities, EPA explicitly recognized these communities as "potentially exposed or susceptible subpopulations." JA370 (Path Forward). EPA went even further in the Rule itself, conducting an environmental justice analysis that "determined that there are potential environmental justice concerns in communities surrounding facilities subject to this regulation," JA110 (Rule at 102,623), and that TCE facility operations "have the potential to result in disproportionate and adverse human

health or environmental effects on communities with [environmental justice] concerns." *Id.* at 102,622.

Underscoring this conclusion, commenters on EPA's Proposed Rule demonstrated that many populations facing the greatest risks from facility releases are low-wealth communities or communities of color, who are exposed not only to TCE but to other toxic chemicals that cause the same types of harms, including cancer, and thus contribute to these communities' cumulative risks of harm. For instance, citing EPA's TCE fenceline assessment for air emissions, comments on the Proposed Rule from various community and environmental organizations explain that:

> the Westlake Chemical Company in Westlake, Louisiana presents fenceline cancer risks exceeding 1-in-10,000, with elevated risks extending up to 2,500 meters from the facility. That facility is located near the border of Westlake and Mossville, a historically Black community that is burdened by more than a dozen industrial facilities within and around its borders. According to EPA's Air Toxics Cancer Risk and Air Toxics Respiratory Hazard Index, air pollution in Mossville is among the worst in the Nation.

JA764-65 (Communities' Comments at 15-16) (footnotes and citations omitted). As a significant producer of TCE, the Westlake facility would be allowed to continue production under the Rule to supply TCE for HFC-134a manufacture, and the substantial risks to fenceline communities calculated by EPA would therefore be present for years. The Westlake facility also produces TCE as a byproduct, which the Rule does not restrict at all, contributing to the substantial risks to

fenceline communities. EPA, *Envirofacts*, https://enviro.epa.gov/envirofacts/tri/form-r/dcn-list/70669PPGNDCOLUM/2024. As the commenters also explain,

> On the other side of the state, residents of Geismar, Louisiana experience unreasonable risks because of Occidental Chemical Company's processing and release of TCE to manufacture other chemicals. In addition to TCE, that facility releases large amounts of methylene chloride, carbon tetrachloride, 1,2-dichloroethane, and other carcinogens, and it is surrounded by other industrial facilities that blanket the surrounding area in toxic pollution.

*Id.* at 16. EPA identified this facility as engaging in a TCE use that is subject to the extended phase out time of 8.5 years and therefore would also continue to expose surrounding communities. EPA, *Trichloroethylene (TCE): Fenceline Technical Support – Ambient Air Pathway* (March 3, 2022), at 33, EPA-HQ-OPPT-2020-0642-0091, JA560.

The commenters provide a graphic depiction of the intense concentration of chemical plants in the Geismar area and the numerous carcinogens they produce:




*Id.* at 17. Plainly, combined exposure to TCE and other carcinogens in the Gesimar area is a significant risk to surrounding communities. By failing to apply TSCA's definition of Potentially Exposed and Susceptible Subpopulations to fenceline communities like Geismar, Westlake, and Mossvile, EPA avoided its obligation to determine whether risks of TCE to such subpopulations are unreasonable. This was a further violation of section 6 of TSCA.

### D. EPA's Failure to Determine Unreasonable Risk Was Arbitrary and Capricious and Lacked Substantial Evidence Support

As explained below, EPA's rationale for not making an unreasonable risk determination for fenceline communities exposed to TCE was confused, contradictory, and in many cases incorrect or unsupported. Thus, its failure to address TCE risks to fenceline communities should be set aside as arbitrary and capricious and lacking substantial evidence in the rulemaking record under the APA and Section 19 of TSCA, 15 U.S.C. § 2618.

#### 1. EPA's Claim that its Assessment Methodology Was Not Intended to Inform Unreasonable Risk Determinations Is Contradicted by the Agency Itself

EPA maintained in the Rule that "the screening level fenceline analyses...do not allow EPA to conclude whether those risks of injury to fenceline communities contribute to the unreasonable risk *because those fenceline screening methodologies were not developed for that purpose*." JA101 (Rule at 102,614) (emphasis added). This is simply untrue. The very reason that EPA developed the Methodology was to evaluate the risks from environmental releases of TCE and other chemicals.

When it announced its plan to assess fenceline risks in June 2021, the Agency faulted EPA's earlier risk evaluations because they "fail[ed] to consistently and comprehensively address potential exposures to potentially exposed or susceptible subpopulations, including fenceline communities." JA370 (2021 Path

Forward). The Agency committed to fill this gap, promising to "ensure these chemicals are used safely and all communities are protected." *Id.* This would be accomplished by determining if TCE and other chemicals "do present unreasonable risks to these communities." *Id*. Thus, EPA committed to "developing a screening-level approach to conduct ambient air and surface water fenceline assessments" which "will use existing data and information to determine if there is the potential for unreasonable risk to fenceline communities associated with air and water exposures." *Id.*

EPA's Methodology also emphasized that, where fenceline assessments show risks that the Agency determines are unreasonable, it would "ensure potential risks to fenceline communities will not go . . . unaddressed" and "it is imperative the Agency address these risks via protective and expeditiously promulgated risk management rules." JA504 (Methodology at 17). To illustrate, EPA explained that where "unreasonable risks [are] found to fenceline communities through the screening level analysis," the Agency would "expeditiously propose[] a ban on the chemical from use" or "reduce fugitive releases to levels below which an unreasonable risk is expected." JA506 (Methodology at 19). These statements directly contradict EPA's claim in the Rule that the "purpose" of its assessment methodology was not to determine whether the risks demonstrated in its assessments were "unreasonable" and required risk management.

"One strains to accept such scant treatment as 'reasoned analysis' sufficient to satisfy the demands of the APA." *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 104 (3d Cir. 2014). Because EPA failed to explain why it was departing from the stated purpose of its Methodology, and from the Methodology's findings, its change in position was arbitrary and capricious.

**2. EPA Did Not Demonstrate that Technical Deficiencies in the Methodology Made it Unsuitable for Determinations of Unreasonable Risk**

EPA's Rule noted that "[t]here are some uncertainties associated with the fenceline analysis for the air pathway for TCE" and cited aspects of its Methodology that suggested that projected exposure levels "may be overestimated." JA99-100 (Rule at 102,612-13). However, EPA has noted that "uncertainties" exist in all risk determination methodologies and do not necessarily produce a "bias" toward overestimating risks. EPA Office of the Science Advisor, Risk Assessment Forum, *Framework for Human Health Risk Assessment to Inform Decision Making* (April 12, 2014), at 44, https://www.epa.gov/sites/default/files/2014-12/documents/hhra-framework-final-2014.pdf. Indeed, in this case, the "bias" was likely in the direction of understating risks. As noted above, EPA's Science Committee recommended changes in its Methodology to account for additional sources of exposure that would necessarily

increase risk levels estimated by EPA in its fenceline assessments. EPA did not adopt these adjustments. JA99 (Rule at 102,612).

To support its decision not to account for these exposures, EPA would have needed to explain why its deficiencies compromised its analyses' scientific validity and made it unsuitable for determining unreasonable risk. But EPA nowhere provided that explanation. Thus, its unexplained reliance on "uncertainties" to back away from its fenceline analyses and its accompanying TSCA duty to protect fenceline communities was arbitrary and capricious and unsupported by substantial evidence in the record.

#### 3. If EPA Was Concerned about the Limitations of its Assessments, Its Methodology Required It to Conduct Further Analysis

As described above, EPA's Methodology identified five possible outcomes of fenceline risk assessments. A "no action" scenario (Outcome One) was only warranted where EPA determined that fenceline releases did not present an unreasonable risk. JA506 (Methodology at 19). However, in its Rule, EPA expressly stated that it could not make this determination for TCE. JA99 (Rule at 102,612). Since EPA did not find an absence of unreasonable risk and the risks it demonstrated in its analyses exceeded its cancer risk benchmark, Outcomes Two, Three and Four of the Methodology expressly called for EPA to proceed with risk management under TSCA or other environmental laws. *Id.* at 19-20.

The only alternative to risk management foreseen by the Methodology (Outcome Five) is the case in which EPA would find that its analyses had "uncertainties which should be considered prior to proposing a risk management rule." In this case, "rather than expeditiously propose" that rule, EPA would undertake "additional analysis beyond the screening level analysis . . . to further substantiate the unreasonable risk finding." *Id.* at 20.

Here, however, EPA did not identify uncertainties in its fenceline assessments that it found warranted further analysis and in fact made clear that it "does not intend to revisit the air pathway for TCE as part of a supplemental risk evaluation." JA99 (Rule at 102,612). Thus, EPA failed to follow the outcome framework in its methodology, opting for "no action" without either finding the absence of unreasonable risk or conducting the "further analysis" it deemed necessary to address "uncertainties" in its initial assessments. EPA's disregard of the Methodology it earlier adopted without acknowledging or explaining this change in position was arbitrary and capricious.

#### 4. EPA Had No Basis to Conclude that Protecting Fenceline Communities During their Years of Exposure to TCE Was Unnecessary Because the Rule Provided for Ultimate Prohibition

EPA also justified taking no action on fenceline risks because the "ultimate prohibition of manufacture, processing, distribution in commerce, use, and disposal of TCE is expected to address the risks identified in the screening analysis." JA101

(Rule at 102,614). However, the Rule allows most production of TCE to continue for several years, and several uses to continue for several decades. An unreasonable risk will remain until these prohibitions take effect. Without controls on emissions and discharges, which are missing from the Rule, fenceline communities will continue to experience years of exposure to TCE at levels above EPA's cancer benchmark.

EPA acknowledged as much. It found in the Rule that fenceline cancer risks exceeding $1 \times 10^{-6}$ (one in a million) "may be associated with the following conditions of use that EPA is prohibiting under longer compliance timeframes: degreasing (open-top batch vapor degreasing; closed-loop batch vapor degreasing); industrial processing aid; manufacturing; and processing as a reactant." JA100 (Rule at 102,613).

An examination of the Rule bears this out. Approximately 84% of TCE's annual production volume is used as an intermediate in the production of the refrigerant HFC-134a. JA101 (Rule at 102,614). The Rule provides an 8.5-year phase-out deadline for this condition of use. 40 C.F.R. § 751.307. To maintain a source of supply for the use, several sites will continue to manufacture TCE and then transport it to other sites to produce HFC-134. 40 C.F.R. § 751.307. Of the HFC-134a production sites, the Arkema facility in Marshall, Kentucky and the Mexichem Fluor facility in Iberville, Louisiana are in areas with multiple high-

emitting chemical plants, exposing fenceline communities not just to TCE but emissions of other toxic chemicals. 14 Attorney Generals, Comments on the Proposed Rule (Dec. 15, 2023), EPA-HQ-OPPT-2020-0642-0311, at 11, JA634.

For 11 other conditions of use, the Rule provides extended phase-out deadlines ranging between 2027 and 2034. 40 C.F.R. § 751.305(b)(10)-(22). For eight additional conditions of use, the Rule grants exemptions allowing TCE use until between 2031 and 2074. 40 C.F.R. § 751.325. For example, until December 2034, TCE may be used for "industrial and commercial uses of TCE. . .for vessels of the Armed Forces and their systems." *Id.* at § 751.325(3). TCE use "as a processing aid for specialty polymeric microporous sheet materials manufacturing" may continue until December 2039, *Id.* at § 751.325, and the chemical's use for "lead-acid battery separator manufacturing" is allowed until December 18, 2044. *Id.* at § 751.325(5). All of these exempted uses have the potential for releases to air and water that pose risks to fenceline communities. Declaration of EDF scientist Paige Varner, Addendum at 001-009

Moreover, as discussed below in Sections II and III, numerous facilities producing and processing TCE as a byproduct or at concentrations under 0.1% are excluded from the Rule. 40 C.F.R. § 751.301. These facilities may thus continue to release and discharge TCE indefinitely, potentially resulting in additional exposure

by fenceline communities to cancer risks above EPA's unreasonable risk benchmark.

In short, extensive evidence in the record showed that, in the absence of restrictions on TCE releases to air and water, the Rule's extended phase-outs of TCE and exclusions from prohibitions of TCE manufacture and use will expose fenceline communities to continuing risks of significant harm long after the Rule's promulgation. EPA's contrary claims were arbitrary and capricious and contradicted by substantial evidence in the record.

### E. EPA Erroneously Concluded That Clean Air Act Standards for Chemical Facilities Would Prevent Increases in Emissions under EPA's Rule

As commenters pointed out and EPA itself acknowledged, "efforts to reduce exposures in the workplace to levels below the [workplace air concentration limit] could lead to adoption of engineering controls that ventilate more TCE outside." JA100 (Rule at 102,613). In this event, fenceline community exposures and risks would *increase.* EPA's Proposed Rule sought comment on whether "owners and operators should be required to attest in their exposure control plan that engineering controls selected do not increase emissions of TCE to ambient air outside of the workplace and document . . . whether additional equipment was installed to capture emissions of TCE to ambient air." JA151 (88 Fed. Reg. at 74,740). However, these requirements were not included in the Rule.

Instead, EPA in the Rule downplayed concerns about increased fenceline emissions, maintaining that EPA "expects that in some situations potential exposure may be limited through facility compliance with existing National Emissions Standards for Hazardous Air Pollutants (NESHAP) that cover TCE." JA100 (Rule at 102,613).

But NESHAPs were in effect when EPA conducted its fenceline risk assessments. JA358-359 (Risk Evaluation at 492-93). Thus, any emission controls as a result of NESHAPs had already failed to prevent exceedances of EPA's cancer risk benchmark. Since NESHAPs had not previously eliminated unsafe TCE emissions, continued implementation of their requirements could not reduce fenceline risks during the TCE phaseout period.

EPA is required under TSCA to evaluate TCE for unreasonable risk by all pathways, and to regulate any unreasonable risk. If EPA felt fenceline risks could be reduced under the NESHAPs or other air regulations under the Clean Air Act without action under TSCA, EPA must follow the mandates of TSCA Section 9(b), which details required steps for declining regulation under TSCA and seeking action under other EPA-administered laws. 15 U.S.C. § 2608(b). However, the Agency expressly declined to invoke section 9(b) because there was no basis to conclude that the "unreasonable risk from TCE under its conditions of use . . ,

could be eliminated or reduced to a sufficient extent by actions taken under other Federal laws administered in whole or in part by EPA." JA103 (Rule at 102,616).

Having expressly concluded that the Clean Air Act was not an effective vehicle for addressing TCE's risks to fenceline communities, EPA could not credibly use existing Clean Air Act regulations as an excuse to forego addressing these risks under TSCA. EPA's reliance on NESHAP to rationalize its failure to require TSCA fenceline protections during the phaseout of TCE was thus arbitrary and capricious.

### F. EPA's Failure to Require Interim Protections for Fenceline Communities Was Arbitrary and Capricious In Light of Its Decision to Require Interim Protections for Workers

The Rule requires facilities with extended phase-out periods to implement interim "Workplace Chemical Protection Programs" to safeguard employees from TCE's harms before its elimination. These protections impose limits on workplace exposure based on EPA's findings of unreasonable risk to workers, including cancer risks exceeding EPA's benchmark. Yet under the Rule, fenceline communities near the very same facilities do not receive protections from their unsafe releases of TCE.

This contradiction was highlighted in Petitioners' comments on EPA's proposed rule. JA638 (EDF Comments) and JA750 (Communities' Comments). However, EPA failed to adequately explain why interim protections were

warranted to eliminate unreasonable risks to workers but not similar risks to fenceline communities. This too was arbitrary and capricious.

### G. Substantial Evidence in the Record Demonstrates that Risks to Fenceline Communities are Unreasonable

Taken as a whole, the record contains substantial evidence that TCE presented unreasonable risks to fenceline communities that EPA was required to eliminate in its risk management rule.

#### 1. The Methodology EPA Used to Determine the Magnitude of Fenceline Risks Was Consistent With Established TSCA Policy and Practice

In the Proposed Rule, EPA stated that "[e]stimates of cancer risk to fenceline communities were calculated and compared to $1\times10^{-6}$ as a benchmark value for cancer risk in fenceline communities." JA179 (88 Fed. Reg. at 74,768). In its Methodology, EPA explained that it "used $1\times10^{-6}$ as the benchmark for cancer risk in fenceline communities. This is consistent with the cancer benchmark used for general population cancer risk in *several other EPA programs and in previous risk evaluations*." JA522 (Methodology at 54) (emphasis added).

EPA has consistently used this benchmark under TSCA risk evaluations for making unreasonable risk determinations for consumers and the general population. For example, in its risk determination for 1,4-dioxane, EPA used 1 "used $1\times10^{-6}$ as the benchmark for the cancer risk to consumers and bystanders from consumer use of products containing 1,4-dioxane as a byproduct," "used

$1\times10^{-6}$ as the benchmark for exposures to surface water from recreational swimming," and stated that "[u]nder TSCA, it is preferable for the drinking water and ambient air concentrations of 1,4 dioxane to not result in an increased cancer risk above the $1\times10^{-6}$ benchmark." *Unreasonable Risk Determination for 1,4-Dioxane*, (Nov. 2024), at 10-11, https://www.epa.gov/system/files/documents/2024-11/2.-1-4-dioxane-.-revised-risk-determination-.-public-release-.-hero-.-nov-2024.pdf. As EPA explained, "a calculated cancer risk estimate that is greater than [this] cancer benchmark supports a determination of unreasonable risk of injury to health from cancer." *Id.* at 11.

Similarly, in its risk evaluation for chrysotile asbestos under TSCA, EPA used the $1\times10^{-6}$ cancer benchmark to determine unreasonable risk to consumers and bystanders exposed to asbestos during "do-it-yourself" repair and replacement of asbestos brakes. EPA Document EPA-740-R1-8012 (Dec. 2020), at 204-09, https://www.epa.gov/system/files/documents/2024-11/1.-1-4-dioxane-.-supplement-to-the-risk-evaluation-.-public-release-.-hero.-nov-2024.pdf

For these reasons, established policy and practice under TSCA required EPA to apply a cancer risk threshold of $1\times10^{-6}$ to determine unreasonable risk to fenceline community residents breathing TCE-contaminated air or ingesting contaminated water.

