**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

**Case No. 25-1079**
(consolidated with Case Nos. 25-1079, 25-1080, 25-1081, 25-1082, 25-1083, 25-1084, 25-1093, 25-1118, 25-1132, 25-1133, and 25-1144)

---

**UNITED STEEL PAPER and FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL and SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.,**

*Petitioners*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent.*

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

# FINAL REPLY BRIEF OF PETITIONERS CENTER FOR ENVIRONMENTAL HEALTH and ENVIRONMENTAL DEFENSE FUND

---

Robert M. Sussman
SUSSMAN & ASSOCIATES
310 Garfield St., N.W.
Washington, D.C. 20008
202-716-0118
bobsussman@comcast.net
*Counsel for Petitioner Center for Environmental Health*

**September 21, 2026**

Samantha Liskow
ENVIRONMENTAL DEFENSE FUND
257 PARK AVE S
NEW YORK, NY 10010
(212) 616-1247
sliskow@edf.org
*Counsel for Petitioner*
*Environmental Defense Fund*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ iii

GLOSSARY ........ viii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. EPA Violated TSCA by Failing to Address the Cancer Risks to Fenceline Communities from Facility Environmental Releases ........ 2

A. EPA Committed to But Then Reneged on Using its Fenceline Assessments to Determine TCE Cancer Risks to Communities ........ 2

B. EPA Had No Discretion Under TSCA to Refuse to Make a Risk Determination for Fenceline Communities Exposed to Releases from TCE Facilities ........ 5

C. TSCA Section 6(c)(2) Does Not Provide EPA Broad Discretion to Decide Whether and How to Reduce TCE Fenceline Risks ........ 9

D. In its Brief, EPA Defends Its Failure to Address TCE Fenceline Emissions on the Incorrect Ground That They Were Not Subject to TSCA ........ 13

II. EPA's Failure to Address Fenceline Risks Was Arbitrary and Capricious and Lacked Substantial Evidence in the Record as a Whole ........ 15

A. EPA Does Not Explain How Its Whole Chemical Approach Could Prohibit All Conditions of Use but Fail to Reduce Environmental Releases That Exceeded Its Cancer Risk Benchmark ........ 16

B. Contrary to EPA, Fenceline Communities are Potentially Exposed and Susceptible Subpopulations ........ 18

C. TSCA Provides Tools to Protect Fenceline Communities to the Extent Necessary to Reduce Cancer Risks Below Risk Benchmarks ........ 20

D. EPA's Fenceline Assessments Understated Risks to Fenceline Communities by Ignoring Aggregate and Cumulative Exposures ........ 22

E. Clean Air Act Regulation Provides No Basis for Failing to Protect Fenceline Communities from Current TCE Cancer Risks ........ 24

F. If the Court Finds that the Current Fenceline Assessments Are Insufficient, EPA Should Expeditiously Complete a Supplemental Risk Evaluation ........ 26

III. EPA's Byproduct Exemptions Are Not Authorized by TSCA .......................28
A. Production of Byproduct TCE Is a TSCA Condition of Use and Could Not Be Exempted from the Risk Evaluation and Management .......................28
B. EPA's Exemption of Site-Limited Processing of Byproduct TCE Violates TSCA and Lacks Substantial Evidence Support .......................................31
C. The Interrelated Byproduct Issues Raised by the Rule Require a Comprehensive Risk-based Framework for Addressing Byproduct TCE under TSCA ..........................................................................................33
IV. EPA's De Minimis Exemption for Products Containing Less than 0.1% TCE Is Not Justified Under TSCA ...............................................................34
A. TSCA Requires EPA to Determine that TCE Levels below its *De Minimis* Threshold Do Not Present an Unreasonable Risk .....................................34
B. EPA's Proposed Rule Did Not Afford Meaningful Notice and Comment on a De Minimis Exemption.........................................................................37
V. The Court Should Remand the Rule to Address Risks to Fenceline Communities and Remand and Vacate the Rule's Byproduct and De Minimis Provisions.........................................................................................39
CONCLUSION ..................................................................................................40
COMBINED CERTIFICATIONS .......................................................................42
CERTIFICATE OF SERVICE ...........................................................................43

## TABLE OF AUTHORITIES

**Cases**

*Am. Pub. Gas Assoc. v. DOE*,
22 F.4th 1018 (D.C. Cir. 2022) ………………………………………………39

*Corrosion Proof Fittings v. EPA*,
947 F.2d 1201 (5th Cir. 1991) ……………………………………………..11

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) ………………………………………………39

*Hasan v. US Dept. of Labor*,
545 F.3d 248 (3d Cir. 2008) ………………………………………………..13

*Kaufman v. Allstate N.J. Ins. Co*.,
561 F.3d 144 (3d Cir. 2009) …………………………………………………29

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ………………………………………………………..10, 13

*NVE Inc. v. Dep't of Health & Hum. Servs.,*
436 F.3d 182 (3d Cir. 2006) …………………………………………………38

*Prometheus Radio Project v. FCC*,
652 F.3d 431 (3d Cir. 2011) …………………………………………………38

*Safer Chemical., Healthy Families v. EPA,*
943 F.3d 397 (9th Cir. 2019) ………………………………………………..29, 30

*SEC v. Chenery Corp*.,
318 U.S. 80 (1943) ………………………………………………………….13, 29

*Tex. Corn Producers v. EPA*,
141 F.4th 687 (5th Cir. 2024) ………………………………………………..39

**Statutes**

15 U.S.C. § 2602(4) …………………………………………………………..5

15 U.S.C. § 2602(12) ………………………………………………………..19

15 U.S.C. § 2605 ……………………………………………………10, 30, 34

15 U.S.C. § 2605(a) ………………………………6, 10, 11, 12, 21, 26, 27, 34, 36

15 U.S.C. § 2605(a)(5) ……………………………………………………...20

15 U.S.C. § 2605(a)(6) ……………………………………………………...20

15 U.S.C. § 2605(b) …………………………………………..10, 12, 28, 36

15 U.S.C. § 2605(b)(4) …………………………………………………….12, 30

15 U.S.C. § 2605(b)(4)(A) …………………………5, 8, 10, 11, 14, 20, 21, 29, 35

15 U.S.C. § 2605(b)(4)(D) …………………………………………………30, 35

15 U.S.C. § 2605(b)(4)(F) ……………………………………………………..35

15 U.S.C. § 2605(b)(4)(F)(i) …………………………………………………6

15 U.S.C. § 2605(b)(4)(G) ……………………………………………………9

15 U.S.C. § 2605 (b)(4)(F)(i) …………………………………………...22, 29

15 U.S.C. § 2605(b)(4)(F)(iii) ………………………………………………11

15 U.S.C. § 2605(b)(4)(F)(iv) ………………………………………………14

15 U.S.C. § 2605(c)(1) ……………………………………………………….9

15 U.S.C. § 2605(c)(2) ……………………………………...9, 10, 12, 21, 22, 36

15 U.S.C. § 2605(c)(2)(A) ……………………………………………..12, 21, 36

15 U.S.C. § 2605(c)(2)(B) …………………………………………………21, 36

15 U.S.C. § 2608(b) ……………………………………………………..15, 25

15 U.S.C. § 2625(k) ………………………………………………………10

15 U.S.C. § 2625(i) ……………………………………………………….8

15 U.S.C. § 2625(o) ………………………………………………………24

**Regulations**

40 C.F.R. § 751.301(c) ....................................................................31

**Federal Register**

EPA, *Final Rule, Perchloroethylene,*
89 Fed. Reg. 103,560 (December 18, 2024) ......................... ............32

EPA, *Final Rule, Carbon Tetrachloride,*
89 Fed. Reg. 103,512 (December 18, 2024) ........................................32