### 2. EPA's Fenceline Assessments Showed Risk Levels for Communities that Were Unreasonable

EPA's single-year analysis for TCE air releases found that, out of the 217 facilities evaluated, risk estimates for fenceline communities were above a risk of 1 x $10^{-6}$ for cancer for 133 facilities at a distance of 100 meters from the releasing facility. JA99 (Rule at 102,613). Based on the multi-year analysis, 58 of these 133 facilities either had cancer risks above $1 \times 10^{-6}$ at distances farther than 100 meters when compared to the single year analysis or posed risks above the benchmark that were not captured in that analysis. *Id.* EPA also found fenceline community risks exceeding its cancer benchmark from exposure to TCE in drinking water, incidental oral ingestion from ambient water, and incidental dermal contact with ambient water. JA99 (Rule at 102,612).

### 3. Because EPA's Methodology Significantly Understated Fenceline Risks, They Were Likely Greater than EPA Calculated

EPA's fenceline assessments were based on unrealistic exposure assumptions that systematically understated risks to fenceline communities. For example, EPA assumed that community members were only exposed to TCE from a single emission source, via a single exposure route, and without any exposures to other hazardous chemicals or non-chemical stressors that increased their susceptibility to harm. JA285-286 (Risk Evaluation at 301-02). In reality, however, community members are exposed to TCE from multiple sources. They may use TCE-

containing consumer products in their homes, ingest drinking water from groundwater contaminated by spills, leaks, and outdoor releases of TCE, and work at plants manufacturing and processing TCE or commercial establishments where TCE-containing products are used or disposed. At home or at work, exposure may also result from TCE vapor intrusion into buildings. *See* Declarations of EDF members Licia Davis, Angela Esslinger, Susan Heath, Lynda Means, Cynthia Robertson, Addendum at 010-029, and Declaration of EDF scientist Paige Varner, Addendum at 001-009.

Similarly, as the Science Committee recognized, where TCE industrial operations are located in areas with several TCE-use sites, the contribution of multiple emission sources to overall exposure levels must be factored into determinations of individual risk. *See* JA881 (Science Committee Report at 15). And where TCE-using facilities also manufacture other substances with known carcinogenic or other adverse health effects also caused by TCE, the risks to community members would be increased by the cumulative harms caused by multiple chemicals with similar toxicity profiles. *Id.*

For these reasons, in its peer review of the Methodology, the Science Committee warned that the "methodology was not protective because of the lack of consideration for cumulative exposures [and] multiple source exposures." *Id.* at 38. It thus urged EPA to "include aggregate . . . exposures from populations exposed at

work who live in the community, or who may also be exposed to multiple facility emissions." *Id.* at 18.

EPA declined the opportunity to strengthen the Methodology to capture all pathways of exposure to TCE and chemicals with similar cancer-causing properties. If the Agency had used more realistic exposure assumptions as recommended by the Science Committee, the Agency-predicted TCE concentrations at various distances from the emitting facility would have been significantly higher and risks exceeding the benchmark would have been found at greater distances from facility boundaries. This would have likely increased both the number of facilities with risks above the benchmark and the size of the population exposed to such risks. *Id.* at 15, 18; JA179-181 (Proposed Rule at 74,768-770).

Substantial evidence in the record established unreasonable risks to fenceline communities via air and water releases and required risk management to eliminate these risks.

### H. The Court Should Remand the Rule to EPA to Revise It to Protect Fenceline Communities During the Interim Period

While EPA did not consider fenceline exposures as part of the Risk Evaluation, it did consider them in its separate Methodology as part of this rulemaking. As described above, that analysis showed risks above the thresholds that EPA normally applies to identify unreasonable risks to the general population.

Nonetheless, EPA failed to require measures to protect fenceline communities during the lengthy periods before TCE use will be phased out, even though the Agency did require exposure limits for protecting workers at the same facilities from similar risks during the interim period. EPA's failure also to take steps to protect fenceline communities, which are potentially exposed and susceptible subpopulations, during the same interim periods was arbitrary and capricious and ignored substantial evidence that demonstrated an unreasonable risk. To remedy this serious deficiency in EPA's risk management rule for TCE, Petitioners request that the Court remand the rule to EPA so that it can be revised to protect those communities in harm's way.

## II. EPA Violated TSCA by Excluding TCE Production as a Byproduct from Its Risk Evaluation and Rule

EPA's risk evaluation does not estimate the quantities of TCE produced as a byproduct, examine the magnitude of exposure to these quantities of TCE, or determine whether exposure to TCE produced as a byproduct presents an unreasonable risk to health. Despite generally prohibiting TCE manufacture, the Rule does not impose any restrictions on the production of TCE as a byproduct.

The Rule also allows unrestricted site-limited processing of byproduct TCE in an enclosed system under 40 C.F.R. § 751.301(c).[4]

A toxic chemical produced as an unintentional byproduct has the same toxicity profiled and ability to cause harm as a toxic chemical intentionally produced. As EPA noted, "TCE is unintentionally manufactured as a byproduct during complex chemical processing streams and then processed and re-processed within those streams alongside other, similar chemicals." EPA, Response to Public Comments (November 20, 2024), EPA-HQ-OPPT-2020-0642-0726, at 36. Production of TCE occurs both at TCE production sites and facilities that produce other chemicals. TCE byproducts are also transported to additional sites where they are used as intermediates in the production of other chemicals. For example, at least 13 facilities produced TCE as a byproduct of 1,2-dichloroethane (1,2-DCA) based on 2015 company reporting for the Toxic Release Inventory. EPA, *Byproducts Assessment for 1,2-Dichloroethane* (April 2026), at 16-17, https://www.epa.gov/system/files/documents/2026-05/04-1-2-dichloroethane-byproducts-assess-public-release-april-2026v2.pdf. Since 1,2-DCA is just one

[4] However, TCE byproducts are subject to the prohibition on processing TCE as a reactant/intermediate that takes effect in December 2026 under 40 C.F.R. § 751.305(b)(9).

chemical whose manufacture produces TCE as a byproduct, the number of facilities producing TCE byproducts must necessarily be considerably larger.

### A. Exemption of TCE Byproducts from Section 6(a) Rules Violates TSCA

Contrary to the Rule, TSCA required EPA to address the risks of TCE byproduct production.

TSCA does not define "byproduct." However, EPA regulations provide that "byproducts" are chemicals "produced without a separate commercial intent during the manufacture, processing, use, or disposal of another chemical substance or mixture." 40 C.F.R. § 720.3(d). EPA's long-standing position has been that "substances that are produced coincidentally during the manufacture, processing, use, or disposal of another substance or mixture" are deemed to be "manufacture[d] for commercial purposes" and are subject to TSCA. 40 C.F.R. § 720.3(r)(2).

In its Proposed Rule, EPA asserted that production of TCE as a byproduct did not fall within TSCA's definition of "manufacture" and was not a TCE "condition of use" requiring inclusion in its risk evaluation. JA 127 (88 Fed. Reg. at 74,726). EPA reiterated this determination in the Rule. JA79 (89 Fed. Reg. at 102,592). This reading of TSCA is contrary to its plain language.

Byproducts are knowingly manufactured as part of a commercial chemical process. TSCA defines "manufacture" as "produce" or "manufacture." 15 U.S.C. §

2602(9). This definition does not differentiate between chemicals based on the purpose for which they are produced or the conditions of their manufacture. Section 6 likewise contains no such distinctions. Risk evaluations must determine unreasonable risks for a chemical's "conditions of use." 15 U.S.C. § 2605(b)(4(A). As defined in section 3(4), this term applies to the "circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured." 15 U.S.C. § 2602(4). Even if lacking commercial intent, formation of TCE as a byproduct is a "known" and "reasonably foreseen" "circumstance" of TCE manufacture and therefore comprises a TCE "condition of use."

Since TSCA does not exempt byproducts, EPA should have considered them in its TCE risk evaluation. As EPA acknowledged in its 2023 proposed rule to establish a framework for TSCA existing chemical risk evaluations, "the known, intended, and reasonably foreseen production of a chemical as a byproduct . . . [is] squarely [a] 'condition[] of use' that generally must be included within the scope of risk evaluations." 88 Fed. Reg. at 74,298. This approach, which was carried forward in the subsequent final rule, 89 Fed. Reg. 37,028, 37,033 (May 3, 2024), was directly contrary to EPA's subsequent exclusion of TCE manufacture as a byproduct in its TCE Rule promulgated six months later. JA79 (89 Fed. Reg. at 102,592). EPA should have followed the framework rule, as a rule of general

applicability governing all EPA risk evaluations, or explained why its approach to TCE byproducts differed. EPA did neither.

In the Rule, EPA also took the position that, rather than addressing TCE byproducts, it would wait until it conducted evaluations of the other chemicals whose manufacturing process generated TCE as a byproduct. JA85 (Rule at 102,598). As an example, EPA points to 1,2-DCA, a TSCA high-priority chemical for which the Agency was conducting a risk evaluation that examined the risks of TCE and other byproducts formed during its manufacture. *Id.*[5]

EPA's bifurcated approach simply does not comport with the basic design and goals of section 6. As TSCA's legislative history confirms, risk evaluations and risk management rules are intended to provide a comprehensive picture of risks across a chemical's lifecycle. Thus, EPA framed its unreasonable risk determination for TCE to apply to the "whole chemical." It would defeat this approach if TCE manufactured as a byproduct was managed not under an integrated, holistic framework for the chemical but through piecemeal evaluations conducted at different times using different datasets and methodologies. The inevitable result would be that some exposed populations would receive less

[5] In fact, EPA recently finalized the 1,2-DCA risk evaluation. In that evaluation, EPA did not assess the risk from the processing of any of the byproducts' streams, which include TCE and which would contribute to the risk of harm from TCE exposure to those living near the facilities. Declaration of EDF scientist Paige Varner, Addendum at 001, ¶ 10.

protection than others (or no protection at all) and that risks are haphazardly managed (or not) based on when (or if) other chemicals are prioritized for attention under Section 6.

1,2-DCA is an instructive example. While EPA recently finalized its risk evaluation, Notice of Availability, 86 Fed. Reg. 24,230 (May 5, 2026), risk management may take several more years based on the recent history of TSCA rulemakings.[6] During this period, byproduct TCE formed during 1,2-DCA production would not be subject to any restrictions even though other TCE conditions of use would be banned under the Rule. Indeed, there is no assurance that, when it is finally promulgated, a 1,2-DCA rule would regulate byproduct TCE production at all, as opposed to focusing only the risks of 1,2-DCA. Inaction or delay in regulating 1,2-DCA would create an unlevel playing field that treats workers and communities facing identical TCE health risks differently depending on how TCE is produced.

Moreover, 1,2-DCA is only one of several chemicals whose production generates TCE as a byproduct. TCE is also produced as a byproduct in the manufacture of vinylidene chloride and other chemicals that are not presently on track for TSCA risk evaluations. JA768 (Communities' Comments at 19). If these

---

[6] For example, the TCE risk evaluation was finalized in November 2020 but the final rule was not promulgated until December 2024.

chemicals are never evaluated and regulated, the risks of TCE byproducts produced during their manufacture will be ignored.

### B. EPA's Exemption for TCE Byproducts Processed at their Sites of Manufacture Is Unlawful

Although it generally prohibits processing of byproducts at other sites, the Rule also allows the processing of byproducts "within a site-limited, physically enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was generated." 40 C.F.R. § 751.301(c). Like the exclusion for production of byproducts, this exemption violates TSCA. A toxic chemical produced as a byproduct has the same health effects as the same chemical that is intentionally produced. While the Rule may require processing to be conducted in a "site-limited, physically enclosed system," this is no guarantee that emissions and leaks that expose workers and communities to TCE will not occur or will be too small to cause harm. As EPA stated in the Rule, "engineering controls" that aim to prevent exposures to workers in facilities can "ventilate more TCE outside" and thus into a facility's surrounding community. JA100 (Rule at 102,613). Therefore, with no further analysis, EPA cannot guarantee that engineering controls such as enclosed systems will protect communities near these facilities from unreasonable risks of TCE.

As a result, EPA had no basis to conclude that fenceline community exposures resulting from these activities were below EPA benchmarks for TCE

cancer and non-cancer risks. Because EPA merely assumed without any analysis that TCE byproducts processed at the sites where they are produced do not present an unreasonable risk, its exemption of these byproducts from the Rule violated TSCA and was arbitrary and capricious.

### C. The Court Should Vacate and Remand EPA's Actions Regarding TCE Byproducts

Accordingly, the Court should vacate and remand EPA's conclusion that the production of byproducts of TCE does not constitute "manufacture" under TSCA. The Court should also vacate and remand EPA's exemption of site-limited processing of TCE byproducts from its rule. The Court should order that, on remand, EPA conduct a new or supplemental risk evaluation addressing the risks of manufacturing and processing TCE byproducts. If unreasonable risks are identified as part of the additional risk evaluation, EPA must undertake rulemaking to eliminate those unreasonable risks.

## III. The Rule's Exemption of *De Minimis* Levels of TCE Was Unlawful

The Rule also exempts from all prohibitions and restrictions "products containing TCE at thresholds less than 0.1 percent by weight." 40 C.F.R. § 751.301(b). This exemption was not included in EPA's Proposed Rule. Instead, the Agency "request[ed] comment on whether it should consider a *de minimis* level of TCE in formulations to account for impurities (*e.g.,* 0.1% or 0.5%) when finalizing the [rule's] prohibitions . . . and, if so, information on and rationale for any level

that should be considered *de minimis.”* JA144 (Proposed Rule at 74,733). The Agency did not elaborate on the rationale for a possible exemption or what threshold level EPA might consider appropriate and why.

In the Rule, EPA established “a regulatory threshold of 0.1% for TCE, indicating that TCE at concentrations less than 0.1% by weight are not subject to the prohibitions and restrictions outlined in this rulemaking.” JA78 (Rule at 102,591).

### A. EPA Lacks Authority to Exempt Conditions of Use from Section 6 Unless It Determines That They do Not Contribute to Unreasonable Risk

Section 6 contains no exemptions from risk evaluations and risk management rules for products and manufacturing and processing activities that contain *de minimis* levels of chemicals. 15 U.S.C. § 2605. Nor is there such an exemption in other TSCA provisions, such as the definitions of “chemical substance” and “mixture” in Sections 3(2) and 3(10) and “conditions of use” in Section 3(4). 15 U.S.C. § 2602. Accordingly, as with all other sources and pathways of exposure, EPA must determine whether *de minimis* levels of TCE in products and in mixtures manufactured, processed, used, or disposed present an “unreasonable risk.” It cannot *assume* that these concentrations of TCE do not present an unreasonable risk simply because the Agency considers the amounts “small.”

In its 2024 risk evaluation framework rule, EPA in fact explicitly rejected exemptions of "so-called '*de minimis*' uses . . .where a chemical may only be present in small amounts as an impurity or within an article." 89 Fed. Reg. at 37,033 (May 3, 2024). As EPA emphasized, "relatively low exposures individually may contribute to unreasonable risk when considered in aggregate." *Id.* Thus, a categorical determination that all exposures of a given chemical below the exemption threshold do not contribute to unreasonable risk would likely be unsupportable.

Yet in the Rule, EPA ignored its prior statements. It provided no analysis demonstrating the absence of unreasonable risk for TCE concentrations below the 0.1% exemption threshold and never found that these concentrations do not present an unreasonable risk. Indeed, EPA's risk evaluation determined that TCE is a genotoxic carcinogen without a threshold for tumor formation, thus producing a response at even the lowest exposure levels. JA280 (Risk Evaluation at 244). Accordingly, a 0.1% exemption level would not provide adequate protection against unreasonable carcinogenic risks.

In addition to the risks that individual products with "low" levels of TCE may present in isolation, workers and consumers are exposed to TCE from multiple sources, including other chlorinated organics, many of which have TCE levels below the *de minimis* threshold. *See* JA78 (Rule at 102,591). It is the

combination of exposures, as opposed to any one exposure individually, that drives the unreasonable risk. Also, environmental releases of mixtures with less than 0.1% TCE will contribute to fenceline community exposure and risk, particularly in communities with multiple facilities that process or use TCE and other chlorinated organics. Since TSCA's mandate under Section 6(a) is to restrict the chemical "to the extent necessary" to eliminate its unreasonable risk, 15 U.S.C. § 2605(a), no level of TCE in products or manufacturing, processing, use, and disposal activities can be presumptively excluded from risk management.

Because EPA made no effort to analyze the combined risks of the TCE exposures that would fall within its *de minimis* exemption, JA78 (Rule at 102,591), it lacked any basis to conclude that, in aggregate, they would not contribute to TCE's unreasonable risk. As an organization representing former EPA employees commented, "[e]ven if EPA could identify a safe concentration of TCE in a particular product . . . , "[a]llowing ongoing sale and use of products with *de minimis* TCE concentrations would leave exposed populations subject to unreasonable risk from their total exposure." Environmental Protection Network, Comments on the Proposed Rule (Dec. 12, 2023), EPA-HQ-OPPT-2020-0642-0266, at 2.

EPA's Rule cited the Hazard Communication Standard of the Occupational Safety and Health Administration (OSHA) as a precedent for the *de minimis*

exemption, JA78 (Rule at 102,591), but this standard provides a plainly insufficient justification.

The goal of the hazard communication standards under OSHA, unlike TSCA, is not to eliminate unreasonable risk but to inform workers about chemical hazards and recommend prudent protective measures. 29 C.F.R. § 1910.1200(a)(2). Accordingly, OSHA has recognized that "risk may remain at concentrations below [exemption] cut-offs, and where there is evidence that is the case, the mixtures are considered hazardous under the standard." *Hazard Communication; Final Rule*; 15 Fed. Reg. 17,574, 17,850 (March 26, 2012). Thus, the hazard communication standard exemption—based on another statute with its own goals and requirements—is simply not determinative of the absence of unreasonable risk under TSCA and consistency with the HCS is not a valid rationale for adopting its 0.1% exemption threshold.

In the absence of a risk-based justification, EPA's sole rationale for the *de minimis* exemption was to "increase regulatory certainty and ease implementation of the eventual prohibition of this chemical." JA79 (Rule at 102,592). These are "costs and other non-risk factors" that TSCA explicitly precludes EPA from considering in its risk evaluations and risk management rules. 15 U.S.C. §§ 2605. Since the exemption is based solely on reducing cost and inconvenience to

regulated entities and not the absence of unreasonable risk, EPA's *de minimis* exemption violated TSCA.