EPA, *Notice of Availability, Trichloroethylene (TCE); Revision to the Toxic Substances Control Act (TSCA) Risk Determination*,
88 Fed. Reg. 1222 (Jan. 9, 2023) ..................................................16

EPA, *Notice, Trichloroethylene; Draft Revision to Toxic Substances Control Act (TSCA) Risk Determination*,
87 Fed. Reg. 40,520 (July 7, 2022) ...............................................16

*Scope of the Risk Evaluation for Trichloroethylene*,
82 Fed. Reg. 31,592 (July 7, 2017), EPA-HQ-OPPT-2016-0737-0057...........35

**Other Authorities**

EPA, *TSCA Work Plan Chemical Risk Assessment: Trichloroethylene: Degreasing, Spot Cleaning and Arts & Crafts Uses* (June 2014),
EPA-HQ-OPPT-2012-0723-0040 ..................................................17

EPA, *EPA Response to RFR 14001A* (Feb. 26, 2016),
https://www.epa.gov/sites/default/files/2016-03/documents/14001a-response_0.pdf ............................................................17

## GLOSSARY

| | |
|---|---|
| EPA | Respondent United States Environmental Protection Agency |
| HCS | Occupational Safety and Health Administration Hazard Communication Standard |
| JA | Joint Appendix |
| NESHAPs | Clean Air Act National Emissions Standards for Hazardous Air Pollutants |
| OSHA | Occupational Safety and Health Administration |
| Rule | United States Environmental Protection Agency, "Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)," 89 Fed. Reg. 102,568 (Dec. 17, 2024) |
| TCE | Trichloroethylene |
| TSCA | Toxic Substances Control Act |

## INTRODUCTION

EPA's rule for trichloroethylene (TCE) contains three fundamental gaps that weaken protection of at-risk populations and violate the Toxic Substances Control Act (TSCA): (1) it fails to address cancer risks to fenceline communities exposed to TCE releases from nearby chemical facilities: (2) it contains open ended-exemptions for TCE formed as a byproduct during the production of other chemicals even though these byproducts have the same harmful effects as intentionally produced TCE; and (3) it exempts products containing *de minimis* levels of TCE without any showing that they are too small to harm product users.

In its brief, EPA dismisses these concerns as insignificant or claims they will be addressed eventually under the TCE rule ("Rule") or rules for other chemicals. But these future measures may never take effect or, if they do, will either be inadequate or come too late to protect real people who are now being exposed to harmful levels of TCE in their workplaces and communities. For example, while the Rule's prohibitions on specific TCE uses will ultimately eliminate air emissions that are now endangering nearby residents, unsafe exposure to TCE in ambient air will continue for years before these prohibitions take effect. Similarly, users of thousands of products will remain exposed to TCE on the dubious ground that its presence is difficult to measure and in any event is too "small" to cause harm.

EPA seeks to justify these results by emphasizing its broad "discretion" under TSCA to base decisions on a range of economic and other "non-risk" factors. It claims that it can use this discretion to choose which risk and exposure pathways it will evaluate and to impose restrictions on unsafe chemicals that fail to eliminate unreasonable risk. But in 2016 Congress strengthened TSCA by removing requirements of the old law that had effectively paralyzed the nation's program for chemical risk management. EPA's misreading of amended TSCA would reinstate interpretations of the law that Congress specifically rejected, and would leave people unprotected from the harms of TCE.

## ARGUMENT

### I. EPA Violated TSCA by Failing to Address the Cancer Risks to Fenceline Communities from Facility Environmental Releases

#### A. EPA Committed to But Then Reneged on Using its Fenceline Assessments to Determine TCE Cancer Risks to Communities

For the first five years after TSCA was amended, EPA failed to protect vulnerable populations from exposure to toxic chemicals produced and used at nearby chemical plants. As a result, EPA's 2020 risk evaluation did not address health risks to fenceline communities from chemical plant releases of TCE. However, EPA announced a new initiative in June 2021 to address this gap in protection for TCE and five other chemicals. *EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ("2021 Path Forward"),

https://www.epa.gov/newsreleases/epa-announces-path-forward-tsca-chemical-risk-evaluations, JA370.

EPA explained that, unlike the 2020 risk evaluation, it would now examine whether emissions of TCE and other chemicals from manufacturing and processing facilities presented "the potential for unreasonable risk to fenceline communities." JA370 (2021 Path Forward). To conduct these assessments, Agency experts developed a detailed methodology which would "ensure potential risks to fenceline communities will not go unidentified and unaddressed" and the Agency would "address these risks via protective and expeditiously promulgated risk management rules." *Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0* ("Methodology"), EPA-HQ-OPPT-2021-0415-0012, JA488.

TCE was a particularly strong candidate for assessing risks to fenceline communities because it was ubiquitous in air, water, and waste, and several communities had earlier suffered devastating harm as a result of pervasive TCE contamination of local water supplies. Environmental Petitioners' Brief at 15-19. TCE's numerous harmful health effects at low levels of exposure also heightened concern that even minuscule concentrations of TCE in air and water would be dangerous to exposed populations. *Id.* at 19-22.

The Methodology was reviewed and endorsed by EPA's Scientific Advisory Committee on Chemicals (Science Committee) in 2022. *Meeting Minutes and Final Report* ("Science Committee Report"), EPA-HQ-OPPT-2021-0415-0095, JA865. Several months later, EPA's fenceline assessment for air emissions found that cancer risks at multiple locations outside TCE facilities exceeded EPA's established cancer risk benchmark of one in one million. EPA, *Trichloroethylene (TCE): Fenceline Technical Support – Ambient Air Pathwa*y, EPA-HQ-OPPT-2020-0642-0091, JA528.

However, in its October 31, 2023 proposed TCE rule, EPA backtracked. Instead of finding that the cancer risk levels calculated in its assessments contributed to TCE's unreasonable risks, EPA maintained that it could not make a determination of unreasonable risk to these communities and therefore would not protect them from cancer risks. JA99 (Rule at 102,612).

EPA maintains that "TSCA does not compel EPA to make such a determination" and whether to address and protect fenceline communities was "within the discretion Congress delegated to EPA when deciding how to address unreasonable risk." EPA Brief at 29. According to EPA, the Path Forward and Methodology merely outlined a procedure for assessing fenceline risks but "neither mandated risk-related conclusions . . . [nor] risk management actions or rulemaking activities." *Id.* at 26. However, Petitioners are not arguing that the

Methodology, in itself, "mandated" a risk assessment and risk management action. As discussed in the text, these were obligations imposed by the statute – the Methodology merely reflected EPA's understanding of what the law required in response to the risk findings of its fenceline assessments.

In fact, however, the commitments EPA made in the two documents correctly stated its obligations under TSCA. TCE fenceline releases were within the scope of TSCA's definition of "conditions of use" and the plain language of the statute directed EPA to address all conditions of use in its TCE risk evaluation and risk management rule. These were not discretionary choices, but requirements imposed by Congress. By refusing to make a risk determination for fenceline communities exposed to facility air and water releases, EPA violated TSCA.

### B. EPA Had No Discretion Under TSCA to Refuse to Make a Risk Determination for Fenceline Communities Exposed to Releases from TCE Facilities

TSCA provides that EPA "*shall*. . .determine whether a chemical substance presents an unreasonable risk of injury. . . under the conditions of use." 15 U.S.C. § 2605(b)(4)(A) (emphasis added). The term "condition of use" is defined broadly as "the circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." 15 U.S.C. § 2602(4). As EPA recognized in its 2020 risk evaluation, TCE manufacture, processing, and use are plainly "conditions of use"

under this definition. JA269 (Risk Evaluation at 53). Releases to air and water also fall within the definition because they are "circumstances" under which TCE is manufactured, processed or used. Accordingly, EPA had a duty to include these releases in its determination of unreasonable risk of TCE.