### B. EPA Did Not Provide Adequate Notice and Opportunity for Comment on Its *De Minimis* Exemption

The APA requires agencies to provide a notice of proposed rulemaking that contains "either the terms or substance of the proposed rule or description of the subjects and issues involved." 5 U.S.C. § 553(b). Following notice, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). TSCA requires that risk management rulemakings must be conducted "in accordance" with APA requirements. 15 U.S.C. § 2605(c)(3). In addition, EPA must publish a notice of proposed rulemaking "stating with particularity the reason for the proposed rule" and "allow interested persons to submit written data, views and arguments." *Id.*

This Court addressed what agencies must do to provide adequate notice and opportunity for comment in *Prometheus Radio Project v. FCC*, 652 F.3d 431, 449 (3d Cir. 2011). It described the goals of these requirements as '"(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'" *Id.* (quoting *Int'l Union, United Mine*

*Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005)). This Court also explained that, to achieve those purposes, an agency's proposal must

> disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based . . . *[A]n agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible*."

*Id.* (quoting *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35–36 (D.C. Cir. 1977). In *Prometheus Radio*, this Court found that the Federal Communications Commission failed to meet this standard because its proposal was "simply too general and open-ended to have fairly apprised the public of the Commission's new approach to cross-ownership." 652 F.3d at 453.

This is the case here. EPA's proposed rule did not include a *de minimis* exemption but merely mentioned that one may be under consideration. The single sentence requesting comment on the issue (repeated virtually verbatim in three different places) was non-committal and open-ended. JA144, 145, 177 (Proposed Rule at 74,733, 74,734, and 74,766). It did not provide the Agency's rationale for the exemption or identify the specific exemption threshold it was considering. The proposal provided two illustrative examples of possible exemption levels but did not discuss the factors EPA would apply in choosing among them or explain why they would satisfy the requirements of TSCA. No analysis was provided of the

numbers of TCE-containing products that different exemption thresholds would cover or the risk implications of excluding these products from the protections afforded by the Rule.

Because EPA failed in its obligation to "disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based," the public was not "fairly apprised" of the issues raised and lacked the ability to submit focused and informed comments supported by targeted data and analysis. Petitioners "do not have a high burden in demonstrating prejudice in notice-and-comment cases. In general, an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 72 F.4th 1324, 1338 (D.C. Cir. 2023) (citations omitted).

While some commenters took positions on the need for an exemption and its desired scope, their comments were not in the record during the comment period and other commenters could not respond. In any case, agencies "cannot bootstrap notice from a comment." *Shell Oil Co. v. EPA*, 950 F.2d 741, 760 (D.C. Cir. 1991). "The APA requires interested parties wishing to play a role in the rulemaking process to comment on the *agency's* proposals, not on other interested parties' proposals." *Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991, 1006 (8th Cir. 2018) (emphasis in original).

As explained above, EPA's lack of statutory authorization for its *de minimis* exemption requires the exemption's vacatur. In addition, vacatur is warranted by EPA's violation of the notice and comment requirements of the APA and TSCA. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (stating that "deficient notice is a 'fundamental flaw' that almost always requires vacatur") (citation omitted).

## IV. Petitioners Have Demonstrated Standing

At least one petitioner must have standing to assert Petitioners' claims. *See Horne v. Flores*, 557 U.S. 433, 446-47 (2009); *Child.'s Health Def., Inc. v. Rutgers,* 93 F.4th 66, 75 (3d Cir. 2024). Petitioner Center for Environmental Health (CEH) is not a membership organization and has brought this case on behalf of its supporters. CEH supports and relies on the standing of co-petitioner Environmental Defense Fund to bring this action. An organization such as Petitioner Environmental Defense Fund has standing to bring an action on behalf of its members where: (1) the organization's members, or any one of them, would have standing to sue individually, *N.J. Coal. of Auto. Retailers, Inc. v. Mazda Motor of Am., Inc.*, 957 F.3d 390, 392 (3d Cir. 2020) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); (2) the interests at stake are germane to the organization's purpose, *Sierra Club v. United States EPA*, 972 F.3d 290, 299 (3d Cir. 2020); and (3) neither

the claim asserted nor the relief requested requires individual members to participate in the lawsuit. *Id.*

EDF members would have standing here to sue on their own behalf because they have: (1) suffered an actual or threatened injury; (2) that is fairly traceable to the challenged action; and (3) is likely to be redressed by a favorable decision. *Valley Forge Christian College. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982). EPA's failure to evaluate and regulate TCE emissions to the extent that TSCA requires injures EDF members. Numerous EDF members live near facilities that, under the Rule, are permitted to continue emitting TCE for years-long phaseouts. *See* Declarations of EDF members Licia Davis, Angela Esslinger, Susan Heath, Lynda Means, Cynthia Robertson, Addendum at 010-029, and Declaration of EDF scientist Paige Varner, Addendum at 001-009; These members will thus continue to be exposed for years to the risks from TCE emissions, which are associated with an increased risk of cancer, Parkinson's, and numerous other harms. *See* JA61-63 (Rule at 102,574-76); Varner Declaration, Addendum at 001, ¶¶ 8, 12.

Members are also exposed indefinitely to TCE due to EPA's decision not to address the unreasonable risk of TCE as a byproduct and contained in products at a *de minimis* threshold. *See* Davis Declaration, Addendum at 010; Heath Declaration, Addendum at 014; Robertson Declaration, Addendum at 021; Varner Declaration,

Addendum at 001. The EDF members who are exposed to the toxic chemical in aggregate ways have increased risk and increased potential harm beyond the individual risks EPA evaluated. Varner Declaration, Addendum at 001, ¶ 12. In addition, EDF's members exposed to TCE who also live within fenceline communities are "a potentially exposed or susceptible subpopulation" of whom Congress mandated EPA to take special care to protect from exposure to existing chemicals. 15 U.S.C. §§ 2602(12), 2605(b)(4)(A).

Concern about the negative effects that TCE has on their health also impacts EDF members' ability to safely work or recreate outside near their homes and workplaces. For example, EDF member Licia Davis' backyard is less than 2,000 feet from a plant that releases thousands of pounds of TCE each year. Davis Declaration, Addendum at 010, ¶ 11. Ms. Davis cherishes her home's large backyard, including a creek alongside, and wants to be outside as much as possible. *Id.* ¶ 3. However, since moving into the home seven years ago she has developed, for the first time, respiratory problems and other health issues that flare up when she's outside and keep her from doing things like mowing her yard. *Id.* ¶ 4-5. She worries about her exposure to TCE from the aerospace facility and other nearby plants. *Id.* ¶ 6-12. Such injuries confer standing. *See Sierra Club v. United States EPA*, 972 F.3d 290, 298-99 (3d Cir. 2020) (organization properly alleged standing where it described negative impacts of ozone pollution on health and

recreational opportunities on its members); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (breathing polluted air is sufficient to demonstrate injury-in-fact).

EDF members' injuries are all "fairly traceable" to EPA's failure to manage the risks TCE poses to them. EDF members are currently exposed to TCE, and will continue to experience these exposures, until EPA manages these risks. *See Toll Bros., Inc. v. Twp. Of Readington*, 553 F.3d 131, 142 (3d Cir. 2009). These harms are redressable by the relief that Petitioner seeks, which is full evaluation and management of the unreasonable risks to their members.

EDF also meets the two remaining prongs of the associational standing test. Petitioner's interest in protecting its members from TCE exposure is germane to the organization's mission to protect public health and the environment. Varner Declaration, Addendum at 001, ¶¶ 3-6 and 13-14. Its interests in this case also align with its mission to address the widespread toxic chemical pollution that threatens communities across the country, particularly communities on the fenceline. *Id*.

Finally, because Petitioners seek injunctive relief, and their claims are broadly applicable to people living near facilities emitting TCE, "the claims asserted and the relief sought by [Petitioners] are not particular to any individual" and "are thus properly resolved in a group context." *Gulf Restoration Network, Inc.*

*v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344 (1977).

**CONCLUSION**

The remedies Petitioners seek are tailored to the three issues raised in this brief. First, as to EPA's failure to protect fenceline communities from unreasonable risks during the interim period prior to the phase-out of TCE, Petitioners request that the Court remand the Rule to EPA so that it is revised to protect those communities.

Second, as to the exclusion of production of TCE as a byproduct from the Risk Evaluation and Rule, Petitioners request that the Court vacate and remand EPA's conclusion that the production of TCE byproducts does not constitute "manufacture" under TSCA. Petitioners also request that the court vacate and remand EPA's exemption of site-limited processing of TCE byproducts from the Rule. Finally, Petitioners request that the Court order EPA to undertake a new or supplemental risk evaluation of the risk of manufacturing and processing TCE byproducts and then engage in rulemaking to eliminate unreasonable risks that are identified.

Third, Petitioners request that the Court vacate the *de minimis* exemption as contrary to TSCA and for violating notice and comment requirements.

Petitioners, who support all other aspects of the Rule, are requesting this partial vacatur to address only its shortcomings demonstrated in this brief. Vacatur limited to the exclusion of byproducts and the *de minimis* exemption from the Rule is fully within the authority of the Court. "It is a routine feature of severability doctrine that a court may invalidate only some applications even of indivisible text, so long as the valid applications can be separated from invalid ones." *Nat. Res. Def. Council v. Wheeler,* 955 F.3d 68, 81 (D.C. Cir. 2020) (citation omitted); *Finnbin, LLC v. Consumer Prod. Safety Comm'n,* 45 F.4th 127, 136 (D.C. Cir. 2022) (stating that partial vacatur is presumptively the appropriate remedy when only one aspect of a rule is challenged). Vacating only these provisions would allow implementation of the remainder of the Rule to proceed.

Partial vacatur is also supported by ordinary severability principles and EPA's expressed preference for severability of the Rule. JA81 (Rule at 102,594). *See Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (noting that a court's "presumption [regarding a regulation] is always in favor of severability.") And partial vacatur is preferable to full vacatur of the entirety of the Rule because "there is no reason to think that [EPA] . . . would have preferred no new rules at all" given EPA's recognition of the need to restrict TCE in light of its unreasonable risks. *Finnbin,* 45 F.4th at 136.

## COMBINED CERTIFICATIONS

1. The foregoing brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(g)(1) and 32(a)(7)(B)(i) because it contains 16,822 words, excluding the parts excluded from length as to briefs under Federal Rule of Appellate Procedure 32(f); and with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

2. In accordance with Third Circuit Local Appellate Rule 28.3(d), counsel for Petitioners Center for Environmental Health and Environmental Defense Fund are members of the bar of the United States Court of Appeals for the Third Circuit.

3. The electronic version of this Brief is identical to the paper copies of the brief filed with the Court.

4. Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program was run on the electronic version of the brief using Windows Security and no virus was detected.

## CERTIFICATE OF SERVICE

On September 21, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

s/ Samantha Liskow
*Counsel for Petitioner*
*Environmental Defense Fund*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

**Case No. 25-1055**
(consolidated with Case Nos. 25-1079, 25-1080, 25-1081, 25-1082, 25-1083, 25-1084, 25-1093, 25-1098, 25-1118, 25-1132, 25-1133, 25-1144)

---

**UNITED STEEL PAPER and FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL and SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.,**

*Petitioners*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent*.

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

**ADDENDUM of PETITIONERS CENTER FOR ENVIRONMENTAL HEALTH and ENVIRONMENTAL DEFENSE FUND**

---

# TABLE OF CONTENTS

**Declarations** ……………………………………………………………..ADD001

Declaration of Paige Varner………………………………………..ADD001

Declaration of Licia Davis…………………………………………ADD010

Declaration of Susan Heath………………………………………...ADD014

Declaration of Lynda Means………………………………………ADD018

Declaration of Cynthia Robertson…………………………………ADD021

Declaration of Ashley Esslinger……………………………………ADD025

**Statutory Providions** ……………………………………………..........ADD030

15 U.S.C. § 2602……………………………………………………ADD030

15 U.S.C. § 2605……………………………………………………ADD034

15 U.S.C. § 2608……………………………………………………ADD050

15 U.S.C. § 2618……………………………………………………ADD054

**Regulatory Provisions** …………………………………………………ADD055

40 C.F.R. § 751.301 ........................................................................ADD055

40 C.F.R. § 751.305 ........................................................................ADD057

40 C.F.R. § 751.307 ........................................................................ADD062

40 C.F.R. § 751.325 ........................................................................ADD064

40 C.F.R. § 751.303…………………………………………………ADD070

40 C.F.R. § 720.3 ............................................................................ADD071

**DECLARATION OF PAIGE VARNER**

I, Paige Varner, declare as follows:

1. I am a scientist at Environmental Defense Fund ("EDF"). In this role, I work within the Healthy Communities department to integrate scientific knowledge on environmental health and toxicology to reduce exposure to toxic chemicals and protect public health. I hold a PhD in environmental engineering and toxicology from Duke University.

2. The information in this declaration is based on my personal knowledge and experience. I am submitting this declaration in support of EDF's petition for review of EPA's Trichloroethylene TSCA rule ("Rule"), in the U.S. Court of Appeals in the Third Circuit.

3. Through my role, I am familiar with EDF's structure, mission, activities, and membership. EDF is a national nonprofit organization that links science, economics, and the law to create innovative, equitable, and cost-effective solutions to urgent environmental problems. EDF is one of the world's largest environmental organizations, with hundreds of thousands of members across the United States and a staff of over 1,000 scientists, policy experts, and other professionals from around the world.

4. EDF was founded in 1967 to address the impacts of the toxic pesticide DDT. Since then, EDF has continued to advocate for regulation of toxic chemicals.

EDF played a central role in the 2016 bipartisan reform of the Toxic Substances Control Act ("TSCA").

5. Since passage of TSCA's amendments, EDF has closely tracked implementation of the new law, continuously advocating for health- and environmentally protective practices, policies, and regulations. EDF has filed thousands of pages of comments on EPA's proposed actions, publicly reported on the Agency's policies and rules implementing the reforms, and engaged with EPA in public meetings.

6. EDF has long advocated for regulation of the toxic chemical trichloroethylene ("TCE") that would protect the health of people living in this country, including our members, from TCE unreasonable risks. Many of our members are exposed to TCE. EDF currently has more than 350,000 members in the United States, across all 50 states and the District of Columbia. EDF conducted an analysis of where our members are adjacent to certain subsets of categories of facilities who engage in TCE use, processing, or manufacturing. Based on that analysis, here are just two examples of categories of many EDF members directly affected by emissions of TCE:

a. Over 8,000 EDF members reside within ten miles of U.S. facilities that use TCE for an industrial process known as batch vapor degreasing or for producing the HFC 134a gas. A distance of 10 miles

represents an appropriate distance within which health impacts could occur, as EPA notes that TCE has the ability to transport long distances in air, with a half-life of several days, and EPA utilized this distance to evaluate TCE risks from drinking water exposure from facility releases – in which they found developmental (based on congenital heart defects) and cancer risks from exposure to drinking water.[1] Many of these members will likely be exposed to TCE for years to come, as EPA's Rule allows many of the facilities in their communities multiple years to continue using TCE. For example, facilities that engage in batch vapor degreasing for certain aerospace uses can continue using TCE until December 2031.[2] Some of these members live in Census block groups that have cancer risks from TCE greater than 99% of the rest of the U.S.

b. As another example, over 2,000 EDF members reside with ten miles of U.S. facilities that manufacture 1,2-dichloroethane, which is a

---

[1] EPA, "Risk Evaluation for Trichlorethylene," at 83 (Nov. 2020), https://www.epa.gov/sites/default/files/2020-11/documents/1._risk_evaluation_for_trichloroethylene_tce_casrn_79-01-6.pdf; EPA, "Trichloroethylene: Fenceline Technical Support – Water Pathway, at 3-5 (March 2023), https://www.regulations.gov/document/EPA-HQ-OPPT-2020-0642-0062.

[2] 15 U.S.C. § 751.305(17).

chemical that produces TCE as a byproduct, a use that is allowed under the Rule in perpetuity and will expose surrounding communities. (See Paragraph 9, below).

7. These examples represent a fraction of the EDF members who are exposed to TCE. For example, numerous additional members reside adjacent to plants engaged in the use of TCE as a processing aid for lead-acid battery separator manufacturing. Under the Rule, those facilities can continue using TCE until December 2044, exposing these members for 20 years beyond the Rule's promulgation.[3]

8. TCE causes multiple harms to human health, including kidney, immunological, neurological, reproductive, and developmental effects as well as multiple types of cancer (liver, kidney, and non-Hodgkin's lymphoma). These harms can occur at extremely low levels of exposure.[4] EPA and other authoritative bodies have identified that TCE causes cancer, particularly kidney cancer, through a mutagenic mode of action.[5] A mutagenic mode of action "is the mode of action of radiation and several other agents that are known

[3] 15 U.S.C. § 751.305(23)

[4] 89 Fed. Reg. 102611

[5] *Id.*

carcinogens."[6] When carcinogens act through a mutagenic mode of action, EPA applies a linear no-threshold approach to risk assessment, which means that no exposure level is assumed to be without an increased cancer risk.[7] Therefore, even very low levels of TCE exposure may contribute to an increased risk of cancer.

9. In addition to members' exposure from facilities that are continuing to use, process, or manufacture TCE under the Rule's various extended phaseouts, numerous EDF members—as referenced above—reside near facilities that expose them to TCE that was manufactured as a byproduct, which was excluded from consideration in the Rule. In addition, EDF members live in fenceline communities near facilities that release TCE that was produced as a byproduct from the manufacture of 1,2-dichloroethane and subsequently processed. The Rule allows facilities to continue indefinitely producing TCE as a byproduct if it "is processed within a site-limited, physically-enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was

---

[6] EPA. "Guidelines for Carcinogen Risk Assessment," https://www.epa.gov/sites/default/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf, at 1-11, (March 2005).