Underscoring this obligation, TSCA directs that EPA risk evaluations "*shall* . . . integrate and assess available information on hazards and exposures for the *conditions of use* of the chemical substance . . . that is relevant to specific risks of injury to health or the environment." 15 U.S.C. § 2605(b)(4)(F)(i) (emphasis added). Since facility environmental releases of TCE are within the scope of its conditions of use, they are plainly "relevant" to determining their "risks of injury to health or the environment." Thus, EPA was required to compile and assess all "available information" on these releases' "hazards and exposures," "integrate" this information into its risk evaluation of TCE, and then "assess" whether facility releases contributed to TCE's unreasonable risk as a whole chemical. *Id.* Upon making this finding, section 6(a) required EPA to regulate these releases "to the extent necessary so that [TCE] no longer presents such [unreasonable] risk."

But EPA's Rule circumvented these requirements by avoiding a determination whether TCE fenceline emissions contributed to TCE's unreasonable risk. As EPA conceded in the Rule, EPA's air emissions assessment

showed that a large population living near TCE-emitting facilities faced cancer risks above its established unreasonable risk benchmark:

> [t]he multi-year analysis evaluated 217 facilities and found risk estimates above one in a million for cancer for 133 of those facilities at a distance of 100 meters from the releasing facility. . . 58 of these 133 facilities [] had cancer risks above one in a million at distances farther than 100 meters . . .

JA100 (Rule at 102,613). The facilities which EPA determined were exposing fenceline communities to TCE were not a small sample but represented a wide range of TCE's conditions of use.[1] EPA also found fenceline community risks exceeding its cancer benchmark from exposure to TCE in drinking water, incidental oral ingestion from ambient water, and incidental dermal contact with ambient water. JA99 (Rule at 102,612).

Faced with these risk findings, EPA conceded that the evidence "did not allow [it] to rule out unreasonable risk to fenceline communities with confidence." *Id.* But EPA then maintained that it was "unable to determine . . . whether those risks drive the unreasonable risk of injury to health presented by TCE." *Id.* EPA's fence-straddling was not permissible under TSCA.

---

[1] According to EPA, these facilities include "degreasing (open-top batch vapor degreasing; closed-loop batch vapor degreasing; conveyorized vapor degreasing; web vapor degreasing; cold cleaning); formulation of aerosol and non-aerosol products; industrial processing aid; manufacturing; metalworking fluids; other industrial uses; process solvent recycling and worker handling of wastes; processing as a reactant; recycling and disposal; and repackaging." JA100 (Rule at 102,613.

TSCA risk evaluations must "determine whether a chemical substance presents an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(b)(4)(A). This wording requires EPA to make a binary choice: it must determine that the substance either presents an unreasonable risk or it does not. Nowhere does the statute allow EPA to avoid this choice (and opt out of risk management) by refusing to assess risks from exposure pathways associated with TSCA conditions of use. Confirming this reading of TSCA, section 6(i) identifies only two outcomes for EPA risk evaluations: (1) "a determination . . . under subsection (b)(4)(A) that a chemical substance does not present an unreasonable risk of injury" or (2) "a final rule promulgated under subsection (a), including the associated determination . . . under subsection (b)(4)(A) that a chemical substance presents an unreasonable risk of injury." EPA cannot bypass these outcomes by refusing to determine whether exposure pathways for a chemical's conditions of use contribute to its unreasonable risk.

It is understandable why Congress would reject giving EPA open-ended discretion to avoid assessing the risk of a chemical's conditions of use. As Petitioners explained, a major concern driving the 2016 TSCA amendments was Congress's frustration with EPA's slow progress during TSCA's first four decades in assessing and regulating harmful chemicals. Petitioners' Brief at 10-12. In addition to overhauling the section 6 framework to remove obstacles to health-

protective risk evaluations and risk management, Congress required EPA to evaluate a minimum number of substances for unreasonable risk and then set deadlines for completing these evaluations and follow-up rulemakings. For example, risk evaluations must be completed in three years (extendable by six months). 15 U.S.C. § 2605(b)(4)(G). When EPA makes a determination of unreasonable risk in any such evaluation, a risk management rule must be proposed within one year and finalized a year later. 15 U.S.C. § 2605(c)(1). These deadlines could not be met where EPA's risk evaluation and rule punted on critical pathways of risk and exposure, leaving them unaddressed indefinitely despite TSCA's strict deadlines to complete risk evaluations and move forward with risk management.

### C. TSCA Section 6(c)(2) Does Not Provide EPA Broad Discretion to Decide Whether and How to Reduce TCE Fenceline Risks

In a novel reading of TSCA, EPA claims that it could somehow "address" TCE fenceline risks without making a risk determination for exposed communities in its evaluation or directly protecting them in its risk management rule. Section 6(c)(2), the Agency maintains, provides it with "discretion in how to address unreasonable risks, including the consideration of non-risk factors at the risk management stage." EPA Brief at 31-32. Thus, it could account for TCE fenceline exposures in its Rule without "reopen[ing] the Risk Evaluation" to

determine whether these exposures contribute to unreasonable risk. EPA Brief at 30.

Under this strained interpretation, the detailed step-by-step process for identifying and addressing unreasonable risks in sections 6(a) and 6(b) would be negated by a seemingly unrelated provision of TSCA. In EPA's telling, the economic and other non-risk factors identified in section 6(c)(2) could authorize either ignoring the risks of particular conditions of use in its risk evaluation or taking no action to protect against them during risk management. For example, EPA could bypass these core TSCA responsibilities in order to protect companies from the cost of regulation or simply to focus its resources on other priorities.

This is plainly not the "best reading" of section 6(c)(2). *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024). Congress carefully designed the TSCA risk evaluation framework to assure that determinations of unreasonable risk encompass all a chemical's conditions of use and are based solely on reasonably available evidence of hazard and exposure.[2] In defining the scope of risk evaluations, section 6(b)(4)(A) focuses only on the "risk of injury to health or the environment" and expressly precludes "consideration of costs or

[2] In implementing section 6, EPA "shall take into consideration information relating to a chemical substance or mixture, including hazard and exposure information, under the conditions of use, that is reasonably available to the Administrator." 15 U.S.C. § 2625(k).

other nonrisk factors.” This prohibition on considering “nonrisk factors” is repeated explicitly in section 6(b)(4)(F)(iii).

In turn, section 6(a) requires EPA to conduct a risk management rulemaking where it “determines in accordance with subsection (b)(4)(A) that . . . a chemical substance . . . presents an unreasonable risk of injury to health or the environment.” EPA’s mission during the rulemaking is to “apply” one or more of the requirements listed in paragraphs (a)(1)-(7) of section 6(a) “to the extent necessary so that the chemical substance or mixture no longer presents such [unreasonable] risk.” Since EPA’s risk evaluation cannot determine unreasonable risk on the basis of “nonrisk factors,” EPA cannot rely on these same factors to compromise the level of protection in its risk management rules under section 6(a). Instead, EPA must assure that the chemical “no longer presents [an unreasonable] risk” – a requirement that EPA cannot circumvent due to factors unrelated to the unreasonable risk itself.

This limitation is supported by TSCA’s legislative history. In 1991, the Fifth Circuit vacated EPA’s ban on asbestos under TSCA section 6 because EPA did not comply with TSCA’s then-requirements to balance costs and benefits and adopt the “least burdensome” regulatory alternative. *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1216-17, 1222-23 (5th Cir. 1991). Concerned by this decision, Congress

rewrote section 6 in 2016 to eliminate cost-benefit analysis and remove the least burdensome requirement. Petitioners' Brief at 11.