[7] *Id.* at 3-21 to 3-22.

generated."[8] As EPA stated in the Rule, such "engineering controls" that aim to prevent exposures to workers in facilities can "ventilate more TCE outside,"[9] and thus into a facility's surrounding community. In addition, downstream processing of the byproduct streams, such as the use of 1,2-dichloroethane byproduct streams, that include TCE, as a reactant to produce HCl, could also expose community members.[10]

10. EPA recently analyzed risks from TCE that is formed as a byproduct of 1,2-dichloroethane manufacturing.[11] However, EPA only assessed the risk to the general population, or those living near the facilities, from the manufacturing process itself and notably did not assess the risk from the processing of any of the

[8] 40 C.F.R. § 751.301(c)

[9] 89 Fed. Reg. 102,613

[10] EPA, "Byproducts Assessment for 1,2-Dichloroethane: Technical Support Document for the Risk Evaluation," at 13, https://www.epa.gov/system/files/documents/2026-05/04-1-2-dichloroethane-byproducts-assess-public-release-april-2026v2.pdf (April 2026) ("Once separated from purified 1,2-dichloroethane, most facilities process the light- and heavy-ends liquid byproduct streams as a reactant to produce hydrochloric acid (HCl) in HCl furnaces or dispose of the byproduct streams, including in an incinerator or thermal oxidizer.").

[11] EPA, "Risk Evaluation for 1,2-Dichlorethane," https://www.epa.gov/system/files/documents/2026-05/01-1-2-dichloroethane-risk-evaluation-public-release-april-2026.pdf (April 2026).

byproducts' streams which would contribute to the risk of health effects from TCE exposure from these processes to those living near these facilities.[12]

11. In addition, many of these EDF members are and will be exposed to TCE via EPA's permanent allowance in the Rule for "*de minimis*" concentrations of TCE.[13] TCE concentrations of up to 0.1% by weight will be permitted in any product. This can harm EDF's members in multiple ways. First, members can also be exposed through EPA's allowance of TCE processing as a byproduct, described above. Further, individuals could be exposed to consumer products that contain TCE at the *de minimis* threshold.

12. In addition, because TCE causes cancer through a mutagenic mode of action, even low levels of TCE carry some amount of risk of cancer. These risks and potential for harm increase if individuals are exposed to TCE from multiple products or through their environment. As EPA notes, even low levels of TCE can cause harm, especially when considered in aggregate.[14] For example, a

---

[12] EPA, "Byproducts Assessment for 1,2-Dichloroethane: Technical Support Document for the Risk Evaluation," at 13, https://www.epa.gov/system/files/documents/2026-05/04-1-2-dichloroethane-byproducts-assess-public-release-april-2026v2.pdf (April 2026) (""EPA notes that any processing of the byproducts streams is not addressed").

[13] 89 Fed. Reg. 102,591 ("To aid the regulated community with implementing the prohibitions on TCE and to account for TCE as a byproduct or impurity in products, EPA is establishing a regulatory threshold of 0.1% for TCE").

[14] 89 Fed. Reg. 37,033

community member living near multiple petrochemical facilities releasing TCE could be exposed to higher levels of TCE in air and drinking water which could result in health harms, even if the releases from individual facilities are relatively low. These individuals might also be exposed to TCE through use of multiple consumer products, even if they meet the *de minimis* threshold, in addition to living near TCE-releasing facilities. Together, these aggregate exposures could result in TCE exposure levels that subject individuals to unreasonable risk.

13. EDF and its members have engaged in many activities to reduce harm from TCE. For example, in 2023 over 10,000 EDF members responded to an "action alert" to have comments submitted to EPA urging the Agency to rapidly ban TCE. And EDF staff have submitted over 15 administrative comments to EPA, and testified at hearings, urging the Agency to fully evaluate the risks of TCE, and then issue a fully protective TSCA regulation.

14. The Rule contains significant protections for EDF's members for which EDF has long advocated. If the Court grants any petitioners' request to narrow or undo the Rule, it will harm the many EDF members who are exposed to TCE, along with many others in this country. At the same time, the portions of the Rule that fail to protect EDF's members – described above and in Petitioners' accompanying brief – will injure EDF members through exposure to TCE that can cause health harms. Our members, and EDF as an organization, have a strong

interest in ensuring that TCE is regulated in a fully protective manner without exemptions so that the unreasonable risk from this toxic chemical is eliminated, as required by TSCA.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct.

Date: May 12, 2026

Paige Varner

Paige Varner, PhD

**DECLARATION OF LICIA DAVIS**

I, Licia Davis, declare as follows:

1. My name is Licia Davis, and I live in Wichita, Kansas, in a neighborhood southeast of downtown.

2. I admire groups who litigate for the environment, and I try to support them as I can, especially those who have good ratings for effectiveness on Charity Navigator like NRDC and EDF, of which I am a member. I love to help people, and have a business working as a masseuse out of my home.

3. I have lived in Wichita for years. In November 2019, I moved to my current house. I love it here, because there is lots of nature and a humongous back yard with a creek in the back, and I try to be outside as much as possible. The trees and space give me so much.

4. I have been a fairly healthy older person. However, since I moved in, I have respiratory problems that have worsened each year, and a pulmonologist last year ruled out COPD. I have to use an inhaler some days, after I have been outside in the yard. I also developed allergy type symptoms, like headaches, and I had not had headaches for decades, before I moved here. On some days, my legs feel heavy and weak.

5. I have always mowed my own yards, but I had to stop doing this since I've lived here, because it's hard for me to breathe when I try to mow this yard.

6. The creek by my house is only like a quarter of a mile from aircraft facilities. I worry about exposures to chemicals through the air and water, and I wonder if my health problems are linked to chemicals. I have a Brita, but I worry that is not enough to keep toxic chemicals out of my drinking water.

7. A while back, I went to a class about an air quality program sponsored by Wichita Parks and Recreation. It was a program where people could get air monitoring stations in their locations. I was hoping that I could get a monitor in this area, and that this could help me understand and fix my asthma and allergies. However, there is no longer any federal funding for the program.

8. I am sad that the Earth is not considered as important as it is, because of course there is no future without us helping the Earth.

9. I understand that EPA has found the chemical trichloroethylene (TCE) to be harmful and moved to ban it. I support the ban of toxic chemicals, and support EDF's efforts to defend this regulation of TCE. But I also understand that there are exceptions to the ban that could harm me.

10. I have been made aware of numerous sources of TCE in my area, to which I fear I am being exposed. In addition to the aircraft facilities that are near my backyard, there is an OxyChem facility less than ten miles from my home. I have seen documents showing that OxyChem manufactures 1,2-dichloroethane, a

process that can make TCE as a byproduct. I understand that EPA has allowed companies to continue this process.

11. I also understand that aerospace companies, like the ones near my house, are able to use TCE for adhesives or for “degreasing” for many years into the future. Examples of the companies I am near are Textron Aviation, which is less than 2,000 feet from my house, and reported releasing a total of over 145,000 pounds of TCE from 2020-2024; Spirit Aerosystems, 2 miles away, which reported releasing a total of over 185,000 pounds of TCE from 2020-2024; and I live less than 10 miles from other aviation facilities that have reported releasing TCE.

12. I do not feel protected by these decisions of EPA’s, and I support EDF’s case seeking to ask EPA to protect people like me and communities like mine that are exposed to TCE. Even though I love where I live, I have considered moving because of the progression of my health.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct.

Date: May 7, 2026

Licia Davis

**DECLARATION OF SUSAN HEATH**

I, Susan Heath, declare as follows:

1. My name is Susan Heath. I have lived in Albany, Oregon, since 2014.

2. I am a member of the Environmental Defense Fund. I support EDF and other environmental organizations because I want to help address the negative effects that certain industries can have on the environment and on people's health.

3. Since moving to Oregon, I have learned about the damage that some companies with significant political influence have done here. For example, I learned that timber companies, after they clear cut, spray toxic chemicals which gets into the air and into the watershed.

4. I am aware of a company called ENTEK, which is located in Lebanon, Oregon, less than eight miles from me. I have been made aware that ENTEK uses the toxic chemical TCE, and that it will be allowed to continue using this chemical for 20 more years. I have friends who live in Lebanon and have told me about a history of toxic emissions – in particular, that a company there was releasing some kind of chemical through their smokestack in high amounts.

5. People report that there is a concerning odor in the air in my area. However, I do not have a sense of smell. I am concerned that there may be something toxic that I need to detect but cannot.

6. I see signs of apparent pollution. A major crop here is grass. During the summer, huge clouds of dust come onto and from the fields and settle for weeks. I'm anxious about what is in this dust. I have sinus issues that are exacerbated by the dust. Sometimes, it mixes with wildfire smoke and you can't do a lot about it – you have to go indoors.

7. I am also concerned that this dust material ends up in our watershed. I have heard people report that they have arsenic in their well water here. I am on the city water system, but I drink bottled water.

8. I live with my sister and our dogs. We are in our sixties. I volunteer for various organizations, and my sister works at her job and raises puppies for Canine Companions. We both like to garden and create a nice area for the dogs to roam in, but when the dust gets bad, we feel that we have to stay inside and close the windows. We don't have central air or air filtration.

9. I am aware that, according to data shown to me from the EPA "Toxic Release Inventory," that ENTEK reported emitting, from 2020 to 2024, over 240,000 pounds of TCE. The last time they reported – about what they released in 2024 – they had emitted over 50,000 pounds of TCE in one year.

10. My sister, myself, our dogs, and my community are exposed to TCE by living near it. I worry about our health and the health of the surrounding community. I understand that TCE causes cancer, and can affect the nervous

system, kidneys, and liver, and is linked to Parkinson’s disease. After learning about TCE emissions near me, I worry about being outside.

11. In addition to the fact that ENTEK will not have to stop using TCE for 20 years, I understand that companies can keep using and releasing TCE even after these delay times if TCE is produced as a “byproduct” from making or using other chemicals, or if they are in products under a certain amount. So I may be exposed to TCE through use of TCE-containing products, which could make harms from TCE from ENTEK worse.

12. Also, I have heard that another battery company may be seeking to open here in Albany. I understand that many battery companies use TCE, and that the EPA regulation may permit them 10-20 years to use this chemical. If that happened, my family and I and my community would be exposed to even more TCE.

13. While these things go on, to my knowledge there is no protection that EPA is giving to my community. I am concerned that my community is not protected from TCE, which I understand EPA has decided is toxic and decided to ban. It is important to me that EPA’s ban of TCE go forward, but also that communities like mine who have to wait for it to go into effect be protected from the chemical.

14. I am submitting this declaration in support of Environmental Defense Fund's case to help show why the national TCE regulation should not be weakened, and should be strengthened, to protect our health from the TCE emissions in our area, and to prevent and reduce the serious harm that my family and my community face from this pollution.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct

Date: May 6, 2026

Susan I Heath
Susan Heath

**DECLARATION OF LYNDA MEANS**

I, Lynda Means, declare as follows:

1. My name is Lynda Means. I live in a neighborhood next to the St. Louis airport, called St. John, in a house that I purchased 46 years ago.

2. I raised my children here. My children visit me often in this home, along with my grandchildren and great grandchildren.

3. I am retired from my career teaching university classes in Native American studies.

4. I have been a member of the Environmental Defense Fund for over 30 years.

5. I became connected to the environment through my father. He was what I would call a conservationist – he was always very respectful of nature. In that way, I became connected to Native American philosophies about nature, and in the 1970s I began supporting environmental groups. For example, I was a founding member of the Cousteau Society.

6. I work outside in my yard. I also like to get around as much as possible. There are times, however, when I smell odd smells and wonder what they are. I assume they are coming from the airport. The saving grace of my neighborhood is our many old trees.

7. I have dealt with post-nasal drip for years, and from time to time it will flare up, and then I can get infections. I take an antihistamine to try to prevent this.

8. I understand that I live less than 3 miles from a Boeing facility, at 6300 James S. McDonell Boulevard, and that the facility is reported to release many pounds of the chemical TCE. For example, it released over 18,000 pounds of TCE in the period from 2020 to 2024. I also understand that companies who use TCE for certain reasons like “degreasing for essential aerospace parts” may continue to do so for years, despite the fact that EPA has called the chemical toxic and called for a ban. I understand that I will therefore likely be exposed for years.

9. I will not feel comfortable being outside and having my grandchildren and great grandchildren over knowing that I am exposed to a toxic chemical.

10. I support EDF bringing this case so that we can have a ban on this toxic chemical, and so that in the meantime people like me, my family, and my community – located near where TCE is emitted – will be protected.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct

Date: May 7, 2026

Lynda Means

Lynda Means

## DECLARATION OF CYNTHIA ROBERTSON

I, Cynthia Robertson, declare as follows:

1. My name is Cynthia Robertson, and I live in Sulphur, Louisiana, less than five miles from 17 petrochemical facilities.

2. I have done lots of things in my working life, including starting a foundation in Texas that worked with the elderly with physical and emotional disabilities. I went to seminary school. I have a masters in social work, a few credits away from a PhD. I also had a restaurant in an old school bus.

3. I lived in Sulphur when I was younger. As an older adult, I moved back to take care of my mother, and I began volunteering with the Open Door Biker Church, which works with community members in need of support.

4. Through that experience, I realized what a great need there was for more assistance here. So, I bought a house here in the neighborhood of Portie Town and moved in. I started by putting a food box in front of the house. Then, we had historic flooding here. Fifty percent of the buildings in our parish were seriously damaged or demolished. So much remains unrepaired. Across the street, one of my neighbors still has a blue tarp on his roof.

5. I founded a group, which I named Micah 6:8 Mission, and we started looking at the root causes of the problems here. Since then, next door we've

established The Commons @ Micah 6:8, which is a resilience education program for the community.

6. The people here struggle. For example, I have recently gotten grants to give away food assistance, and distributed thousands in gift cards. Many of the people who came for assistance have been making do with only around $1,200 per month.

7. Increasing climate change means increasing struggle. Here at Micah 6:8 Mission, we have a community garden, a greenhouse, a rainwater catchment system, a rain garden, and solar power. We built these to demonstrate to the community how they might adapt to the changing climate, since most of the residents are low income and cannot afford to move away.

8. The petrochemical facilities and industry are also a big part of people's struggles. We have very high cancer rates in our community. We have many people with respiratory problems who cannot be outside on certain days. My group has set up air pollution detectors – including through federal grants from the previous administration's Environmental Protection Agency – to try to give people some idea of what pollution they're dealing with. Also, I have two amazing scientists working with me, and they have studied and challenged permit applications filed for the area.

9. The petrochemical industry is huge in my family. My daddy was a chemical engineer, and he worked for Union Carbide in New Orleans and then Texas City, Texas, and then ended up at Olin in Westlake. He died of heart disease, for which he had received a heart transplant.

10. My mom was a high school teacher in Westlake, less than three miles from the petrochemical facilities. She had dealt with high blood pressure and atrial fibrillation.

11. I have many health issues, including chronic fatigue and fibromyalgia, that I'm sure are associated with living in and around chemical plant areas.

12. I understand from information that I have reviewed that the Eagle US 2/Westlake US 2 facility produces 1,2-dichloroethane (1,2-DCA), from which trichlorethylene (TCE) is a byproduct, and that they are listed as emitting a total of over 216,000 pounds of 1,2-DCA from 2020-2024. I also understand that EPA, in its 2024 regulation, has allowed companies to emit certain TCE byproducts, even after its ban of TCE goes into effect.

13. My community already has so much exposure to so many toxic chemicals. We deserve to and must be relieved of the burden of toxic TCE, which EPA saw fit to ban in many places. Therefore, I support EDF's case seeking to defend a ban of TCE with no loopholes and with robust protections for communities like mine.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct.

Date: May 10, 2026

Cynthia Robertson

## DECLARATION OF ANGELA ESSLINGER

I, Angela Esslinger, declare as follows:

1. My name is Angela Esslinger. I have been a member of Environmental Defense Fund ("EDF") since 2015. I became particularly interested in environmental issues when I learned about threats to environmental protections. I stay involved by reading about issues such as toxic chemicals, signing petitions to agencies, and educating my friends on social media.

2. My family and I have resided on our block in Wichita, Kansas, for 45 years. We bought a house on this block in 1979. Ten years later, we bought and moved into the house next door.

3. I currently live in the house with my husband. My husband is 72, and I will turn 70 next month. We are both retired and spend a lot of our time at home. We plan to stay in this house.

4. All of my children and grandchildren live in the area. I have four children, ten grandchildren and one great grandchild, who is two years old.

5. The two-year-old, along with the younger grandchildren, come to my house frequently. My husband and I babysit the children, and they also come over to visit with their parents. When the children are over, they play outside constantly.

6. My husband and I also are outside as much as weather permits, either working in the yard, being with our two dogs, or watching and playing with the grandchildren.

7. From the environmental news I have read and the petitions I have signed, I learned about the chemical trichlorethylene, also known as TCE. I became aware that the chemical was very toxic and that the Environmental Protection Agency was trying to regulate it.

8. I have more recently learned that five separate facilities near my home emit TCE. I am aware that, according to data reported to the EPA Toxic Release Inventory, the facilities Spirit Aerosystems, Textron Aviation, 3P Processing, Globe Engineering, and Metal Finishing combined, from 2017 to 2022, have reported emitting over 400,000 pounds of TCE.

9. Most of my children and grandchildren also live near these facilities.

10. My husband worked for years at the Spirit facility, as an industrial engineer. I now have a son-in-law who works at the same plant. And, my son works at the Textron facility. He works with various chemicals, and wears gloves for protection. These activities likely have increased my family's exposure to TCE.

11. I am aware that data from EPA's Toxics Release Inventory indicates that some of the facilities near me have some of the highest releases of TCE across the country. In fact, because of these releases, my census block group has greater

cancer risks from TCE than 99% of the rest of the block groups in the country, according to EPA's AirToxScreen.

12. Our area has long dealt with toxic issues. A train spilled TCE into our soil that has contaminated our groundwater for many years.

13. Down on Kellogg, there is a company that refines old oil. When they are processing it, we get smells like a rendering plant.

14. About two years ago, I began noticing a film that would develop on top of the water in our bird bath. I've called my husband out to look at it, and we could not figure out what it was. I often dump out the water and refill the bird bath, but the next day, the film will be back.

15. My husband and I both have asthma. Our symptoms did not develop until the mid-1980s.

16. Five of my grandchildren have asthma. They seem to have particular trouble with their asthma when there is a strong wind outside. My six-year-old granddaughter and my 12-year-old grandson cannot be around a campfire without their symptoms becoming severe, and that grandson was hospitalized during an asthma attack. My son-in-law was also hospitalized for asthma.

17. Two other of my grandchildren repeatedly get sick and get infections.

18. I worry about my health and the health of my family. I understand that TCE is a concern, and a potential health harm, particularly because we are close to

so many facilities that release it. I understand that TCE causes cancer, and can affect the nervous system, kidneys, and liver. Even small amounts can be highly toxic and can hurt the immune system and development during pregnancy. I am also concerned about the harms from breathing in other industrial emissions in my area, which can cause some of the same health effects as TCE and increase the risk and severity of these harms.