By reading section 6(c)(2) to reinstate the very regulatory constraints that Congress rejected in 2016, EPA would give this limited provision far more importance than its wording and narrow purpose warrant. Section 6(c)(2)(A) merely requires EPA, during section 6(a) rulemakings, to "consider and publish a statement based on reasonably available information with respect to . . .the effects . . . on health and the magnitude of the exposure of human beings" and "the reasonably ascertainable economic consequences of the rule." 15 U.S.C. § 2605(c)(2)(A). While EPA "shall factor in" these analyses "in selecting among prohibitions and other restrictions," it may consider them only "to the extent practicable" and "in accordance with subsection (a)."

Thus, while the statement may assist EPA in choosing among regulatory alternatives, the Agency cannot replace the risk-based framework Congress established in sections 6(a) and (b) with non-risk factors that section 6(b) precludes EPA from considering. As a result, under section 6(b)(4), EPA must determine whether the risks of facility releases of TCE to air and water contribute to unreasonable risk presented by TCE as a whole and then impose requirements sufficient to eliminate these risks in its risk management rule.

### D. In its Brief, EPA Defends Its Failure to Address TCE Fenceline Emissions on the Incorrect Ground That They Were Not Subject to TSCA

In its 2020 risk evaluation, EPA excluded TCE facility environmental releases from its determination of unreasonable risk – and from any subsequent risk management rulemaking – because TSCA did not require it to "evaluate risk to the general population from ambient air, water and disposal and pathways for any condition of use." JA255 (Risk Evaluation at 39). The basis for this approach was that "exposures to the general population via [environmental release] pathways are covered under the jurisdiction of other environmental statutes." *Id.*

However, EPA categorically disavowed this position in 2021, explaining that it had "resulted in a failure to consistently and comprehensively address potential exposures to . . . fenceline communities (i.e., communities near industrial facilities)." JA370 (2021 Path Forward). Thus, the Agency committed to "assess air, water or disposal exposures to the general population" whether or not other laws might apply.

EPA now defends its failure to address fenceline risks on the supposed basis that TSCA "expressly permits" evaluations to disregard activities "that are regulated by other EPA-administered statutes (e.g., the Clean Air Act)." EPA Brief at 25. Because this interpretation of TSCA was explicitly rejected by EPA at the time of its TCE rulemaking, it cannot now be considered by the Court. *See Hasan*

*v. US Dept. of Labor*, 545 F.3d 248, 251 (3d Cir. 2008) (stating that "[i]t is black-letter law that 'an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained'" (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)).

In any case, the "best reading" of TSCA does not support resurrecting this rejected interpretation of the law. *See Loper Bright,* 603 U.S. at 400. As EPA acknowledged in the Rule, "TSCA is the only regulatory authority able to prevent or reduce unreasonable risk of TCE to a sufficient extent across the range of conditions of use, exposures, and populations of concern." JA103 (Rule at 102,616). Since environmental releases result in "exposures" to "populations of concern" from facilities manufacturing, processing, or using TCE, they are plainly within the TSCA definition of "conditions of use" and must be addressed in risk evaluations, even if other laws may apply. 15 U.S.C. § 6(b)(4)(A). This is reinforced by section 6(b)(4)(F)(iv), which provides that evaluations "shall . . . take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance." Environmental releases from facilities where TCE is manufactured, processed or used clearly fall within this broad requirement and are obviously "relevant" to TCE's risks to fenceline communities from its conditions of use.

EPA also claims that section 9(b) of TSCA overrides the statute's plain language and authorizes EPA to categorically disregard environmental releases potentially subject to other laws. EPA Brief at 39. But EPA's Rule in fact rejected the application of section 9(b) to environmental releases of TCE, JA103 (Rule at 102,616), and the statute confirms its conclusion. Section 9(b) only requires EPA to defer to other laws where it determines "that a risk to health or the environment associated with a chemical substance … could be eliminated or reduced to a sufficient extent by actions taken under the" other law. 15 U.S.C. § 2608(b). This determination is case-specific and requires EPA to analyze concrete chemical risks in light of the opportunities for risk reduction under one or more identified laws after it has evaluated the unreasonable risk under TSCA. EPA may not escape its obligation to conduct the analysis under TSCA and make the determination required by section 9(b) by pointing to the mere existence of possibly applicable regulatory requirements established under another statute.

## II. EPA's Failure to Address Fenceline Risks Was Arbitrary and Capricious and Lacked Substantial Evidence in the Record as a Whole

In addition to violating TSCA, EPA's rationale for disregarding risks to fenceline communities was arbitrary and capricious and unsupported by substantial evidence. Petitioners' Brief at 48-60. EPA's Brief further reinforces the absence of a reasoned basis for the Agency's failure to protect fenceline communities, reinforcing the justification for remanding this aspect of the Rule.

### A. EPA Does Not Explain How Its Whole Chemical Approach Could Prohibit All Conditions of Use but Fail to Reduce Environmental Releases That Exceeded Its Cancer Risk Benchmark

In 2021, EPA adopted a "whole chemical" approach to implementation of TSCA section 6. JA370 (2021 Path Forward). Under this approach, EPA would "continue to assess and analyze each condition of use" during risk evaluations, but then "make the determination of unreasonable risk just once for the whole chemical when it is clear the majority of the conditions of use warrant one determination." *Id.*

In 2022, EPA proposed to align its previous unreasonable risk determination for TCE with the whole chemical approach. EPA, *Notice, Trichloroethylene; Draft Revision to Toxic Substances Control Act (TSCA) Risk Determination.* 87 Fed. Reg. 40,520, 40,526 (July 7, 2022). It explained that this approach "is appropriate for TCE because there are benchmark exceedances for multiple conditions of use . . . spanning across most aspects of the chemical lifecycle." *Id.* at 40,523. In early 2023, EPA finalized its revised risk determination, reiterating that TSCA required it "to make an unreasonable risk determination for TCE as a whole" and then to regulate all conditions of use that contributed to this unreasonable risk. EPA, *Notice of Availability, Trichloroethylene (TCE); Revision to the Toxic Substances Control Act (TSCA) Risk Determination,* 88 Fed. Reg. 1222, 1223 (Jan. 9, 2023).

Building on this approach, the Rule reaffirmed that "all industrial, commercial, and consumer uses of TCE evaluated in the 2020 Risk Evaluation for TCE contribute to the unreasonable risk of injury to health" because their pathways of exposure "exceeded health-based risk benchmarks." JA63 (Rule at 102,576). Given the severity of TCE's adverse effects and their occurrence at low levels of exposure, the Rule then prohibited *all* TCE conditions of use. JA58-59 (Rule at 102,571-102,572).[3]

In contrast to its reliance on exceedances of EPA risk benchmarks to prohibit facilities from manufacturing, processing, and using TCE, the Rule failed to address environmental releases from these same facilities that exceeded cancer risk benchmarks. In the Rule, EPA labors to explain this contradiction but fails to provide a coherent rationale. For example, EPA asserts it could not "conclude

---

[3] Certain industry Petitioners have called into question the "Johnson study." Dckt. No. 97 (Case No. 25-1083) at 49-55. However, the record underlying EPA's conclusions is much broader than the Johnson study, relying on a strong weight of evidence analysis indicating the developmental harms from TCE of fetal cardiac malformations. This evidence was the subject of multiple peer reviews – including by EPA's Science Advisory Board – and considered a wide range of evidence. *See, e.g., TSCA Work Plan Chemical Risk Assessment: Trichloroethylene: Degreasing, Spot Cleaning and Arts & Crafts Uses* (June 2014), EPA-HQ-OPPT-2012-0723-0040, at 49-54; *EPA Response to RFR 14001A* (Feb. 26, 2016), https://www.epa.gov/sites/default/files/2016-03/documents/14001a-response_0.pdf. The record simply does not support the arguments that EPA's conclusion rested on an unreliable study considered in isolation or that the Agency disregarded the broader evidence.

whether those risks of injury to fenceline communities contribute to the unreasonable risk because those fenceline screening methodologies were not developed for that purpose." JA101 (Rule at 102,614). But the Path Forward states that fenceline assessments would be conducted for the precise purpose of examining whether the assessed chemicals present "the potential for unreasonable risk to fenceline communities associated with air and water exposures." JA370 (2021 Path Forward). Similarly, the Rule claims that "exposures to any fenceline communities from these facilities will be eliminated under the prohibitions in this rulemaking" but then acknowledges that numerous facilities with cancer risks "that may exceed one in a million" are subject to "longer compliance timeframes" and TCE fenceline exposures will continue until applicable prohibitions take effect. JA100 (Rule at 102,613).