19. I worry about my grandchildren playing outside – especially those children with asthma – and I worry about the fact that TCE harms fetuses, as I have children and grandchildren who are likely to have more children. After learning about TCE emissions near me from the facilities, I do not feel as comfortable with my family being outside.

20. I understand that EPA issued a regulation to ban TCE. I also understand that it is now being challenged in a court case. It is very important to me that this law stay in place, so that the TCE emissions in our community will stop.

21. I am submitting this declaration in support of the intervention and litigation of EDF to help show why the national TCE rule should not be weakened, and should be strengthened, to protect our health from the TCE emissions in our area, and to prevent and reduce the serious harm that my family and my community face from these sources' pollution.

I declare under the penalty of perjury that, to the best of my knowledge, the above is true and correct

Date: January 29, 2025.

Angela Esslinger

# 15 USCS § 2602

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.

***United States Code Service > TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123) > CHAPTER 53. TOXIC SUBSTANCES CONTROL (§§ 2601 — 2697) > CONTROL OF TOXIC SUBSTANCES (§§ 2601 — 2629)***

## § 2602. Definitions

As used in this Act [15 USCS §§ 2601 et seq.]:

**(1)** the [The] term “Administrator” means the Administrator of the Environmental Protection Agency.

**(2)**

**(A)** Except as provided in subparagraph (B), the term “chemical substance” means any organic or inorganic substance of a particular molecular identity, including—

**(i)** any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and

**(ii)** any element or uncombined radical.

**(B)** Such term does not include—

**(i)** any mixture,

**(ii)** any pesticide (as defined in the Federal Insecticide, Fungicide, and Rodenticide Act [7 USCS §§ 136 et seq.]) when manufactured, processed, or distributed in commerce for use as a pesticide,

**(iii)** tobacco or any tobacco product,

**(iv)** any source material, special nuclear material, or byproduct material (as such terms are defined in the Atomic Energy Act of 1954 [42 USCS §§ 2011 et seq.] and regulations issued under such Act),

**(v)** any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1954 [1986] [26 USCS § 4181] (determined without regard to any exemptions from such tax provided by section 4182 or 4221 [26 USCS § 4182 or 4221] or any other provision of such Code) and any component of such an article (limited to shot shells, cartridges, and components of shot shells and cartridges), and

**(vi)** any food, food additive, drug, cosmetic, or device (as such terms are defined in section 201 of the Federal Food, Drug, and Cosmetic Act [21 USCS

§ 321]) when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

The term “food” as used in clause (vi) of this subparagraph includes poultry and poultry products (as defined in sections 4(e) and 4(f) of the Poultry Products Inspection Act [21 USCS § 453(e) and 4(f)]), meat and meat food products (as defined in section 1(j) of the Federal Meat Inspection Act [21 USCS § 601(j)]), and eggs and egg products (as defined in section 4 of the Egg Products Inspection Act [21 USCS § 1033]).

**(3)** The term “commerce” means trade, traffic, transportation, or other commerce (A) between a place in a State and any place outside of such State, or (B) which affects trade, traffic, transportation, or commerce described in clause (A).

**(4)** The term “conditions of use” means the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of.

**(5)** The terms “distribute in commerce” and “distribution in commerce” when used to describe an action taken with respect to a chemical substance or mixture or article containing a substance or mixture mean to sell, or the sale of, the substance, mixture, or article in commerce; to introduce or deliver for introduction into commerce, or the introduction or delivery for introduction into commerce of, the substance, mixture, or article; or to hold, or the holding of, the substance, mixture, or article after its introduction into commerce.

**(6)** The term “environment” includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things.

**(7)** The term “guidance” means any significant written guidance of general applicability prepared by the Administrator.

**(8)** The term “health and safety study” means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying information and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological studies of a chemical substance or mixture, and any test performed pursuant to this Act [15 USCS §§ 2601 et seq.].

**(9)** The term “manufacture” means to import into the customs territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States), produce, or manufacture.

**(10)** The term “mixture” means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except that such term does include any combination which occurs, in whole or in part, as a result of a chemical reaction if none of the chemical substances comprising the combination is a new chemical substance and if the combination could have been manufactured for commercial purposes without a

chemical reaction at the time the chemical substances comprising the combination were combined.

**(11)** The term “new chemical substance” means any chemical substance which is not included in the chemical substance list compiled and published under section 8(b) [15 USCS § 2607(b)].

**(12)** The term “potentially exposed or susceptible subpopulation” means a group of individuals within the general population identified by the Administrator who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, or the elderly.

**(13)** The term “process” means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce—

**(A)** in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

**(B)** as part of an article containing the chemical substance or mixture.

**(14)** The term “processor” means any person who processes a chemical substance or mixture.

**(15)** The term “protocols and methodologies for the development of information” means a prescription of—

**(A)** the—

**(i)** health and environmental effects, and

**(ii)** information relating to toxicity, persistence, and other characteristics which affect health and the environment,

for which information for a chemical substance or mixture are to be developed and any analysis that is to be performed on such information, and

**(B)** to the extent necessary to assure that information respecting such effects and characteristics are reliable and adequate—

**(i)** the manner in which such information are [is] to be developed,

**(ii)** the specification of any test protocol or methodology to be employed in the development of such information, and

**(iii)** such other requirements as are necessary to provide such assurance.

**(16)** The term “State” means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, or any other territory or possession of the United States.

**(17)** The term “United States”, when used in the geographic sense, means all of the States.

## History

### HISTORY:

Oct. 11, 1976, P. L. 94-469, Title I, § 3, 90 Stat. 2004; Oct. 22, 1986, P. L. 99-519, § 3(c), 100 Stat. 2989; Aug. 23, 1988, P. L. 100-418, Title I, Subtitle B, § 1214(e)(1), 102 Stat. 1156; Nov. 25, 2015, P. L. 114-92, Div A, Title III, Subtitle B, § 315, 129 Stat. 791, June 22, 2016, P. L. 114-182, Title I, §§ 3, 19(c), 130 Stat. 448, 505.

United States Code Service
Copyright © 2026 All rights reserved.

End of Document

# 15 USCS § 2605

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.



## § 2605. Prioritization, risk evaluation, and regulation of chemical substances and mixtures

**(a) Scope of regulation.** If the Administrator determines in accordance with subsection (b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment, the Administrator shall by rule and subject to section 18, and in accordance with subsection (c)(2), apply one or more of the following requirements to such substance or mixture to the extent necessary so that the chemical substance or mixture no longer presents such risk:

**(1)** A requirement (A) prohibiting or otherwise restricting the manufacturing, processing, or distribution in commerce of such substance or mixture, or (B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce.

**(2)** A requirement—

**(A)** prohibiting or otherwise restricting the manufacture, processing, or distribution in commerce of such substance or mixture for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement, or

**(B)** limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement.

**(3)** A requirement that such substance or mixture or any article containing such substance or mixture be marked with or accompanied by clear and adequate minimum warnings and instructions with respect to its use, distribution in commerce, or disposal or with respect to any combination of such activities. The form and content of such minimum warnings and instructions shall be prescribed by the Administrator.

**(4)** A requirement that manufacturers and processors of such substance or mixture make and retain records of the processes used to manufacture or process such substance or mixture or monitor or conduct tests which are reasonable and necessary

to assure compliance with the requirements of any rule applicable under this subsection.

**(5)** A requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance or mixture.

**(6)**

**(A)** A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance or mixture, or of any article containing such substance or mixture, by its manufacturer or processor or by any other person who uses, or disposes of, it for commercial purposes.

**(B)** A requirement under subparagraph (A) may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision, and shall require each person subject to it to notify each State and political subdivision in which a required disposal may occur of such disposal.

**(7)** A requirement directing manufacturers or processors of such substance or mixture (A) to give notice of such determination to distributors in commerce of such substance or mixture and, to the extent reasonably ascertainable, to other persons in possession of such substance or mixture or exposed to such substance or mixture, (B) to give public notice of such risk of injury, and (C) to replace or repurchase such substance or mixture as elected by the person to which the requirement is directed.

Any requirement (or combination of requirements) imposed under this subsection may be limited in application to specified geographic areas.

**(b) Risk evaluations.**

**(1)** Prioritization for risk evaluations.

**(A)** Establishment of process. Not later than 1 year after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall establish, by rule, a risk-based screening process, including criteria for designating chemical substances as high-priority substances for risk evaluations or low-priority substances for which risk evaluations are not warranted at the time. The process to designate the priority of chemical substances shall include a consideration of the hazard and exposure potential of a chemical substance or a category of chemical substances (including consideration of persistence and bioaccumulation, potentially exposed or susceptible subpopulations and storage near significant sources of drinking water), the conditions of use or significant changes in the conditions of use of the chemical substance, and the volume or significant changes in the volume of the chemical substance manufactured or processed.

**(B)** Identification of priorities for risk evaluation.

**(i)** High-priority substances. The Administrator shall designate as a high-priority substance a chemical substance that the Administrator concludes, without consideration of costs or other nonrisk factors, may present an

unreasonable risk of injury to health or the environment because of a potential hazard and a potential route of exposure under the conditions of use, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator.

**(ii)** Low-priority substances. The Administrator shall designate a chemical substance as a low-priority substance if the Administrator concludes, based on information sufficient to establish, without consideration of costs or other nonrisk factors, that such substance does not meet the standard identified in clause (i) for designating a chemical substance a high-priority substance.

**(C)** Information request and review and proposed and final prioritization designation. The rulemaking required in subparagraph (A) shall ensure that the time required to make a priority designation of a chemical substance be no shorter than nine months and no longer than 1 year, and that the process for such designations includes—

**(i)** a requirement that the Administrator request interested persons to submit relevant information on a chemical substance that the Administrator has initiated the prioritization process on, before proposing a priority designation for the chemical substance, and provide 90 days for such information to be provided;

**(ii)** a requirement that the Administrator publish each proposed designation of a chemical substance as a high- or low-priority substance, along with an identification of the information, analysis, and basis used to make the proposed designations, and provide 90 days for public comment on each such proposed designation; and

**(iii)** a process by which the Administrator may extend the deadline in clause (i) for up to three months in order to receive or evaluate information required to be submitted in accordance with section 4(a)(2)(B) [15 USCS § 2603(a)(2)(B)], subject to the limitation that if the information available to the Administrator at the end of such an extension remains insufficient to enable the designation of the chemical substance as a low-priority substance, the Administrator shall designate the chemical substance as a high-priority substance.

**(2)** Initial risk evaluations and subsequent designations of high- and low-priority substances.

**(A)** Initial risk evaluations. Not later than 180 days after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall ensure that risk evaluations are being conducted on 10 chemical substances drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments and shall publish the list of such chemical substances during the 180 day period.

**(B)** Additional risk evaluations. Not later than three and one half years after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall ensure that risk

evaluations are being conducted on at least 20 high-priority substances and that at least 20 chemical substances have been designated as low-priority substances, subject to the limitation that at least 50 percent of all chemical substances on which risk evaluations are being conducted by the Administrator are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments.

**(C)** Continuing designations and risk evaluations. The Administrator shall continue to designate priority substances and conduct risk evaluations in accordance with this subsection at a pace consistent with the ability of the Administrator to complete risk evaluations in accordance with the deadlines under paragraph (4)(G).

**(D)** Preference. In designating high-priority substances, the Administrator shall give preference to—

**(i)** chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments as having a Persistence and Bioaccumulation Score of 3; and

**(ii)** chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments that are known human carcinogens and have high acute and chronic toxicity.

**(E)** Metals and metal compounds. In identifying priorities for risk evaluation and conducting risk evaluations of metals and metal compounds, the Administrator shall use the Framework for Metals Risk Assessment of the Office of the Science Advisor, Risk Assessment Forum, and dated March 2007, or a successor document that addresses metals risk assessment and is peer reviewed by the Science Advisory Board.

**(3)** Initiation of risk evaluations; designations.

**(A)** Risk evaluation initiation. Upon designating a chemical substance as a high-priority substance, the Administrator shall initiate a risk evaluation on the substance.

**(B)** Revision. The Administrator may revise the designation of a low-priority substance based on information made available to the Administrator.

**(C)** Ongoing designations. The Administrator shall designate at least one high-priority substance upon the completion of each risk evaluation (other than risk evaluations for chemical substances designated under paragraph (4)(C)(ii)).

**(4)** Risk evaluation process and deadlines.

**(A)** In general. The Administrator shall conduct risk evaluations pursuant to this paragraph to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use.

**(B)** Establishment of process. Not later than 1 year after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall establish, by rule, a process to conduct risk evaluations in accordance with subparagraph (A).

**(C)** Requirement. The Administrator shall conduct and publish risk evaluations, in accordance with the rule promulgated under subparagraph (B), for a chemical substance—

**(i)** that has been identified under paragraph (2)(A) or designated under paragraph (1)(B)(i); and

**(ii)** subject to subparagraph (E), that a manufacturer of the chemical substance has requested, in a form and manner and using the criteria prescribed by the Administrator in the rule promulgated under subparagraph (B), be subjected to a risk evaluation.

**(D)** Scope. The Administrator shall, not later than 6 months after the initiation of a risk evaluation, publish the scope of the risk evaluation to be conducted, including the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider, and, for each designation of a high-priority substance, ensure not less than 12 months between the initiation of the prioritization process for the chemical substance and the publication of the scope of the risk evaluation for the chemical substance, and for risk evaluations conducted on chemical substances that have been identified under paragraph (2)(A) or selected under subparagraph (E)(iv)(II) of this paragraph, ensure not less than 3 months before the Administrator publishes the scope of the risk evaluation.

**(E)** Limitation and criteria.

**(i)** Percentage requirements. The Administrator shall ensure that, of the number of chemical substances that undergo a risk evaluation under clause (i) of subparagraph (C), the number of chemical substances undergoing a risk evaluation under clause (ii) of subparagraph (C) is—

**(I)** not less than 25 percent, if sufficient requests are made under clause (ii) of subparagraph (C); and

**(II)** not more than 50 percent.

**(ii)** Requested risk evaluations. Requests for risk evaluations under subparagraph (C)(ii) shall be subject to the payment of fees pursuant to section 26(b) [15 USCS § 2625(b)], and the Administrator shall not expedite or otherwise provide special treatment to such risk evaluations.

**(iii)** Preference. In deciding whether to grant requests under subparagraph (C)(ii), the Administrator shall give preference to requests for risk evaluations on chemical substances for which the Administrator determines that restrictions imposed by 1 or more States have the potential to have a significant impact on interstate commerce or health or the environment.

**(iv)** Exceptions.

**(I)** Chemical substances for which requests have been granted under subparagraph (C)(ii) shall not be subject to section 18(b) [15 USCS § 2617(b)].

**(II)** Requests for risk evaluations on chemical substances which are made under subparagraph (C)(ii) and that are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments shall be granted at the discretion of the Administrator and not be subject to clause (i)(II).

**(F)** Requirements. In conducting a risk evaluation under this subsection, the Administrator shall—

**(i)** integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations identified as relevant by the Administrator;

**(ii)** describe whether aggregate or sentinel exposures to a chemical substance under the conditions of use were considered, and the basis for that consideration;

**(iii)** not consider costs or other nonrisk factors;

**(iv)** take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance; and

**(v)** describe the weight of the scientific evidence for the identified hazard and exposure.

**(G)** Deadlines. The Administrator—

**(i)** shall complete a risk evaluation for a chemical substance as soon as practicable, but not later than 3 years after the date on which the Administrator initiates the risk evaluation under subparagraph (C); and

**(ii)** may extend the deadline for a risk evaluation for not more than 6 months.

**(H)** Notice and comment. The Administrator shall provide no less than 30 days public notice and an opportunity for comment on a draft risk evaluation prior to publishing a final risk evaluation.

**(c) Promulgation of subsection (a) rules.**

**(1)** Deadlines. If the Administrator determines that a chemical substance presents an unreasonable risk of injury to health or the environment in accordance with subsection (b)(4)(A), the Administrator—

**(A)** shall propose in the Federal Register a rule under subsection (a) for the chemical substance not later than 1 year after the date on which the final risk evaluation regarding the chemical substance is published;

**(B)** shall publish in the Federal Register a final rule not later than 2 years after the date on which the final risk evaluation regarding the chemical substance is published; and

**(C)** may extend the deadlines under this paragraph for not more than 2 years, subject to the condition that the aggregate length of extensions under this subparagraph and subsection (b)(4)(G)(ii) does not exceed 2 years, and subject to the limitation that the Administrator may not extend a deadline for the publication of a proposed or final rule regarding a chemical substance drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments or a chemical substance that, with respect to persistence and bioaccumulation, scores high for 1 and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), without adequate public justification that demonstrates, following a review of the information reasonably available to the Administrator, that the Administrator cannot complete the proposed or final rule without additional information regarding the chemical substance.

**(2)** Requirements for rule.

**(A)** Statement of effects. In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to—

**(i)** the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

**(ii)** the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

**(iii)** the benefits of the chemical substance or mixture for various uses; and

**(iv)** the reasonably ascertainable economic consequences of the rule, including consideration of—

**(I)** the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

**(II)** the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

**(III)** the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

**(B)** Selecting requirements. In selecting among prohibitions and other restrictions, the Administrator shall factor in, to the extent practicable, the considerations under subparagraph (A) in accordance with subsection (a).

**(C)** Consideration of alternatives. Based on the information published under subparagraph (A), in deciding whether to prohibit or restrict in a manner that substantially prevents a specific condition of use of a chemical substance or mixture, and in setting an appropriate transition period for such action, the Administrator shall consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect.

**(D)** Replacement parts.

**(i)** In general. The Administrator shall exempt replacement parts for complex durable goods and complex consumer goods that are designed prior to the date of publication in the Federal Register of the rule under subsection (a), unless the Administrator finds that such replacement parts contribute significantly to the risk, identified in a risk evaluation conducted under subsection (b)(4)(A), to the general population or to an identified potentially exposed or susceptible subpopulation.