EPA here makes no attempt to explain how TCE pathways of exposure that exceeded risk benchmarks "contributed" to unreasonable risk but environmental releases from facilities that presented cancer risks above these benchmarks did not. Without such an explanation, EPA's failure to protect fenceline communities was arbitrary and capricious and should be set aside.

### B. Contrary to EPA, Fenceline Communities are Potentially Exposed and Susceptible Subpopulations

According to EPA, its risk evaluation "did not identify fenceline communities as potentially exposed or susceptible subpopulations" and therefore

did not consider whether their exposure to releases from TCE-using facilities contributed to unreasonable risk. EPA Brief at 31. However, as EPA concedes, its sole reason for not designating these communities as TSCA vulnerable populations was that its evaluation had "excluded ambient air, drinking water, and surface water exposure pathways to the general population." *Id.* As discussed above, EPA reversed this interpretation in 2021 because the Agency had failed to "consistently and comprehensively address potential exposures to potentially exposed or susceptible subpopulations, including fenceline communities (i.e., communities near industrial facilities)." JA370 (2021 Path Forward).

TSCA defines a "potentially exposed or susceptible subpopulation" as "a group of individuals within the general population" who, because of either "greater susceptibility or greater exposure" to a chemical, are "at greater risk than the general population of adverse health effects." 15 U.S.C. §2602(12). The elevated TCE exposures and cancer risks demonstrated in EPA's fenceline assessments plainly met these criteria. Several commenters strongly supported this conclusion. JA843 (EPA Response to Comments at 133). EPA's own analysis in the Rule agreed that TCE facility operations "have the potential to result in disproportionate and adverse human health or environmental effects on communities with [environmental justice] concerns." JA109 (Rule at 102,622).

In short, extensive evidence in the record supported designating fenceline communities as a "potentially exposed and susceptible subpopulations" and EPA's Brief identifies no evidence to the contrary. Thus, TSCA required EPA to determine whether these communities – as distinct from the general population – are experiencing an unreasonable risk of harm from TCE releases by nearby facilities. 15 U.S.C. §2605(b)(4)(A). However, despite finding that cancer risks to fenceline communities exceeded its unreasonable risk benchmarks, the Agency refused to make this determination. This was contrary to TSCA and arbitrary and capricious.

### C. TSCA Provides Tools to Protect Fenceline Communities to the Extent Necessary to Reduce Cancer Risks Below Risk Benchmarks

EPA maintains that its failure to make an unreasonable risk determination for fenceline communities was "harmless error" because Petitioners "do not, and cannot, contend that EPA would have adopted any more stringent requirements had it formally" found that risks to fenceline communities were unreasonable. EPA Brief at 32. This is incorrect.

The risk management measures Congress authorized EPA to employ include "regulating any manner or method of commercial use of" a substance and "prohibiting or otherwise regulating any manner or method of [its] disposal." 15 U.S.C. §§ 2605(a)(5)-(6). Thus, EPA had the authority to set maximum limits on the TCE concentrations that facilities release to air and water or mandate pollution

control technologies to reduce or eliminate these releases. These (or similar) requirements could have lowered TCE risks to fenceline communities sufficiently to reduce cancer risks below EPA's one-in-one million benchmark. This would have satisfied EPA's obligation to impose requirements "necessary so that [TCE] no longer presents [an unreasonable] risk." 15 U.S.C. §2605(a).

But in its Brief, EPA ignores section 6(a) – the central driver for risk management under amended TSCA. Instead, it maintains that its "chosen approach" was to address the "potential risks to fenceline communities under section 6(c)(2)." EPA Brief at 28-29. In the words of EPA counsel, "EPA evaluated its screening level findings in conjunction with . . . the human health, environmental, and economic factors" described in section 6(c)(2)(A)–(B) and determined that the Rule adequately "address[ed] potential risk to fenceline communities from ambient air and water exposure" and nothing more was needed. *Id.* at 32.

EPA's Brief does not demonstrate how "the human health, environmental, and economic factors" in section 6(c)(2)(A)-(B) led to this conclusion. While the Rule discusses these factors, JA98-103 (Rule at 102,611-616), it never explains why those factors justify ignoring section 6(b)(4)(A)'s express requirement of an unreasonable risk determination for potentially exposed or susceptible subpopulations.

EPA did claim that the Rule's "ultimate prohibition of manufacture, processing, distribution in commerce, use, and disposal of TCE is expected to address the risks identified in the screening analysis." JA101 (Rule at 102,614). However, this claim is contradicted by the Rule's compliance deadlines, which allow most production of TCE to continue for several years and some uses to continue for decades. Petitioners' Brief at 52-55. During these extended periods, fenceline communities will remain exposed to TCE at levels that exceed the EPA cancer risk benchmark. Nowhere does section 6(c)(2) or any other TSCA provision allow EPA to disregard these risks to potentially exposed or susceptible subpopulations.

### D. EPA's Fenceline Assessments Understated Risks to Fenceline Communities by Ignoring Aggregate and Cumulative Exposures

EPA's fenceline assessments did not take into account "aggregate" and "cumulative" exposures of fenceline communities to TCE and other substances with similar adverse health effects. Petitioners' Brief at 23. As a result, these assessments *understated* TCE exposure and risk. Citing section 6(b)(4)(F)(ii), EPA maintains that "Congress specifically declined to require EPA to consider risk from aggregate exposures in risk evaluations." EPA Brief at 33. However, where EPA does not address such exposures, the same TSCA provision directs it to "describe whether aggregate or sentinel exposures to a chemical substance under the

conditions of use were considered, and the basis for that consideration." EPA failed to meet this obligation.

In its comments on EPA's draft TCE risk evaluation and then its fenceline assessment Methodology, EPA's Science Committee urged EPA to consider TCE exposure from multiple routes and sources. *See, e.g.,* Science Committee Report (warning that EPA's calculations "may not be protective overall because potential key exposure pathways are excluded" and there was no "consideration for cumulative exposures, multiple source exposures, [or] aggregate exposures"). JA881 (at 15). Commenters also urged EPA to include aggregate and cumulative exposures in its EPA's fenceline risk assessments. JA842 (EPA Response to Comments at 132).

EPA did not offer a credible rationale for rejecting these recommendations. While the Agency acknowledged that the Science Committee and other commenters faulted EPA's fenceline assessments for failing to consider aggregate and cumulative exposures, its only response was that "EPA intends to continue to improve upon the fenceline screening methodology for subsequent risk evaluations." JA842 (EPA Response to Comments at 132).[4] TSCA designates the

---

[4] EPA cites its Response to Comments for the TCE risk evaluation as stating there is "low confidence" in the science on aggregate exposures. EPA Brief at 35. However, no such statement appears on the cited page of the Response. JA839 (Response to Comments at 95).