**(ii)** Definitions. In this subparagraph—

**(I)** the term “complex consumer goods” means electronic or mechanical devices composed of multiple manufactured components, with an intended useful life of 3 or more years, where the product is typically not consumed, destroyed, or discarded after a single use, and the components of which would be impracticable to redesign or replace; and

**(II)** the term “complex durable goods” means manufactured goods composed of 100 or more manufactured components, with an intended useful life of 5 or more years, where the product is typically not consumed, destroyed, or discarded after a single use.

**(E)** Articles. In selecting among prohibitions and other restrictions, the Administrator shall apply such prohibitions or other restrictions to an article or category of articles containing the chemical substance or mixture only to the extent necessary to address the identified risks from exposure to the chemical substance or mixture from the article or category of articles so that the substance or mixture does not present an unreasonable risk of injury to health or the environment identified in the risk evaluation conducted in accordance with subsection (b)(4)(A).

**(3)** Procedures. When prescribing a rule under subsection (a) the Administrator shall proceed in accordance with section 553 of title 5, United States Code (without regard to any reference in such section to sections 556 and 557 of such title [5 USCS §§ 556, 557]), and shall also—

**(A)** publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule;

**(B)** allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available;

**(C)** promulgate a final rule based on the matter in the rulemaking record; and

**(D)** make and publish with the rule the determination described in subsection (a).

**(d) Effective date.**

**(1)** In general. In any rule under subsection (a), the Administrator shall—

**(A)** specify the date on which it shall take effect, which date shall be as soon as practicable;

**(B)** except as provided in subparagraphs (C) and (D), specify mandatory compliance dates for all of the requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in a case of a use exempted under subsection (g);

**(C)** specify mandatory compliance dates for the start of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in the case of a use exempted under subsection (g);

**(D)** specify mandatory compliance dates for full implementation of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable; and

**(E)** provide for a reasonable transition period.

**(2)** Variability. As determined by the Administrator, the compliance dates established under paragraph (1) may vary for different affected persons.

**(3)**

**(A)** The Administrator may declare a proposed rule under subsection (a) to be effective, and compliance with the proposed requirements to be mandatory, upon publication in the Federal Register of the proposed rule and until the compliance dates applicable to such requirements in a final rule promulgated under section 6(a) [subsec. (a) of this section] or until the Administrator revokes such proposed rule, in accordance with subparagraph (B), if—

**(i)** the Administrator determines that—

**(I)** the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture subject to such proposed rule or any combination of such activities is likely to result in an unreasonable risk of serious or widespread injury to health or the environment before such effective date without consideration of costs or other non-risk factors; and

**(II)** making such proposed rule so effective is necessary to protect the public interest; and

**(ii)** in the case of a proposed rule to prohibit the manufacture, processing, or distribution of a chemical substance or mixture because of the risk determined under clause (i)(I), a court has in an action under section 7 [15 USCS § 2606] granted relief with respect to such risk associated with such substance or mixture.

Such a proposed rule which is made so effective shall not, for purposes of judicial review, be considered final agency action.

**(B)** If the Administrator makes a proposed rule effective upon its publication in the Federal Register, the Administrator shall, as expeditiously as possible, give interested persons prompt notice of such action in accordance with subsection (c), and either promulgate such rule (as proposed or with modifications) or revoke it.

**(e) Polychlorinated biphenyls.**

**(1)** Within six months after the effective date of this Act [15 USCS § 2601 effective date note] the Administrator shall promulgate rules to—

**(A)** prescribe methods for the disposal of polychlorinated biphenyls, and

**(B)** require polychlorinated biphenyls to be marked with clear and adequate warnings, and instructions with respect to their processing, distribution in commerce, use, or disposal or with respect to any combination of such activities.

Requirements prescribed by rules under this paragraph shall be consistent with the requirements of paragraphs (2) and (3).

**(2)**

**(A)** Except as provided under subparagraph (B), effective one year after the effective date of this Act [15 USCS § 2601 effective date note] no person may manufacture, process, or distribute in commerce or use any polychlorinated biphenyl in any manner other than in a totally enclosed manner.

**(B)** The Administrator may by rule authorize the manufacture, processing, distribution in commerce or use (or any combination of such activities) of any polychlorinated biphenyl in a manner other than in a totally enclosed manner if the Administrator finds that such manufacture, processing, distribution in commerce, or use (or combination of such activities) will not present an unreasonable risk of injury to health or the environment.

**(C)** For the purposes of this paragraph, the term "totally enclosed manner" means any manner which will ensure that any exposure of human beings or the environment to a polychlorinated biphenyl will be insignificant as determined by the Administrator by rule.

**(3)**

**(A)** Except as provided in subparagraphs (B) and (C)—

**(i)** no person may manufacture any polychlorinated biphenyl after two years after the effective date of this Act [15 USCS § 2601 effective date note], and

**(ii)** no person may process or distribute in commerce any polychlorinated biphenyl after two and one-half years after such date [15 USCS § 2601 effective date note].

**(B)** Any person may petition the Administrator for an exemption from the requirements of subparagraph (A), and the Administrator may grant by rule such an exemption if the Administrator finds that—

**(i)** an unreasonable risk of injury to health or environment would not result, and

**(ii)** good faith efforts have been made to develop a chemical substance which does not present an unreasonable risk of injury to health or the environment and which may be substituted for such polychlorinated biphenyl.

An exemption granted under this subparagraph shall be subject to such terms and conditions as the Administrator may prescribe and shall be in effect for such period (but not more than one year from the date it is granted) as the Administrator may prescribe.

**(C)** Subparagraph (A) shall not apply to the distribution in commerce of any polychlorinated biphenyl if such polychlorinated biphenyl was sold for purposes other than resale before two and one half years after the date of enactment of this Act [enacted Oct. 11, 1976].

**(4)** Any rule under paragraph (1), (2)(B), or (3)(B) shall be promulgated in accordance with paragraph (3) of subsection (c).

**(5)** This subsection does not limit the authority of the Administrator, under any other provision of this Act [15 USCS §§ 2601 et seq.] or any other Federal law, to take action respecting any polychlorinated biphenyl.

**(f) Mercury.**

**(1)** Prohibition on sale, distribution, or transfer of elemental mercury by federal agencies. Except as provided in paragraph (2), effective beginning on the date of enactment of this subsection [enacted Oct. 14, 2008], no Federal agency shall convey, sell, or distribute to any other Federal agency, any State or local government agency, or any private individual or entity any elemental mercury under the control or jurisdiction of the Federal agency.

**(2)** Exceptions. Paragraph (1) shall not apply to—

**(A)** a transfer between Federal agencies of elemental mercury for the sole purpose of facilitating storage of mercury to carry out this Act [15 USCS §§ 2601 et seq.]; or

**(B)** a conveyance, sale, distribution, or transfer of coal.

**(3)** Leases of Federal coal. Nothing in this subsection prohibits the leasing of coal.

**(g) Exemptions.**

**(1)** Criteria for exemption. The Administrator may, as part of a rule promulgated under subsection (a), or in a separate rule, grant an exemption from a requirement of a subsection (a) rule for a specific condition of use of a chemical substance or mixture, if the Administrator finds that—

**(A)** the specific condition of use is a critical or essential use for which no technically and economically feasible safer alternative is available, taking into consideration hazard and exposure;

**(B)** compliance with the requirement, as applied with respect to the specific condition of use, would significantly disrupt the national economy, national security, or critical infrastructure; or

**(C)** the specific condition of use of the chemical substance or mixture, as compared to reasonably available alternatives, provides a substantial benefit to health, the environment, or public safety.

**(2)** Exemption analysis and statement. In proposing an exemption under this subsection, the Administrator shall analyze the need for the exemption, and shall make public the analysis and a statement describing how the analysis was taken into account.

**(3)** Period of exemption. The Administrator shall establish, as part of a rule under this subsection, a time limit on any exemption for a time to be determined by the Administrator as reasonable on a case-by-case basis, and, by rule, may extend, modify, or eliminate an exemption if the Administrator determines, on the basis of reasonably available information and after adequate public justification, the exemption warrants extension or modification or is no longer necessary.

**(4)** Conditions. As part of a rule promulgated under this subsection, the Administrator shall include conditions, including reasonable recordkeeping, monitoring, and reporting requirements, to the extent that the Administrator determines the conditions are necessary to protect health and the environment while achieving the purposes of the exemption.

**(h) Chemicals that are persistent, bioaccumulative, and toxic.**

**(1)** Expedited action. Not later than 3 years after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator shall propose rules under subsection (a) with respect to chemical substances identified in the 2014 update of the TSCA Work Plan for Chemical Assessments—

**(A)** that the Administrator has a reasonable basis to conclude are toxic and that with respect to persistence and bioaccumulation score high for one and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), and are not a metal or a metal compound, and for which the Administrator has not completed a Work Plan Problem Formulation, initiated a review under section 5, or entered into a consent agreement under section 4 [15 USCS § 2603], prior to the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016]; and

**(B)** exposure to which under the conditions of use is likely to the general population or to a potentially exposed or susceptible subpopulation identified by the Administrator, or the environment, on the basis of an exposure and use assessment conducted by the Administrator.

**(2)** No risk evaluation required. The Administrator shall not be required to conduct risk evaluations on chemical substances that are subject to paragraph (1).

**(3)** Final rule. Not later than 18 months after proposing a rule pursuant to paragraph (1), the Administrator shall promulgate a final rule under subsection (a).

**(4)** Selecting restrictions. In selecting among prohibitions and other restrictions promulgated in a rule under subsection (a) pursuant to paragraph (1), the Administrator shall address the risks of injury to health or the environment that the Administrator determines are presented by the chemical substance and shall reduce exposure to the substance to the extent practicable.

**(5)** Relationship to subsection (b). If, at any time prior to the date that is 90 days after the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act [enacted June 22, 2016], the Administrator makes a designation under subsection (b)(1)(B)(i), or receives a request under subsection (b)(4)(C)(ii), such chemical substance shall not be subject to this subsection, except that in selecting among prohibitions and other restrictions promulgated in a rule pursuant to subsection (a), the Administrator shall both ensure that the chemical substance meets the rulemaking standard under subsection (a) and reduce exposure to the substance to the extent practicable.

**(i) Final agency action.** Under this section and subject to section 18 [15 USCS § 2617]—

**(1)** a determination by the Administrator under subsection (b)(4)(A) that a chemical substance does not present an unreasonable risk of injury to health or the environment shall be issued by order and considered to be a final agency action, effective beginning on the date of issuance of the order; and

**(2)** a final rule promulgated under subsection (a), including the associated determination by the Administrator under subsection (b)(4)(A) that a chemical substance presents an unreasonable risk of injury to health or the environment, shall be considered to be a final agency action, effective beginning on the date of promulgation of the final rule.

**(j) Definition.** For the purposes of this Act, the term “requirement” as used in this section shall not displace statutory or common law.

## History

**HISTORY:**

Oct. 11, 1976, P. L. 94-469, Title I, § 6, 90 Stat. 2020; Oct. 22, 1986, P. L. 99-519, § 3(c), 100 Stat. 2989; Oct. 17, 2006, P. L. 109-364, Div A, Title III, Subtitle B, § 317(a), 120 Stat. 2142; Oct. 14, 2008, P. L. 110-414, § 3, 122 Stat. 4342; June 22, 2016, P. L. 114-182, Title I, § 6, 130 Stat. 460.

United States Code Service
Copyright © 2026 All rights reserved.

End of Document

# 15 USCS § 2608

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.

***United States Code Service > TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123) > CHAPTER 53. TOXIC SUBSTANCES CONTROL (§§ 2601 — 2697) > CONTROL OF TOXIC SUBSTANCES (§§ 2601 — 2629)***

## § 2608. Relationship to other Federal laws

**(a) Laws not administered by the Administrator.**

**(1)** If the Administrator determines that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator, under the conditions of use, and determines, in the Administrator's discretion, that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator, the Administrator shall submit to the agency which administers such law a report which describes such risk and includes in such description a specification of the activity or combination of activities which the Administrator has reason to believe so presents such risk. Such report shall also request such agency—

**(A)**

**(i)** to determine if the risk described in such report may be prevented or reduced to a sufficient extent by action taken under such law, and

**(ii)** if the agency determines that such risk may be so prevented or reduced, to issue an order declaring whether or not the activity or combination of activities specified in the description of such risk presents such risk; and

**(B)** to respond to the Administrator with respect to the matters described in subparagraph (A).

Any report of the Administrator shall include a detailed statement of the information on which it is based and shall be published in the Federal Register. The agency receiving a request under such a report shall make the requested determination, issue the requested order, and make the requested response within such time as the Administrator specifies in the request, but such time specified may not be less than 90 days from the date the request was made. The response of an agency shall be accompanied by a detailed statement of the findings and conclusions of the agency and shall be published in the Federal Register.

**(2)** If the Administrator makes a report under paragraph (1) with respect to a chemical substance or mixture and the agency to which such report was made either—

**(A)** issues an order, within the time period specified by the Administrator in the report, declaring that the activity or combination of activities specified in the description of the risk described in the report does not present the risk described in the report, or

**(B)** responds within the time period specified by the Administrator in the report and initiates, within 90 days of the publication in the Federal Register of the response of the agency under paragraph (1), action under the law (or laws) administered by such agency to protect against such risk associated with such activity or combination of activities,

the Administrator may not take any action under section 6(a) or 7 [15 USCS § 2605(a) or 2606] with respect to such risk.

**(3)** The Administrator shall take the actions described in paragraph (4) if the Administrator makes a report under paragraph (1) with respect to a chemical substance or mixture and the agency to which the report was made does not—

**(A)** issue the order described in paragraph (2)(A) within the time period specified by the Administrator in the report; or

**(B)**

**(i)** respond under paragraph (1) within the timeframe specified by the Administrator in the report; and

**(ii)** initiate action within 90 days of publication in the Federal Register of the response described in clause (i).

**(4)** If an agency to which a report is submitted under paragraph (1) does not take the actions described in subparagraph (A) or (B) of paragraph (3), the Administrator shall—

**(A)** initiate or complete appropriate action under section 6(a) [15 USCS § 2605(a)]; or

**(B)** take any action authorized or required under section 7 [15 USCS § 2606], as applicable.

**(5)** This subsection shall not relieve the Administrator of any obligation to take any appropriate action under section 6(a) or 7 [15 USCS § 2605(a) or 2606] to address risks from the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or any combination of those activities, that are not identified in a report issued by the Administrator under paragraph (1).

**(6)** If the Administrator has initiated action under section 6(a) or 7 [15 USCS § 2605(a) or 2606] with respect to a risk associated with a chemical substance or mixture which was the subject of a report made to an agency under paragraph (1), such agency shall before taking action under the law (or laws) administered by it to protect against such risk consult with the Administrator for the purpose of avoiding duplication of Federal action against such risk.

**(b) Laws administered by the Administrator.**

**(1)** The Administrator shall coordinate actions taken under this Act [15 USCS §§ 2601 et seq.] with actions taken under other Federal laws administered in whole or in part by the Administrator. If the Administrator determines that a risk to health or the environment associated with a chemical substance or mixture could be eliminated or reduced to a sufficient extent by actions taken under the authorities contained in such other Federal laws, the Administrator shall use such authorities to protect against such risk unless the Administrator determines, in the Administrator's discretion, that it is in the public interest to protect against such risk by actions taken under this Act [15 USCS §§ 2601 et seq.]. This subsection shall not be construed to relieve the Administrator of any requirement imposed on the Administrator by such other Federal laws.

**(2)** In making a determination under paragraph (1) that it is in the public interest for the Administrator to take an action under this title [15 USCS §§ 2601 et seq.] with respect to a chemical substance or mixture rather than under another law administered in whole or in part by the Administrator, the Administrator shall consider, based on information reasonably available to the Administrator, all relevant aspects of the risk described in paragraph (1) and a comparison of the estimated costs and efficiencies of the action to be taken under this title [15 USCS §§ 2601 et seq.] and an action to be taken under such other law to protect against such risk.

**(c) Occupational safety and health.** In exercising any authority under this Act [15 USCS §§ 2601 et seq.], the Administrator shall not, for purposes of section 4(b)(1) of the Occupational Safety and Health Act of 1970 [29 USCS § 653(b)(1)], be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

**(d) Coordination.** In administering this Act [15 USCS §§ 2601 et seq.], the Administrator shall consult and coordinate with the Secretary of Health and Human Services and the heads of any other appropriate Federal executive department or agency, any relevant independent regulatory agency, and any other appropriate instrumentality of the Federal Government for the purpose of achieving the maximum enforcement of this Act [15 USCS §§ 2601 et seq.] while imposing the least burdens of duplicative requirements on those subject to the Act and for other purposes. The Administrator shall, in the report required by section 30 [15 USCS § 2629], report annually to the Congress on actions taken to coordinate with such other Federal departments, agencies, or instrumentalities, and on actions taken to coordinate the authority under this Act with the authority granted under other Acts referred to in subsection (b).

**(e) Exposure information.** In addition to the requirements of subsection (a), if the Administrator obtains information related to exposures or releases of a chemical substance or mixture that may be prevented or reduced under another Federal law, including a law not administered by the Administrator, the Administrator shall make such information available to the relevant Federal agency or office of the Environmental Protection Agency.

## History

### HISTORY:

Oct. 11, 1976, P. L. 94-469, § 9, 90 Stat. 2030; Oct. 22, 1986, P. L. 99-519, § 3(c), 100 Stat. 2989; June 22, 2016, P. L. 114-182, Title I, §§ 9, 19(h), 130 Stat. 476, 507.

United States Code Service
Copyright © 2026 All rights reserved.

---

End of Document

# 15 USCS § 2618

Current through Public Law 119-73, approved January 23, 2026, with a gap of Public Law 119-70.

***United States Code Service > TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123) > CHAPTER 53. TOXIC SUBSTANCES CONTROL (§§ 2601 — 2697) > CONTROL OF TOXIC SUBSTANCES (§§ 2601 — 2629)***

## § 2618. Judicial review

**(a) In general.**

**(1)**

**(A)** Except as otherwise provided in this title [15 USCS §§ 2601 et seq.], not later than 60 days after the date on which a rule is promulgated under this title, title II, or title IV [15 USCS §§ 2601 et seq., 2641 et seq. or 2681 et seq.], or the date on which an order is issued under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS §§ 2603, 2604(e), (f), 2605(i)(1)], [,] any person may file a petition for judicial review of such rule or order with the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which such person resides or in which such person's principal place of business is located. Courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of such a rule or order if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

**(B)** Except as otherwise provided in this title [15 USCS §§ 2601 et seq.], courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of an order issued under this title [15 USCS §§ 2601 et seq.], other than an order under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS § 2603, 2604(e), (f), or 2605(i)(1)], if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

**(C)**

**(i)** Not later than 60 days after the publication of a designation under section 6(b)(1)(B)(ii) [15 USCS § 2605(b)(1)(B)(ii)], any person may commence a civil action to challenge the designation.