Science Committee as EPA's independent advisor on TSCA science issues, 15 U.S.C. § 2625(o), but this brush-off of its recommendations did not give appropriate weight to the Committee's statutory role.

In any case, even without considering aggregate and cumulative exposures, EPA's finding of exceedances of its one-in-one million cancer benchmark required it to determine that fenceline emissions contributed to TCE's unreasonable risk and take risk management action to protect exposed communities.

### E. Clean Air Act Regulation Provides No Basis for Failing to Protect Fenceline Communities from Current TCE Cancer Risks

In its rulemaking, EPA recognized that compliance with its TCE workplace requirements "could lead to adoption of engineering controls that ventilate more TCE outside," increasing fenceline community exposures and risks. JA100 (Rule at 102,613). Its proposal asked whether its rule should include requirements to prevent these emission increases. JA100-01 (Rule at 102,613-14). Despite support from some commenters, EPA ultimately concluded that Clean Air Act National Emissions Standards for Hazardous Air Pollutants (NESHAPs) and state-issued air permits "may in some situations, prevent emission increases under the Rule." EPA Brief at 35.

This statement is hardly a ringing affirmation of the role of NESHAPs in preventing future emissions and in any case is not meaningfully supported in the record. Because EPA provides no analysis of specific NESHAPs and how they

apply to TCE-emitting facilities, there is no basis to conclude that any NESHAPs for these facilities will be strengthened in the future and therefore no reason to conclude they will prevent TCE emissions from increasing because of workplace controls under the Rule. JA648, 658, 659 (EDF Comments at 11, 21, 22).

More importantly, the relevant question is not whether future emissions will increase but whether NESHAPs or state permits will *lower* emissions and thereby *reduce* risks below cancer benchmarks that are now being exceeded. Neither the Rule nor the rulemaking record shows that NESHAPs or other existing requirements will compel industry to install additional emission controls that reduce these risks. Because current Clean Air Act requirements would not eliminate the unacceptable risk to fenceline communities that presently exists, EPA cannot decline to address these risks under section 6(a) of TSCA.[5]

---

[5] EPA's claim (EPA Brief at 39) that TSCA section 9(b) supports its decision to "regulate the existing TCE emissions to the environment via the Clean Air Act" should carry no weight. As discussed above, before EPA can rely on regulation under other laws in lieu of action under TSCA, it must make a particularized finding that the risk in question "could be eliminated or reduced to a sufficient extent" under these laws. EPA has made no such finding for fenceline emissions from TCE facilities.

### F. If the Court Finds that the Current Fenceline Assessments Are Insufficient, EPA Should Expeditiously Complete a Supplemental Risk Evaluation

As Petitioners have demonstrated, EPA's existing fenceline assessments provide substantial evidence that TCE facility releases are contributing to its unreasonable risk. Petitioners' Brief at 58-62. Accordingly, TSCA section 6(a) required EPA to regulate these emissions "to the extent necessary" to eliminate that risk. Petitioners' Brief at 52-55.

However, if the current assessments are inadequate to support risk management, the logical solution would be a supplemental evaluation. EPA argues against this step, claiming it would be "time- and resource-intensive" and "frustrate[] Congress' desire for EPA to address risks . . . expeditiously for both those exposed to toxic chemicals and the regulated community." EPA Brief at 26.

These are meritless claims. Because a supplemental evaluation would only address fenceline emissions and build on existing work, the expenditure of time and resources would be modest. Nor would a supplemental evaluation delay the Rule's protections. While the evaluation is underway, the Rule's compliance deadlines would remain in effect. While EPA asserts that "industry resources should be focused on transitioning as quickly as possible to TCE alternatives," EPA Brief at 38, a supplemental evaluation for fenceline communities would not interfere with this transition.

Most importantly, resource and time constraints are not a lawful excuse for dispensing with a supplemental risk evaluation. These are "cost and other non-risk factors" that section 6(b) does not allow EPA to consider. Moreover, since facility TCE environmental releases are within the TSCA definition of "conditions of use," they must be addressed in EPA's TCE risk evaluation. Therefore, if EPA is unwilling to rely on its current assessments, it cannot simply walk away but must conduct an adequate evaluation that determines the risks of these conditions of use.

EPA's Methodology provides an alternative (Outcome Five) where the Agency's fenceline assessment has "uncertainties which should be considered prior to proposing a risk management rule." JA507 (Methodology at 20). In this case, "rather than expeditiously propose" that rule, EPA would undertake "additional analysis beyond the screening level analysis . . . to further substantiate the unreasonable risk finding." *Id*. at 20.

Petitioners strongly disagree that the "uncertainties" in EPA's fenceline assessments are so serious that it cannot rely on the Agency's cancer risk findings to take risk management action under section 6(a).[6] However, if the Court finds

---

[6] While the Rule noted that "[t]here are some uncertainties associated with the fenceline analysis," JA99 (Rule at 102,612), they are minor and do not call into question the Agency's finding that risks to fenceline communities exceed unreasonable risk benchmarks for cancer. Petitioners' Brief at 51-52. Moreover, because EPA's Methodology did not address aggregate and cumulative exposure, the risk estimates in the assessments are understated and would be considerably higher if a more robust assessment were conducted.

that fundamental flaws in these assessments preclude their use to determine whether facility releases contribute to TCE's unreasonable risk, it should remand the Rule and set an expeditious schedule for completing a supplemental evaluation under section 6(b).

## III. EPA's Byproduct Exemptions Are Not Authorized by TSCA

### A. Production of Byproduct TCE Is a TSCA Condition of Use and Could Not Be Exempted from the Risk Evaluation and Management

During the rulemaking, EPA justified excluding production of byproduct TCE from the Rule on the basis that it did not fall within TSCA's definition of "manufacture" and was not a TCE "condition of use" subject to section 6. JA137 (Proposed Rule at 74,726); JA79 (Rule at 102,592). However, this reading of TSCA was incorrect: production of TCE as a byproduct is "manufacture" as defined by TSCA and comprises a "condition of use" requiring risk evaluation and risk management. Petitioners' Brief at 65-66.

In its Brief, EPA ignores its earlier legal rationale for the byproduct exclusion. Conceding now that byproduct production is a "condition of use," it instead claims to have "discretion to decide which conditions of use will be considered in a particular risk evaluation" and can "select [the] subset of conditions of use" that it will "evaluate at any particular time." EPA Brief at 40-41. This is a *post hoc* rationalization that nowhere appears in the TCE proposed or final rules. To now uphold EPA's rule on a ground that EPA did not offer in its TCE

rulemaking would be unjustified. *See SEC v. Chenery Corp.*, 318 U.S. at 95; *Hasan v. US Dept. of Labor*, 545 F.3d at 251.

In any case, EPA's claim that TSCA allowed it to exclude production of byproduct TCE from the Rule lacks merit. The statute directs that risk evaluations must "determine whether a chemical substance presents an unreasonable risk . . . under *the* conditions of use" (emphasis added). 15 U.S.C. § (b)(4)(A). Similarly, section 6(b)(4)(F)(i) requires evaluations to "integrate and assess available information on hazards and exposures for *the* conditions of use" (emphasis added). It is well established that when "the" precedes a collective or plural noun, such as "conditions of use," it is equivalent to "all." *Kaufman v. Allstate N.J. Ins. Co*., 561 F.3d 144, 155 (3d Cir. 2009) (explaining that "the definite article preceding the term 'claims' indicates that 'the claims asserted' means *all* the claims asserted" (emphasis in original)).