**(ii)** The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over a civil action filed under this subparagraph.

**(2)** Copies of any petition filed under paragraph (1)(A) shall be transmitted forthwith to the Administrator and to the Attorney General by the clerk of the court with which such petition was filed. The provisions of section 2112 of title 28, United States Code, shall

apply to the filing of the record of proceedings on which the Administrator based the rule or order being reviewed under this section and to the transfer of proceedings between United States courts of appeals.

**(b) Additional submissions and presentations; modifications.** If in an action under this section to review a rule, or an order under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS § 2603, 2604(e), (f), or 2605(i)(1)], the petitioner or the Administrator applies to the court for leave to make additional oral submissions or written presentations respecting such rule or order and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the proceeding before the Administrator, the court may order the Administrator to provide additional opportunity to make such submissions and presentations. The Administrator may modify or set aside the rule or order being reviewed or make a new rule or order by reason of the additional submissions and presentations and shall file such modified or new rule or order with the return of such submissions and presentations. The court shall thereafter review such new or modified rule or order.

**(c) Standard of review.**

**(1)**

**(A)** Upon the filing of a petition under subsection (a)(1) for judicial review of a rule or order, the court shall have jurisdiction (i) to grant appropriate relief, including interim relief, as provided in chapter 7 of title 5, United States Code [5 USCS §§ 701 et seq.], and (ii) except as otherwise provided in subparagraph (B), to review such rule or order in accordance with chapter 7 of title 5, United States Code [5 USCS §§ 701 et seq.].

**(B)** Section 706 of title 5, United States Code, shall apply to review of a rule or order under this section, except that—

**(i)** in the case of review of—

**(I)** a rule under section 4(a), 5(b)(4), 6(a) [15 USCS § 2603(a), 2604(b)(4), or 2605(a)] (including review of the associated determination under section 6(b)(4)(A)), or 6(e) [15 USCS § 2605(b)(4)(a), or 2605(e)], the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole; and

**(II)** an order under section 4, 5(e), 5(f), or 6(i)(1) [15 USCS § 2603, 2604(f), or 2605(i)(1)] , the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such order if the court finds that the order is not supported by substantial evidence in the record taken as a whole; and"; and

**(ii)** the court may not review the contents and adequacy of any statement of basis and purpose required by section 553(c) of title 5, United States Code, to

be incorporated in the rule or order, except as part of the record, taken as a whole.

**(2)** The judgment of the court affirming or setting aside, in whole or in part, any rule or order reviewed in accordance with this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of title 28, United States Code.

**(d) Fees and costs.** The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such a decision, may include an award of costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate.

**(e) Other remedies.** The remedies as provided in this section shall be in addition to and not in lieu of any other remedies provided by law.

## History

**HISTORY:**

Oct. 11, 1976, P. L. 94-469, Title I, § 19, 90 Stat. 2039; Oct. 22, 1986, P. L. 99-519, § 3(b)(2), (c), 100 Stat. 2989; Oct. 28, 1992, P. L. 102-550, Title X, Subtitle A, § 1021(b)(8), 106 Stat. 3923; June 22, 2016, P. L. 114-182, Title I, §§ 14, 19(m), 130 Stat. 498, 508.

United States Code Service
Copyright © 2026 All rights reserved.

End of Document

# 40 CFR 751.301

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.



## § 751.301 General.

**(a)** Applicability. This subpart sets certain restrictions on the manufacture (including import), processing, distribution in commerce, use, and disposal of trichloroethylene (TCE) (CASRN 79-01-6) to prevent unreasonable risk of injury to health in accordance with TSCA section 6(a).

**(b)** Regulatory threshold. Unless otherwise specified in this subpart, the prohibitions and restrictions of this subpart do not apply to products containing TCE at thresholds less than 0.1 percent by weight. This threshold does not apply to wastewater.

**(c)** Byproducts within site-limited, physically enclosed systems. Unless otherwise specified in this subpart, the prohibitions and restrictions of this subpart do not apply to TCE processed as a byproduct when that byproduct TCE is processed within a site-limited, physically enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was generated. This exclusion does not permit TCE to be present in any product that results from such site-limited, physically enclosed systems, except as permitted by paragraph (b) of this section.

**(d)** Owner and operator requirements. Any requirement for an owner or operator or an owner and operator is a requirement for any individual that is either an owner or an operator.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

End of Document

# 40 CFR 751.305

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS > Title 40 Protection of Environment > Chapter I — Environmental Protection Agency > Subchapter R — Toxic Substances Control Act > Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act > Subpart D — Trichloroethylene (TCE)***

## § 751.305 Prohibitions of manufacturing, processing, distribution in commerce, use and disposal.

**(a)** Applicability. The provisions of this section apply to the following:

**(1)** Manufacturing (including importing and manufacturing for export);

**(2)** Processing (including processing for export);

**(3)** All industrial and commercial uses;

**(4)** All consumer uses;

**(5)** Distribution in commerce; and

**(6)** Disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(b)** Prohibitions.

**(1)** After March 17, 2025, all persons are prohibited from manufacturing (including importing and manufacturing for export) TCE, except as specified for manufacturing in paragraphs (b)(5) through (25) of this section.

**(2)** After June 16, 2025, all persons are prohibited from processing (including processing for export) and distributing in commerce (including making available) TCE, including any TCE-containing products, except as specified for processing or distributing in commerce in paragraphs (b)(5) through (25) of this section, and all retailers are prohibited from distributing in commerce (including making available) TCE for any use.

**(3)** After September 15, 2025, all persons are prohibited from industrial and commercial use of TCE, including any TCE-containing products, except as specified for industrial or commercial use in paragraphs (b)(5) through (25) of this section.

**(4)** After September 15, 2025, all persons manufacturing (including importing), processing, and using TCE are prohibited from disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works except as specified in paragraphs (b)(14), (23) (24), and (26) of this section.

**(5)** After June 16, 2025, all persons are prohibited from manufacturing (including importing) TCE for industrial and commercial use for batch vapor degreasing in open-top and closed-loop degreasing equipment, except for the use specified in paragraphs (b)(11), (15), (16), (17), (20), and (21) of this section.

**(6)** After September 15, 2025, all persons are prohibited from processing TCE for industrial and commercial use for batch vapor degreasing in open-top and closed-loop degreasing equipment, except for the use specified in paragraphs (b)(11), (15), (16), (17), (20), and (21) of this section.

**(7)** After December 18, 2025, all persons are prohibited from the industrial and commercial use of TCE for batch vapor degreasing in open-top and closed-loop degreasing equipment, except for the use specified in paragraphs (b)(11), (15), (16), (17), (20), and (21) of this section.

**(8)** After June 10, 2026, all persons are prohibited from manufacturing (including importing) TCE for: (i) Processing of TCE as a reactant/intermediate, except for the use as specified in paragraph (b)(18) of this section; and (ii) Processing TCE for the industrial and commercial use of TCE as a processing aid for: process solvent used in battery manufacture; process solvent used in polymer fiber spinning, fluoroelastomer manufacture and Alcantara manufacture; extraction solvent used in caprolactam manufacture; precipitant used in beta-cyclodextrin manufacture, except for those uses specified in paragraphs (b)(14), (23) and (24) of this section.

**(9)** After December 18, 2026, except for those uses specified in paragraphs (b)(14), (23), (24), and (27) of this section, all persons are prohibited from:

**(i)** Processing TCE as a reactant/intermediate, except for the use as specified in paragraph (b)(18) of this section;

**(ii)** Processing for and industrial and commercial use of TCE as a processing aid in: process solvent used in battery manufacture; process solvent used in polymer fiber spinning, fluoroelastomer manufacture and Alcantara manufacture; extraction solvent used in caprolactam manufacture; precipitant used in beta-cyclodextrin manufacture; and

**(iii)** The disposal of TCE from the uses specified in (b)(9)(i) and (ii) of this section to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(10)** After December 18, 2027, all persons are prohibited from industrial and commercial use of TCE in energized electrical cleaners and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such a use.

**(11)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop batch vapor degreasing for rayon fabric scouring for end use in producing rocket booster nozzles for Federal agencies and their contractors, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use. If such persons obtain and maintain the records required by §§ 751.309 and 751.323 demonstrating that a final pre-launch test was completed using an alternative to TCE in the production of the rocket booster nozzles, the industrial and commercial use of TCE as a solvent in closed-loop batch

vapor degreasing for rayon fabric scouring for end use in producing rocket booster nozzles for Federal agencies and their contractors, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use may continue beyond December 18, 2029.

**(12)** After December 18, 2029, all persons are prohibited from industrial and commercial use of TCE in adhesives and sealants for essential aerospace applications, and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such uses.

**(13)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE as a laboratory chemical for asphalt testing and recovery using manual centrifuge processes, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as further detailed in § 751.311.

**(14)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE as a processing aid for lithium battery separator manufacturing, and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use as well as the disposal of TCE from such industrial or commercial use to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(15)** After December 18, 2029, all persons are prohibited from the industrial and commercial use of TCE for batch vapor degreasing for land-based DoD defense systems by Federal agencies and their contractors, and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(16)** After December 18, 2031, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop batch vapor degreasing necessary for rocket engine cleaning by Federal Agencies and their contractors as described in § 751.325(b)(1) and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(17)** After December 18, 2031, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop and open-top batch vapor degreasing for essential aerospace parts and components and narrow tubing for medical devices, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use as described in § 751.325(b)(2).

**(18)** After June 18, 2033, all persons are prohibited from the industrial and commercial use of TCE as an intermediate for manufacturing hydrofluorocarbon 134-a, also known as 1,1,1,2-tetrafluroethane (HFC-134a: CASRN 811-97-2), and manufacturing (including importing), processing, and distribution in commerce for such use as described in § 751.307.

**(19)** After December 18, 2034, all persons are prohibited from the industrial and commercial use of TCE in laboratory use for asphalt testing and recovery, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as described in § 751.311.

**(20)** After December 18, 2034, all persons are prohibited from the industrial and commercial use of TCE as a solvent in closed-loop batch vapor degreasing for rayon fabric scouring for end use in producing rocket booster nozzles for Federal agencies and their contractors, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(21)** After December 18, 2034, for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems, prohibit the industrial and commercial use of TCE as (and manufacturing (including importing), processing, and distribution in commerce of TCE for): potting compounds for naval electronic systems and equipment; sealing compounds for high and ultra-high vacuum systems; bonding compounds for materials testing and maintenance of underwater systems and bonding of nonmetallic materials; and cleaning agents to satisfy cleaning requirements (which includes degreasing using wipes, sprays, solvents and vapor degreasing) for: materials and components required for military ordnance testing; temporary resin repairs in vessel spaces where welding is not authorized; ensuring polyurethane adhesion for electronic systems and equipment repair and installation of elastomeric materials; various naval combat systems, radars, sensors, equipment; fabrication and prototyping processes to remove coolant and other residue from machine parts; machined part fabrications for naval systems; installation of topside rubber tile material aboard vessels; and vapor degreasing required for substrate surface preparation prior to electroplating processes.

**(22)** After December 18, 2034, all persons are prohibited from manufacturing (including import), processing, distribution in commerce, or use of TCE, including any TCE containing products, for industrial or commercial use in an emergency by NASA or its contractors as described in § 751.325(b)(4), and manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

**(23)** After December 18, 2044, all persons are prohibited from the industrial and commercial use of TCE as a processing aid for lead-acid battery separator manufacturing, and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as well as the disposal of TCE from such industrial or commercial use to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(24)** After December 18, 2039, all persons are prohibited from the industrial and commercial use of TCE as a processing aid for specialty polymeric microporous sheet materials manufacturing, and the manufacturing (including importing), processing, and distribution in commerce of TCE for such use, as well as the disposal of TCE from such industrial or commercial use to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

**(25)** After December 18, 2074, all persons are prohibited from industrial and commercial uses of TCE for the laboratory uses described in § 751.325(b)(7), and from the manufacturing (including importing), processing, and distribution in commerce of TCE for such uses.

**(26)** After December 18, 2074, all persons are prohibited from disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works for the purposes of cleanup projects of TCE-contaminated water and groundwater as described in § 751.325(b)(8).

**(27)** After September 15, 2028, all persons are prohibited from the industrial and commercial use of TCE as a processing aid in the manufacture of nuclear fuel, and manufacturing (including importing), processing, and distribution in commerce of TCE for such use.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025; 90 FR 44772, 44781, Sept. 17, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

---

End of Document

# 40 CFR 751.307

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS > Title 40 Protection of Environment > Chapter I — Environmental Protection Agency > Subchapter R — Toxic Substances Control Act > Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act > Subpart D — Trichloroethylene (TCE)***

## § 751.307 Phase-out of processing trichloroethylene to manufacture of HFC-134a.

**(a)** Baseline. Before June 16, 2025, each manufacturer of HFC-134a who processes TCE as an intermediate must establish a baseline annual volume of TCE processed as an intermediate.

**(1)** The manufacturer must use the average annual volume of any 12 consecutive months in the 3 years preceding December 17, 2024 to calculate the baseline.

**(2)** The manufacturer must retain records that demonstrate how the baseline annual volume was calculated, in accordance with § 751.323(d)(1).

**(b)** Phase-out.

**(1)** Beginning June 7, 2027, each manufacturer of HFC-134a who processes TCE as an intermediate is not permitted to process TCE as an intermediate at an annual volume greater than 75 percent of the baseline.

**(2)** Beginning June 18, 2029, each manufacturer of HFC-134a who processes TCE as an intermediate is not permitted to process TCE as an intermediate at an annual volume greater than 50 percent of the baseline.

**(3)** Beginning June 18, 2031, each manufacturer of HFC-134a who processes TCE as an intermediate is not permitted to process TCE as an intermediate at an annual volume greater than 25 percent of the baseline so established.

**(4)** Beginning June 18, 2033, each manufacturer of HFC-134a who processes TCE as an intermediate is prohibited from processing TCE as an intermediate.

**(c)** Workplace chemical protection program. The owner or operator of the location where TCE is processed as an intermediate in accordance with this section, and manufacturers (including importers) and processors of TCE for such use, must comply with § 751.315.

**(d)** Recordkeeping. The owner or operator of the location where TCE is processed as an intermediate in accordance with this section must comply with the recordkeeping requirements in § 751.323.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

---

End of Document

# 40 CFR 751.325

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS > Title 40 Protection of Environment > Chapter I — Environmental Protection Agency > Subchapter R — Toxic Substances Control Act > Part 751— Regulation Of Certain Chemical Substances And Mixtures Under Section 6 Of the Toxic Substances Control Act > Subpart D — Trichloroethylene (TCE)***

## § 751.325 Exemptions.

**(a)** In general.

**(1)** The time-limited exemptions described in this section are established in accordance with 15 U.S.C. 2605(g).

**(2)** In order to be eligible for the exemptions described in this section, regulated parties must comply with all conditions established for such exemptions in this section.

**(b)** Exemptions—

**(1)** Closed-loop batch vapor degreasing necessary for rocket engine cleaning by Federal agencies and their contractors until December 18, 2031. The following are specific conditions of the exemption for industrial and commercial use of TCE as a solvent for closed-loop vapor degreasing necessary for rocket engine cleaning by Federal agencies and their contractors described in § 751.305(b)(15):

**(i)** The use of TCE in industrial and commercial as a solvent for closed-loop vapor degreasing is limited to the closed-loop batch vapor degreasing necessary for rocket engine cleaning by Federal agencies and their contractors.

**(ii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iii)** The owner or operator of the location where such use of TCE occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the recordkeeping requirements in § 751.323.

**(2)** Closed-loop and Open-top batch vapor degreasing for essential aerospace parts and components and narrow tubing for medical devices until December 18, 2031. The following are specific conditions of the exemption for vapor degreasing described in § 751.305(b)(16):

**(i)** The use of TCE for closed-loop and open-top batch vapor degreasing is limited to the cleaning of:

**(A)** Essential aerospace parts and components where cleaning alternatives present technical feasibility or performance challenges to meet specifications from Federal agencies or other long-standing design specifications included in existing contracts; and

**(B)** Narrow tubing for medical devices.

**(ii)** The owner or operator of the location where such use of TCE occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iii)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(3)** Certain industrial and commercial uses of TCE for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems until December 18, 2034. The following are specific conditions of the exemption for industrial and commercial uses of TCE for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems described in § 751.305(b)(20):

**(i)** The industrial and commercial use of TCE must be limited for vessels of the Armed Forces and their systems, and in the maintenance, fabrication, and sustainment for and of such vessels and systems: as potting compounds for naval electronic systems and equipment; sealing compounds for high and ultra-high vacuum systems; bonding compounds for materials testing and maintenance of underwater systems and bonding of nonmetallic materials; and cleaning agents to satisfy cleaning requirements (which includes degreasing using wipes, sprays, solvents and vapor degreasing) for: materials and components required for military ordnance testing; temporary resin repairs in vessel spaces where welding is not authorized; ensuring polyurethane adhesion for electronic systems and equipment repair and installation of elastomeric materials; various naval combat systems, radars, sensors, equipment; fabrication and prototyping processes to remove coolant and other residue from machine parts; machined part fabrications for naval systems; installation of topside rubber tile material aboard vessels; and vapor degreasing required for substrate surface preparation prior to electroplating processes.

**(ii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iii)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(4)** Use of TCE or TCE-containing products in an emergency by the National Aeronautics and Space Administration and its contractors operating within the scope of their contracted work until December 18, 2034—

**(i)** Applicability. This exemption shall apply to the following specific conditions of use:

**(A)** Industrial and commercial use as solvent for open-top or closed-loop batch vapor degreasing.

**(B)** Industrial and commercial use as solvent for cold cleaning.

**(C)** Industrial and commercial use as a solvent for aerosol spray degreaser/cleaner and mold release.

**(D)** Industrial and commercial use as a lubricant and grease in tap and die fluid.

**(E)** Industrial and commercial use as a lubricant and grease in penetrating lubricant.

**(F)** Industrial and commercial use as an adhesive and sealant in solvent-based adhesives. and sealants.

**(G)** Industrial and commercial as a functional fluid in heat exchange fluid.

**(H)** Industrial and commercial use in corrosion inhibitors and anti-scaling agents.

**(I)** Industrial and commercial use of TCE as a processing aid.

**(J)** Manufacturing (including importing) and processing of TCE for the industrial and commercial uses listed in paragraphs (b)(4)(i)(A) through (I) of this section.