In *Safer Chems., Healthy Families v. EPA,* 943 F.3d 397, 425 (9th Cir. 2019), the court rejected EPA's attempt to exclude from its evaluations activities that "unambiguously" fell within the TSCA definition of "conditions of use." The court stressed that "EPA is required—rather than just permitted—to consider in risk evaluations" activities that fall within the definition of conditions of use and that EPA's "assertion of discretion" to selectively evaluate a chemical's uses was "impermissible." *Id.* at 425 n.22.

Ignoring section 6(b)(4)'s express requirement to determine unreasonable risk for "the [chemical's] conditions of use," EPA turns to section 6(b)(4)(D), which defines the "scoping document" EPA must prepare early in the risk evaluation process. This document must describe the conditions of use of a chemical that EPA "expects to consider" in the evaluation. However, this phrase is best understood as calling for a preliminary listing of the conditions of use identified by EPA after an initial information search, not a mandate to pick and choose which conditions of use the Agency will ultimately evaluate. Consistent with this reading, *Safer Chemicals* concluded that "the phrase that refers to the conditions of use 'that the EPA plans to consider' simply refers to the Agency's role in determining what the conditions of use are for a particular substance" and "unambiguously do[es] not grant EPA the discretion" to exclude conditions of use from a risk evaluation. 943 F.3d. at 419.

EPA argues that the risks of production of byproduct TCE are best addressed not in the TCE rulemaking, but in future evaluations of other chemicals whose manufacture forms TCE as a byproduct. EPA Brief at 41-42. However, section 6 of TSCA focuses on evaluating and managing the unreasonable risks of the whole chemical, and deferring consideration of a major condition of use to later evaluations of other chemicals would frustrate this approach. As Petitioners' opening brief emphasized, addressing risks of byproduct TCE through multiple

evaluations and rulemakings conducted at different times (or not conducted at all, depending on EPA resources and priorities) would both be complex and inefficient and create major gaps in public health protection. Petitioners' Brief at 67-69. EPA itself acknowledges that it "could cause confusion and result in potentially conflicting information for the byproduct chemicals if EPA must evaluate the same byproducts (e.g., TCE, carbon tetrachloride) in many risk evaluations for many chemicals." EPA Brief at 41.

Thus, EPA's exclusion of production of byproduct TCE from the Rule must be set aside as both unlawful and unworkable.

### B. EPA's Exemption of Site-Limited Processing of Byproduct TCE Violates TSCA and Lacks Substantial Evidence Support

For similar reasons, the Court should vacate the Rule's exemption of byproduct TCE processing "within a site-limited, physically enclosed system" at the facility "where the byproduct TCE was generated." 40 C.F.R. § 751.301(c). As with all other forms of TCE processing, TSCA obligates EPA to evaluate these processing activities to determine whether they present or contribute to unreasonable risk. EPA cannot simply assume that, because processing of byproduct TCE would occur in an enclosed system, there was no risk. Instead, EPA must examine whether, at expected levels of exposure, TCE processing under the exemption conditions would exceed its benchmark risk levels for TCE's many harmful health effects.

While the use of an "enclosed system" at a single site may *lower* TCE levels in the workplace, there is no monitoring data or other evidence in the record that such a system will consistently reduce worker exposures *below* EPA risk benchmarks for TCE health effects. Nor is there evidence that an enclosed system as defined in the Rule will *preclude* fugitive emissions that harm fenceline communities. Absent such evidence, EPA had no basis under TSCA to exempt these operations from the Rule.

EPA's only defense of its site-limited byproduct exemption is that the Agency "was not obligated to regulate site-limited, physically enclosed systems." EPA Brief at 43. If EPA is again claiming that TSCA allows the Agency to select which conditions of use to evaluate, this interpretation of the law is not supported by the statute, as shown above. On the other hand, if EPA is claiming that it can exempt processing of byproduct TCE from the Rule because it is now or may in the future be regulated by rules for other chemicals, this claim must fail as well.

An example is TCE formed as a byproduct during the manufacturing processes for perchloroethylene and carbon tetrachloride, which are subject to recently promulgated section 6(a) rules. EPA, *Final Rule, Perchloroethylene,* 89 Fed. Reg. 103,560 (December 18, 2024); EPA, *Final Rule, Carbon Tetrachloride,* 89 Fed. Reg. 103,512 (December 18, 2024). EPA claims that these rules establish "worker protection program[s]" . . . which generally provide[] a level of protection

for any potential risk from TCE." EPA Brief at 43. However, the rules' workplace exposure limits were based on risk determinations for perchloroethylene and carbon tetrachloride, not TCE, which was not considered in either rulemaking. Thus, there is no evidence that these limits will fully protect against the health risks identified in EPA's risk evaluation of TCE itself. Moreover, because the TCE Rule was promulgated a week before the other two rules, it does not take into account their applicability to TCE and therefore their requirements cannot justify the TCE Rule's exemption of site-limited production of TCE byproduct.

### C. The Interrelated Byproduct Issues Raised by the Rule Require a Comprehensive Risk-based Framework for Addressing Byproduct TCE under TSCA

The Rule's approach to byproduct TCE is both internally inconsistent and inconsistent with other TSCA risk evaluations and rules for chemicals whose manufacture forms byproduct TCE. Taken as a whole, the Rule and these other evaluations and rules provide different levels of protection to workers and communities depending on where TCE production and processing are occurring and whether TCE is an intended commercial product or a byproduct. The result is a confusing and illogical patchwork of approaches that fail to provide the health protections for TCE-exposed populations that TCSA requires.

For example, while on-purpose TCE manufacture is subject to prohibitions and stringent worker controls under the Rule, EPA permits TCE to be produced as

a byproduct without any restrictions even though it is exactly the same chemical and has the same health effects as intentionally-produced TCE. And if byproduct TCE is formed during the manufacture of another chemical that EPA is regulating under TSCA (e.g., perchloroethylene or carbon tetrachloride), in the absence of protections afforded by EPA's regulation of TCE, the level of protection afforded workers and fenceline communities will depend on the rule for the other chemical, which provides less protection against TCE's adverse health effects than the TCE Rule itself.

EPA must therefore reexamine its treatment of byproduct TCE in light of the TSCA section 6 requirements for determining and eliminating unreasonable risk.

## IV. EPA's De Minimis Exemption for Products Containing Less than 0.1% TCE Is Not Justified Under TSCA

### A. TSCA Requires EPA to Determine that TCE Levels below its *De Minimis* Threshold Do Not Present an Unreasonable Risk

The Rule's *de minimis* exemption for TCE in products violates TSCA's risk evaluation and management framework. Petitioners' Brief at 70-75. EPA may not arbitrarily exclude "small" levels of TCE from regulation under section 6(a) without demonstrating that they do not present or contribute to unreasonable risk. Absent this showing, section 6(a) requires all TCE in products to be restricted "to the extent necessary so that [TCE] no longer presents [an unreasonable] risk."

Ignoring the plain language of the statute, EPA points to section 6(b)(4)(D), which it claims gives "EPA discretion in determining the scope of a risk evaluation" so that it can focus "on those exposures that are likely to present the greatest concern."[7] EPA Brief at 44. However, as demonstrated above, this is a misreading of section 6(b)(4)(D) and overlooks section 6(b)(4)(A) and (F), which require EPA determinations of unreasonable risk to address "the conditions of use" of the chemical under evaluation. Moreover, nothing in EPA's scoping for the risk evaluation, *Scope of the Risk Evaluation for Trichloroethylene*, 82 Fed. Reg. 31,592 (July 7, 2017), EPA-HQ-OPPT-2016-0737-0057, or the 2020 TCE risk evaluation provides any basis to conclude that products containing "small" amounts of TCE are "low risk." To the contrary, the evaluation determined that nearly all of the multiple TCE-containing products reviewed by EPA presented an unreasonable risk, regardless of the TCE concentrations present. JA304-308 (Risk Evaluation at 411-415).