**(ii)** Emergency use.

**(A)** In general. An emergency is a serious and sudden situation requiring immediate action, within 15 days or less, necessary to protect:

**(1)** Safety of NASA's or their contractors' personnel;

**(2)** NASA's missions;

**(3)** Human health, safety, or property, including that of adjacent communities; or

**(4)** The environment.

**(B)** Duration. Each emergency is a separate situation; if use of TCE exceeds 15 days, then justification must be documented.

**(iii)** Eligibility. To be eligible for the exemption, the NASA and its contractors must:

**(A)** Select TCE because there are no technically and economically feasible safer alternatives available during the emergency.

**(B)** Perform the emergency use of TCE at locations controlled by NASA or its contractors.

**(C)** Comply with the following conditions:

**(1)** Notification. Within 15 working days of the emergency use by NASA and its contractors, NASA must provide notice to the EPA Assistant Administrators of both the Office of Enforcement and Compliance Assurance and the Office of Chemical Safety and Pollution Prevention that includes the following:

**(i)** Identification of the conditions of use detailed in paragraph (b)(4)(i) of this section that the emergency use fell under;

**(ii)** An explanation for why the emergency use met the definition of emergency in paragraph (b)(4)(i)(B) of this section; and

**(iii)** An explanation of why TCE was selected, including why there were no technically and economically feasible safer alternatives available in the particular emergency.

**(2)** Exposure control. The owner or operator must comply with the Workplace Chemical Protection Program provisions in § 751.315, to the extent technically feasible in light of the particular emergency.

**(3)** Recordkeeping. The owner or operator of the location where the use takes place must comply with the recordkeeping requirements in § 751.323.

**(5)** Lead-acid battery separator manufacturing until December 18, 2044. The following are specific conditions of the exemption for use as a processing aid in the manufacturing of lead-acid battery separators described in § 751.305(b)(22):

**(i)** The use of TCE as a processing aid for battery separator manufacturing must be limited to lead acid battery separator manufacturing.

**(ii)** This specific industrial and commercial use of TCE as a processing aid can only be used at industrial facilities in which TCE is in use for the manufacture of lead acid battery separators prior to February 18, 2025.

**(iii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iv)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(6)** Industrial and commercial use of TCE as a processing aid for specialty polymeric microporous sheet materials manufacturing until December 18, 2039. The following are specific conditions of the exemption for industrial and commercial use as a processing aid at § 751.305(b)(23):

**(i)** The use of TCE as a processing aid must be limited to specialty polymeric microporous sheet materials manufacturing.

**(ii)** This specific industrial and commercial use of TCE as a processing aid can only be used at industrial facilities in which TCE is in use for the manufacture of specialty polymeric microporous sheet materials prior to February 18, 2025.

**(iii)** The owner or operator of the location where such use occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(iv)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(7)** Laboratory use for essential laboratory activities until December 18, 2074. The following are specific conditions of the exemption for laboratory use at § 751.305(b)(24):

**(i)** The industrial and commercial use of TCE as a laboratory chemical must only be for essential laboratory activities. Essential laboratory activities are:

**(A)** Laboratory activities associated with cleanup and exposure monitoring activities, including chemical analysis, chemical synthesis, extracting or purifying other chemicals, dissolving other substances, research and development for the advancement of cleanup activities, and as an analytical standard for monitoring related to TCE contamination or exposure monitoring.

**(B)** Laboratory activities conducted by Federal agencies and their contractors, other than those described in paragraph (b)(7)(i)(A) of this section, and similar laboratory activities, provided the use is essential to the agency's mission.

**(ii)** The use of TCE as a laboratory chemical for testing asphalt is regulated under § 751.311, and is not considered an essential laboratory activity.

**(iii)** The use of TCE as a laboratory chemical must be performed on the premises of a laboratory.

**(iv)** The owner or operator of the location where such use of TCE occurs, and manufacturers (including importers) and processors of TCE for such use, must comply with the Workplace Chemical Protection Program provisions in § 751.315.

**(v)** The owner or operator of the location where such use of TCE occurs must comply with the recordkeeping requirements in § 751.323.

**(8)** Disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works for the purposes of cleanup projects of TCE-contaminated water and groundwater until December 18, 2074. The following are specific conditions of the exemption for disposal at § 751.305(b)(25):

**(i)** The disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works must only be for the purposes of cleanup projects of TCE-contaminated water and groundwater, and is limited to sites undergoing cleanup under CERCLA, RCRA, or other Federal, state, and local government laws, regulations, or requirements.

**(ii)** The owner or operator of the cleanup site location where TCE industrial treatment or pretreatment occurs must comply with the wastewater worker protection requirements in § 751.319.

**(iii)** The owner or operator of publicly owned treatment works that receive TCE wastewater must comply with the worker protection requirements in § 751.319.

**(iv)** The owner or operator of the location where such disposal of TCE occurs must comply with the recordkeeping requirements in § 751.323.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

End of Document

# 40 CFR 751.303

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.



## § 751.303 Definitions.

The definitions in subpart A of this part apply to this subpart unless otherwise specified in this section. In addition, the following definitions apply:

Distribute in commerce has the same meaning as in section 3 of the Act, except that the term does not include retailers for purposes of § 751.321 and § 751.323.

Interim ECEL means a concentration of airborne TCE of 0.2 parts per million (ppm) calculated as an eight (8)-hour time weighted average (TWA) that will be in place only for the timeframes indicated for specified conditions of use, after which prohibitions would take effect.

Interim ECEL action level means a concentration of airborne TCE of 0.1 parts per million (ppm) calculated as an eight (8)-hour time-weighted average (TWA).

Site-limited has the same meaning as in 40 CFR 711.3.

## Statutory Authority

Authority Note Applicable to 40 CFR Ch. I, Subch. R, Pt. 751

## History

[89 FR 102568, 102623, Dec. 17, 2024; 90 FR 8254, Jan. 28, 2025; 90 FR 14415, Apr. 2, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

---

End of Document

# 40 CFR 720.3

This document is current through the May 8, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 25073, 91 FR 25141, 91 FR 25118.

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS > Title 40 Protection of Environment > Chapter I — Environmental Protection Agency > Subchapter R — Toxic Substances Control Act > Part 720 — Premanufacture Notification > Subpart A — General Provisions***

## § 720.3 Definitions.

In addition to the definitions under section 3 of the Act, 15 U.S.C. 2602, the following definitions apply to this part.

Act means the Toxic Substances Control Act, 15 U.S.C. 2601 et seq.

Applicable review period means the period starting on the date EPA receives a complete notice under section 5(a)(1) of the Act and ending 90 days after that date or on such date as is provided for in sections 5(b)(1) or 5(c) of the Act.

Article means a manufactured item:

**(1)** Which is formed to a specific shape or design during manufacture;

**(2)** Which has end use function(s) dependent in whole or in part upon its shape or design during end use; and

**(3)** Which has either no change of chemical composition during its end use or only those changes of composition which have no commercial purpose separate from that of the article and that may occur as described in § 720.30(h)(5), except that fluids and particles are not considered articles regardless of shape or design.

Byproduct means a chemical substance produced without a separate commercial intent during the manufacture, processing, use, or disposal of another chemical substance or mixture.

Byproduct material, source material, and special nuclear material have the meanings contained in the Atomic Energy Act of 1954, 42 U.S.C. 2014 et seq. and the regulations issued under it.

Central Data Exchange or CDX means EPA's centralized electronic document receiving system, or its successors.

Chemical substance means any organic or inorganic substance of a particular molecular identity, including any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and any chemical element or uncombined radical, except that “chemical substance” does not include:

**(1)** Any mixture;

**(2)** Any pesticide when manufactured, processed, or distributed in commerce for use as a pesticide;

**(3)** Tobacco or any tobacco product;

**(4)** Any source material, special nuclear material, or byproduct material;

**(5)** Any pistol, firearm, revolver, shells, or cartridges; or

**(6)** Any food, food additive, drug, cosmetic, or device, when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

Commerce means trade, traffic, transportation, or other commerce:

**(1)** Between a place in a State and any place outside of such State; or

**(2)** Which affects trade, traffic, transportation, or commerce between a place in a State and any place outside of such State.

Cosmetic, device, drug, food, and food additive have the meanings contained in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 321 et seq., and the regulations issued under it. In addition, the term “food” includes poultry and poultry products, as defined in the Poultry Products Inspection Act, 21 U.S.C. 453 et seq.; meats and meat food products, as defined in the Federal Meat Inspection Act, 21 U.S.C. 60 et seq.; and eggs and egg products, as defined in the Egg Products Inspection Act, 21 U.S.C. 1033 et seq.

Customs territory of the United States means the 50 States, Puerto Rico, and the District of Columbia.

Director means the Director of the EPA Office of Pollution Prevention and Toxics (OPPT).

Distribute in commerce means to sell in commerce, to introduce or deliver for introduction into commerce, or to hold after introduction into commerce.

EPA means the U.S. Environmental Protection Agency.

e-PMN software means electronic-PMN software created by EPA for use in preparing and submitting Premanufacture Notices (PMNs) and other TSCA section 5 notices and support documents electronically to the Agency.

Health and safety study or study means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying data and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological, or other studies of a chemical substance or mixture, and any test performed under the Act. Chemical identity is always part of a health and safety study.

**(1)** Not only is information which arises as a result of a formal, disciplined study included, but other information relating to the effects of a chemical substance or mixture on health or the environment is also included. Any data that bear on the effects of a chemical substance on health or the environment would be included.

**(2)** Examples include:

**(i)** Long- and short-term tests of mutagenicity, carcinogenicity, or teratogenicity; data on behavioral disorders; dermatoxicity; pharmacological effects; mammalian

absorption, distribution, metabolism, and excretion; cumulative, additive, and synergistic effects; acute, subchronic, and chronic effects; and structure/activity analyses.

**(ii)** Tests for ecological or other environmental effects on invertebrates, fish, or other animals, and plants, including acute toxicity tests, chronic toxicity tests, critical life stage tests, behavioral tests, algal growth tests, seed germination tests, plant growth or damage tests, microbial function tests, bioconcentration or bioaccumulation tests, and model ecosystem (microcosm) studies.

**(iii)** Assessments of human and environmental exposure, including workplace exposure, and impacts of a particular chemical substance or mixture on the environment, including surveys, tests, and studies of: Biological, photochemical, and chemical degradation; air, water, and soil transport; biomagnification and bioconcentration; and chemical and physical properties, e.g., boiling point, vapor pressure, evaporation rates from soil and water, octanol/water partition coefficient, and water solubility.

**(iv)** Monitoring data, when they have been aggregated and analyzed to measure the exposure of humans or the environment to a chemical substance or mixture.

**(v)** Any assessments of risk to health and the environment resulting from the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance.

Importer means any person who imports a chemical substance, including a chemical substance as part of a mixture or article, into the customs territory of the United States. “Importer” includes the person primarily liable for the payment of any duties on the merchandise or an authorized agent acting on his or her behalf. The term also includes, as appropriate:

**(1)** The consignee.

**(2)** The importer of record.

**(3)** The actual owner if an actual owner's declaration and superseding bond has been filed in accordance with 19 CFR 141.20; or

**(4)** The transferee, if the right to draw merchandise in a bonded warehouse has been transferred in accordance with 19 CFR part 144, subpart C. (See “principal importer.”)

Impurity means a chemical substance which is unintentionally present with another chemical substance.

Intermediate means any chemical substance that is consumed, in whole or in part, in chemical reactions used for the intentional manufacture of another chemical substance(s) or mixture(s), or that is intentionally present for the purpose of altering the rates of such chemical reactions.

Inventory means the list of chemical substances manufactured or processed in the United States that EPA compiled and keeps current under section 8(b) of the Act.

Known to or reasonably ascertainable by means all information in a person's possession or control, plus all information that a reasonable person similarly situated might be expected to possess, control, or know.

Manufacture means to produce or manufacture in the United States or import into the customs territory of the United States.

Manufacture for commercial purposes means:

**(1)** To manufacture with the purpose of obtaining an immediate or eventual commercial advantage for the manufacturer, and includes, among other things, “manufacture” of any amount of a chemical substance or mixture.

**(2)** The term also applies to substances that are produced coincidentally during the manufacture, processing, use, or disposal of another substance or mixture, including byproducts that are separated from that other substance or mixture and impurities that remain in that substance or mixture. Byproducts and impurities without separate commercial value are nonetheless produced for the purpose of obtaining a commercial advantage, since they are part of the manufacture of a chemical substance for commercial purposes.

Manufacture solely for export means to manufacture for commercial purposes a chemical substance solely for export from the United States under the following restrictions on activities in the United States:

**(1)** Distribution in commerce is limited to purposes of export or processing solely for export as defined in § 721.3 of this chapter.

**(2)** The manufacturer and any person to whom the substance is distributed for purposes of export or processing solely for export (as defined in § 721.3 of this chapter), may not use the substance except in small quantities solely for research and development in accordance with § 720.36.

Manufacturer means a person who imports, produces, or manufactures a chemical substance. A person who extracts a component chemical substance from a previously existing chemical substance or a complex combination of substances is a manufacturer of that component chemical substance. A person who contracts with a manufacturer to manufacture or produce a chemical substance is also a manufacturer if:

**(1)** The manufacturer manufactures or produces the substance exclusively for that person; and

**(2)** That person specifies the identity of the substance and controls the total amount produced and the basic technology for the plant process.

Mixture means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except “mixture” does include:

**(1)** Any combination which occurs, in whole or in part, as a result of a chemical reaction if the combination could have been manufactured for commercial purposes without a chemical reaction at the time the chemical substances comprising the

combination were combined, and if all of the chemical substances comprising the combination are not new chemical substances; and

**(2)** Hydrates of a chemical substance or hydrated ions formed by association of a chemical substance with water, so long as the nonhydrated form is itself not a new chemical substance.

New chemical substance means any chemical substance which is not included on the Inventory.

Nonisolated intermediate means any intermediate that is not intentionally removed from the equipment in which it is manufactured, including the reaction vessel in which it is manufactured, equipment which is ancillary to the reaction vessel, and any equipment through which the chemical substance passes during a continuous flow process, but not including tanks or other vessels in which the substance is stored after its manufacture.

Person means any natural person, firm, company, corporation, joint-venture, partnership, sole proprietorship, association, or any other business entity, any State or political subdivision thereof, any municipality, any interstate body, and any department, agency or instrumentality of the Federal Government.

Pesticide has the meaning contained in the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136 et seq. and the regulations issued under it.

Possession or control means in possession or control of the submitter, or of any subsidiary, partnership in which the submitter is a general partner, parent company, or any company or partnership which the parent company owns or controls, if the subsidiary, parent company, or other company or partnership is associated with the submitter in the research, development, test marketing, or commercial marketing of the chemical substance in question. (A parent company owns or controls another company if the parent owns or controls 50 percent or more of the other company's voting stock. A parent company owns or controls any partnership in which it is a general partner). Information is included within this definition if it is:

**(1)** In files maintained by submitter's employees who are:

**(i)** Associated with research, development, test marketing, or commercial marketing of the chemical substance in question.

**(ii)** Reasonably likely to have such data.

**(2)** Maintained in the files of other agents of the submitter who are associated with research, development, test marketing, or commercial marketing of the chemical substance in question in the course of their employment as such agents.

Potentially exposed or susceptible subpopulation means a group of individuals within the general population identified by EPA who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, the elderly, or overburdened communities.

Principal importer means the first importer who, knowing that a new chemical substance will be imported rather than manufactured domestically, specifies the identity of the

chemical substance and the total amount to be imported. Only persons who are incorporated, licensed, or doing business in the United States may be principal importers.

Process means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce:

**(1)** In the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

**(2)** As part of a mixture or article containing the chemical substance or mixture.

Processor means any person who processes a chemical substance or mixture.

Small quantities solely for research and development (or "small quantities solely for purposes of scientific experimentation or analysis or chemical research on, or analysis of, such substance or another substance, including such research or analysis for the development of a product") means quantities of a chemical substance manufactured or processed or proposed to be manufactured or processed solely for research and development that are not greater than reasonably necessary for such purposes.

State means any State of the United States and the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, and any other territory or possession of the United States.

Support documents means material and information submitted to EPA in support of a TSCA section 5 notice, including but not limited to, correspondence, amendments (if notices for these amendments were submitted prior to January 19, 2016), and test data. The term "support documents" does not include orders under TSCA section 5(e) (either consent orders or orders imposed pursuant to TSCA section 5(e)(2)(B)).

Technically qualified individual means a person or persons:

**(1)** Who, because of education, training, or experience, or a combination of these factors, is capable of understanding the health and environmental risks associated with the chemical substance which is used under his or her supervision;

**(2)** Who is responsible for enforcing appropriate methods of conducting scientific experimentation, analysis, or chemical research to minimize such risks; and

**(3)** Who is responsible for the safety assessments and clearances related to the procurement, storage, use, and disposal of the chemical substance as may be appropriate or required within the scope of conducting a research and development activity.

Test data means data from a formal or informal test or experiment, including information concerning the objectives, experimental methods and materials, protocols, results, data analyses, recorded observations, monitoring data, measurements, and conclusions from a test or experiment.

Test marketing means the distribution in commerce of no more than a predetermined amount of a chemical substance, mixture, or article containing that chemical substance or mixture, by a manufacturer or processor, to no more than a defined number of potential

customers to explore market capability in a competitive situation during a predetermined testing period prior to the broader distribution of that chemical substance, mixture, or article in commerce.

United States, when used in the geographic sense, means all of the States.

## History

[48 FR 21742, May 13, 1983, as amended at 51 FR 15101, Apr. 22, 1986; 75 FR 773, 784, Jan. 6, 2010.; 80 FR 42739, 42745, July 20, 2015; 87 FR 39756, 39763, July 5, 2022; 89 FR 102773, 102789, Dec. 18, 2024]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

End of Document