---

[7] EPA cannot reliably identify conditions of use that "have the greatest potential for risk" and exclude others that are "low risk" unless it makes an assessment of their exposure and risks. Without such an assessment, any exemptions of use conditions at the scoping stage could later prove to be unwarranted in light of fuller scientific analysis. Since the *de minimis* exemption in the Rule was not based on EPA's risk evaluation and therefore was not supported by any risk analysis of products with "low levels" of TCE, the only considerations supporting it were economic and administrative, which TSCA risk evaluations may not consider.

Shifting ground, EPA asserts that, even if TSCA section 6(b) affords no discretion to exclude TCE-containing products from risk evaluations, section 6(c)(2) allows the Agency to consider a broad range of cost and administrative factors when designing risk management rules.[8] EPA Brief at 45-46. This discretion, it claims, allowed EPA to adopt a *de minimis* exemption "to aid the regulated community with implementing the prohibitions of TCE" and "increase regulatory certainty" and because "it is not feasible to remove TCE at levels below 0.1 percent." *Id.* at 44, 46.

EPA, however, is again reading section 6(c)(2)(A)-(B) far more broadly than its language warrants. As discussed above, while EPA must prepare a statement addressing "the reasonably ascertainable economic consequences" of risk management rules, including the costs and benefits, this statement can influence the requirements of these rules only "to the extent practicable" and "in accordance with subsection (a)." Since risk evaluations under section 6(b) cannot consider "costs and other nonrisk factors" in determining unreasonable risks, and section 6(a) requires EPA to impose restrictions "necessary" to eliminate such risks, basing a rule's restrictions on non-risk factors would be neither "practicable" nor in "accordance with subsection (a)." Thus, a *de minimis* exemption which is based on

[8] This too is a *post hoc* rationalization. The Rule itself does not rely on section 6(c)(2) to justify the *de minimis* exemption.

cost, feasibility, or convenience rather than a finding of no unreasonable risk for the exempted activities is contrary to TSCA.

Citing OSHA's Hazard Communication Standard (HCS), EPA maintains that "practical concerns warrant establishing a *de minimis* threshold of 0.1 percent" because "levels below 0.1 percent are not required to be reported on Safety Data Sheets" under the HCS and therefore "manufacturers are likely unaware that certain of their products may contain TCE at [these] levels." EPA Brief at 46. In addition, EPA argues, industry "has already calibrated its processes to a 0.1 percent standard to comply with the" HCS and similar programs. *Id.*

These are speculative benefits that are not documented in the record. Moreover, compliance with the HCS – which is based on another statute with its own requirements – cannot establish that TCE-containing products do not present an unreasonable risk under TSCA. Thus, EPA's stated desire to align its Rule with these OSHA requirements to simplify compliance and reduce costs is not a permissible rationale for its *de minimis* exemption.

### B. EPA's Proposed Rule Did Not Afford Meaningful Notice and Comment on a De Minimis Exemption

EPA's proposed rule contained a single sentence notifying commenters of its interest in a *de minimis* exemption:

> EPA also requests comment on whether it should consider a de minimis level of TCE in formulations to account for impurities (e.g., 0.1% or 0.5%) when finalizing the prohibitions described in this unit, and, if so, information on and rationale for any level that should be considered de minimis.

JA144 (Proposed Rule at 74,733). This sentence was opaque and unrevealing and did not "fairly apprise interested parties of all significant subjects and issues involved." *NVE Inc. v. Dep't of Health & Hum. Servs.,* 436 F.3d 182, 191 (3d Cir. 2006) (quoting *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 291 (3d Cir. 1977)). For example, it did not address the scope of the possible exemption (i.e., whether it applied to products, process streams, or environmental releases and covered only impurities or intentional product components as well). Nor did it provide criteria for setting the exemption cutoff (i.e., risk, exposure, cost, or detectability). Similarly, while noting hypothetical exemption cutoff levels, the proposal did not provide any legal basis or technical rationale. In *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011), this Court emphasized that, in order to provide adequate notice and opportunity for comment, an agency must "disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *Id.* at 449 (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977)). EPA did not satisfy this test.

## V. The Court Should Remand the Rule to Address Risks to Fenceline Communities and Remand and Vacate the Rule's Byproduct and De Minimis Provisions

Since the Rule does not protect fenceline communities at risk from TCE air and water releases, the Court should remand the Rule with instructions to expeditiously conduct further rulemaking to address these risks. If the Court finds that a supplemental risk evaluation is necessary before further rulemaking, it should direct EPA to promptly modify its current fenceline assessments and then revise the Rule. Petitioners' Brief at 82.

On the other hand, the Court should both remand and vacate the Rule's exclusions for production of TCE byproducts and site-limited byproduct processing and its *de minimis* exemption for TCE-containing products. The "default rule is that vacatur is the appropriate remedy." *Tex. Corn Producers v. EPA*, 141 F.4th 687, 710 (5th Cir. 2024) (citation omitted); accord *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 182 (D.C. Cir. 2025) ("[T]he ordinary response to a violation is to vacate the unlawful agency action."). Moreover, since these elements of the Rule are severable from other provisions, the Rule as a whole would remain in effect and implementation would proceed on the current compliance schedule. Petitioners' Brief at 83.

Vacatur would not frustrate "Congress' desire for prompt regulation of toxic substances," EPA Brief at 51, but enhance it. The Rule's exemptions for TCE

byproducts and products with *de minimis* TCE levels *fail* to provide health protections to TCE-exposed populations and, if they are no longer in effect, these sources of TCE exposure would be subject to the Rule's current prohibitions on TCE manufacture and processing. As a result, reductions in risks would be realized expeditiously. Without vacatur, however, "[t]he agency may have little or no incentive to fix the deficient rule," *Am. Pub. Gas Assoc. v. DOE*, 22 F.4th 1018, 1030 (D.C. Cir. 2022), and unsafe exposures to TCE could continue for years.

## CONCLUSION

The Rule's provisions challenged by Petitioners Center for Environmental Health and Environmental Defense Fund should be vacated and remanded for the reasons presented above and in Petitioners' opening Brief.

Respectfully submitted,

/s/ Robert M. Sussman
Robert M. Sussman
SUSSMAN & ASSOCIATES
310 Garfield St., N.W.
Washington, D.C. 20008
202-716-0118
bobsussman@comcast.net
*Counsel for Petitioner Center for Environmental Health*

/s/ Samantha Liskow
Samantha Liskow
ENVIRONMENTAL DEFENSE
FUND
257 PARK AVE S
NEW YORK, NY 10010
(212) 616-1247
sliskow@edf.org
*Counsel for Petitioner
Environmental Defense Fund*

## COMBINED CERTIFICATIONS

1. The foregoing brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(g)(1) and 32(a)(7)(B)(i) and the Court's Order of April 13, 2026 (Dckt. No. 88, Case No. 25-1079) because it contains 8,975 words, excluding the parts excluded from length as to briefs under Federal Rule of Appellate Procedure 32(f); and with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font. The text of this brief in electronic form is identical to the paper copies that will be served, in accordance with Third Circuit Local Appellate Rule 31.1(c).

2. In accordance with Third Circuit Local Appellate Rule 28.3(d), counsel for Petitioners are members of the bar of the United States Court of Appeals for the Third Circuit.

3. Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program was run on the electronic version of the brief using Windows Security and no virus was detected.

## CERTIFICATE OF SERVICE

On September 21, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

s/ Samantha Liskow
*Counsel for Petitioner*
*Environmental Defense Fund*